UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:20-cv-01992-CEM-LRH

RICHARD HALL,

 Plaintiff,

v.

INSURANCE CORPORATION OF
BRITISH COLUMBIA,

 Defendant.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO ICBC'S**
**<u>AMENDED MOTION TO DISMISS</u>**

## PRELIMINARY STATEMENT

As ICBC has recognized, the Complaint in this action "alleges that ICBC orchestrated a criminal enterprise designed to injure Plaintiff."[1]  Among other misconduct, the Complaint alleges that ICBC's agents engaged in "aggressive, fraudulent and highly damaging contacts" with Plaintiff's "business partners, investors, and acquaintances in the United States," and that ICBC and Kenneth Carter (the private investigator ICBC hired to investigate Plaintiff) "conspired to hack" Plaintiff's computer while Plaintiff was present in the United States.[2]

Faced with these very serious allegations, ICBC had a choice.  It could have disputed the jurisdictionally relevant facts alleged in the Complaint.  It could have told the Court that it had investigated Plaintiff's allegations of fraudulent and damaging communications, hacking and other misconduct reaching into and targeting Florida and other parts of the United States and found them to be false.  And it could have proffered affidavits or other evidence to back that up.

But ICBC did none of those things.  Instead, ICBC's Amended Motion to Dismiss (the "Motion") asserts only a narrow legal defense to jurisdiction under the Foreign Sovereign Immunities Act (the "FSIA").  In a nutshell, ICBC contends that this Court lacks jurisdiction as a matter of law "based on the facts of this case."[3]  By taking that approach, ICBC necessarily concedes that, for purposes of its Motion, "the facts of this case" are those alleged in the Complaint.  But ICBC otherwise ignores the facts entirely; indeed, the Motion contains no "factual background" section and barely even hints at what this case is about.

In particular, the Motion never mentions Carter – a central figure in the criminal enterprise alleged in the Complaint.  More recently, however, ICBC has attempted to distance itself from

---

[1]  ECF No. 50 at 2.
[2]  Compl. at ¶¶ 67, 92.
[3]  Motion at 15.

Carter by claiming that he was merely an "independent contractor."[4]   But ICBC cannot avoid responsibility for Carter's actions on that basis.  Instead, as ICBC's records show[5] – and as its corporate representative conceded at deposition – ICBC specifically engaged and paid Carter to investigate Plaintiff, and Carter at all relevant times was acting on behalf of ICBC.

Moreover, jurisdictional discovery has uncovered evidence of significant additional, jurisdictionally relevant misconduct by Carter and ICBC.  For example, ICBC's records confirm that Carter taped his conversations with two of Plaintiff's key business contacts in Florida without their consent.   Under Florida law, that constitutes *criminal wiretapping*.   Similarly, ICBC's "surveillance file" includes a bizarre personal advertisement that ICBC appears to have planted in a local newspaper urging Plaintiff to contact a U.S.-based email address.  Finally, ICBC's records confirm that ICBC was conducting "cyber investigations" of Plaintiff in 2016 and 2017, just when a number of the hacking incidents occurred.

As for its legal argument, ICBC spends the bulk of the Motion asserting that the Court lacks jurisdiction under the FSIA's "non-commercial tort" exception in 28 U.S.C. § 1605(a)(5). But that is irrelevant because – as we show below – the Court has jurisdiction over this action under the FSIA's "commercial activity" exception to immunity in 28 U.S.C. § 1605(a)(2).

Accordingly, the Court should deny the Motion and allow this case to proceed.  By deliberately injecting itself into Florida and the United States and targeting Plaintiff and his key business relationships here, ICBC has forfeited any claim to sovereign immunity under the FSIA.

---

[4]   ECF No. 50 at 14.
[5]   Certain issues pertaining to ICBC's document production remain unresolved as of the date of this filing, accordingly Plaintiff reserves the right to seek leave to bring any additional, relevant evidence that emerges from any supplemental document production to the Court's attention.

## FACTUAL BACKGROUND

### A.  The Automobile Accident That Critically Injured Plaintiff

On November 10, 2003, Plaintiff was in a major car accident (the "Accident") in British Columbia. Exhibit A: Declaration of Richard Hall ("Hall Decl.") at ¶ 4.While his car was stationary, his vehicle was hit by an ICBC-insured truck. *Id.* Plaintiff's U.S.-based insurer, Allstate Insurance ("Allstate"), deemed his S-Class Mercedes sedan a total loss for insurance purposes. *Id.* at ¶ 5.  Even worse, the Mayo Clinic found that Plaintiff had suffered a "traumatic brain injury" as a result of the accident. *Id.*  Plaintiff submitted an insurance claim following the Accident. *Id.*

### B.  ICBC Forms the ICBC Enterprise with Kenneth Carter and Action Pacific

In approximately June 2004, ICBC hired Carter to investigate Plaintiff's insurance claim and paid Carter for that work. Exhibit B: Deposition Transcript of James Di Cesare ("Cesare Tr."), at 79:4-6, 21-23; 118:15 – 119:13; Ex. 11. ICBC's corporate representative, John Di Cesare, testified that, when Carter "was making these telephone conversations and recording these conversations" (as described below), he did so as part of his "investigation . . . on behalf of ICBC." *Id*. at 149:1-4.  Di Cesare volunteered that ICBC paid Carter "less than $15,000" in connection with Plaintiff's claim. Cesare Tr. at 83:13-15.  But ICBC has not disputed that it paid Carter's firm, Action Pacific, a total of $76,690 in 2004, with payments steadily increasing thereafter and reaching $722,183 by 2017.  Compl. at ¶ 48.

Di Cesare confirmed that, when Carter was confronted with several affidavits in 2014 alleging improprieties in his investigation, "there was an attempt [by ICBC] to have a discussion about what his response to the affidavits was." Cesare Tr. at 178:4-6.  But Carter never submitted an affidavit contesting those allegations, and he "didn't want to provide [ICBC] with the complete file materials" that he had. *Id*. at 183:16 – 184:7. Indeed, an August 13, 2014 email from ICBC's counsel to Di Cesare states that Carter "himself, told me that he did not send the entire file," and

that "he had a box of stuff sitting on top of his file cabinet." *Id*. at Ex. 28. And an internal ICBC note authored by Di Cesare urged cooperation with Carter "(UNLESS THERE IS SOMETHING THAT HE IS NOT WANTING US TO SEE)." *Id*. at Ex. 29. When confronted with this note, Di Cesare conceded that this was "always a possibility." *Id*. at 185:5-13.

### C. The ICBC Enterprise's Campaign of Intimidation, Fraud and Life-Altering Interference Targeting Plaintiff's Most Critical U.S. Business Relationships, and Compelling Him to Go "Off the Grid"

#### 1. Carter's Targeted Communications to the David Leadbetter Golf Academy in Orlando, Florida

Acting at ICBC's direction, Carter targeted Plaintiff's most critical business relationships in Florida and the United States, permanently damaging or even outright destroying them. And Carter recorded his conversations with David Leadbetter and Darin Tennyson in Florida without their consent. That was a crime under Florida law.[6] Cesare Tr. at Ex. 18, 19; 154:15 – 155:18. Carter first targeted Leadbetter, the founder of the David Leadbetter Golf Academy (the "Leadbetter Academy") headquartered just outside Orlando, Florida. *See* Compl. at ¶¶ 53-58. Plaintiff's longstanding relationship with Leadbetter was a key reason why Plaintiff was successfully able to obtain a U.S. residency visa, and Leadbetter's support was also critical to Plaintiff's ability to obtain a Canadian visa to launch his business in Canada. Hall Decl. at ¶ 3. On or about August 6, 2004, Tennyson (the then-General Manager of the Leadbetter Academy) received a phone call from Carter, who falsely held himself out as calling on behalf of the Canadian immigration authorities. Exhibit C: Declaration of Darin Tennyson ("Tennyson Decl.") at ¶ 4. Carter questioned Tennyson about a letter Leadbetter had written in support of Plaintiff's Canadian

---

[6]   *See, e.g., France v. France,* 90 So.3d 860, 862 (Fla. Dist. Ct. App. 5th Dist. 2012) ("The Florida Security of Communications Act makes it a crime to intentionally intercept a person's electronic communications, including a telephone call, without prior consent of all parties to the communication.") (citing Fla. Stat. § 934.03).

visa application. *Id*. Tennyson found Carter's questions "aggressive and highly disparaging of"

Plaintiff. *Id*. at ¶ 5. Leadbetter observed that Tennyson became noticeably "ruffled" as a result of

this call. Exhibit D: Declaration of David Leadbetter ("Leadbetter Decl."), at ¶ 6.

When Tennyson put him through to Leadbetter, Carter again falsely claimed to be calling

on behalf of the Canadian immigration authorities. *Id*. at ¶ 7.[7]  Carter asked Leadbetter "a very

aggressive series of questions." *Id*. at ¶ 9.  He appeared very suspicious of Plaintiff and his golfing

abilities, and of whether the contents of Leadbetter's letter in support of Plaintiff's Canadian visa

application were true. *Id*. at ¶ 13. Finding Carter's continued aggressive questioning "offensive,"

Leadbetter terminated the call.  *Id*. ¶¶ 12-13.

### 2. Carter's Targeted Communication to Porsche Cars North America in Atlanta, Georgia

Carter's next target was Porsche Cars North America ("PCNA").  *See* Compl. at ¶¶ 59-61.

PCNA was to be Plaintiff's primary corporate sponsor for his new business, Global Organic

Partners, and a critical element of his strategy to continue growing his brand.  Hall Decl. at ¶ 14.

Plaintiff was first introduced to PCNA by British Columbia businessman Wayne Ayers in late

2004.  *Id*. at ¶ 14.  A purported transcript produced by ICBC of a December 20, 2004 telephone

call confirms that Ayers told Carter, "I think he [Plaintiff] has an agreement with Porsche cars

---

[7]   ICBC has produced what purport to be transcripts of Carter's "recorded telephone interview[s]" with Leadbetter and Tennyson.  Cesare Tr. at Ex. 18, 19.  Neither transcript includes Carter's statement – to which both witnesses have attested under oath – that he was calling on behalf of the Canadian immigration authorities.  But Carter never provided ICBC with the tapes from which the transcripts were prepared, nor did ICBC otherwise attempt to verify that they are accurate. *Id*. at 128:8-20; 129:9-17.  And even the transcripts produced by ICBC do not indicate that Carter properly identified himself as a private investigator acting on behalf of ICBC.  Similarly, a fax Carter sent to Leadbetter before he spoke to him made no mention of ICBC. *Id*. at Ex. 17; 142:7-11, 143:7-10.  These omissions alone would have been contrary to ICBC's policies requiring Carter to "always be clear that he's a private investigator retained to conduct the investigation."  *Id*. at 130:19 - 131:1.

North America for a sponsorship." Cesare Tr. at Ex. 12, at ICBC 003198.  And in a related note to ICBC, Carter specifically identified "Porsche of North America to verify sponsorship in 2005" among several "Future interviews/ research." Exhibit E: Action Pacific Report, at ICBC_002889. Shortly thereafter, in early 2005, PCNA without explanation made clear that it was no longer prepared to move forward with the planned sponsorship. Hall Decl. at ¶ 14.  The inference is overwhelming that PCNA's abrupt termination of its relationship with Plaintiff was the result of another targeted, disparaging call from Carter.

A purported transcript produced by ICBC of a subsequent June 30, 2005 call shows that Ayers told Carter he believed Plaintiff was being "targeted" by ICBC. Exhibit F: Recorded Second Interview of Wayne Ayers, at ICBC_003218.   When Ayers confronted Carter about PCNA's sudden change of heart, Carter denied contacting PCNA:

> [Carter]:  It was not me.  I could not find out who to contact there.

> [Ayers]:  Whoever it was, someone contacted Porsche.

*Id.* at ICBC_003220.  But, despite Carter's denial, Di Cesare conceded at his deposition that "I think he [Carter] made a phone call" to PCNA (although he claimed that Carter "could never be put in touch with the proper person to speak to" there).  Cesare Tr. at 133:5-24.

### 3. Hacking of Plaintiff's Email Account and Transmission of Unauthorized Emails to the Florida-Based PGA Tour

On January 1, 2005, Plaintiff received an out of office "bounce-back" email from an email address apparently associated with the PGA Tour in Jacksonville, Florida.  Hall Decl. at ¶ 11. Plaintiff had never written to the PGA Tour.  *Id.*  But a few months previously, in September 2004, a break-in occurred at Plaintiff's home in British Columbia.  *Id.* at ¶ 10.  As a forensic examination confirmed, Plaintiff's laptop computer had been accessed and tampered with at that time.  The forensic examiner explains that "[t]he person(s) who hacked the computer would have had the

ability to 'spoof' Mr. Hall's email system to send emails remotely from any computer and make it look like the email had been sent by Mr. Hall." Exhibit G: Declaration of Sydney Lapan at ¶ 5(c).

### 4. ICBC's Apparent Placement of a False Personal Ad Containing Information Evidently Obtained from Plaintiff's Hacked Emails in an Attempt to Lure Him into Correspondence with a U.S. Email Address

ICBC's "surveillance" file for Plaintiff includes a newspaper clipping from a local Canadian newspaper with a bizarre personal advertisement that reads, in full:

> **FOR RICHARD** British residence Salt Spring drives light coloured Mercedes Benz, crunch left rear with Oregon plates, Dog German Shepard.  For recording Beethoven unfinished write B. Hogan at dalziel@qwest.net

Cesare Tr. at Ex. 13.  Significantly, the personal ad directed Plaintiff to write to *a U.S. email address* (Qwest is a U.S.-based company and email domain)[8].  And it included numerous details that suggest it was planted by ICBC in an effort to lure Plaintiff into responding.  Indeed, there is no other reasonable explanation for why the ad forms part of ICBC's "surveillance" file.  Notably, Di Cesare testified that, in his 30 years at ICBC, he could not recall ever having seen another personal ad in a claim file.  *Id*. at 136:17 – 137:5.

When an acquaintance brought the ad to Plaintiff's attention at the time, the reference to "Beethoven unfinished" was particularly troubling to him because it was a unique phrase that had a particular meaning to him, but of which only one of his closest friends was aware.  Hall Decl. at ¶ 12.  The only time Plaintiff had ever used the phrase "Beethoven unfinished" was in email correspondence with that friend, and its unexplained appearance in this strange personal ad was therefore deeply unnerving.  *Id*.  Once again, the inference that ICBC could only have hit upon this phrase by hacking into and reading Plaintiff's personal emails is overwhelming.

---

[8]  *See  https://www.nytimes.com/2010/08/05/technology/05qwest.html,*  discussing  Qwest's acquisition by Centurylink and its U.S.-based operations.

**5. Leading Risk Consultant Control Risks Advises Plaintiff to Go "Off the Grid" to Prevent Further Damage to His Business and His Most Critical Business Relationships**

Faced with the ICBC Enterprise's sustained campaign of intimidation and damaging interference, Plaintiff in late 2004 or early 2005 sought expert advice from Control Risks Group ("Control Risks"), a leading crisis management company. Hall Decl. at ¶ 13; *see* Compl. at ¶ 66. As Control Risks' then-National Director of Investigations, Elaine Carey, confirms, Control Risks conducted a "risk assessment" and determined that the threats and activities against Mr. Hall were "legitimate and credible." Exhibit H: Declaration of Elaine Carey at ¶ 13. Ms. Carey attests "that in my professional judgment, Mr. Hall had no other reasonable choice but to take immediate evasive action to remove himself and his company (and its key assets) from any further threat from the ICBC and its negative interference." *Id.* at ¶ 15. On that basis, Control Risks "advised Mr. Hall that the only viable solution was for him to take specific deliberate steps to go off the grid[.]" Plaintiff promptly followed Control Risks' advice and went off the grid for a number of years beginning in 2005.

**D. Continued, Serious Hacking Incidents in 2016 and Beyond**

**1. ICBC's "Cyber Investigation" of Plaintiff Matching the Dates of the Hacking Incidents**

ICBC's records indicate that it conducted surveillance activities on dates that correspond with the hacking incidents in 2016 and thereafter (as described below). For example, ICBC's records include an entry dated July 11, 2016 stating: "WE DID A RECENT A [sic] CYBER INVESTIGATION THAT SHOWS THE PLAINTIFF DOING LOTS OF WORK." Cesare Tr. at Ex. 32. Di Cesare attempted to explain away this "cyber investigation" (in which he was not involved) as limited to "a person's social media activity just to get a sense of what they're up to." *Id.* a 192:21 - 193:6. But in fact, there was no way that ICBC could have determined, through

legitimate online research, that Plaintiff was "doing lots of work." Indeed, neither Plaintiff nor his company, Global Organics, maintained a website in 2016, nor did Plaintiff otherwise publicly discuss (via social media or otherwise) his business activities.  Hall Dec. at ¶ 15.  And tellingly, ICBC's records do not document what evidence its "cyber investigation" uncovered.[9]

## 2.   Hacking of Plaintiff's Emails and Laptop Computer While Plaintiff Was Present in New York and California in July 2016

The timing of the July 11, 2016 entry in ICBC's records confirming ICBC's recent "cyber investigation" of Plaintiff's activities is particularly troubling, as Plaintiff's email account had been hacked again just days earlier, on July 7, 2016.  Hall Decl. at ¶ 16; *see* Compl. at ¶¶ 89-91.  Plaintiff was visiting New York at the time this hack occurred.  Hall Decl. at ¶ 16

Later that month, while Plaintiff was in California for a business meeting, a highly threatening message stating: "We Do Not Forgive. We Do Not Forget. Expepect [sic] Us." appeared on his laptop computer. *Id*. at ¶ 17; Exhibit I: Screenshot of Threatening Message; see Compl. ¶¶ 92-95. The hackers encrypted all of Plaintiff's files containing his company's key data – which were stored locally on the laptop computer he had with him in California – such that he was no longer able to access this critically important information.  Hall Decl. at ¶ 17.

## 3.   Additional Hacking Incidents in 2017, Including Attempted Hacking of Plaintiff's Twitter Account

ICBC and its agents continued their illicit "cyber surveillance" of Plaintiff into 2017 and beyond.  A December 7, 2016 email from Di Cesare to ICBC's Canadian outside counsel refers to another private investigator, Janene Severson, describing her as "excellent at conducting online

---

[9]   At deposition, Di Cesare suddenly claimed to have recalled being told that "something about [Plaintiff's] participating in some form in a lecture or something along those lines." Cesare Tr. at 202:8-18.  But that is not reflected in ICBC's records, and Di Cesare's convenient attempt to explain away the reference to Plaintiff "doing lots of work" on that basis is not credible.

reviews/investigations" and requesting that she be retained "to conduct such an investigation on Mr. Hall and his business venture."  Cesare Tr. at Ex. 33.

Di Cesare confirmed that Severson is "somebody that we retain to do cyber investigations." Cesare Tr. at 199:2-6.  And the website for Severson's firm, 247 Investigations [*see* https://www.cpirc.com/investigators-in-canada/], specifically touts the firm's "unique way of approaching investigations" and its "Online, Cyber, Media and Social Media Research" capabilities, emphasizing that "we have created a niche in social media investigations and deep web cyber searching over the past 20 years."  *See* https://247investigations.ca/#Services.

Perhaps predictably, ICBC's engagement of Severson coincided with an attempt to hack into Plaintiff's Twitter account.  Plaintiff at the time was using the pseudonym "Julian Bond" to communicate with friends on Twitter. Hall Decl. at ¶ 15.  And on February 4, 2017, he sent a highly critical tweet referring to "ICBCs [sic] abhorrent treatment of Ms. Danica Arsenovski."  *Id.* ¶ 19; Exhibit J: screenshot of February 4, 2017 Tweet.  *The day after he sent that tweet,* Plaintiff received a Twitter alert informing him that:

> We have detected unusual activity on your account.  For your security, your account has been locked until you change your password.

Hall Delc. at ¶ 19; Exhibit K: Screenshot of February 5, 2017 Twitter Alert.  Notably, Twitter is a U.S. company with U.S.-based servers.  And this was not the first time that someone had targeted one of Plaintiff's Twitter accounts:  previously, in August 2016, Twitter had alerted Plaintiff to "unusual activity" targeting a Twitter account he maintained under a different pseudonym.  Hall Decl. at ¶ 19; Exhibit L: Screenshot of August 2016 Twitter Alert.

### E.  ICBC's Dissemination of False and Misleading Information to Allstate Insurance in the United States

Beginning in December 2003, an ICBC insurance adjuster by the name of Joanne Nelson began disseminating false and misleading information and making disparaging comments about Plaintiff

to Allstate in the U.S., ultimately leading Allstate to deny Plaintiff's insurance claim in relation to his serious head injuries. Hall Decl. at ¶ 6.  Plaintiff only discovered that this had occurred as a result of ICBC's production of heavily redacted documents to the Plaintiff in response to a freedom of information ("FOI") request in British Columbia.  *Id.*

For example, a fax that Nelson twice sent to Allstate in the United States in December 2003 utterly misrepresented the seriousness of the Accident and falsely claimed that *"[o]ur investigation indicates this is a minor accident and damages are minimal."*  Hall Decl.: Ex. A, at ICBC_003639 (emphasis added).  That statement was false when made, as was ICBC's characterization of the Accident in its own records as an "LVI."  Cesare Tr. at Ex. 3.  "LVI" is short for "low velocity impact" – a term that ICBC uses for "relatively minor accidents" involving impact speeds of 8 kilometers per hour (around 5 mph) or less.  *Id*. at 44:17-22; 53:7-12.

ICBC's "LVI" designation is belied by a contemporaneous ICBC "Low Velocity Impact Questionnaire."  *Id.* at Ex. 4; 68:18 – 69:9. The other driver's responses on that questionnaire indicated an estimated impact speed of 20 mph – *four times* the 5 mph limit for an LVI.  *Id.* at. Ex. 4; 71:5-11; *see also* 71:12-20.

### F.  ICBC Destroys Evidence of Its Conduct Reaching Into and Targeting the United States

The evidence Plaintiff now proffers further confirms ICBC's destruction of relevant evidence, as alleged in the Complaint.  In particular, ICBC has produced different versions of its claim files to Plaintiff over time, both in Canada and now in this action, that contain glaring inconsistencies and reveal ICBC's deletion of jurisdictionally and otherwise relevant information.  Hall Decl. at. ¶ 21; *Id*. at Ex. B.  At his deposition, Di Cesare was unable to explain how or why those deletions occurred. Cesare Tr. at 189:15 – 190:2.

11

## STANDARD APPLICABLE TO ICBC'S MOTION

On a motion to dismiss for lack of subject matter jurisdiction under the FSIA, the plaintiff bears the initial burden of "producing evidence that the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions" to immunity. *Butler v. Sukhoi Co.,* 579 F.3d 1307, 1313 (11th Cir. 2009) (internal quotation marks and citation omitted, alteration in original). "[T]he burden then shifts to the defendant to prove, by a preponderance of the evidence, that the plaintiff's claims do not fall within that exception." *Id.*

The defendant "may challenge either the legal sufficiency or the factual underpinning" of the plaintiff's jurisdictional allegations. *Phoenix Consulting Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C. Cir. 2000). Where the defendant "does not contest the alleged jurisdictional facts, but rather, challenges their legal adequacy," the only relevant question is whether "the complaint's jurisdictional allegations," taken as true, are "sufficient to eliminate the [defendant's] presumptive immunity." *Butler,* 579 F.3d at 1313. The same standard applies where the defendant "d[oes] not expressly concede [the plaintiff's] factual allegations but argue[s] that the allegations, even if substantiated, [a]re insufficient to trigger [the relevant] FSIA exception." *Id.* (citing *Mwani v. bin Laden,* 417 F.3d 1, 15-16 (D.C. Cir. 2005)).

In contrast, "[i]n cases involving a factual attack on subject matter jurisdiction, the district court 'is free to independently weigh facts[.]'" *Sequeira v. Republic of Nicaragua,* 815 F. App'x 345, 349 (11th Cir. 2020) (quoting *Morrison v. Amway Corp.,* 323 F.3d 920, 924–25 (11th Cir. 2003)). To mount a factual challenge, the defendant must "either contest a jurisdictional fact alleged by the plaintiff . . . or raise a mixed question of law and fact," such as "whether [the] person alleged to have harmed plaintiff was [an] agent of [the defendant]." *Phoenix Consulting,* 216 F.3d at 40 (citation omitted). Only then need the court "look beyond the pleadings to factual

submissions, including affidavits, submitted to the court in order to resolve [the] factual dispute." *Robinson v. Gov't of Malaysia,* 269 F.3d 133, 140–41 (2d Cir. 2001).

Here, ICBC has not contested *any specific jurisdictional fact* alleged in the Complaint. Therefore, the Court need not look beyond the four corners of the Complaint to determine its jurisdiction.  And the additional evidence now Plaintiff proffers further illuminates and confirms the jurisdictional facts alleged in the Complaint in every critical respect.

## ARGUMENT

I.   **The Court has Jurisdiction under the FSIA's "Commercial Activity" Exception in 28 U.S.C. § 1605(a)(2)**

### A.   ICBC is a Foreign State-Owned Insurance Company

Under the FSIA, the province of British Columbia is a "political subdivision" of Canada and is thus a "foreign state" under 28 U.S.C. § 1603(a).[10]  ICBC, in turn, is a corporation wholly-owned by British Columbia and is therefore an "agency or instrumentality" of a foreign state under 28 U.S.C. § 1603(b).  *See* Oct. 27, 2020 Decl. of W.A. Scott Macfarlane ("Macfarlane Decl."; ECF No. 7-1), ¶ 2.  As such, ICBC itself is "considered a foreign state for FSIA purposes." *Peterson v. Islamic Republic of Iran,* 563 F. Supp. 2d 268, 273 (D.D.C. 2008).

That said, ICBC is an *insurance company;* it "provide[s] universal auto insurance in British Columbia."  Macfarlane Decl. ¶ 7.  Therefore, ICBC's activities are commercial.  *See W. Protectors Ins. Co. v. Ins. Corp. of Brit. Columbia,* No. C08-5385 FDB, 2009 WL 159212, at *3 (W.D. Wash. Jan. 22, 2009) (explaining that ICBC's business of "providing insurance coverage to vehicles registered in British Columbia is a 'commercial activity' [under] the FSIA").

---

[10]   *See* H.R. Rep. No. 94–1487, at 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6613 ("The term 'political subdivisions' includes all governmental units beneath the central government, including local governments.").

**B.  This Action is Based Upon the ICBC Enterprise's Commercial Activity**

This Court has jurisdiction over this action under § 1605(a)(2) because it is "based upon" ICBC's "commercial activity . . . or acts performed in connection with [such] commercial activity." *Jam v. Int'l Fin. Corp.,* 139 S. Ct. 759, 772 (2019).  The requirements for "commercial activity" jurisdiction are satisfied here because the ICBC Enterprise's pattern of misconduct – as alleged in the Complaint and further confirmed by the evidence Plaintiff now proffers – is "commercial," and because this action is "based upon" that pattern of misconduct.

**1.  The ICBC Enterprise's Pattern of Misconduct Giving Rise to This Action is Commercial in Nature**

"A foreign state loses its immunity if it engages in commercial activity." *Honduras Aircraft Registry, Ltd. v. Gov't of Honduras,* 129 F.3d 543, 548 (11th Cir. 1997).  Conduct is deemed "commercial" as long as it is "the *type* of activity that private persons and corporations regularly engage in" and is not "*uniquely or peculiarly sovereign* in nature." *Devengoechea v. Bolivarian Republic of Venezuela,* 889 F.3d 1213, 1221 (11th Cir. 2018) (emphasis added).

Applying that standard here, the ICBC Enterprise's pattern of misconduct is unequivocally "commercial."  Indeed, an equally unscrupulous, but privately-owned, insurance company just as easily could have engaged in the "extreme measures" described in the Complaint involving "private investigators, computer hackers and common criminals" in an effort "to prevent [an accident victim] from pursuing a simple insurance claim."  Compl. at ¶¶ 2-3; *see Guevara v. Republic of Peru,* 468 F.3d 1289, 1303 (11th Cir. 2006) (the commercial activity exception confers jurisdiction where the foreign state acts "in the manner of a private player" in the market) (quoting *Weltover,* 504 U.S. at 614).  ICBC's engagement of Carter, a private investigator, as its agent to carry out many of these acts underscores their commercial nature.

ICBC does not, and cannot, dispute the commercial nature of the ICBC Enterprise's actions.  And its attempts to argue that this concededly commercial conduct should not trigger jurisdiction under § 1605(a)(2) are meritless.  *First,* ICBC's assertion that it "does not operate or engage in a regular course of commercial conduct in the United States" because it does not sell automobile insurance in this country (Motion at 12) is irrelevant because "the commercial nature of an activity does not depend upon whether it is a single act or a regular course of conduct."  *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 612 (1992).

*Second,* contrary to ICBC's insinuation, "commercial activity" jurisdiction is not confined to disputes arising from "commercial transaction[s]" (Motion at 12), nor does it depend on the existence of a contractual or other direct relationship between the plaintiff and the foreign state.  Thus, for example, the Second Circuit recently affirmed the exercise of "commercial activity" jurisdiction in a copyright infringement action against a foreign state.  *See Pablo Star Ltd. v. Welsh Gov't,* 961 F.3d 555 (2d Cir. 2020).  There (as here), the parties never entered into a "commercial transaction."  But that fact was irrelevant to the court's holding that the Welsh Government's "unauthorized use of photographs in promotional websites and printed materials advertising tourism related to Wales" constituted "commercial activity."  *Id.* at 564.

In particular, the commercial activity exception confers jurisdiction over *commercial tort* actions such as Plaintiff's lawsuit here.  For example, the Eleventh Circuit in *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534 (11th Cir. 1993), held that the "commercial activity" exception conferred jurisdiction in a personal injury action against a foreign state-owned automobile manufacturer involving tort claims for "negligent design and manufacture" of a vehicle involved in an accident.  *See id.* at 1543 & 1544 n.13; *see also Youming Jin v. Ministry of State Sec.,* 475 F. Supp. 2d 54, 65 (D.D.C. 2007) (court had jurisdiction under commercial activity exception over

Falun Gong practitioners' claims against Chinese state defendants for interference with contractual relations). Even more specifically, the "commercial activity" exception confers jurisdiction *in a civil RICO action* where (as here) the plaintiff's claims "sound in tort rather than contract." *Southway v. Cent. Bank of Nigeria,* 198 F.3d 1210, 1219 (10th Cir. 1999) (affirming exercise of commercial activity jurisdiction in RICO action against Nigeria and its central bank); *accord Rosner v. Bank of China,* 528 F. Supp. 2d 419, 425 (S.D.N.Y. 2007) (exercising commercial activity jurisdiction in RICO action against state-owned Chinese bank).

## 2. This Action is "Based Upon" the ICBC Enterprise's Pattern of Misconduct Targeted at and Reaching Into Florida and the United States

This action is "based upon" the ICBC Enterprise's pattern of commercial misconduct alleged in the Complaint. The United States Supreme Court has instructed that "an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs,* 577 U.S. 27, 35 (2015) (quoting *Saudi Arabia v. Nelson,* 507 U.S. 349, 358 (1993)). Therefore, courts must "zero[] in on the core of [the plaintiff's] suit"—that is, *the specific "acts that actually injured" the plaintiff. Id.* (emphasis added).

As ICBC concedes, the gravamen of this lawsuit is that "ICBC has engaged in investigatory practices that have harmed [Plaintiff]." Motion at 13. More specifically, the "acts that actually injured" Plaintiff are the tortious and fraudulent acts alleged in the Complaint and further described in the Factual Background section of this brief that occurred within, and/or were specifically targeted to reach into several different parts of Florida and the United States.

Contrary to ICBC's mischaracterization, foreign state-owned insurers are not shielded from "commercial activity" jurisdiction whenever the plaintiff is not their "named insured." *See* Motion at 13. The cases ICBC cites are inapposite because the plaintiffs there asserted that ICBC was *contractually liable* under insurance policies it had issued. *See Jung Nyeo Lee v. Ins. Corp.*

16

*of British Columbia,* No. 2:16-CV-00084, 2017 WL 3641915, at *1 (W.D. Wash. Aug. 24, 2017) (plaintiffs sought "damages for injuries they sustained in an accident as passengers aboard a bus owned and operated by ICBC's insured"); *W. Protectors,* 2009 WL 159212, at *1 (plaintiff insurer claimed that the accident at issue "was covered by [another insured's] ICBC policy"). But here, Plaintiff is not demanding payment from ICBC under an insurance policy; rather, he seeks to hold ICBC liable for the harm he suffered when "ICBC's racketeering enterprise intentionally reached into the United States and Florida repeatedly in order to damage and destroy [Plaintiff] and his business." Compl. at ¶ 5.[11]

### C.  This Court Has Jurisdiction Under All Three Prongs of § 1605(a)(2)
####    1.  Jurisdiction Exists Under § 1605(a)(2)'s First Prong

The Court has jurisdiction under § 1605(a)(2)'s first prong because this "action is based upon a commercial activity carried on in the United States by [ICBC]." 28 U.S.C. § 1605(a)(2). All that is required is "some 'commercial activity' by [ICBC] that had 'substantial contact' with the United States." *Saudi Arabia v. Nelson,* 507 U.S. 349, 356 (1993); see 28 U.S.C. § 1603(e).

The FSIA's legislative history specifically cites "business torts occurring in the United States" as an example of commercial activity having "substantial contact" with the United States. *See* H.R. Rep. No. 94–1487 ("FSIA House Report"), at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615. The commercial misconduct alleged in the Complaint easily meets that description. In particular, both Carter's false and misleading statements in phone calls to Leadbetter and Porsche North America and ICBC's false and misleading statements in faxes and phone calls to Allstate satisfy the jurisdictional requirements for application of the wire fraud statute in 18 U.S.C.

---

[11]   Moreover, the exclusion of certain torts (including "interference with contract rights") from jurisdiction under the *non-commercial* tort exception codified in § 1605(a)(5) is "inapplicable to tort cases based upon commercial activity." *El-Hadad v. United Arab Emirates,* 216 F.3d 29, 35 (D.C. Cir. 2000); *cf.* Motion at 7-8.

§ 1343 (one of the predicate acts for Plaintiff's Fla. Stat. § 772.103(3) claim in Count I of the Complaint).  Indeed, § 1343 "*require[s]* that the wires cross state *or international* lines for purposes of federal jurisdiction."  *United States v. Hussain,* 972 F.3d 1138, 1144-45 (9th Cir. 2020) (holding that defendant's conviction for wire fraud based *inter alia* on "phone or video conference calls among participants in the United Kingdom and California" was "a *domestic application* of the [wire fraud] statute") (emphasis added).

### 2.  Jurisdiction Exists Under § 1605(a)(2)'s Second Prong

The Court also has jurisdiction under § 1605(a)(2)'s second prong because this "action is based upon . . . an act performed in the United States in connection with a commercial activity of [ICBC] elsewhere" – namely ICBC's investigation of Plaintiff in connection with his claim against ICBC in Canada.  28 U.S.C. § 1605(a)(2).  Congress intended the second prong to apply "where a claim arises out of a specific act in the United States which is commercial or private in nature and which relates to a commercial activity abroad," provided that the act occurring in the United States is "sufficient to form the basis of a cause of action."  FSIA House Report, at 19.

These requirements are amply satisfied here.  Courts have not hesitated to exercise jurisdiction under the second prong where, as here, "[a]ll of the elements necessary for [the plaintiff] to recover under his [tort] claim are 'based upon' acts that occurred in the United States." *Hyewoong Yoon v. Seyeon Lee,* 433 F. Supp. 3d 18, 24 (D. Mass. 2019) (asserting jurisdiction under second prong over wiretapping claim against South Korea's public broadcaster based on journalist's unauthorized recording of phone call with plaintiff in the United States).

The Eleventh Circuit's decision in *Guevara* is instructive.  There, Peru engaged in commercial activity outside the U.S. by offering a reward in Peru for the capture of a fugitive.  The court deemed a "solitary" telephonic statement by a Peruvian government official confirming the

availability of the reward insufficient for jurisdiction under the second prong.  *Guevara,* 608 F.3d at 1309.  Notably, the Peruvian official *did not even initiate the phone call.*[12]

Not only is *Guevara* easily distinguishable; its reasoning *supports* the exercise of jurisdiction under § 1605(a)(2)'s second prong here.  *First,* the court's analysis plainly assumed that telephonic statements by a foreign state's agent to individuals located in the United States may constitute "acts committed by [the foreign state] in the United States 'in connection with' commercial activity elsewhere."  *See id.* at 1308.  And the difference between *Guevara* and this case could not be more stark:  here, the ICBC Enterprise engaged in a pattern of commercial misconduct reaching into Florida and the United States that included multiple communications targeting multiple parties (combined with the additional, serious misconduct described above).

*Second,* the court in *Guevara* relied by way of analogy on *personal jurisdiction* cases holding that "one telephone call" is not "sufficient to create minimum contacts with the forum state."  *Id.* at 1310.  But that personal jurisdiction analogy does not apply here.  Instead, where (as here) the defendant is alleged to have committed "an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum," the plaintiff need not show that the defendant has "minimum contacts" with the forum state.  *Licciardello v. Lovelady,* 544 F.3d 1280, 1288 (11th Cir. 2008).  And Florida specifically authorizes the exercise of personal jurisdiction where the plaintiff's cause of action arises from a tortious act committed through the *"defendant's telephonic, electronic, or written communications into Florida." Acquadro v. Bergeron,* 851 So. 2d 665, 670 (Fla. 2003) (citation omitted, emphasis added).

---

[12]   Rather, in *Guevara,* an FBI agent "(in Chile) placed a long distance telephone call to [another FBI agent] (in Miami) and to [the Peruvian official] (in Peru)."  *Id.* at 1308.

### 3. Jurisdiction Exists Under § 1605(a)(2)'s Third Prong

Finally, the Court has jurisdiction under § 1605(a)(2)'s third prong to the extent that any of the ICBC Enterprise's commercial acts upon which this action is based occurred "outside the territory of the United States" because those acts "cause[d] a direct effect in the United States." In particular, even on the (implausible) assumption that no-one acting on behalf of the ICBC Enterprise ever set foot in the United States in connection with the hacking of Plaintiff's laptop and email systems while he was physically present in the United States, the third prong confers jurisdiction here because the hacking had a "direct effect" in the United States. *See Azima v. RAK Inv. Auth.,* 305 F. Supp. 3d 149, 168 (D.D.C. 2018), *rev'd on other grounds,* 926 F.3d 870 (D.C. Cir. 2019) (court "confidently conclude[d]" that plaintiff had pled a "direct effect in the United States" arising from foreign state's hacking of his laptop computers where at least one of plaintiff's laptops "was in the United States when the hacking occurred").[13]

### II. Because the "Commercial Activity" Exception Confers Jurisdiction Over This Action, the Court Need Not Reach the "Noncommercial Tort" Exception in 28 U.S.C. § 1605(a)(5)

For all of the reasons just discussed, this Court has jurisdiction over this action under the commercial activity exception in § 1605(a)(2). And, where (as here) the plaintiff's "suit . . . is encompassed by the commercial activity exception, the non-commercial tort exception [in § 1605(a)(5)] does not apply." *Nn aka v. Fed. Republic of Nigeria,* 238 F. Supp. 3d 17, 30 (D.D.C. 2017), *aff'd,* 756 F. App'x 16 (D.C. Cir. 2019). Instead, the two exceptions are "mutually exclusive." *De Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir. 1984). Accordingly,

---

[13] ICBC has previously attempted to distinguish *Azima* by arguing that the parties there had "a working commercial relationship before the alleged hackings occurred." ECF No. 21 [Nov. 24, 2020 ICBC Opposition], at 10. But that argument fails because, as discussed in Section I.B.1 above, a contractual or other direct commercial relationship between the parties is not a prerequisite for commercial activity jurisdiction.

ICBC's assertion that jurisdiction over Plaintiff's claims "would be barred under the non-commercial tort exception" – even taken at face value – *"'do[es] not limit'* the claims that he can pursue through the commercial activity exception." *Nn aka,* 238 F. Supp. 3d at 30 (quoting *El–Hadad v. United Arab Emirates,* 216 F.3d 29, 35 (D.C. Cir. 2000) (emphasis added)).

## CONCLUSION

For all of the foregoing reasons, ICBC's motion should be denied with prejudice.


DATED:  April 2, 2021                                         Respectfully submitted,

                                                             **MARK MIGDAL & HAYDEN**
                                                             80 S.W. 8th Street, Suite 1999
                                                             Miami, Florida 33130
                                                             Telephone: (305) 374-0440

                                                             By: *s/ Etan Mark*
                                                                 Etan Mark, Esq.
                                                                 Florida Bar No. 720852
                                                                 Daniel S. Maland, Esq.
                                                                 Florida Bar No. 114932
                                                                 Niki Namazi, Esq.
                                                                 Florida Bar No. 1018346
                                                                 etan@markmigdal.com
                                                                 daniel@markmigdal.com
                                                                 niki@markmigdal.com
                                                                 eservice@markmigdal.com
                                                                 *Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of April 2021, a true and correct copy of the foregoing was served by electronic transmission through the Court's CM/ECF system upon all counsel of record.

                                                             By: *s/ Etan Mark*