# EXHIBIT B

**Page 1**

1          UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF MIAMI

3               ORLANDO DIVISION

4

5   RICHARD HALL,                    )

6               Plaintiff,   ) CASE NO.:

7          v.              ) 6:20-cv-01992-CEM-LRH

8   INSURANCE CORPORATION OF         )

9   BRITISH COLUMBIA,                )

10              Defendant.  )

11  _____ )

12

13

14

15

16

17

18

19

20

21      The discovery deposition of JAMES KIM and JOHN DI

22  CESARE, taken in the above-entitled cause, before Lisa

23  Ciurysek, BCSRA No. 623, official reporter, on the

24  19th day of March, 2021, at 4th Floor, 885 West Georgia

25  Street, Vancouver, B.C.

**Page 2**

1   APPEARANCES:

2

3       Mark Migdal & Hayden

4       80 SW 8TH STREET, SUITE 1999

5       Miami, Florida

6       Ph:  305-710-2641

7       Etan@markmigdal.com

8       BY: Etan Mark,

9           On behalf of the Plaintiff;

10

11      Scheer Law Group

12      830 - 2102 4th Avenue

13      Seattle, Washington

14      Ph:  (206) 800-4070

15      Jen@scheer.law

16      BY:  Jennifer Crow and Mark Scheer,

17          On behalf of the Defendant;

18

19      McIntyre Winteringham

20      1402-543 Granville St.,

21      Vancouver, British Columbia

22      Ph:  604-605-4302

23      Jj@mwlawoffices.ca

24      BY: J.J. McIntyre,

25          On behalf of Richard Hall in the BC action;

**Page 3**

1   Baumann, Gant & Keeley, P.A.

2   1401 E. Broward Boulevard, Suite 200

3   Ft. Lauderdale, Florida

4   Ph:  954-440-4611

5   Shuda@baumannlegal.com

6   BY: Sophia Huda,

7       On behalf of the Defendant;

8

9   ALSO PRESENT:

10      Pamela Perry, special master;

11      Mike Gill (A/S);

12      Richard Hall, plaintiff.

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1               I N D E X

2

3   INDEX OF EXAMINATIONS:

4     EXAMINATION OF JAMES KIM                  PAGE

5       BY MR. MARK                              8

6     EXAMINATION OF JOHN DI CESARE

7       BY MR. MARK                              36

8       Reporter certification                  214

9

10  EXHIBITS:

11  NUMBER        DESCRIPTION                   PAGE

12  Exhibit 1     Amended notice of taking
                  deposition                     41

13

        Exhibit 2     Oral Reasons for Judgment of The

14                    Honourable Mr. Justice R. D.
                      Wilson in ICBC v. Yuan, 2008

15                    BCSC 1703                   51

16  Exhibit 3     Singe page PDF document titled
                  "Insurance Corporation of

17                British Columbia claim file
                  folder" Bates stamp 00050       53

18

        Exhibit 4     Low velocity impact

19                    questionnaire               67

20  Exhibit 5     Claim file report              72

21  Exhibit 6     31-page PDF titled "Insurance
                  Corporation of British Columbia

22                Claim File Folder (with conf
                  notes)."                        90

23

        Exhibit 7     60-page PDF titled "Insurance

24                    Corporation of British Columbia
                      Claim File Folder (with conf

25                    notes)                       94



**Page 5**

| 1  | Exhibit 8  | Two-page fax from Joanne Nelson at icbc to Allstate dated December 1, 2003 | |
| 2  | | | 98 |
| 3  | Exhibit 9  | Affidavit of John Di Cesare sworn on May 3, 2017 | |
| | | | 103 |
| 4  | | | |
| 5  | Exhibit 10 | Fax to Joanne Nelson from Allstate dated December 3, 2003 | 112 |
| 6  | Exhibit 11 | ICBC memo from Gerard Wright to Ben Shotton dated June 14, 2004 | 118 |
| 7  | | | |
| 8  | Exhibit 12 | Transcript of recorded interview of Wayne Ayers | 127 |
| 9  | Exhibit 13 | Two-page PDF titled "Surveillance" and attached newspaper clipping | |
| 10 | | | 135 |
| 11 | Exhibit 14 | Email from Diane Bobsien dated may 27, 2004, subject "advice of assignment" | |
| 12 | | | 138 |
| 13 | Exhibit 15 | Email from Agostino Pietramala | 138 |
| 14 | Exhibit 16 | Special Investigation Unit notes | 140 |
| 15 | Exhibit 17 | Four-page Fax and attached letter from Ken Carter to David Leadbetter | |
| 16 | | | 142 |
| 17 | Exhibit 18 | Transcript of recorded telephone interview of David Leadbetter | 144 |
| 18 | | | |
| 19 | Exhibit 19 | Transcript of recorded telephone interview of Darren (LNU) | 147 |
| 20 | Exhibit 20 | Five-page PDF called "Insurance Corporation of British Columbia Claim File Folder" | |
| 21 | | | 155 |
| 22 | Exhibit 21 | Three-page email string from Karen Burke Da Silva to Agostino Pietramala | 160 |
| 23 | | | |
| 24 | Exhibit 22 | Two-page PDF email string from Agostino to John Di Cesare | 164 |
| 25 | | | |

**Page 6**

| 1  | Exhibit 23 | Email from Agostino Pietramala to John Di Cesare | 166 |
| 2  | | | |
| 3  | Exhibit 24 | Insurance Corporation of British Columbia Claim File Folder (with conf notes) | 168 |
| 4  | | | |
| 5  | Exhibit 25 | Special Investigation unit notes of Tino Pietramala summary of activity | 169 |
| 6  | | | |
| 7  | Exhibit 26 | Three-page email string from laurie Olstrom to "Ken" | 171 |
| 8  | Exhibit 27 | Five-page PDF email string from Laurie Olstrom to Gordon Marshall | 176 |
| 9  | | | |
| 10 | Exhibit 28 | Three-page PDF email string from Jasroop Grewal to John Di Cesare | 180 |
| 11 | | | |
| 12 | Exhibit 29 | Insurance Corporation of British Columbia claim file folder (with conf notes) | 183 |
| 13 | | | |
| 14 | Exhibit 30 | Insurance Corporation of British Columbia Claim File Folder | 186 |
| 15 | Exhibit 31 | Insurance Corporation of British Columbia Claim File Folder (with conf notes) dated May 1, 2014 | 187 |
| 16 | | | |
| 17 | Exhibit 32 | Insurance Corporation of British Columbia claim file folder (with conf notes) dated January 4, 2021 | 191 |
| 18 | | | |
| 19 | | | |
| 20 | Exhibit 33 | Email sting From John Di Cesare to Jasroop Grewal subject "FW: Janene Severson - APAC/MR. Hall" | 199 |
| 21 | | | |
| 22 | Exhibit 34 | Two-page PDF invoices from Action Pacific Investigations | 206 |
| 23 | Exhibit 35 | 14-page PDF Action Pacific Investigative Service invoices | 208 |
| 24 | | | |
| 25 | | | |

**Page 7**

| 1 | ADDITIONAL INFORMATION REQUESTED: |
| 2 | Page  /  Line |
| 3 | 15   / 4 |
| 4 | 157  / 5 |
| 5 | 212  / 8 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 8**

1    Vancouver, BC, CANADA

2    March 19, 2021

3    *****

4    (PROCEEDINGS COMMENCED AT 9:07 A.M. PACIFIC TIME)

5    JAMES KIM,

6  called as a witness, having been first affirmed, was

7  examined and testified as follows:

8    EXAMINATION

9  BY MR. MARK:

10    Q.  Good morning, Mr. Kim.  My name is Etan Mark.

11  I'm an attorney with the law firm of Mark Migdal & Hayden

12  in Miami, Florida.  I represent Richard Hall.  You

13  understand you're under oath today; correct?

14    A.  Yes, I do.

15    Q.  And you have been designated to testify

16  concerning one of the topics that have been noticed for

17  today's deposition; is that right?

18    A.  Correct.

19    Q.  Okay.  And what is the topic about which you are

20  prepared to testify today?

21    A.  I have been asked to testify about the file

22  management system for our claims files.

23    Q.  All right.  Now, let me go through some ground

24  rules for today's deposition.  Have you ever had your

25  deposition taken before?



JAMES DI CESARE                                      March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                      9–12

Page 9

1    A. I have not.

2    Q. Okay. And I know Mr. Di Cesare's in the room
3  with you as well, so hopefully I can only go through this
4  once. And I'm assuming that he can hear me. So obviously
5  I don't expect your portion of the deposition this morning
6  to go for long. So notwithstanding -- if I ask a question
7  and you don't understand the question, please feel free to
8  ask me to rephrase it. I'll be happy to do that. If I
9  ask you a question and you answer it, I'm going to assume
10 that you understand the question. All right?

11   A. Sounds good. Yes.

12   Q. Please provide verbal responses. There's
13 somebody who's obviously transcribing everything you say,
14 so a shake of the head, a nod is not go to be able to get
15 recorded. Do you understand?

16   A. Yes, I do.

17   Q. All right. If at any point this morning either
18 you or Mr. Di Cesare wishes to take a quick break, I've
19 got no problem with that at all. I know that it is
20 9:00 A.M. your time, and while, Mr. Kim, you'll be long
21 gone by lunchtime -- but to the extent Mr. Di Cesare
22 wishes to break for lunch, certainly that's something that
23 we can accommodate if you wish -- or if he wishes. But if
24 you need to take a quick break for whatever reason over
25 the next 30 minutes or so, feel free to ask and I'd be

Page 10

1  happy to accommodate you. Okay?

2    A. Thank you. I understand.

3    Q. All right. So you've indicated that you are here
4  to testify about ICBC's file management system; is that
5  correct?

6    A. That is correct.

7    Q. All right. So what did you do to prepare for the
8  deposition today?

9    A. I interviewed a number of staff at ICBC who've
10 had somewhat more direct access and support functions for
11 those systems than I have had.

12   Q. And what is your role at ICBC?

13   A. I manage IT security. I'm responsible for the IT
14 security controls program.

15      MR. MARK: Okay. So just for the court reporter,
16 joining the deposition is JJ McIntyre. He's counsel for
17 Mr. Hall in British Columbia.

18 BY MR MARK:

19   Q. You had indicated that you are responsible for
20 the -- I'm sorry -- the IT security program, is that what
21 you stated, at ICBC?

22   A. That's correct.

23   Q. And what's your title?

24   A. Manager, IT security.

25   Q. And what are your roles and responsibilities as

Page 11

1  manager of IT security at ICBC?

2    A. I manage the security controls for the
3  organization. I am also responsible for some measure of
4  threat management -- cyber threat management to ICBC, and
5  as pertains to this case I manage the e-discovery process
6  for ICBC.

7    Q. Okay. So were you the person who took the lead
8  in collecting documents that were responsive to the
9  requests for production in this case, to your knowledge?

10   A. To my knowledge, yes. I coordinated that
11 process.

12   Q. You stated that you interviewed staff at ICBC in
13 preparation for your deposition. Who did you interview?

14   A. Are you looking for names or roles?

15   Q. Both, please.

16   A. Okay. So the names are going to be a little bit
17 foggy, but I interviewed people who are responsible for
18 our email system, for example. So that would be Ken Chen.
19 He is an email administrator. I also emailed people
20 responsible for the file storage. In that case that would
21 be John Hui, H-u-i. I also interviewed people responsible
22 for our redaction system. The main person there would be
23 Richard Coulthard, C-o --

24   Q. Could you --

25   A. Sorry. Yeah?

Page 12

1    Q. I was going to ask you to spell the last name,
2  but you beat me to it.

3    A. Yeah. C-o-u-l-t-h-a-r-d.

4       And finally, interviewed people responsible for
5  the Claims Work Management System, and the main person
6  there was Gary Stevens.

7    Q. Did you say the Claims and Work Management
8  System?

9    A. That's correct.

10   Q. Okay. And what is that?

11   A. That is a mainframe based tool that we used to
12 manage our claims up until a few years ago.

13   Q. And what system do you use now?

14   A. We use a product called GuideWire ClaimsCenter.

15   Q. And what was the name of the system that you used
16 a few years ago?

17   A. The Claims Work Management System, so CWMS.

18   Q. Gotcha. When did it transition from CWMS to
19 GuideWire?

20   A. Approximately 2005 -- I'm sorry. 2015.

21   Q. Okay.

22   A. Time is very fluid.

23   Q. All right. So tell me, please -- let's start
24 with the documents that were produced in response to the
25 requests for production and sort of your efforts in



Page 13

1  collecting those documents.  Can you tell me the general
2  categories of documents that you sought to collect to
3  respond to that request?
4      A.  Can you explain what you mean by "category of
5  documents"?
6      Q.  Sure.  Hard -- hard copies of documents, emails,
7  text messages, claims files.  Just give me sort of broad
8  brushstroke category of the types of documents that you
9  were collecting.
10     A.  So I was involved purely in e-discovery, so
11  nothing to do with hard copies of anything.  And what I
12  did was coordinate collection of anything that was
13  referenced in that claim file, so that would include a
14  database file, it would include Word documents, emails.
15  That's probably most of it right there.
16     Q.  So you start with a claims file and then look to
17  see if there were references to other documents within the
18  claims file and then you would try to hunt down those
19  other documents?
20     A.  We conducted a search based on parameters that
21  were given to us and we used that as well.
22     Q.  Okay.  But is the answer to my first question
23  yes?  I understand that there were additional things that
24  you used, but I guess what I'm trying to understand is --
25  it sounds like what you did is you took the claims file,

Page 14

1  you looked for references to other documents within the
2  claims file, and then you went to search for those
3  documents, and then in addition you used search terms that
4  were provided to you.
5      A.  No.  We started with the claims file and we also
6  conducted a search.
7      Q.  Okay.  And the search terms were provided to you
8  by whom?
9      A.  Provided to us by -- I want to say Gavin.
10     Q.  And who's Gavin?
11     A.  He is the person who was running the court --
12  coordinating the discovery process on behalf of Scheer
13  Law.  So he was helping us with the search parameters and
14  collecting the data that would be sent back.
15     Q.  I see.  Okay.  So somebody from Mr. Scheer's
16  office was working with ICBC to provide search terms to
17  collect the documents; is that right?
18     A.  That is correct.
19     Q.  Okay.  Do you recall what search terms were used?
20     A.  Not all of them, no.  There -- there were quite a
21  few, as -- as I recall.  I can give you examples, if that
22  would be helpful.
23     Q.  Sure.
24     A.  Sure.  So they were -- on the -- along the lines
25  of searching for documents that had "Richard Hall," for

Page 15

1  example, and variations on that name.
2      MS. CROW:  Etan, just for the record, you know,
3  I -- and we can do this when we take a break.  I'm happy
4  also to give you the list of those search terms.
5      MR. MARK:  Okay.  That would be great.  So we --
6  so now, Mr. Kim, your lawyer just saved you about seven
7  minutes, so you can thank her later.
8      MS. CROW:  Okay.  I'll also say for the record
9  that beyond what Mr. Kim just stated, you know, names,
10  claim numbers, I believe the phrases, you know, "PGA
11  Tour," "Leadbetter," "Allstate" -- I'll give you the
12  complete list, but those are some examples of what the
13  search terms were --
14     MR. MARK:  Right.
15     MS. CROW:  -- which I'm sure you were planning to
16  ask about.
17  BY MR. MARK:
18     Q.  Mr. Kim, did you -- so you were not responsible
19  for checking for any sort of hard documents; is that
20  right?  Hard copies of documents.
21     A.  That is correct.  I was not responsible for that.
22     Q.  Do you know who at ICBC was, if anyone?
23     A.  I do not know.
24     Q.  Do you know whether you obtained a copy of -- do
25  you know who Ken Carter is?

Page 16

1      A.  Do I know -- sorry.  Say that one more time.
2      Q.  Who Ken Carter is.
3      A.  I do not know who Ken Carter is, no.
4      Q.  Okay.  Do you know whether Ken Carter's
5  investigative file was included in the electronic
6  documents that you provided to counsel?
7      A.  I don't know that either.
8      Q.  Okay.  Besides emails and Word documents and the
9  actual claims file, are there any other electronic format
10  documents that you participated in the collection of?
11     A.  No, I did not.  No other --
12     Q.  Did you -- I'm sorry.
13     A.  The answer was no.
14     Q.  And do you know -- do you understand --
15  I assume -- do you understand what I mean when I say
16  "native format"?
17     A.  I believe you're talking about the format in
18  which a document was originally produced.  If that's
19  not --
20     Q.  Correct.
21     A.  Okay.
22     Q.  Do you know -- I assume ICBC has the capacity to
23  produce these documents in native format; correct?
24     A.  Yes.  If they have not --
25     Q.  Did you --



Page 17

1    A.  The answer is yes.

2    Q.  Okay.  And do you know whether these documents

3  were produced to your counsel in native format?

4    A.  Yes.  They were produced in native format.  What

5  we discovered was not changed.

6    Q.  So if, for example, it was a Word document, you

7  produced it to your counsel in Word format?  If it was a

8  PDF, you produced it in PDF?  If it was a TIFF, you

9  produced it as a TIFF?

10    A.  That is correct.

11    Q.  Did you do any searches for any text messages or

12  anything like that?

13    A.  We did not.

14    Q.  Did you produce any video files?

15    A.  The best of my knowledge, we did not.

16    Q.  Now, you had testified earlier that you spoke to

17  someone at ICBC about -- it looks like you spoke to

18  somebody about the email system, somebody about file

19  storage, someone about the redaction system and someone

20  about the Claims Work Management System; right?

21    A.  That is correct.

22    Q.  Okay.  Did I miss anybody in the -- those were

23  the four categories I have.  Did I miss someone?

24    A.  You did not miss anything.

25    Q.  Okay.  Great.  When you say "the redaction

Page 18

1  system," what do you mean by that?

2    A.  The redaction system is a tool used by our

3  privacy and FOI -- FOI is freedom of information -- for

4  redaction purposes.  So protecting -- protecting or

5  blocking out information that might be distributed.

6    Q.  And what was -- I'm trying to understand.  What

7  was the purpose of your discussion with the -- with the

8  folks working on the redaction system?

9    A.  To discover if they had any files that were

10  pertinent to the search parameters that were provided.

11    Q.  So I'm going to kind of take a logical leap here,

12  and if I get it wrong just tell me and you can explain to

13  me where I got it wrong.  Okay?  It sounds like what

14  you're saying is you received the files, there were

15  redactions on the files, you went to the redaction

16  department, and you asked them to confirm that none of the

17  redacted information had any of the search terms that you

18  were looking for; is that correct?

19    A.  No.  I did not receive --

20    Q.  Okay.

21    A.  -- any of the files.  I -- I did not look at the

22  files.  What we -- what we did, as a fairly standard part

23  of your e-discovery process, is -- because with a claim

24  file there is often a point at which a person may ask for

25  information, that information may be captured within our

Page 19

1  redaction system.  So it wasn't necessarily specific to

2  this case.  It would just be a step along the way.

3    Q.  When you say -- what do you mean by "redaction"?

4    A.  The process of blacking out information according

5  to -- again that -- whatever privacy and FOI deem is --

6  you know, is -- needs to be hidden or is somehow of, you

7  know, consequence to ICBC.  Sorry.  I'm not really

8  familiar with that side of it, but it's a tool that's used

9  to essentially black out information so that a document --

10    Q.  All right.  Sorry.

11    A.  No, I'm just saying so if a document is sent out

12  certain information may be hidden.

13    Q.  Okay.  But you're not aware of, like, sort of

14  criteria that ICBC uses with respect to actually redacting

15  information or why certain information would be redacted;

16  is that right?

17    A.  That is correct.

18    MS. CROW:  And, Etan, for the record it -- more

19  questions about the FOI process are probably better

20  directed at John rather than James.

21    MR. MARK:  That's fine.  I'm just trying to

22  understand --

23    MS. CROW:  Yeah.

24  BY MR. MARK:

25    Q.  Mr. Kim, when you -- I'm trying to understand the

Page 20

1  relationship between the search terms and the redactions.

2  And I just -- I think I'm just missing something.  So

3  did you ask the redaction department to look for

4  responsive documents?

5    A.  For, sorry, responsive documents?

6    Q.  Right.  Documents in response to the requests for

7  production.

8    A.  Yes.

9    Q.  Okay.

10    A.  We -- I would say --

11    Q.  Go ahead.

12    A.  Part of the search parameters we were provided,

13  that is what we gave to the redaction department.

14    Q.  All right.  So you met with the redaction

15  department, you showed the -- you gave them the search

16  parameters, and you said to the redaction department

17  effectively to the extent that there is anything that has

18  been redacted that is responsive to this list of search

19  terms, can you please let us know.  Is that effectively

20  what you did?

21    A.  That's -- that's about it, yes.

22    Q.  Okay.  And -- and as you know, if you look at,

23  for example, a claims file, you'll see that there's parts

24  of it that are blacked out; correct?

25    A.  Yes.



Page 21

1    Q. And was it then -- so are you telling me then
2  that if there was a search term -- let's say -- let's
3  say -- one of the search terms that your counsel indicated
4  was "Leadbetter"; okay?  So if the word "Leadbetter"
5  showed up on a -- in a particular search within the
6  redaction department -- in other words, they would have
7  identified that there would be a sentence in the claim
8  file that had been redacted that had the word "Leadbetter"
9  in it -- then they would provide you with a copy of the
10  unredacted statement?
11    A. As -- as far as I know, yes.
12    Q. Okay.  Now, do you know whether the redaction
13  department in fact provided you with any documents that
14  were responsive to the request?
15    A. They did not.  What they did was, I believe, lock
16  those files.  But AccessPro is not a tool to export that
17  kind of information.
18    Q. So I'm just -- I'm just -- I'm just a lawyer, so
19  I need you to explain that to me a little bit less
20  technically, if you can.  When you say that they "locked"
21  the files, what do you mean by that?
22    A. The files were put into a state which would make
23  it difficult for other users to make any further changes.
24    Q. So does that mean that the redactions cannot be
25  removed?

Page 22

1    A. That would be correct.
2    Q. Okay.  So even today -- even if you asked them to
3  remove a redaction, they wouldn't be able to?
4    A. It depends on who you're asking.  There is an
5  admin who might be able to do that.
6    Q. Who is the admin?
7    A. That would be Richard Coulthard.
8    Q. I'm sorry.  Can you -- can you -- you already
9  spelled his last name, but I'm having trouble
10  understanding it.  Would you mind telling it to me one
11  more time?
12    A. Yeah, C-o-u-l-t-h-a-r-d.
13    Q. Coulthard.  Okay.  Thank you.
14    A. Yeah.
15    Q. So if there was a responsive redacted -- if there
16  were a responsive redaction, you could ask Mr. Coulthard
17  to remove that redaction.  But that is not something that
18  a less senior person at ICBC could do; is that correct?
19    A. That is correct.
20    Q. Okay.  So do you know whether the redaction
21  department in fact identified any responsive redacted
22  documents?
23    A. My understanding is yes, that there were hard
24  copies provided.  But beyond that I am not sure.  As I
25  say, I wasn't really involved with that.

Page 23

1    Q. And do you -- and do you know whether any of
2  those redactions were removed in the production?
3    A. I don't.
4    Q. Certainly it's your understanding that the
5  redaction department did not produce any responsive
6  electronic documents; correct?
7    A. That is correct.
8    Q. Okay.  Do you know what a legacy database is?
9    A. My definition of a legacy database would be
10  something that is no longer considered to be in current
11  use but is maintained because it still has value.
12    Q. And are you aware of whether any of the documents
13  responsive to the requests are being maintained in some
14  kind of a legacy database?
15    A. That would be referencing our CWMS, which is now
16  considered a legacy system since it was effectively
17  replaced.
18    Q. And are you -- so the answer is yes; right?
19    A. That's right.
20    Q. There's documents that --
21    A. Sorry.
22    Q. Okay.  Now, are the -- to the extent there are
23  redactions on the documents, are those redactions
24  apparent -- do these redactions exist in the legacy system
25  as well?

Page 24

1    A. They do not, no.
2    Q. So when the redactions department redacts a
3  document, that redaction is -- does not impact the file as
4  it's maintain in the legacy system?
5    A. That is correct.  It does not impact -- it does
6  not change that source file.
7    Q. Does deleting entries change that source file?
8    A. If you were to delete the source file it would
9  change it.  Is that what you mean?
10    Q. Well, that's a great clarification.  So I assume
11  that the way it works is that if somebody goes into the
12  legacy system and deletes something off of the legacy
13  system -- let's say the claims file.  Let's use the claims
14  file as an example.  The claims file is maintained
15  presumably on the legacy system; correct?
16    A. That is correct.
17    Q. Is there anywhere else that the claims file is
18  maintained?
19    A. No.
20    Q. All right.  So if somebody deletes something from
21  the claims file, the only place that that deletion could
22  occur is on the legacy system?
23    A. No.
24    Q. Okay.  Where else could that deletion occur?
25    A. On our file storage system.  So the claims legacy



Page 25

1  system doesn't -- it is essentially a repository of notes.
2      Q.  Okay.  And what's -- and then you mentioned
3  something else, the claims -- what did you call it?  The
4  Claims Management System?
5      A.  Yes, CWMS.
6      Q.  Okay.  And the CWMS is separate from the legacy
7  system?
8      A.  No.  The CWMS is the legacy system.
9      Q.  Okay.  So you just said -- I asked you if you
10  delete something from -- I asked you if the only way to
11  delete something from the claims file is to delete it from
12  the legacy system, and you'd said no, that there's another
13  way to delete something; is that right?
14      A.  It depends on what part of the claims file you're
15  talking about.
16      Q.  Okay.  Could you elaborate on that, please?
17      A.  Yes.  There -- for example, you were asking
18  earlier about emails or Word documents.  So someone can
19  keep an email in their inbox which would not be directly
20  linked to the claims file.
21      Q.  All right.  So obviously that email could be
22  deleted and it wouldn't change the claims file, is what
23  you're saying?
24      A.  That is correct.
25      Q.  Right.  But I'm talking about entries --

Page 26

1  specifically entries on a claims file; okay?  So you've
2  got -- you've seen the claims files.  You know what they
3  look like.  They've got dates and they've got entries;
4  right?  Is there any way to delete an entry off a claims
5  file other than to delete it from the legacy system?
6      A.  Then the answer is no.
7      Q.  And is it fair to say then that once an item is
8  deleted from the legacy system it doesn't -- there's no
9  way to retrieve it?
10      A.  Entries that are deleted off the legacy system --
11  that is correct -- they cannot be retrieved short of a
12  database restore.
13      Q.  And do you know whether a database restore was
14  ever attempted in connection with this case?
15      A.  To the best of my knowledge no, it was not.
16      Q.  And how does one physically -- if you know --
17  this might be outside of your wheelhouse, and maybe I'll
18  ask Mr. Di Cesare if it is, but how does someone
19  physically delete something from the legacy claims file?
20      A.  That I'm -- I would not know.  I have not used
21  the system.
22      Q.  Okay.  Do you know what BICIT is?
23      A.  I don't think so, no.
24      Q.  Okay.  Does the claim file link to external
25  documents ever?  In other words, on the legacy system

Page 27

1  obviously I know that the claims file exists.  Can you
2  tell me a little bit about sort of the structure and
3  organization of the legacy system?  Is it just the claims
4  file, or are there folders with emails and Word documents
5  and all that other stuff as well?
6      A.  There -- as far as I know there are no folders.
7  You can store information, however.  Within that claims
8  file you could also include a -- essentially a pointer to
9  an external document.
10      Q.  And how do you know, when looking at the claims
11  file, if there is a pointer to an external document?
12      A.  There would be a reference to that document.  So,
13  for example, something that exists on a drive might be
14  preceded with, you know, our drive reference, which is T,
15  so T:\ and then the file name.
16      Q.  I see.  So when you then sort of, quote -- when
17  you then produce the claims file, does it necessarily link
18  to those additional documents as well, or does that have
19  to be done separately?
20      A.  That would have to be done separately.
21      Q.  Right.  And do you know if in this case there
22  were any pointers to any external documents within the
23  claims file?
24      A.  I don't know.  I did not read those claims files.
25      Q.  When you produced the claims file -- but you were

Page 28

1  participating, obviously, in producing the claims file;
2  correct?
3      A.  That is correct.
4      Q.  Okay.  And when you produced the claims file did
5  you produce any other documents along with the claims
6  file?
7      A.  Yes, we did.
8      Q.  Okay.  You produced certain Word documents;
9  correct?
10      A.  That is correct.
11      Q.  And that was -- and those were produced because
12  of -- that's what came up via the search terms; is that
13  right?
14      A.  That is right.  Yes.
15      Q.  And when you input these search terms did you put
16  these into sort of an ICBC-wide net or did you just pick
17  specific custodians and search solely on their local drives?
18      A.  Sorry.  Can you clarify that question?
19      Q.  Yeah.  Did you search -- did you use these search
20  terms on -- throughout the whole entire ICBC network?
21      A.  We did it in the four areas that would -- that I
22  mentioned earlier.  ICBC doesn't have a single master
23  search repository.
24      Q.  Okay.  So you only used -- those four departments
25  conducted searches internally using those search terms



JAMES DI CESARE                                      March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                  29–32

Page 29

1  that were provided by counsel; is that right?
2      A.  That is correct.
3      Q.  And did you assist each of those departments in
4  actually doing the search?
5      A.  Did I -- how can -- how -- can you define that?
6  How -- what do you mean by "assist" in this case?
7      Q.  Well, sure.  You gave them the search terms;
8  right?  And did they just then come back to you a week
9  later and say here are the documents, or were you the one
10  that actually implemented the search terms, collected the
11  documents and then provided them to counsel?
12     A.  More the former than the latter.  So we had
13  several departments, and they represented the people who
14  had the expertise and the -- and the rights to do that.
15     Q.  And who selected these four departments?
16     A.  I did in conjunction with their managers.
17     Q.  And who made the determination that -- that
18  responsive documents were going to be able to be gleaned
19  from each of these four departments and that there
20  wouldn't be any outstanding documents that were going to
21  be missed?
22     A.  I did.
23     Q.  And what is it that you understand about the
24  current case that informs your ability to make that
25  determination?

Page 30

1      A.  It's -- I would say it's less about case and more
2  about my responsibility for files and systems at ICBC that
3  gives me some visibility into the systems that we
4  maintain.
5      Q.  Did you do -- do you know what SIU is?
6      A.  Yes.
7      Q.  Okay.  What is SIU?
8      A.  That refers to our special investigations unit.
9      Q.  And did you search for -- through the ICBC's SIU
10  to find responsive documents?
11     A.  We did, yes.
12     Q.  Okay.  And what department that you mentioned
13  involved SIU?
14     A.  That would be our servers department.  So I
15  mentioned the name John Hui earlier.
16     Q.  M'mm-hmm.
17     A.  He would have been the lead on that work.
18     Q.  And did -- to your knowledge, the SIU files, were
19  they provided to you for production or were they unable to
20  find anything?
21     A.  I don't recall if they were able to find
22  anything.  But if they were able, those files would have
23  been included.
24     Q.  I notice that in part of the production there
25  were some -- there was some handwriting -- there were some

Page 31

1  handwritten notes.  Did you participate in the collection
2  of those handwritten notes, or that was something that
3  somebody else handled?
4      A.  That would have been somebody else.
5      Q.  So you don't know one way or the other, as you
6  sit here today, whether SIU actually produced documents?
7  You're just assuming that if there were documents that
8  were responsive to our request, then they would have
9  provided them?
10     A.  That is correct.
11         MS. CROW:  And, counsel, he's speaking for the
12  electronic files, obviously, only.  And I assume that's
13  what your question is limited to, because there is a paper
14  SIU file as well.
15         MR. MARK:  I'm just asking about what he knows.
16  That's all.  I'm hearing like a radio.
17         MS. CROW:  Yeah.  I think the only person that's
18  not an mute is your client's BC counsel.
19         MR. MARK:  Oh, okay.  Mr. McIntyre, if you could
20  just mute your phone, that would be great.  All right.
21  There he goes.
22  BY MR. MARK:
23     Q.  Do you know whether I -- the SIU, in the regular
24  course, maintains electronic files?
25     A.  I do know.  And yes, they do.

Page 32

1      Q.  Okay.  Do they maintain separate claims files
2  electronically?
3      A.  Claims files?  Yes.
4      Q.  Okay.  And -- but as you sit here today you don't
5  know -- well, do you know whether they maintained a
6  separate electronic claims file with respect to this case?
7      A.  I don't know.  I can only tell you that is
8  their current practice.  I am not sure -- just given the
9  age of this particular claim, I can't really speak to
10  their practices back in -- you know, I believe 2005.
11     Q.  When you did you start working at ICBC?
12     A.  About eight years ago.
13         MR. MARK:  All right.  Now, I do want to talk
14  about redactions that were made specific to this case.
15  But as I understand counsel's statement is that those are
16  better asked of Mr. Di Cesare.  Is that right, counsel?
17         MS. CROW:  If we want to talk about redactions
18  related to the FOI process, as James mentioned, that would
19  be better directed at John because John can give you a
20  better description of the FOI process where those
21  redactions are made.
22         MR. MARK:  Who is going to be the witness that's
23  going to explain discrepancies between FOI productions?
24  Is that going to be Mr. Kim or is that Mr. Di Cesare?
25         MS. CROW:  That would be -- that would be John.



JAMES DI CESARE                                                March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                            33–36

Page 33

1        MR. MARK:  Okay.

2        MS. CROW:  That would be Mr. Di Cesare.  And you

3    know --

4        MR. MARK:  I just don't want -- I just don't want

5    to let go of Mr. Kim without -- you know what I'm saying?

6    I don't want to ask Mr. Di Cesare a question and then he

7    says to me oh, no, that's for -- that would have been

8    Mr. Kim.  So I just want to make sure I understand.

9        MS. CROW:  I don't think that is going to happen,

10   you know, and certainly, as you and I have discussed,

11   there are also, you know, a handful of redactions made by

12   my office for, you know, correspondence with my office or

13   things like that.  So -- but in terms of redactions made

14   by the redaction department, that would be Mr. Di Cesare

15   because those relate to the FOI process.

16       MR. MARK:  Okay.

17       MS. CROW:  And so if you want -- if you were

18   going to, say, pull up a note that has -- that your client

19   got in the FOI process and you want to compare that to

20   what we produced recently, that would absolutely be

21   Mr. Di Cesare.  Does that help?

22       MR. MARK:  It does.  Thank you.

23       MS. CROW:  That would most certainly be

24   Mr. Di Cesare.

25       MR. MARK:  What -- and who would be the person

Page 34

1    to kind of explain what the different little codes and

2    initials and things on these claims files mean?

3        MS. CROW:  Mr. Di Cesare.

4        MR. MARK:  Okay.

5        MS. CROW:  What do you mean by "the codes"?  Just

6    to clarify -- so, for example, in your complaint there are

7    a couple of references to like "LVI" and what that means.

8    Something like that Mr. Di Cesare can testify about.

9        MR. MARK:  No.  But like there's things where --

10   there's columns in the claims file.  It will say "work

11   type" and then it will list what work type it is.  It will

12   say "TYP," "EXP," and then there's a column there.  Is

13   that something that Mr. Di Cesare's prepared to talk about

14   or is that Mr. Kim?

15       MS. CROW:  So those specific columns,

16   Mr. Di Cesare can -- Mr. Di Cesare can explain the

17   process of those and why there could be discrepancies --

18       MR. MARK:  Okay.

19       MS. CROW:  -- between what you receive in FOI and

20   what you receive in our production.  I would say precise

21   details of why an individual redaction was made would have

22   to be that particular FOI officer, but the general --

23       MR. MARK:  Okay.  All right.  I got it.  I got

24   it.

25       MS. CROW:  If anybody can answer that -- if --

Page 35

1    to the extent one of these two witnesses can, it would be

2    Mr. Di Cesare.

3        MR. MARK:  Okay.

4        MS. CROW:  FOI is its only whole process, as

5    Mr. Di Cesare can explain.

6        MR. MARK:  Okay.  I don't believe --

7    BY MR. MARK:

8        Q.  Well, Mr. Kim, let me ask you this.  Do you --

9    are there any -- is there anything else that you did in

10   connection with your either preparation for this

11   deposition or in connection with your collection of

12   documents that we haven't talked about this morning?

13       A.  I don't believe so, no.

14       Q.  Okay.  You think we've covered everything?

15       A.  As far as I can tell, yes.

16       MR. MARK:  Okay.  Good.  All right.  In that case

17   I think I'm -- I appreciate your time, Mr. Kim.  Thank you

18   so much for doing it this morning.  And -- and I think

19   we're ready to move on to the next witness.

20   (PROCEEDINGS ADJOURNED AT 9:49 A.M. PACIFIC TIME)

21   (PROCEEDINGS COMMENCED AT 9:57 A.M. PACIFIC TIME)

22              JOHN DI CESARE,

23   called as a witness, having been first affirmed, was

24   examined and testified as follows:

25              EXAMINATION

Page 36

1    BY MR. MARK:

2        Q.  Good morning, Mr. Di Cesare.  My name's Etan

3    Mark.  You heard the ground rules that I provided to

4    Mr. Kim?

5        A.  I did.

6        Q.  Okay.  Do you have any questions about them?  Are

7    you comfortable proceeding?

8        A.  Yeah, if I don't understand a question I'll ask

9    you.

10       Q.  All right.  Are you under any medication that

11   would impact your ability to testify truthfully or

12   completely today?

13       A.  No.

14       Q.  All right.  Did you hear Mr. Kim testify about

15   the ability to delete particular records from the claims

16   file?

17       A.  I did.  I heard all of his testimony.

18       Q.  All right.  Do you have the ability to delete

19   entries from a claims file?

20       A.  So are we talking about the CWMS file

21   specifically, I guess we could start with?

22       Q.  Yes, sir.

23       A.  So a claims handler who makes a note on the file,

24   if you are the person producing the note, you have up to

25   five days to change or delete that note.  Beyond that,



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
37—40

Page 37

1  management has the ability to go in and delete a file -- a
2  note by a function called "super delete."  As a claims
3  handler and the initial note maker you don't have that
4  ability.
5      Q.  So once five days is up, then the only person
6  that can delete an entry in a claims file is the -- is
7  management; is that right?
8      A.  That's my understanding.
9      Q.  Okay.  And are you considered management?
10     A.  No.
11     Q.  So you do not have the ability to delete anything
12  from a claims file after five days?
13     A.  Not on the electronic notes system, no.  We're
14  talking about CWMS; correct?
15     Q.  Yes.  Now, what about -- what's the name of the
16  current system again?  Remind me.
17     A.  The which system?
18     Q.  The current system?
19     A.  Oh, ClaimCenter.
20     Q.  ClaimCenter?
21     A.  Yes.
22     Q.  All right.  Do you have the ability to delete
23  entries on files in ClaimCenter?
24     A.  Let me start by saying that ClaimCenter is not in
25  any way related to this file.  So this file has not been

Page 38

1  managed in any way, shape or form via ClaimCenter.
2      Q.  All right.  So was the only system used to manage
3  this particular file then CWMS?
4      A.  It's legacy file, so we had CWMS as our means of
5  making electronic notes.  We have a paper file with the
6  paper documents.
7      Q.  So you never -- other than in your capacity as a
8  claims handler on this particular file, you never had the
9  ability to delete any entries on -- in the claims file;
10  correct?
11     A.  On CWMS, that's correct.  Yeah.
12     Q.  Did you, as claims handler on the Hall file, ever
13  delete any entries from the claim file?
14     A.  No.
15     Q.  Okay.  Did you -- did you ever delete any entries
16  in the Hall claim file at all?
17     A.  I can't think of anything that I've ever
18  purposefully deleted.
19     Q.  What does "super delete" mean?
20     A.  That's just the name, I think, given to the --
21  the function or the power -- the ability to delete beyond
22  five days.
23     Q.  But is the process to delete something beyond
24  five days the same as the process that a claims handler
25  would employ within the five-day period?  Or do you need

Page 39

1  to put in some kind of supervisor password or --
2      A.  Oh.  Well, I believe --
3      Q.  -- click your heels three times?
4      A.  Right.  Yeah.  No, I believe it's the same
5  process.  But when you go in to do that, the person trying
6  to delete it would be recognized by their computer
7  credentials; right?  They've logged in under their
8  credentials, for example, their login ID.  So I couldn't
9  go in under my ID and use the super delete function.  I
10  wouldn't have that ability.
11     Q.  I see.  So it's your understanding then that
12  if -- give me the name of a -- of someone in management
13  that would have the ability to delete from the CWMS system
14  after five days.
15     A.  So at the time I'm guessing Grant Hill.
16     Q.  I'm sorry?
17     A.  Not guessing.  Grant Hill was my manager at one
18  point in time, during the life of this file, so he would
19  have had that ability.
20     Q.  Okay.  So Hill?  H-i-l-l?
21     A.  Yes.
22     Q.  Okay.  So Mr. Hill, if he wanted to delete
23  something after the five-day period, all he -- he would
24  just -- it would be the same exact process as if you
25  wanted to delete something within the five-day period.

Page 40

1  The only difference would be he would have his
2  credentials, he would press the "delete" button and it
3  would get deleted.  But that -- the name you just called
4  that was "super delete" internally; is that right?
5      A.  I believe it's -- that's -- the process is the
6  same.  In preparing for this I looked at the user guide
7  for our CWMS message system, and it explained that any
8  message creator had the five-day period.  Beyond that only
9  management has the ability to use this function that's
10  called "super delete."  It doesn't specifically say that
11  the function is the same or the process is the same.  But
12  I believe it is.
13         MR. MARK:  I'm going to mark as the first
14  document the amended notice of taking deposition in this
15  case.  It should --
16         MS. CROW:  I have got -- I have a hard copy of
17  that here.  So he can look at that and have a hard copy of
18  that.
19         THE WITNESS:  I have it in front of me.
20         MR. MARK:  And there's no notes or anything on
21  it?
22         MS. CROW:  No.
23         THE WITNESS:  No.
24         MS. CROW:  It's a copy I took across the border.
25         MR. MARK:  Okay.  So everybody should have up on



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
41–44

Page 41

1  their screen now, marked as Exhibit 1, the amended notice
2  of taking deposition, or they should be able to see it.
3      (Exhibit 1 was marked for identification and is
4      attached hereto.)
5      MR. MARK:  Is anybody having any technical
6  issues?  Okay.
7      MS. CROW:  Yes, you look at the paper copy.
8      THE WITNESS:  Okay.  Fair enough.
9  BY MR. MARK:
10     Q.  I believe in the top left corner there might be
11 something that says "document 1" or "1" that you can click
12 on to show it.  All right.  So, Mr. Di Cesare, am I
13 correct that you are the witness that has been designated
14 to testify about the -- certainly the first three topics
15 that are listed on the cover page of Exhibit 1?
16     A.  Yes.
17     Q.  Okay.  And you are also prepared to testify about
18 the specific FOI deletions -- or certain FOI deletions
19 that have been alleged to have been made in this case as
20 well, as I understand your counsel's statement; is that
21 right?
22     A.  Yeah.  To the extent I can.
23     Q.  Okay.  And what did you do to prepare for your
24 deposition this morning?
25     A.  Well, I reviewed -- I reviewed two batches of

Page 42

1  documents provided by my counsel, which as I understand is
2  effectively what was produced to you.  I've reviewed the
3  CWMS notes directly from our system.  I've spoken with
4  four people that I believe were probably the key people
5  that handled the claim around the relevant time when the
6  allegations are being made.  I've reviewed our user guide,
7  as I mentioned, for CWMS.  I've reviewed excerpts from our
8  procedures manual from 2003/2004 that deal with retainer
9  of PIs and our SIU department.  I think that's everything.
10     Q.  Who were the four -- who were the people you
11 spoke with?
12     A.  I spoke with Joanne Nelson, who was the first
13 examiner on the file.  I spoke with Gerard Wright, who was
14 the second examiner on the file.  I spoke with Ben
15 Shotton, who was the first SIU officer involved in the
16 file.  And I spoke with Tino Pietramala, who inherited the
17 file on behalf of SIU.
18     Q.  Did all -- do all these people still work at
19 ICBC?
20     A.  No.  Only Tino does.
21     Q.  How much time -- how much time did you spend with
22 each of these individuals?
23     A.  Oh, half an hour maybe.  Telephone calls.
24     Q.  Separately or together?
25     A.  No, individually.

Page 43

1      Q.  Is -- I'm just going to call him Tino, not out of
2  disrespect but just because I have trouble with the last
3  name.  Is he -- is he still in SIU?
4      A.  No.  He's a manager now, a claims manager.
5      Q.  And is Ms. -- does Ms. Nelson still live in BC?
6      A.  In where?
7      Q.  In British Columbia.
8      MS. CROW:  Does she live in BC?
9      THE WITNESS:  Yeah, I believe on the island.
10 BY MR. MARK:
11     Q.  Okay.  And Mr. Shotton?  Does he still live --
12     A.  Yeah, all of these area codes, the phone numbers,
13 so ...
14     Q.  Okay.  Okay.  What about Mr. Carter?  Did you
15 talk to Ken Carter at all?
16     A.  No.
17     Q.  Did you try to speak to Mr. Carter?
18     A.  I did not.
19     Q.  You didn't reach out to him?
20     A.  No.
21     Q.  Why not?
22     A.  In discussions about what I should do to prepare
23 for it that was never one of the items suggested of me.
24     Q.  Did you ever think it might make sense to speak
25 to Mr. Carter?

Page 44

1      A.  I reviewed all of his reports.
2      Q.  Well, you reviewed all of the reports that you
3  believe he provided to ICBC; correct?
4      A.  Correct.
5      Q.  Okay.  Are there any documents that you reviewed
6  from Mr. Carter that were not part of the files that were
7  provided to you by counsel?
8      A.  No.  There were --
9      MS. CROW:  Etan, for the record, you know, I
10 didn't ask John to compare, but I will say for the record
11 we did not remove anything from Mr. Carter's files prior
12 to producing them to you.  What we -- what ICBC has of
13 Mr. Carter's files.
14 BY MR. MARK:  Okay.
15     Q.  Do you know what an -- what "LVI" means?
16     A.  I do.  It stands --
17     Q.  Okay.  What does "LVI" mean?
18     A.  It stand for low velocity impact.
19     Q.  Okay.  And what does that mean?
20     A.  It's a term we use to describe accidents that we
21 thought were, you know, minor in force, relatively minor
22 accidents.
23     Q.  And what's the -- what qualifies as an LVI?
24     A.  Initially --
25     MS. CROW:  Now?  At what point in time?



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
45—48

Page 45

1  BY MR. MARK:
2      Q.  How about in 2004?
3      A.  You know, we're going back so far that I can't
4  recall specifically what it stood for back then.
5          What I can tell you is that initially "low
6  velocity impact" was a term used to describe fairly low
7  impact accidents whereby we might question whether an
8  injury could reasonably be expected to have been
9  sustained, other than for the very short term.
10         But from there, you know, the term did get used
11 for -- because we had a very specific program at one time
12 that looked at low velocity claims and whether or not we
13 would honour the claims.
14         But beyond that it morphed into -- we would
15 just -- we could be using the term more generally to
16 describe accidents that we didn't think were significant.
17 And that would vary from person to person.  They might use
18 that term; they might not.
19     Q.  So there was something called the LVI program; is
20 that right?
21     A.  Once upon a time.
22     Q.  Okay.  And when did that LVI program cease to
23 exist?
24     A.  I don't know when it ended.
25     Q.  Was it before 2004?

Page 46

1      A.  Honestly, I don't know that.
2      Q.  Okay.
3      A.  I know -- sorry.  Go ahead.
4      Q.  Well, as you know, in this file there's
5  characterizations of the accident as LVI; correct?
6      A.  Yes.
7      Q.  Okay.  And those characterizations were made by
8  ICBC; correct?
9      A.  Yes.
10     Q.  So were those -- and you don't know if in
11 2003/2004 the LVI program was in existence at ICBC?
12     A.  I just don't know to what extent it was still
13 being utilized.  So, for example, like I say, when it
14 first came into its existence there was a very formal
15 process where the, you know, assessment of the damages to
16 all vehicles involved -- there would be a committee
17 process that reviewed those documents and the allegations
18 of injury and there would be a determination, for example,
19 about whether an injury would -- claim would be honored,
20 both in tort and/or for no-fault medical benefits.
21         That program had its -- different stages where it
22 changed a bit.  At the date of loss I don't know where we
23 were in that program.  But whether or not formally there
24 would have been a committee, there wasn't on this file.
25 It never got to that stage.

Page 47

1      Q.  Why didn't it get to that stage?
2      A.  Initially it was thought that it might be part
3  of -- it was described as an LVI because of the
4  description of the damages that we had relating to our
5  insured's vehicle.  But ultimately, with the dollar value
6  of the damages to Mr. Hall's vehicle, it was decided that
7  it wouldn't meet sort of the formal LVI designation, if
8  you will.
9      Q.  Now, as I understand it, the LVI program was in
10 place -- well, let me ask you this.  Do you know when the
11 LVI program was first put into place?
12     A.  I don't.
13     Q.  When did you start at ICBC?
14     A.  I've been here 30 years, and it was sometime
15 after I started.
16     Q.  Okay.  And before 2003; correct?
17     A.  Yes.
18     Q.  Okay.  So at some point before Mr. Hall's
19 accident the LVI program was in place and at a certain
20 point in time the LVI program no longer was in existence,
21 but you're not sure when that occurred; is that right?
22     A.  That's correct.  And between the start and the
23 finish there were different phases of the program.
24     Q.  Okay.  And there was -- in fact low velocity
25 impact suggests that there's -- well, let me ask you this.

Page 48

1  Was there ever a speed that was sort of the threshold
2  speed that would be considered LVI or not LVI?
3      A.  There was, based on engineering opinions.  And as
4  I can best recall the threshold was -- depending on the
5  make of the car and the bumper capacities, because they
6  changed obviously with the year of the vehicle, as I
7  recall, it was in or about 8 kilometers an hour for the
8  standard make/vehicle, standard bumper construction.
9      Q.  Okay.  And do you know whether Mr. Hall's car
10 qualified as a standard make vehicle?
11     A.  I don't -- I didn't see that that was -- we ever
12 went that far.  We never had an engineer inspect for an
13 opinion on velocity.
14     Q.  And do you know -- do you have -- do you know, as
15 you sit here today, what the alleged speed was of the
16 cars -- of Mr. Dove's car at the time of the accident?
17         MS. CROW:  Objection.  Counsel, I'm not trying to
18 get -- I'm trying to give you a good amount of leeway with
19 respect to topics, but I'm not quite sure how, you know,
20 speed of the accident that I think we agree happened in BC
21 relates to jurisdiction.
22         MR. MARK:  So, as you know, one of the
23 allegations obviously that we've made is that there have
24 been material misrepresentations cross-border made to,
25 among others, Allstate Insurance, which we contend is one



JAMES DI CESARE                                      March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                49–52

Page 49

1  of the bases for FSI jurisdiction here.  And part of that
2  misrepresentation, it's our contention, includes the
3  characterization of this accident as LVI as, frankly, an
4  intentional misrepresentation.  So what I'd like to
5  understand is, from the witness -- and I'm not going to go
6  very far afield here at all, just probably about four or
7  five more questions on this line -- just what his
8  understanding was of the speed at the time, because I
9  think it substantiates our allegation and claim that there
10 was an intentional misrepresentation to Allstate
11 concerning the status of the accident as LVI.
12     MS. PERRY:  That went across the border?
13     MR. MARK:  Correct.
14     MS. CROW:  And is -- would that -- would it be
15 proper to rephrase that question as to -- you know, what
16 was reported in the claim file as to what it was?  Because
17 I think that would be the basis of a misrepresentation.
18 You know, he may have seen pictures of the accident and
19 may have his own opinion based on those pictures about
20 what the speed could be.  That wouldn't be the basis of a
21 misrepresentation.  The basis of any misrepresentation
22 would be, I think, what is noted in the claim file around
23 the time that any communications were made, which were not
24 when he was on the file.
25     MR. MARK:  Let me try to re-ask the question and

Page 50

1  let's kind of take it from there, because now I'm a little
2  confused.  So here's my question --
3     MS. PERRY:  Okay.  I'm going to just -- just --
4  just for the record, I'm overruling the objection just
5  because he's rephrasing the question.
6     MS. CROW:  Okay.
7  BY MR. MARK:  Great.
8     Q.  Mr. Di Cesare, do you know how fast Mr. Dove's
9  car was travelling pursuant to the ICBC claim file?
10    A.  I don't recall whether he gave us a specific
11 speed.  He did describe it as not a high speed impact.
12 His vehicle sustained less than $2,000 damage to the front
13 end.  He described that Mr. Hall was pushed into a vehicle
14 in front of him.  There was a female driver of that
15 vehicle.  She got out and looked at her vehicle, and there
16 was no damage to her car, didn't want any part of it, so
17 she left the scene.  So that's what I can tell you with
18 respect to the dynamics of the accident, the speed of the
19 accident.
20    Q.  Okay.  But you don't remember what speed Mr. Dove
21 actually said he was travelling at?
22    A.  I don't recall that.
23    MR. MARK:  Okay.  But -- all right.  Let me show
24 you a document which we'll mark as the next exhibit,
25 because this goes to the LVI program.

Page 51

1     (Exhibit 2 was marked for identification and is
2     attached hereto.)
3  BY MR. MARK:
4     Q.  And what I'd like to understand from you -- this
5  is an order from the Supreme Court of British Columbia.
6  And you can zoom in and play around with it as you wish.
7  But I really want to direct your attention to paragraph 7.
8  It states that --
9     MS. CROW:  Hold on.  Just a second.  Can you wait
10 just a second?  We're zooming.  It's really small on our
11 screen.
12    MR. MARK:  Sure.
13    MS. CROW:  Thank you.  Okay.  Thank you.
14 BY MR. MARK:
15    Q.  Okay.  So this order is dated July 8th, 2008.
16 Now, that was after Mr. Hall's accident; correct?
17    A.  That's right.
18    Q.  Okay.  And would you agree with me, sir, that to
19 the extent that there was an attribution of -- or to the
20 extent that there was a designation of LVI at a particular
21 speed that existed in 2008, that that designation would
22 also have existed in 2003, 2004, 2005?
23    A.  I'm not sure if I understand the question fully.
24 I think the velocity -- how do I answer this best.  I
25 think we would define the same speed of impact as --

Page 52

1     Q.  Right.
2     A.  -- something we would consider as low velocity.
3  So that speed or that force would not have changed that
4  I'm aware of.
5     Q.  Right.  Okay.  In other words, the speed at which
6  you would consider an accident to be LVI in 2008 would be
7  the same as the speed that you would consider an accident
8  to be LVI in 2003; correct?
9     A.  I believe so.
10    Q.  And if you look at paragraph 7 of this, you'll
11 see a statement that says:
12        The Corporation -- "
13 And that, I'll represent to you, is referring to ICBC.
14        -- determined that in the ordinary course of
15        events, a collision which resulted from a
16        deceleration of less than eight kilometers per
17        hour would not cause damage or injury to human
18        tissue."
19 And that's what's referred to as the "low velocity impact
20 program [sic]."  Now, does that refresh your recollection
21 that, at least as of the time of Mr. Hall's accident, that
22 the limit -- the speed limit at which an accident would be
23 considered LVI was 8 kilometers per hour?
24    A.  Yeah.  Well, that's -- I think that's the speed
25 that I had recollected as being the relevant speed.  So I



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
53—56

Page 53

1  agree that that would be the speed that we would use as a
2  threshold of sorts to consider an accident as formally
3  fitting within the low velocity program.  Now, there
4  were -- there could be exceptions based on engineering
5  evidence, but that was the general rule, as I understand
6  it.
7      Q.  Okay.  In other words, if you got over the
8  8 kilometre an hour speed, then at least you're in the --
9  you're outside the LVI range subject to engineering
10  analyses and reports; correct?
11      A.  The formal program, yes.
12      MR. MARK:  I'll show you Exhibit 3.  I'm going to
13  move this sticker up, though.
14      (Exhibit 3 was marked for identification and is
15      attached hereto.)
16  BY MR. MARK:
17      Q.  Do you see this document?
18      A.  Yes.
19      Q.  Have you seen this before?
20      A.  Yeah, I believe so.  Those are part of the --
21      Q.  Can you identify --
22      A.  -- CWMS notes.
23      Q.  I'm sorry, sir?
24      A.  Those are part of our CWMS notes system.
25      Q.  Okay.  Can you -- is this part of what we'll call

Page 54

1  the claim file?
2      A.  Yes.
3      Q.  Now, you'll see that there's some redactions on
4  this page; correct?
5      A.  Sorry.  My counsel's just scrolling.  Yeah, I do
6  see some redactions.
7      Q.  I think it's just a one-page document.  Do you
8  know who made those redactions?
9      A.  Well, it depends what the source of this note
10  was.  Did this come from freedom of information or was
11  this -- do you know the source of this?
12      Q.  Well, the date in the top left corner says
13  May 1st, 2007, so I believe it was in response to an FOI.
14      A.  Right.  So if it was received as part of an FOI
15  request, then our FOI department would have made the
16  redaction.
17      Q.  And do you know what criteria the FOI department
18  uses to determine when to redact a document?
19      A.  Our FOI department basically reviews files in
20  keeping with specific legislation that guides this freedom
21  of information process.  And so as they go through the
22  file they look for any part of that file that should be
23  properly redacted in keeping with that legislation.  So
24  they would have used the relevant legislation.
25      Q.  What would be an example, if you know, of

Page 55

1  something that the FOI department would determine to be
2  redacted?
3      A.  If it was something that was -- I believe, for
4  example, that if it was in the contemplation of litigation
5  at the time or litigation's underway and it had something
6  to do with a liability assessment or opinion, that would
7  be redacted.
8      Q.  Okay.  Anything else that you're aware of?
9      A.  There are many, many criteria that allow for
10  redactions.  I don't have that list memorized or anything
11  like that.
12      Q.  Okay.
13      A.  There are a number of reasons that something
14  might be redacted.  I don't have a complete list of those
15  reasons.
16      Q.  Okay.  Let's -- let's just kind of go through
17  this document, if you will, with me just so I can
18  understand what it is that I'm looking at.
19      A.  Okay.
20      Q.  So first of all, in the top right corner you'll
21  see a stamp that says "00050."  Do you see that?
22      A.  I do.
23      Q.  What is that?
24      A.  That looks to me like something that would have
25  been stamped by the FOI department.  Typically when they

Page 56

1  went through a file they numbered every page, and that
2  looks like the numbering that they would use.  So this was
3  probably page 50 of the FOI package.
4      Q.  Okay.  Now, you'll see a number also in the lower
5  right, "000047."  Do you know what that number is, as
6  opposed to the top right number?
7      A.  Good question.  So I'm going to say that one of
8  those numbers relates to the page.  I believe the top
9  number relates to the page number.  That may relate to --
10  I'm guessing, honestly.
11      MS. CROW:  Don't guess.
12  BY MR. MARK:
13      Q.  Don't need to -- don't worry about it.  Don't
14  guess.  Don't guess.
15      A.  One of those numbers relates to the page; the
16  other one has some other meaning.
17      Q.  Okay.  Now, under the date -- next to the date
18  underneath the exhibit stamp it says "01MAY07."  I
19  understand that to be the date that this was printed; is
20  that correct?
21      A.  Yeah, I believe that's true.
22      Q.  Okay.  And then under that it says "program:
23  CWI306P."  Do you see that?
24      A.  Yeah.
25      Q.  What does that mean?



Page 57

1   A. I don't know what that means, to be honest.

2   Q. Do you know what the reference to "program" means

3   at all?

4   A. No.

5   Q. Okay. "Claim: L3735714." That's the internal

6   claim number?

7   A. That's correct.

8   Q. And am I correct that this is the claim number

9   for Mr. Dove and there's a separate claim number for

10  Mr. Hall?

11  A. Initially there was, yes.

12  Q. Okay. And then you'll see that there is four

13  columns: "DATE," "WORK TYPE," "DESCRIPTION/DETAIL" and

14  "TYPE/EXP." Do you see that?

15  A. Yes.

16  Q. I assume "DATE" is the date of the entry.

17  A. Yes.

18  Q. "WORK TYPE"? What does that mean?

19  A. So what type of note is being entered. So for

20  example "ADMIN" would mean that the -- someone in

21  administration would have made that -- an admin assistant,

22  clerical type, if you will, would have made that entry.

23  Somebody in our initial reporting system.

24  Q. All right. What does "NOTE" mean?

25  A. It's just -- that just says -- it says a note to

Page 58

1   file.

2   Q. And are those typically made by the -- who

3   typically makes -- puts in the note?

4   A. It may be somebody who handled the initial intake

5   and then beyond that various people involved in the

6   handling of the claim.

7   Q. All right. So there's no -- anybody could put a

8   note in?

9   A. That's a good question. I don't know -- there

10  are certain authorities and permissions, if you will. So

11  I don't know that anybody could make a note on the file,

12  but certainly anybody who handled the intake at the

13  outset, anybody who subsequently was involved in the

14  handling of the claim could make a note on the file.

15  Q. Okay. What does "INCURRED" mean?

16  A. Where do you see that?

17  Q. Under "WORK TYPE."

18  A. Oh, this is relating to the exposure. So

19  we're -- it refers to -- every file, if we -- if there's,

20  let's say, a bodily injury claim being presented, we open

21  an exposure to represent that claim and then we set a

22  reserve. And so that "incurred" would mean either that

23  the exposure was incurred, it was set up, or it

24  reflects -- it has something to do with setting up the

25  exposure and/or the reserve.

Page 59

1   Q. Okay. Now, do you put "incurred" also any time

2   that there is an expense that gets paid out pursuant to

3   the claim?

4   A. So just to back up for one sec, if you look to

5   the far right column --

6   Q. Yes.

7   A. -- there's a "22B."

8   Q. Yeah.

9   A. So what that would reflect is that there was an

10  exposure set up to accommodate payment at some point for

11  damages to the third party vehicle.

12  Q. All right. And what does "21B" mean?

13  A. An exposure being set up to accommodate the

14  investigation of a personal injury claim.

15  Q. I see. Okay. So the November 17th, 2003,

16  "INCURRED" entry means we're setting up a reserve to

17  investigate the claim?

18  A. Something was done with respect to either opening

19  the exposure or setting a reserve and it related to the

20  personal injury claim.

21  Q. Gotcha. Now, I -- and I think I asked this

22  question and I don't think I got an answer. Do you also

23  use the term -- the work type "INCURRED" to reflect money

24  spent in connection with the investigation of a claim?

25  A. So "incurred" is a term that comes up in

Page 60

1   reserving practices, but I don't think that it's used in

2   that reference in this case.

3   Q. Okay. Now, you'll see also it says "ESTIMATE."

4   Do you see that a little farther down?

5   A. Yes, do I.

6   Q. And what is -- what does a work type "ESTIMATE"

7   mean?

8   A. Well, it's a note that reflects in some form a

9   comment on the estimate. So I'm just reading it as I'm

10  talking to you. It says the vehicle is drivable.

11     Notes: LVI to front bumper headlight. No ICBC

12     coverage. New damage: to front end. Old

13     damage: nothing noted."

14  So this is a comment on an inspection of the vehicle or a

15  request to view the vehicle. And in this case it looks

16  like there's been a request put in to review the vehicle

17  for an estimate, and the notes are reflecting that --

18  check the front end because it was a low velocity impact

19  type claim or suspected of that and the damage was

20  restricted to the front bumper and headlight.

21  Q. And this obviously just relates to Mr. Dove's

22  car; correct?

23  A. Yes. Correct.

24  Q. Do you know how it was determined -- so am I

25  correct that by November 19th, 2003, which is six days



Page 61

1  after the claim was reported, that ICBC made the
2  determination that this was an LVI?
3     A. I think that all that reflects is that that was
4  under consideration. And I'm not sure I can tell you much
5  more than that, but certainly it was a consideration at
6  that point. And it was sort of alerting whoever was going
7  to be looking at the vehicle that that may be the context.
8     Q. And what was the basis at this time, if you know,
9  of that consideration?
10    A. I don't know.
11    Q. Now, on November 19th, 2003, you'll see there's
12 an entry that says "SEND LVI TO TPA." Do you see that?
13    A. Yes.
14    Q. What does that mean?
15    A. It just -- send the low -- any information you
16 have relating to the LVI consideration to the third party
17 adjuster, so the adjuster handling the cross file, in this
18 case Mr. Hall's claim.
19    Q. So who in this case is the third party adjuster?
20    A. At the time I don't know who it was.
21    Q. Now, is this an individual that works -- that is
22 hired by ICBC or is this --
23    A. It is -- yeah, in this case it would be.
24       MS. CROW: Make sure you let him finish the
25 question.

Page 62

1        THE WITNESS: Oh, sorry. Okay. Sorry. Go
2  ahead.
3        MS. CROW: Etan, what don't you ask the question
4  again, because I don't think you got your whole question
5  out.
6  BY MR. MARK:
7     Q. Was this an individual that was hired by ICBC,
8  the TPA?
9        MS. CROW: Object to form.
10    A. I believe so.
11 BY MR. MARK:
12    Q. Okay. So send -- when it says "SEND LVI TO TPA,"
13 what is -- what does that mean? Like how do you send an
14 LVI? What is actually being sent to the TPA?
15    A. I don't know what documents they had in their
16 possession at this time that were being considered in the
17 context of this LVI consideration. But whatever documents
18 they had, this note implies that they were going to send
19 that information to the other adjuster. So there would be
20 one adjuster for each of the files set up at ICBC
21 initially. And so whoever's handling this file is
22 indicating in some form that they're sending some
23 information to the other adjuster.
24    Q. Now, could this other adjuster be Mr. Hall's
25 adjuster at Allstate?

Page 63

1     A. No, I don't think so.
2     Q. All right. Why?
3     A. Well, TPA is a common acronym, I guess, for our
4  internal file handling. We have -- we always refer to the
5  cross-file adjuster as "the TPA."
6     Q. Okay.
7     A. We would have -- we would have specifically said,
8  in all likelihood, Allstate adjuster.
9     Q. Now, on November 26th, 2003, you'll see another
10 entry that says "RED TAG TO SHELLIE." Do you see that?
11    A. I do, yeah.
12    Q. What does that mean?
13    A. So I'll explain the claim setup process a little
14 bit. When a party, say -- in this case you've got two
15 parties that filed a claim with ICBC. In most instances
16 in BC both are insured with ICBC.
17       In any event, when they call their claim in they
18 are assigned a claim file that has a claim file number and
19 an adjuster. And so ultimately one file will be handled
20 on behalf of the person who was likely at fault; one
21 person will be handling the file on the person who wasn't
22 at fault.
23       At some point in time, if liability is
24 resolved -- or when liability is resolved, it's common
25 practise to transfer the liable file to the person

Page 64

1  handling, if there is such a thing, an injury claim so
2  that they have both files.
3       So in this case whoever was handling Mr. Dove's
4  claim would have transferred it to Shellie Fife, who was
5  likely handling Mr. Hall's claim, because there was
6  mention of an injury claim.
7     Q. I see. And who is Shellie Fife?
8     A. She was a an adjuster at the time.
9     Q. And was she with the SIU or was she with ICBC's
10 normal unit?
11    A. She was a normal, for lack of a better word,
12 claims adjuster.
13    Q. And what is SIU?
14    A. Special investigation unit.
15    Q. And what's their role generally?
16    A. So they're -- and specific to this time frame SIU
17 was actually part of a group called fraud prevention unit.
18 So they had a fairly significant role internally in that
19 they -- any time fraud, for example, was suspected they
20 would become involved in a file. Because at the time SIU
21 officers were actually special provincial officers under
22 the Police Act and they had the ability to recommend
23 changes to Crown counsel, for example, if there was
24 everyday supportive of a fraud charge.
25       But they would also get involved in files for a



Page 65

1 number of other criteria, including if there was a
2 suspected exaggerated wage loss claim, for example.
3     Q. Now, at a certain point in time the SIU got
4 involved with Mr. Hall's file; correct?
5     A. That is correct.
6     Q. Do you know when this matter was referred to the
7 SIU?
8     A. So in talking with the people that were involved
9 in the claim initially, I know that Joanne Nelson said
10 that -- I'll back up for a second and tell you that
11 initially the four people I spoke to didn't recall that
12 file until certain details were used to jog their memory
13 and then they had some memory. And Joanne told me that
14 she had some discussion, in all likelihood, with SIU as an
15 examiner but never referred it formally to SIU. Gerard
16 Wright did in fact involve SIU formally. He inherited the
17 file from Joanne Nelson.
18     Q. What does the "REVIEW" designation under "WORK
19 TYPE" mean?
20     A. Review? Oh, it's -- so when you make a note you
21 designate the note as any one of a number of sort of, I
22 guess, key terms to help you identify what the note is
23 about. So somebody was reviewing the file and decided
24 that they would send this -- some form of information to
25 the third party adjuster. So when they made the note they

Page 66

1 just coded it as a review note.
2     Q. Okay. And on the right column you'll see it says
3 "TYPE/EXP" and it says "CMPL," "A," "NOTE," "A," "NOTE."
4 Do you see that?
5     A. I see "CMPL" and then "A" and then "NOTE," "A,"
6 "CMPL."
7     Q. Right.
8     A. Right.
9     Q. So what does that -- what does that mean?
10     A. So it looks like it's just a reiteration that
11 it's -- there's a note. But where you see complete, that
12 means some task was completed. So, for example, if -- it
13 says "FILE TRANSFERRED TO SHELLIE FIFE," that process was
14 completed in theory. Because they would --
15     Q. So --
16     A. They would --
17     Q. Okay. But I guess how does that populate? In
18 other words, on November 26th, 2003 --
19     A. Right.
20     Q. -- somebody comes in and puts in the work type
21 "TRANSFER" and says okay, I'm going to transfer the file
22 to Shellie Fife; right? And they type in that note.
23     A. Yeah.
24     Q. And then three hours later they transfer the file
25 to Shellie Fife. Do they then go back in and then type in

Page 67

1 "COMPLETE"?
2     A. No. So what happens in the typical course -- for
3 example, I might want my administrative assistant to do
4 some function on the file on complete some function -- so
5 in this case whoever was handling the file may have wanted
6 they administration assistant to transfer the file to
7 Shellie Fife, so they would have completed a task, in all
8 likelihood, asking that the file be transferred. So that
9 note -- or that task would then show up in a folder of
10 tasks that our administrative staff access as functions
11 that they have to complete during the day. So once they
12 completed that task and transferred it formally into
13 Shellie Fife's name they would have noted by way of
14 entry -- I think it was a C -- that the task had been
15 completed, and so it would show up on the system as
16 completed.
17     MR. MARK: Okay. I'm showing you what we'll mark
18 as Exhibit 4.
19     (Exhibit 4 was marked for identification and is
20     attached hereto.)
21     THE WITNESS: Okay.
22 BY MR. MARK:
23     Q. Have you seen this document before?
24     A. I may have in my review. I don't have a specific
25 memory of seeing this document.

Page 68

1     Q. All right. What is a low velocity impact
2 questionnaire?
3     A. It's a questionnaire meant to address questions
4 relating to whether or not this was in fact a low velocity
5 type claim.
6     Q. Okay. And you'll see here that when -- is there
7 a way to tell when this document was completed?
8     A. I'm not sure if at the bottom -- is there a date
9 at the bottom?
10     Q. No.
11     A. Yeah. So unless it's noted in the file -- and I
12 don't have a specific recollection of that -- it's hard to
13 say exactly when it was done.
14     Q. All right. And this is obviously something that
15 would be completed in connection with the low velocity
16 impact program?
17     A. Yes.
18     Q. Now, Mr. Dove appears to have filled this out;
19 correct?
20     A. Pardon me?
21     Q. Mr. Dove appears to have filled this out;
22 correct?
23     A. I don't know if he filled it out. It was either
24 that or somebody was filling it out in response to him
25 answering questions.



Page 69

1    Q.  Oh, I see.  So Mr. -- so this adjuster,
2  S. Humbe -- I don't know what that says -- perhaps
3  interviewed Mr. Dove and then filled this out pursuant to
4  that interview?
5      MS. CROW:  Form.  Go ahead.
6      THE WITNESS:  Yeah.  That's -- it would have been
7  either him completing it himself or them asking him
8  questions and filling it out in accordance with his
9  answers.
10    Q.  Gotcha.  Now, you see at the top there's sort of
11  two holes punched into the top of this document?
12    A.  Yes.
13    Q.  So this leads me to believe that somewhere at
14  ICBC's offices is a file with those two -- that that's
15  maintained that has hard copies of all these documents.
16  Is that -- is that correct?  This looks like a photocopy
17  of a hard copy.
18    A.  Yeah, I think you're right.  And yes, so those
19  are I guess photocopies of the hole punches that would
20  have been used to attach this to the physical file.
21    Q.  All right.  And you can see -- in the top left
22  corner you'll see "claim number," and that's the claim
23  number -- that Mr. Dove's claim number; correct?
24    A.  Yeah.  That -- you know, I go back and forth with
25  the two claim numbers, but it looks like it, yeah.

Page 70

1    Q.  All right.
2    A.  Given it has Donald Dove's name on it.
3    Q.  All right.  And you'll see that in this Mr. Dove
4  indicates that he was driving at 20 miles an hour; is that
5  right?
6      MS. CROW:  Just a second.  We're scrolling down.
7      THE WITNESS:  Yes.
8  BY MR. MARK:
9    Q.  Is that more than 8 kilometers per hour?
10    A.  8 -- 2.2 -- it's pretty close.  16 and -- it's
11  about the same, is it not?  Isn't 8 kilometers 20 miles?
12    Q.  You're converting the wrong way.  20 miles an
13  hour is about 40 kilometers an hour.  Or a little bit less
14  than that.  35 kilometers an hour.
15    A.  My apologies.
16    Q.  That's okay.  So let me ask the question again.
17  Is 20 miles an hour faster than 8 kilometers an hour?
18    A.  Given your clarification, yes.
19    Q.  Okay.  In fact it's more than three times as
20  fast; right?
21      MS. CROW:  Is 40 more than three times eight?  I
22  think that math is off.
23      THE WITNESS:  Yeah, two and a bit.  Two and a
24  half.
25      MR. MARK:  Thank god for Google; right?

Page 71

1      MS. CROW:  I think we can agree it's more.
2      MR. MARK:  I'd rather be precise, if I can.
3      MS. CROW:  Sure.
4  BY MR. MARK:
5    Q.  Okay.  So 20 miles per hour converts to 32 and a
6  little bit kilometers per hour, I'll represent to you.
7  Okay?
8    A.  Yes.
9    Q.  So it's actually approximately four times the
10  threshold for an LVI; correct?
11    A.  If those numbers are accurate.
12    Q.  Okay.  And you'll also see that Mr. Dove seems to
13  indicate that he, on number 9:
14      Braked as hard as I could and had moderate
15      impact."
16  Do you see that?
17    A.  Yes.
18    Q.  And "moderate impact," is that in your mind
19  consistent with an LVI?
20    A.  Not on the face of it, no.
21    Q.  Do you know whether ICBC ever designated this
22  accident as anything other than LVI?
23    A.  I don't think it was ultimately determined to be
24  an LVI impact.  It was considered within that realm early
25  on, but ultimately I don't think it was ever -- it wasn't

Page 72

1  maintained that it was formally part of the LVI program.
2    Q.  So it wasn't part of the formal LVI program, but
3  --
4    A.  At some --
5    Q.  I'm sorry.  Go ahead.
6    A.  At some point it was determined that it wasn't
7  part of the LVI program.  I don't know when that was.
8      MR. MARK:  I'm going to show you a document that
9  we'll mark at Exhibit 5.
10      (Exhibit 5 was marked for identification and is
11      attached hereto.)
12      THE WITNESS:  Okay.
13  BY MR. MARK:
14    Q.  Do you know what this is?
15    A.  Yeah, as it says at the top, "Claim File Report."
16  It's the form that gets completed when the claim is
17  initially called in.
18    Q.  So if you look under "Insured Owner" --
19    A.  Yes.
20    Q.  -- and "Insured Driver" you'll see that it says
21  Donald Dove is deceased.  Am I reading that correctly?
22    A.  Where do you see "deceased"?  Sorry.  I don't --
23  right under his name?
24    Q.  It's okay.  No, it's -- it's at the bottom of the
25  box.



Page 73

1    A. Oh, here at the bottom. Yeah, I see that. I see
2  where it says that.
3    Q. All right. Now, obviously Mr. Dove was not
4  deceased at the time of this claim -- at the time of the
5  accident; right?
6    A. That's right.
7    Q. So I'm trying to figure out -- so -- and you had
8  indicated this claim file report was done at the time of
9  the accident --
10    A. That's --
11    Q. -- or when the claim is -- or at least when the
12  claim is first submitted.
13    A. That's typically what --
14    Q. Can you -- okay. So would you know then why this
15  claim file report suggests that Mr. Dove is deceased?
16    A. I don't. I'm trying to read -- it says -- to the
17  left of "deceased" it says "DL," which is driver's
18  license, and then something -- "status"?
19    Q. I think that's right.
20    A. Yeah. I can't explain why it says "deceased" if
21  it was created at the time the claim was called in, which
22  is normally when this form -- particular form is produced.
23    Q. Okay. And you'll see here that Ms. Humber, who
24  is the adjuster, writes "is in LVI" under "Description"
25  under the "Accident Details." Do you see that?

Page 74

1    A. Yes, I see that.
2    Q. And then under "Resource Action" it says
3  "possible LVI." Do you see that?
4    A. Sorry. I'm trying to find that. Is that lower
5  down?
6    MS. CROW: Yeah.
7    THE WITNESS: Oh, "Resource Action." Okay.
8  Yeah, I see "possible LVI."
9  BY MR. MARK:
10    Q. And then it says "SET UP CA APPOINTMENT FOR
11  POSSIBLE LVI WORK UP IF REQ=ASSUMING TP HAD AMERICAN
12  PLATES, INS NOT SURE. BUT INS WITH ALLSTATE." Do you see
13  that?
14    A. I do see that.
15    Q. Okay. What does it mean when Ms. Humber says
16  "SET UP CA APPOINTMENT FOR POSSIBLE LVI WORK UP IF REQ,"
17  et cetera?
18    A. So my interpretation of that is set up CA
19  appointment -- and "CA" is a designation for a type of
20  adjuster. So, for example, we had a claims adjuster that
21  typically handled claims for property damage with very
22  few -- or very little exposure to any personal injury
23  claims, whereas somebody who handled personal injury
24  claims referred to as a BI adjuster or BI. So to me this
25  says set up a CA appointment for possible LVI workup,

Page 75

1  meaning they want to assign this file to somebody to look
2  at the potential for this to fit into the LVI program.
3  And then it says assuming TP had American plates, so our
4  insured wasn't sure who insured the other vehicle. It
5  says insured not sure -- oh, I see. So third party had
6  American plates, insured not sure. I take it that means
7  that they weren't sure if the plates were American, but it
8  does confirm that the insurance is with Allstate.
9    Q. I see.
10    A. That makes sense.
11    Q. But why does it say "POSSIBLE LVI WORK UP
12  REQ=ASSUMING TP HAD AMERICAN PLATES"?
13    A. It may be that as part of the LVI process they
14  want to look at both vehicles and we may not have access
15  to the other vehicle if it's American plated because we
16  don't insure that vehicle. So we wouldn't necessarily
17  have access to that vehicle.
18    Q. What is "IF REQ"? What does that designation
19  mean?
20    A. I'm guessing. I can --
21    MS. CROW: Don't guess.
22  BY MR. MARK:
23    Q. Well, you've filled out -- have you ever filled
24  out these forms before?
25    A. This particular cover sheet? No.

Page 76

1    Q. Not this actual form, but have you ever filled
2  out a claim file report before?
3    A. No, this page is something that gets produced by
4  our -- the people that handle the intake of claims. So
5  they could be an administrative person. I have never done
6  one.
7    Q. All right. Do you have an understanding as to
8  what "IF REQ" means?
9    A. Again, I'd be guessing.
10    Q. Okay. Well, don't guess.
11    A. I've given you the general context.
12    Q. Right. Okay. Were -- did you assist in any way
13  in the production of documents responsive to any requests
14  in this case?
15    A. Well -- sorry. I'm just -- we're changing the
16  screens here. I asked one of our clerical assistants to
17  make a copy of the entire paper file and send it to
18  counsel and -- in fact two copies. So I --
19    Q. Anything else?
20    A. -- was involved in that sense.
21    Q. Did you do anything else?
22    A. Nothing that stands out, no.
23    Q. Okay. What is the purpose of a claims file?
24    A. To document anything of significance that happens
25  in the claim, I suppose is the best way to put it.



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
77—80

Page 77

1    Q.  Is it important that it be accurate?
2    A.  Yeah.
3    Q.  Sorry.  Thanks.  Is it important that it be
4  comprehensive?
5    A.  It should be as comprehensive as possible.
6    Q.  And what kind of information is typically
7  maintained in a claims file?
8    MS. CROW:  Sorry, counsel.  Can I -- where are we
9  going with jurisdiction on this?
10   MR. MARK:  Well, I mean this is foundational
11  stuff.  I -- I mean I'm going to be showing him the -- the
12  actual claims file itself.  You'll note -- you know, of
13  course, that one of the topics that we've agreed to as --
14  for the witness to testify about is ICBC's maintenance of
15  the claims file.  So I think this is just kind of
16  foundational.
17   MS. CROW:  I think it probably depends on how far
18  we're going.  I guess if you're just keeping -- a few
19  foundation questions ...
20   MR. MARK:  I'm just asking what kind of
21  information is typically maintained in the claims file.
22  Are you objecting to the question?
23   MS. CROW:  This one's okay.  I may object if we
24  go a lot more into claim file generalities.
25   MR. MARK:  Okay.

Page 78

1    MS. PERRY:  If you could keep the foundational
2  questions to a minimum.  You want to establish that proper
3  claims file keeping is important, and you can do that in a
4  couple questions; right?
5  BY MR. MARK:
6    Q.  Okay.  What kind of information is typically
7  maintained in a claims file?
8    A.  Anything that has developed that relates to the
9  investigation of the claim with respect to coverage,
10  liability, any personal injuries, anything that is an
11  issue on that particular claim file.  Anything that we
12  produce or collect in the investigation of that would be
13  in the claim file in one form or another.
14   Q.  Okay.  Incurred expenses?
15   A.  That's part of the reserving ...
16   Q.  So yes?  It's maintained in the --
17   A.  There's information on incurred expenses within
18  the claim file, yes.
19   Q.  SIU's involvement?
20   A.  There would probably -- there would be notes of
21  their involvement, yes.  And there may be a report from
22  SIU.
23   Q.  And what about the activities taken by third
24  party -- or an independent investigator such as
25  Mr. Carter?

Page 79

1    A.  It would definitely reflect the fact that there
2  was one involved, if there was.  And the reports produced
3  from that investigation would be part of the file.
4    Q.  Now, Mr. Carter was hired by ICBC to investigate
5  Mr. Hall; correct?
6    A.  Investigate the claim.
7    Q.  Correct.  To investigate the claim.  And he
8  submitted -- and he submitted reports occasionally to ICBC
9  concerning the status of that investigation; correct?
10   A.  That's correct.
11   Q.  And did he report on a sort of semi-regular
12  basis?  Did he report on a monthly basis?  How often did
13  Mr. Carter report back to ICBC concerning his
14  investigation of Mr. Hall?
15   A.  I don't know what his criteria was, but typically
16  it's whenever there's enough additional substance that it
17  warrants producing another report, or in many cases if
18  there's a certain passage of time they might provide us
19  with an updated report.  I don't know that there's any
20  hard and fast rule.
21   Q.  Did Mr. Carter submit invoices to ICBC to be
22  paid?
23   A.  Yes.
24   Q.  And to whom were those invoices submitted?
25   A.  They would go to the claims handler at the time.

Page 80

1    Q.  And would those be maintained in the claims file?
2    A.  Yes.
3    Q.  Have you ever seen any of Mr. Carter's invoices?
4    A.  I believe I've seen them all.
5    Q.  Okay.  And are they generalized or are they
6  specific?  In other words, do they contain -- are they
7  descriptive?
8    A.  Some are more descriptive than others.
9    Q.  In other words, Mr. Carter says this is the work
10  that I did, this is the amount that it's going to cost
11  you, and then there's an invoice; right?
12   A.  Yeah.  And, for example, if there had been a
13  number of inquiries, it may detail the individual time
14  spent on each inquiry.  If it was on a day -- day-to-day
15  basis, for example -- like for example on Monday, whatever
16  the date of the month was, this is what I did, how much
17  time spent, this is the charge.  And it would have
18  line-by-line items like that on occasion and then sum that
19  total so that we had an invoice total.  And there would
20  be --
21   Q.  What was the --  sorry.
22   A.  It's okay.  Go ahead.
23   Q.  No.  No.  Please.  And then there would be
24  issues ...?
25   A.  No, I said and then there would be ultimately an



Page 81

1  invoice total at the bottom.
2     Q.  I see.  When was the last time you saw
3  Mr. Carter's invoices in connection with the Hall file?
4        MS. CROW:  Clarifying, last time he read them or
5  last time Carter invoiced?
6        MR. MARK:  Last time he saw them was the
7  question.
8        THE WITNESS:  This week.
9  BY MR. MARK:
10    Q.  Okay.  And were those in -- part of the two --
11 you earlier testified about the two kind of batches of
12 documents that counsel provided you.  That was in one of
13 the batches?
14    A.  No.  I think that was something that I looked at
15 in addition when I was reviewing the reports of Ken
16 Carter.
17    Q.  So you separately had access to the invoices that
18 were -- that was separate from the documents that counsel
19 provided you?
20    A.  I requested them, and so I was -- I was provided
21 with the documents, yes.
22    Q.  Okay.  And who did you request them from?
23    A.  From somebody that -- I'll just back up for a
24 second.  I'm working from home, so I didn't have access
25 this past week to the actual physical paper file.  So I

Page 82

1  asked that somebody review the files, scan them and send
2  them to me so that I could review them in conjunction with
3  reviewing the reports.
4        MS. PERRY:  He's asking you who you asked when
5  you were working from home.
6        THE WITNESS:  Right.  So I sent an email to -- I
7  believe it was to my manager, who then made a series of
8  inquiries, and ultimately I believe it was her that
9  actually found them, scanned them and sent them to me.
10 BY MR. MARK:
11    Q.  Did you ever provide those to your counsel?
12    A.  Yes, just in the last day or so.
13    Q.  And they are part --
14    A.  And --
15    Q.  Go ahead.
16    A.  When I received them I forwarded them.
17    Q.  And they are part of the claims file; correct?
18    A.  Yes.
19        MR. MARK:  Counsel, I -- those have not been
20 produced to us.
21        MS. CROW:  Are those not in the claim file that
22 you were produced?
23        MR. MARK:  They are not.
24        MS. CROW:  Okay.  It was my understanding they
25 were in the claim file.  I will track that down and we

Page 83

1  will promptly get those over -- well, I will say I will
2  get them to you, I would say, on our next break.  My
3  apologies.  My understanding is they were in the paper
4  claim file.
5  BY MR. MARK:
6     Q.  Okay.  Was there something specific,
7  Mr. Di Cesare, that you were looking for in those invoices
8  or was it just to sort of refresh your memory as to what
9  it was that Mr. Carter did generally?
10    A.  No.  I mean, the first reason I looked on a --
11 first I looked on our system to see how much we had paid
12 them, because I understood that there were allegations
13 that we were paying Ken Carter large sums of money to
14 conduct the investigation.  And I learned that we had
15 ultimately paid him in total less than $15,000.
16        I also looked at them because there were
17 allegations that Ken Carter may have entered the US to
18 conduct his investigation, so I looked at the invoice to
19 see if there was any indication, because there wasn't
20 anywhere else.  And there was nothing in the invoices that
21 indicated he made any trips into the US.
22    Q.  How much -- since you brought up the amount of
23 money that he's been paid, how much money has ICBC paid
24 Action Pacific over the past, let's say, ten years?
25        MS. CROW:  Objection.  That's outside the scope

Page 84

1  as that doesn't relate to Mr. Hall's claim, unless you're
2  confining it to just Mr. Hall's claim.
3        MR. MARK:  Well, he's already testified that
4  it -- sort of gratuitously that they paid Mr. Carter
5  $15,000 or so with respect to Mr. Hall's claim.  And I
6  think one of the -- obviously the allegations in the
7  complaint here is that Mr. Carter's been paid very
8  handsomely over the years by ICBC in conjunction with many
9  investigations.  So I'm just -- would like to get
10 confirmation from the witness as to his understanding of
11 the amount of money that Mr. Carter's been paid over the
12 past several years.
13        MS. CROW:  And I would object to that as being
14 outside the scope relevant to jurisdiction because the
15 exception of -- the commercial activity exception would
16 apply with respect to this particular claim.  It doesn't
17 relate to ICBC's work on other claims that may or may not
18 involve only Canadian citizens.  So that would be outside
19 the scope of the potential jurisdictional exception on
20 this claim.  I think he's welcome to testify --
21        MS. PERRY:  Let me -- let me ask you a question.
22        MS. CROW:  Okay.
23        MS. PERRY:  I think what counsel's trying to
24 establish is this gentleman's alliance to ICBC.  If
25 there's been a large amount of money paid to him over the



JAMES DI CESARE                                          March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                    85–88

Page 85

1  years -- obviously a "large amount of money" is -- can be
2  subjective.  We don't know how many investigations there
3  are and all of that.  But from a strict jurisdictional
4  perspective, why wouldn't his potential
5  alliance/allegiance go to the jurisdictional question if
6  it might cause him to engage in certain conduct as a
7  result of that alliance?  That's really my -- alleged
8  alliance.  That's my question.
9        MS. CROW:  Because the jurisdiction exception
10  relates to actions only with respect to this particular
11  claim.  To prove the jurisdictional exception you have to
12  prove sufficient activity in the US for this specific
13  claim, not activity in the US for some other claim.  For
14  example, Mr. Carter could have investigated, before this,
15  only claims involving only Canadian citizens that would
16  have nothing to do with things that would give
17  jurisdiction in the US.  I understand why he wants the
18  question asked, but it doesn't relate to jurisdiction
19  because the jurisdiction --
20        MS. PERRY:  It goes to -- it goes to -- and I'm
21  thinking this through.  It goes -- it goes to motive.  It
22  would go to Mr. Carter's motive to do something allegedly
23  improper in this case.  So --
24        MS. CROW:  I think --
25        MS. PERRY:  -- tell me why that's outside of the

Page 86

1  exception.
2        MS. CROW:  Well, I mean, it doesn't relate --
3  well, asking a question about their -- you could ask
4  another question about motive.  If -- I don't think that's
5  related to jurisdiction.  But if we're going to operate
6  under the assumption that his motive would be relevant, I
7  think it would be fair to say has Mr. Carter worked with
8  ICBC before, had he worked there for a number of years,
9  and keep those questions general.  I think the specific
10  financial amounts paid to Mr. Carter for claims goes well
11  beyond what could be considered --
12        MS. PERRY:  Why don't you -- why don't -- why
13  don't we try -- why don't we try that.  If you're ever
14  deposing Mr. Carter you can talk to him about, you know,
15  what percentage of his business is ICBC and all of that.
16  But why don't we try and do what Ms. Crow --
17        MR. MARK:  Sure.  And I will point out again -- I
18  mean, typically I don't like to ask people how much they
19  get paid -- this is public record.  I mean, ICBC actually
20  provides public reports as to how much it pays each of its
21  investigators, so there's not -- there's no sort of
22  confidentiality or privacy concerns.  And I understand
23  Ms. Crow's objection, although I tend to agree that his
24  motivations obviously to act in a way that might be, you
25  know, a little bit on the margins, to say the least, could

Page 87

1  very well be triggered by his desire to impress his most
2  important client.
3  BY MR. MARK:
4        Q.  Do you know, Mr. Di Cesare, whether Mr. Carter
5  does a lot of work for ICBC today?  Let's start with
6  today.
7        A.  I don't know how much work he does for us today.
8  He does still do work for us, I believe, but I don't know
9  how much.
10        Q.  Okay.  And do you know whether he did a lot of
11  work for ICBC in the 2003/2004/2005 time frame?
12        MS. CROW:  Object to form.  Go ahead and answer.
13        THE WITNESS:  I don't know how much, but he
14  definitely did work for us in and around that time frame
15  and was somebody in particular that was retained in
16  relation to claims that were on the island, Vancouver
17  Island.
18  BY MR. MARK:
19        Q.  I see.  Did you -- what was he -- was he paid
20  hourly or was he maintained -- or was he on a retainer?
21        A.  No, he's hourly.
22        MR. MARK:  Okay.  And I just received the
23  invoices, Ms. Crow.
24        MS. CROW:  Yes.  My apologies.  I thought they
25  were in the claims file.  And, counsel, we've been going

Page 88

1  about an hour with him.  If you want to take a five-minute
2  break right now, it's probably not a bad time.  That might
3  give you a minute to look at the invoices, if you want to
4  ask questions about them.
5        MR. MARK:  Okay.
6        MS. PERRY:  All right.  Why don't we come back at
7  2:15.  It's 2:08.  Does that work?
8        MR. MARK:  Sure.
9        MS. PERRY:  All right.  2:15.  Thank you.
10        (PROCEEDINGS RECESSED AT 11:08 A.M. PACIFIC TIME)
11        (PROCEEDINGS RECONVENED AT 11:16 A.M. PACIFIC
12        TIME)
13        MR. MARK:  All right.  Mr. Di Cesare, I'm going
14  to show you what we'll mark as Exhibit 6.
15        THE WITNESS:  Okay.
16        (Exhibit 6 was marked for identification and is
17        attached hereto.)
18  BY MR. MARK:
19        Q.  This is a document that ICBC produced to us a
20  couple weeks ago.  Do you know what that is?
21        A.  This looks like another page from our CWMS note
22  taking system.
23        Q.  All right.  What does it mean -- at the top
24  you'll see it says "Claim File Folder" and then it says
25  "(with conf notes)."



JAMES DI CESARE                                      March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                89–92

Page 89

1    A. Oh, confidential notes.
2    Q. Oh, I see. So what does that mean, "confidential
3 notes"?
4    A. As part of our note taking system, we have the
5 capacity to identify certain notes as confidential, and
6 when you do that, then only certain people will have
7 access to that note.
8    Q. I see. Now, you'll also notice, though, that
9 there are redactions -- if you go to, for example -- so at
10 the top of your screen you'll see that it says -- there's
11 a little box and you can type in the page number. It
12 says -- there's a blank and it says "/31."
13    A. Oh, yes.
14    Q. So if you go to page 24 of 31 you'll see some
15 redactions.
16    A. 20 ...?
17    MS. CROW: 24.
18    THE WITNESS: 24?
19 BY MR. MARK:
20    Q. Yeah, 24, 25, 26.
21    A. Okay.
22    Q. Do you know who made those redactions?
23    MS. CROW: Counsel, that's mine.
24    MR. MARK: Oh, you made those redactions?
25    MS. CROW: Yeah. As you and I discussed

Page 90

1 previously, things that were, you know, discussions with
2 ICBC and its counsel were redacted. Those -- that's my
3 office. So here's -- I know we looked at a couple sets of
4 redactions, so the redactions that you looked at earlier
5 that had that grey-ish box, this FOI. This like hard
6 black, that's my office.
7    MR. MARK: Okay. So you -- so you had -- so just
8 so I understand, counsel, you're telling me that in
9 January of 2006 in when were involved in this case?
10    MS. CROW: No -- well, at that time ICBC had
11 defense counsel involved in the case, and so
12 communications between ICBC's defense counsel and it were
13 privileged. And keep in mind when we did this your client
14 still had the BC action pending where ICBC had that
15 defense counsel retained.
16    MR. MARK: Look, I don't want to get too far
17 afield here. As you know, Ms. Crow, you took the position
18 in the BC proceedings that one of the reasons that the BC
19 case should be -- that you were seeking an order from the
20 judge in the BC case to prohibit the production of
21 documents in Florida because they contained privileged
22 communications between ICBC and its counsel, and then you
23 produced documents after that case was dismissed with the
24 redactions. So I'm not sure how both of those things can
25 be true.

Page 91

1 I'm not going to fuss about it with you now
2 because I've still got a few hours of questioning and it's
3 Friday, but I am going to -- to tell you that I intend to
4 request the unredacted copies of these documents.
5    MS. CROW: Fine --
6    MR. MARK: It's just --
7    MS. CROW: Counsel, I also note -- I don't object
8 to that. Keep in mind I think we've produced about 3,000
9 pages, so I probably did not catch every single one that I
10 had redacted -- that I'd redacted when the BC action was
11 pending. I think it was like 20 -- I think it
12 concluded -- what? A day before 3,000 pages were
13 produced. So I probably did not catch every single thing
14 that had been redacted. I have no issue with giving you
15 unredacted copies now that that BC action is concluded.
16    MR. MARK: Okay. All right.
17    MS. CROW: I will tell you none of those -- or
18 certainly I don't think any of those redactions refer to
19 Carter or discussions with Allstate and the like, which is
20 why I don't have any -- any issue.
21    MR. MARK: Okay. Well, I hope that even if it
22 did discuss those things you wouldn't have any issue.
23 But --
24    MS. CROW: Well, no --
25    MR. MARK: -- I take your -- I take your point.

Page 92

1 Okay.
2 BY MR. MARK:
3    Q. So, Mr. Di Cesare, this Exhibit 6, then, you'll
4 see the date printed is January 4th, 2021. Do you see
5 that?
6    A. Yes.
7    Q. Do you know why this document was printed -- did
8 you participate in the collection of this document at all?
9    A. Well, as I referenced earlier, I was the one who
10 asked our clerical staff to make a complete copy of the
11 file for counsel. And in fact two copies were made, and
12 this is probably the date that that was done, I'm
13 guessing. Well --
14    Q. Okay.
15    A. -- it was around that date. So it's not really a
16 guess. I just don't know if it was exactly that date. It
17 must have been because that's the date on the document.
18    Q. All right. Now, this is not -- if you go to the
19 first page of this document you'll see that there is an
20 entry on November 3rd, 2011, that says "INSURED HAS
21 ALREADY CONTACTED ALLSTATE, THEY'VE ADVISED TO CLAIM
22 THROUGH ICBC."
23    MS. CROW: Just a second. He's looking for it.
24    MR. MARK: Sure.
25    MS. CROW: It's up a little bit. Right there.



Page 93

1  THE WITNESS:  The insured has already contacted
2  Allstate?
3  BY MR. MARK:
4     Q.  Now, I assume that it's fairly normal for ICBC to
5  be communicating with the other party's insured when
6  there's a motor vehicle accident in British Columbia;
7  correct?
8     A.  Yes.
9     Q.  And is it ICBC's practise to maintain all records
10 of those communications?
11    A.  I would say that a good file handling practise is
12 to make sure that anything significant is documented in
13 the file.
14    Q.  And to the extent that there was phone calls with
15 Allstate, would you expect those phone calls to be
16 referenced in the file as well?
17    A.  If there was anything of significance.
18    Q.  And what about if there was voicemails that are
19 left by Allstate?  Would you expect those to be preserved
20 in a claims file?
21    A.  I don't know that the actual voicemail would
22 always be preserved.  There might be a note to file
23 reflecting what the voicemail was about, if it was
24 significant.
25    Q.  Now, this -- this particular document, Exhibit 6,

Page 94

1  you'll see claim L3734575.  Do you see that?
2     A.  I'm just going to scroll to the top.  475 point
3  6 -- or dash 6?  Yeah.
4     Q.  Do you know if that's Mr. Dove's number or
5  Mr. Hall's?
6     A.  You know, I haven't memorized the two claims
7  numbers.  It's one or the other.
8     MR. MARK:  Okay.  And I'm going to mark
9  Exhibit 7, the production of the file with respect to
10 Mr. -- with respect to the other claimant.
11    (Exhibit 7 was marked for identification and is
12       attached hereto.)
13 BY MR. MARK:
14    Q.  Do you see that document?
15    A.  I do.
16    Q.  All right.  So here you'll see another claim -- a
17 different claim number; correct?
18    A.  That's right.
19    Q.  And you'll see some statements in here that show,
20 for example, "INCURRED."  Look at February 6th, 2004.  Do
21 you see that entry?
22    A.  February 6th?
23    Q.  Yes, sir.
24    A.  Then that's the first page?
25    Q.  Yes, sir.

Page 95

1     A.  Let me just go down.  Yes.
2     Q.  So it'll say "INCURRED," "RICHARD HALL," "REASON:
3  INVESTIGATION/INTERVIEWS."  Do you see that?
4     A.  I do.
5     Q.  Okay.  Now, you remember when we earlier were
6  talking about what does "incurred" mean, and you said
7  well, that's typically when there's a reserve.  Does this
8  refresh your memory that one of the reasons why something
9  may be incurred is to the extent there's payment made to
10 an investigator?
11    A.  Yeah.  I think -- I believe I said that there was
12 more than one reason.  I said "incurred" is a term used in
13 reserving, but in this particular case it looks like there
14 was an expense incurred and paid.
15    Q.  Okay.  And presumably -- what is the relationship
16 between the date that an entry comes on the file with
17 respect to incurred as it -- as it pertains to
18 investigators and the investigator's invoice?
19    So in other words, Mr. Carter will invoice you
20 every three months and -- I'm just picking a random
21 number; I'm not suggesting it was only every three
22 months -- and he would itemize the things that he did and
23 the dates that he did those things.  Does -- is the
24 practise then for the ICBC adjuster to go into the file
25 the date that they receive the invoice or near the date

Page 96

1  that they receive the invoice and put in the total amount
2  of the invoice and say "INCURRED" or --
3     A.  No.
4     Q.  Okay.
5     A.  Sorry.  I didn't let you finish your question.
6     Q.  No.  No, if the answer's no, then I'll shut up
7  and you can just explain to me why -- what I got wrong.
8     A.  So in a typical course under this system we would
9  get paper invoices delivered to us through the mail.
10    Q.  Okay.
11    A.  As the file handler you would receive that.  It
12 wouldn't necessarily reconcile with the date of the
13 invoice.  You'd get it, you know, in the course of
14 delivery through the mail or what have you.  You would
15 review it, and if you were okay with the invoice and the
16 amount of the invoice, typically you would initial it, put
17 your resource number on it and what have you and then
18 submit it to our clerical department for payment.  They
19 would actually make the payment and note the file, in this
20 context, "INCURRED."
21    Q.  All right.  So in this case you'll see where it
22 says "INCURRED" and then it says "CL288."
23    A.  Right.
24    Q.  What does that -- what does that mean?  What is
25 that?



Page 97

1    A. The CL288 is -- relates to a check.  So a check's
2  been produced.
3    Q. Okay.  And then it says "03 1275 RICHARD HALL."
4  What does that mean?
5    A. You've got -- I'm trying to -- I'm racking my
6  brain to see if I can come up with -- I don't know, to be
7  honest with you.  The "03" might be the location where the
8  file was, but I am -- I am guessing.
9    Q. Okay.  And then is says the amount.  And then it
10  says "LE:9."  What does "LE" mean?
11    A. So "LE" stands for loss expense.  And so it's a
12  coding that tells you what type of an expense is being
13  paid.
14    Q. Are you aware of whether there was any other
15  investigators that were used in connection with Mr. Hall's
16  investigation besides Mr. Carter?
17    MS. CROW: Object to form.  Go ahead.
18    THE WITNESS: Yes, there were others.
19  BY MR. MARK:
20    Q. Who?
21    A. I believe Canpro and Cox & Côté's, from my review
22  of the file, the two names that I recall being involved,
23  both for purposes of surveillance.
24    Q. The second one was who?  Cox & Côté's?
25    A. I believe that's the name.  Cox & Côté's, yeah.

Page 98

1  "Co-tay's" it's pronounced, I believe.
2    Q. Is that the one who did the surveillance in
3  Ireland?
4    A. No, Cox & Côté's oversaw the surveillance.  They
5  didn't conduct it.  They had the contact in Ireland.
6    Q. And what did the other -- what was the other
7  investigator's name?
8    A. I believe it was Canpro.
9    Q. And what did they do?
10    A. Some local surveillance.
11    MR. MARK: All right.  I'll show you what we'll
12  mark as Exhibit 8.
13    THE WITNESS: Okay.
14    (Exhibit 8 was marked for identification and is
15    attached hereto.)
16  BY MR. MARK:
17    Q. Have you seen this letter before?
18    A. To be honest, I don't recall seeing this one in
19  my review.
20    Q. Now, you do know who Joanne Nelson is?
21    A. Yes.  She was one of the individuals I spoke to.
22  She was an examiner at the time.
23    Q. And she's communicating with Allstate in the US;
24  correct?
25    A. Yeah.  Looks like she's sending a fax.

Page 99

1    Q. And the first sentence says:
2      Further to several conversations with Shellie
3      Fife and your offices ... "
4  Right?
5    A. Yes.
6    Q. Okay.  Did you ask Ms. Nelson when you spoke with
7  her how much -- how many times she communicated with
8  Allstate?
9    A. No, I did not.
10    Q. Did you have any discussions with Ms. Nelson at
11  all concerning what she spoke to Allstate about?
12    A. No, I didn't.  I don't believe I did.
13    Q. Okay.  Now, if you look at page 2 of this letter
14  you'll see a -- you'll see that Ms. Nelson writes that --
15  to Allstate:
16      ... we would ask that both your company and ours
17      remain on the same page regarding this issue."
18  Referring to duplication of payments for medical expenses.
19  Do you see that?
20    A. No.  Where are you looking?  Sorry.
21    Q. It's the first paragraph of the second page.
22    A. Yeah, and ...
23    Q. You can read it.
24    A. "We can confirm" ... Okay.  I've read the
25  paragraph.

Page 100

1    Q. Do you know -- do you know why Ms. Nelson is
2  suggesting to Allstate that Mr. Hall is going to be
3  seeking reimbursement of the same medical expenses from
4  both Allstate and ICBC?
5    A. Yeah.  I would say that this -- he was insured by
6  Allstate, so very properly they were the ones that should
7  have been providing him with medical and rehab benefits,
8  but he was asking us to pay for them.  And so there was
9  the very real chance that one or both would inadvertently
10  pay for the same invoices.  I think the -- the letter's in
11  that context look, we don't insure him for medical and
12  rehab benefits, but he's come to us asking us to do that.
13  You're responsible for the benefits, so we need to keep
14  track of what exactly's being claimed.  Because ultimately
15  Mr. Hall actually sued both of us for medical and rehab
16  benefits.
17    Q. Okay.  And then you see in the next sentence --
18  in the next paragraph the first sentence says:
19      Our investigation indicates this is a minor
20      accident and damages were minimal."
21  Do you see that?
22    A. I do.
23    Q. Okay.  And the date of this fax is December 1st,
24  2003, which is about three weeks after the accident; is
25  that right?



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
101–104

Page 101

1   A. I don't see the date because I'm on page 2, but
2   if you say that, you're right. It was a couple weeks
3   after the accident.
4       Q. All right. Do you know what investigation
5   Ms. Nelson's referring to to come to the determination
6   that this was a minor accident with minimal damages?
7       A. Well, I don't recall exactly what had been done
8   at this point, but there had been some investigation,
9   obviously, into the type of accident it had been.
10      Q. But you don't know what that was?
11      A. I don't remember the timing of every component of
12  the investigation, so I don't know what had been done by
13  this point and what hadn't. But, for example, at some
14  point we talked to Mr. Dove and he explained that there
15  wasn't a lot of damage to the front of his vehicle, that
16  Mr. Hall got out of his vehicle and walked around, didn't
17  appear to be injured, that the lady in the frontmost
18  vehicle got out of her car, and there was no damage to her
19  car, so she didn't want to be involved and drove off. I
20  don't know when that happened in relation to this letter.
21      Q. Now, Ms. Nelson doesn't say here that this was a
22  low velocity impact accident, does she?
23      A. I don't see that.
24      Q. Okay. And that's consistent with your testimony
25  earlier that neither you nor anyone at ICBC ever actually

Page 102

1   concluded that this was a low velocity impact accident;
2   correct?
3       A. Yeah. I don't know if that was her mindset. But
4   like I said, at some point this was being considered as a
5   low velocity impact claim; at some point that ended.
6       Q. But you don't know when?
7       A. I don't know the date, to be honest.
8       Q. But you would agree with me that it was never
9   formally determined to be a low velocity impact --
10      A. I agree with you.
11      Q. -- accident; correct?
12          And to the extent that it was actually found to
13  not be an LVI, that's not something that would have
14  occurred -- that's something that would have occurred
15  when? Like, what year? 2006? '07? '08?
16      A. No, I would -- I'm guessing, but --
17      MS. CROW: Don't guess.
18      THE WITNESS: Okay.
19      MS. CROW: Don't guess.
20  BY MR. MARK:
21      Q. All right. Well, you don't -- let me ask you
22  this way. You don't know, then, when this was determined
23  not to be an LVI; correct?
24      A. I don't know the specific date, no.
25      MR. MARK: Give me one second here. All right.

Page 103

1   I will mark this as Exhibit 9.
2       THE WITNESS: Okay.
3       (Exhibit 9 was marked for identification and is
4       attached hereto.)
5   BY MR. MARK:
6       Q. You've seen this document before; right?
7       A. Yes.
8       Q. This is an affidavit you signed about four years
9   ago?
10      A. Yes.
11      Q. So when you state in paragraph 4 that:
12          The accident involved a low velocity impact."
13  That's not a true statement, is it?
14      A. I think it was a true statement in the sense that
15  it was not a high velocity impact, in my opinion.
16      Q. But it doesn't -- it wasn't characterized by ICBC
17  as a low velocity impact, was it?
18      MS. CROW: Object to form. Go ahead and answer.
19  And get to the -- why don't you go to the page that has
20  the paragraph he's asking about.
21      MR. MARK: Paragraph 4.
22      MS. CROW: It's on the next page.
23      THE WITNESS: Oh. We're not getting anything on
24  page -- is page 2 blank?
25      MS. PERRY: It takes a minute to load. It's

Page 104

1   weird. Just give it a minute. Go to 1 and then scroll up
2   and give it a minute.
3   BY MR. MARK:
4       Q. I think actually if you go down -- I think it's
5   actually page 3 of 7, is what has paragraph 4 on it.
6       MS. CROW: Got it.
7       MS. PERRY: I think it was -- yeah.
8       MS. CROW: Okay. Sorry. Go ahead and ask the
9   question again.
10      MR. MARK: Can you read back the question,
11  please, Lisa?
12      (REPORTER READ BACK)
13      MR. MARK: You can answer.
14      MS. CROW: Objection. Go ahead and answer.
15      THE WITNESS: Yeah, I did in that it was still
16  part of our low velocity impact program. I just said that
17  the impact was of low velocity.
18  BY MR. MARK:
19      Q. And you consider in your opinion that 20 miles an
20  hour is a low velocity impact?
21      A. I consider the whole of the information obtained
22  to reflect an impact that was of relatively low velocity,
23  particularly in the context of the claims being made.
24      Q. Well, when you said that the accident involved a
25  low velocity impact you were referring to -- you were not



Page 105

1 referring to the low velocity impact program; correct?

2    A. I was not saying that it was part of that program

3 formally, yes.

4    Q. Okay. So you were referring to the actual speed

5 of the car; right?

6    MS. CROW: Object to form. Go ahead and answer.

7    THE WITNESS: Yeah, the relative speed of the car

8 was low, the relative impact. The velocity of impact was

9 low.

10 BY MR. MARK:

11    Q. Okay. So it's your testimony, then, that when a

12 car is moving at 20 miles an hour and it hits a stationary

13 vehicle, that that is considered a low velocity impact?

14    MS. CROW: Object. How does this relate to

15 jurisdiction?

16    MR. MARK: Well, again -- you know, I'd like to

17 get an I answer to the question before I argue with you

18 about this.

19    MS. PERRY: Hold on. Hold on. It's --

20    MS. CROW: We need a decision from the special

21 master before he answers. I understand --

22    MS. PERRY: What is -- what is the jurisdictional

23 nexus of this question?

24    MR. MARK: A component of our FSIA claims, and

25 one of the exceptions that we've alleged is based on

Page 106

1 ICBC's communications and characterization of this as an

2 LVI cross-border into the United States, which had the

3 impact -- which affected Mr. Hall's claim to Allstate

4 Insurance, again, which is in the united States.

5    ICBC has consistently maintained that this was a

6 low velocity impact accident and has suggested as well to

7 Allstate that it is a low velocity impact. Further, the

8 claims files that ICBC maintains has deletions relating to

9 its characterization as an LVI. Those deleted files or

10 portions of those deleted files were also provided to

11 counsel and then to Mr. Hall a couple of years ago, which

12 we consider to be an additional sort of attempt to conceal

13 part of this activity.

14    So I -- I think that -- I'd like to understand

15 why the -- I mean, I think the only question I asked was

16 whether or not he considers 20 miles an hour of a car

17 hitting a stationary vehicle to be a LVI. I think that's

18 my last question on this, and I'm going to move on to the

19 next subject.

20    MS. CROW: And if I may briefly -- you know, I

21 understand your questions about the notes in the claim

22 files in 2003, 2004, 2005 when those communications were

23 happening with Allstate. This is in 2017 by a claims

24 examiner that did not communicate with Allstate on the

25 file. This was four years ago. I don't believe there are

Page 107

1 any allegations about communications with Allstate in the

2 time frame of when this statement was made. And that's my

3 differentiator between the questions earlier about notes

4 in the claim file from around the time that Allstate was

5 communicated with.

6    MR. MARK: Yeah. And this isn't -- the main

7 problem I have here is that if it wasn't an LVI in 2003,

8 it's not going to turn into an LVI in 2017. And what I

9 don't want to have to deal with is an insinuation from

10 ICBC that oh, well, we made some determination at a later

11 point in time that it was in fact an LVI. I think we've

12 established that that determination was not made, and I'd

13 like to understand why Mr. Di Cesare is putting an

14 affidavit in that this accident is an LVI, which happens

15 be consistent with the representations that ICBC was

16 making to Allstate but seems to be contrary to all the

17 evidence that we've seen.

18    MS. CROW: And I think that goes to the merits,

19 not jurisdiction. Any explanation as to why a decision

20 may -- may have been changed years down the road doesn't

21 go to jurisdiction, doesn't go to what communications

22 were had with Allstate. That -- I mean, that's the

23 jurisdictional theory here, communication -- misleading

24 communications with Allstate. We're 12 years past that at

25 this point, at the time of this --

Page 108

1    MR. MARK: Okay. How about this? I'll withdraw

2 the question. I'm going to ask you another question,

3 Mr. Di Cesare. Okay?

4    MS. PERRY: Right.

5 BY MR. MARK:

6    Q. Did you believe that characterizing this accident

7 as an LVI to Allstate in 2003 is an accurate

8 characterization?

9    A. Which characterization are we talking about?

10    Q. Do you believe that -- do you believe that

11 characterizing this accident to Allstate as a low velocity

12 impact accident is accurate?

13    A. Yes.

14    Q. Okay. And is -- and is part of that your

15 understanding as to what the definition of a low velocity

16 impact accident is?

17    A. No. Because you're referring to the low velocity

18 impact program, which Allstate wouldn't know anything

19 about. I'm talking -- when we're talking about

20 communications with Allstate, to say something was a low

21 velocity impact was not making any reference to a low

22 velocity impact program.

23    Q. Okay. So what did ICBC mean when it told

24 Allstate that it was a low velocity impact?

25    A. That they didn't think it was a significant



JAMES DI CESARE                                    March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA              109—112

Page 109

1  velocity, keeping in mind Allstate knew what the damages
2  to their insured's vehicle was.
3      Q.  Okay.  So ICBC is telling Allstate that it did
4  not believe that it was -- ICBC told Allstate that it did
5  not believe that this was a -- that there was significant
6  impact; correct?
7      A.  Correct.
8      Q.  But they didn't use those words; right?  They
9  said "low velocity"; correct?
10     A.  Correct.
11     Q.  Okay.  Do you know what "velocity" means?
12     A.  Yeah, it's equated to speed.
13     Q.  Speed?  Okay.  Do you consider 20 miles an
14 hour -- do you, as a corporate representative of ICBC,
15 consider 20 miles an hour to be low speed?
16     A.  I do.  I mean, we're talking about school zone
17 speeds; right?
18     Q.  I'm sorry?
19     A.  You're talking about school zone speeds --
20     Q.  Okay.
21     A.  -- as opposed to a very high velocity highway
22 impact.
23     Q.  Okay.  So today then -- so you consider 20 miles
24 an hour to be a low speed; correct?
25     A.  Relatively speaking, yes.

Page 110

1      Q.  Okay.  Does ICBC today have any policies or other
2  internal designations for what may constitute a low
3  velocity speed versus a medium velocity speed versus a
4  high velocity speed?
5      A.  Not that I'm aware of.
6      Q.  Okay.  So today if there was an accident and
7  it was a 20 mile an hour accident, which is about
8  36 kilometers an hour, ICBC would no longer characterize
9  the accidents by velocity high, medium, low?
10     MS. CROW:  Object, as this is I think certainly
11 outside of -- what ICBC would characterize an accident as
12 in 2021 I don't think relates to communications with
13 Allstate.
14     MR. MARK:  Okay.  I --
15     MS. PERRY:  I'm going to sustain that.
16 BY MR. MARK:
17     Q.  Okay.  But let me then go back to the 2003 time
18 frame.  You'd agree with me then, sir, that -- and I think
19 we've already established this, but I want to get your
20 confirmation -- that at least as it pertained to how ICBC
21 was defining a, quote, low velocity impact claim, that the
22 speed at which Mr. Dove's car was travelling fell outside
23 of the bounds of that LVI speed when the accident occurred
24 in 2003; correct?
25     MS. CROW:  Object to form.  Go ahead and answer.

Page 111

1      THE WITNESS:  So the speed that -- to the
2  extent we were aware of the speed, and that comes from our
3  insured and we've gone over that, that speed was over the
4  threshold that we would consider the claim to fall within
5  the low velocity impact program.  But it doesn't speak to
6  whether we still thought that it -- as a low velocity
7  versus a medium velocity versus a high velocity type
8  claim.
9  BY MR. MARK:
10     Q.  Are you aware that Allstate took the position
11 that the car was totalled?
12     A.  Yeah, they paid for the total loss of the
13 vehicle.
14     Q.  And are you aware that that was based on their
15 view that the car was totalled?
16     A.  Yeah.  I believe so, yes.
17     Q.  Okay.  Do you know what investigation Allstate
18 did to make that determination?
19     A.  I don't, to be honest with you.
20     Q.  Do you know why Allstate would consider the car
21 totalled if the car wasn't totalled?
22     A.  If -- there's different formulas, but effectively
23 if the cost to repair it was worth -- cost more than they
24 deemed the vehicle to be worth, having consideration for
25 what salvage value there might be, then typically the

Page 112

1  insurer would determine it to be a total loss.  And I
2  think in this case it was 7-, $8,000.  Something like
3  that.
4      Q.  Okay.  And do you know whether ICBC ever made a
5  determination as to what the value of the car was?
6      A.  It ultimately paid the subrogated claim with
7  Allstate.  There was some discussion back and forth about
8  what the proper amount should be, but we did ultimately
9  make the subrogated claim that we believe was reasonable.
10     Q.  That was in excess of $8,000; right?
11     A.  I don't remember the specific payment, but it was
12 in that neighbourhood.
13     MS. PERRY:  What was that number you just said?
14     MR. MARK:  8,000.
15     MS. PERRY:  Thank you.
16     THE WITNESS:  We are talking about a Mercedes, so
17 costs add up fairly quickly.
18     MR. MARK:  All right.  I'll show you what we'll
19 mark as Exhibit 10.
20     (Exhibit 10 was marked for identification and is
21     attached hereto.)
22     MS. CROW:  He's gone back to the doc.
23     THE WITNESS:  Yeah.  I'll get it.  Okay.
24 BY MR. MARK:
25     Q.  If you go to page 2 of 5 --



Page 113

1    A. Okay.

2    Q. -- you'll see that -- you'll see the statement

3  that says:

4       Allstate has determined Mr. Hall's vehicle to be

5       a total loss ..."

6  Do you see that?

7    A. Yes.

8    Q. And that's consistent with your recollection;

9  correct?

10   A. Yes. In this ballpark, yeah.

11   Q. Does the fact that the -- that the driver's --

12  I'm sorry. Does the fact that the -- in this case the one

13  who was not insured through Allstate -- that Mr. Hall's

14  car is determined to be a total loss, does that inform

15  ICBC's view one way or the other as to whether or not it's

16  considered an LVI?

17   A. In terms of the program or in terms of the

18  impact? Because those are two different things.

19   Q. Well, the program. Because at this point in time

20  we've established there was the program.

21   A. Right, but I'll -- to answer your question, at

22  $9,700 it would not have fallen within the low velocity

23  impact program.

24   Q. Okay. So at least as of December 3rd, 2003,

25  number 1, you were aware that the car travelling behind

Page 114

1  him was travelling at about 36 kilometers an hour, and

2  number 2, you're aware that the value of the car exceeds

3  the threshold for the LVI program; correct?

4       MS. CROW: Object to form. Go ahead.

5       THE WITNESS: Yeah. Assuming your math is

6  correct on the translation from miles to kilometers, plus.

7  When I hear 20 miles an hour, I think school zone speeds.

8  BY MR. MARK:

9    Q. Does whether or not the other car is moving or

10  stationary impact its determination as to whether or not

11  it falls into an LVI?

12      MS. CROW: Object to form. Go ahead.

13      THE WITNESS: Not necessarily, no.

14  BY MR. MARK:

15   Q. Okay. Have you ever worked on any cases with

16  Mr. Carter besides the Hall matter?

17      MS. CROW: Him personally or ICBC?

18      MR. MARK: Mr. Di Cesare, have you ever

19  personally. I'm not going to get into the specifics. I

20  just want to get like a ballpark sense.

21      MS. CROW: No, that's fine. I just wanted to

22  clarify that that question was for him personally. And

23  just for the record, Mr. Di Cesare didn't work with

24  Mr. Carter on this matter.

25      MR. MARK: I got it. But, counsel, please try to

Page 115

1  keep the commentary -- it's okay if you want to invoke

2  the -- Ms. Perry, but please try to keep the commentary to

3  a minimum.

4       MS. PERRY: He's asking if you've ever worked

5  with this gentleman, with Mr. Carter.

6       THE WITNESS: Are you asking whether I've ever

7  retained him?

8  BY MR. MARK:

9    Q. No. I know you've never retained him. I know

10  that ICBC's the one that retains him. I'm asking that --

11  in your capacity as an employee of ICBC I assume you

12  occasionally work with multiple investigators -- outside

13  investigators; right?

14   A. I'm trying to understand what you mean by "work

15  with him." I've got -- you know, I've had files where

16  he's been involved as an investigator.

17   Q. Okay. That's what I'm trying to ask.

18   A. I don't actually work with him in the

19  investigation.

20   Q. I understand you're not standing on street

21  corners in like a trench coat and a hat.

22   A. Okay.

23   Q. So -- but you -- but in connection with these

24  investigations -- you've worked on investigations with

25  Mr. Carter in which Mr. Carter would report to you the

Page 116

1  findings of his investigation; right? Mr. Hall's case

2  wasn't the first time that's happened; right?

3       MS. CROW: Object to form. Go ahead.

4       THE WITNESS: Yes.

5  BY MR. MARK:

6    Q. Okay. Do you know anything about Mr. Carter's

7  background? Where he came from before he was an

8  investigator? How he was hired? Who hired him? Any of

9  that stuff?

10   A. There's a couple things I know. I believe he's

11  ex-police or RCMP. And interestingly enough, when I was

12  speaking with Joanne Nelson she shared with me that her

13  dad was ex-insurance person and that they had dealings

14  with him and that she knew him through that connection as

15  well as through ICBC and that he was somebody that they

16  hired regularly because they had the utmost respect for

17  the way he conducted his investigations. So he's a

18  long-time insurance investigator that, in her words, is

19  very well respected.

20   Q. And so Ms. Nelson has a personal relationship

21  with Mr. Carter?

22   A. No. She just knew of him through her dad.

23   Q. So her dad has a personal relationship with

24  Mr. Carter?

25   A. He had a professional relationship with him.



Page 117

1    Q. That predated his work at ICBC?

2    A. This goes to when he worked -- yeah, her dad

3  worked in private insurance, so it's a different hiring.

4    Q. No. I understand. So Ms. Nelson's father and

5  Mr. Carter worked together before Mr. Carter worked for

6  ICBC?

7    A. Her father? Yes.

8    Q. Do you know why he stopped working at RCMP?

9    A. No, I don't.

10   Q. Are you aware of anybody ever complaining about

11 Mr. Carter or the work that he's done?

12   A. No, I don't.

13   Q. That's never happened? No one's ever complained

14 to you about him?

15   A. Not that I'm aware of, other than the allegations

16 that Mr. Hall is raising.

17   Q. Do you -- does ICBC maintain any kind of internal

18 file or system where it logs -- where it keeps track of

19 those kinds of things?

20   A. I'm not aware of that.

21   Q. Was Mr. Carter hired after SIU got involved or

22 before?

23   A. He had already been retained to conduct some

24 initial investigations by Joanne Nelson, and then when the

25 file was transferred to Gerard Wright he felt the need to

Page 118

1  get SIU involved and they then sort of oversaw the

2  retainer of Ken Carter.

3    Q. And do you know whether the invoices you reviewed

4  are invoices -- which I haven't really had a chance to

5  look at yet -- are invoices that were produced both to SIU

6  and to -- let's call it ICBC main office?

7    A. No, the invoices would all come to the main

8  office because the file handler would pay the invoices.

9    Q. Okay. So even for work that Carter did relating

10 to his involvement in the -- or his engagement by the SIU,

11 those would still go to the same place?

12   A. Yes.

13       MR. MARK: All right. I'll show you what we'll

14 mark as Exhibit 11.

15       (Exhibit 11 was marked for identification and is

16       attached hereto.)

17 BY MR. MARK:

18   Q. Have you seen this document before?

19   A. Yes, I have.

20   Q. This is part of the ICBC claim file?

21   A. Yes, it is.

22   Q. It seems like a --

23   A. I think I -- sorry. I think I saw it in the SIU

24 file, to be honest.

25   Q. Okay. And this is a -- this is a -- this is a --

Page 119

1  it looks like a memo from Mr. Wright to Mr. Shotton -- and

2  Mr. Shotton being the SIU employee -- confirming that SIU

3  is going to be employing Ken Carter; is that right?

4    A. Yes.

5    Q. And then it lists sort of the 12 areas about

6  which -- that Mr. Carter will be asked to investigate; is

7  that right?

8    A. Yeah. And I think it concludes by saying this

9  may not be exhaustive.

10   Q. Right. And in fact this wasn't exhaustive;

11 right? I mean, Mr. Carter did more than these 12 things;

12 right?

13   A. Yes. I believe so.

14   Q. Do you know whether Mr. Carter turned over his

15 entire file to ICBC in connection with his investigation

16 of Mr. Hall?

17   A. We have his reports.

18   Q. Okay. I got that. But do you know whether he

19 turned over his entire file with respect to his

20 investigation of Mr. Hall?

21   A. I'm only aware of the reports.

22   Q. Did anybody ever ask him for his entire file?

23   A. I'm not aware of that.

24       MS. PERRY: Guys, I apologize profusely. I need

25 60 seconds.

Page 120

1        MR. MARK: Sure. Sure no problem. Why don't we

2  take three minutes. We'll take a few minutes.

3        (PROCEEDINGS RECESSED AT 12:02 P.M. PACIFIC TIME)

4        (PROCEEDINGS RECONVENED AT 12:35 P.M. PACIFIC

5        TIME)

6  BY MR. MARK:

7    Q. All right. Mr. Di Cesare, you understand you're

8  still under oath?

9    A. Yes.

10   Q. Okay. Let's go back it to Exhibit 6, please, for

11 a minute.

12   A. 6?

13   Q. Yes, sir.

14   A. Oh. What am I doing? Sorry. Yeah. Okay.

15   Q. Now, you'll see that under -- go to page 7,

16 please. And -- are you there, sir?

17   A. I am, yeah.

18   Q. All right. And you'll see an entry that begins

19 with "EXAMINER CALLED TO ALLSTATE." Do you see that?

20   A. Yes.

21   Q. And in this entry it states that Ms. Nelson left

22 a message for Allstate referring to the fax, which we've

23 previously looked at, asked for an acknowledgment, and

24 then, quote, she relays:

25        His evasive nature and lack of cooperation in



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
121–124

Page 121

1        providing details of this MVA or signing anything
2        [and] if he continues in this manner we will not
3        be covering anything."
4    Do you see that?
5        A. I do, yeah.
6        Q. Is it normal for ICBC to communicate with other
7    insurance companies about, for example, the, quote,
8    evasive nature or lack of cooperation of the claimant?
9        A. I don't think it's unusual.
10       Q. Okay. And do you think that that's appropriate
11   for Ms. Nelson to be communicating with Allstate in this
12   manner?
13       MS. CROW: Objection. I don't -- what does his
14   opinion about appropriateness do in terms of jurisdiction?
15       MR. MARK: It's either a form objection or it's a
16   jurisdictional objection, counsel. So you tell me which
17   one you want to do.
18       MS. CROW: Jurisdictional.
19       MR. MARK: Okay. Well, this involves
20   communication with Allstate, which is obviously one of
21   the predicates for our FSI exemption, so I believe that's
22   well within bounds.
23       THE REPORTER: You're on mute, Ms. Perry.
24       MS. PERRY: Sorry. Thank you. Jennifer, your
25   position?

Page 122

1        MS. CROW: Yeah. I think, you know, we can
2    ask -- certainly establish what the communications were.
3    But the witness's opinion on communications that happened
4    15 years ago I don't think relates to jurisdiction. It's
5    not the facts that would give rise to the exception.
6        MS. PERRY: You asked about his opinion of those
7    communications. Why is that -- why is his opinion --
8        MR. MARK: So --
9        MS. PERRY: -- [indiscernible] in a
10   jurisdictional discovery?
11       MR. MARK: Well, one of the -- obviously one of
12   the categories of -- for today is communications with
13   Allstate.
14       MS. PERRY: Right.
15       MR. MARK: He's here in a corporate
16   representative capacity as ICBC. I'm not asking for
17   his personal opinion. I'm asking whether ICBC has a
18   practise of basically defaming its claimants to third
19   party insurance companies, therefore potentially impacting
20   the clients that they're making. In other words, if this
21   is something that's in the regular course --
22       MS. PERRY: Why don't you ask him a question
23   along those lines --
24       MR. MARK: Okay.
25       MS. PERRY: -- as opposed to his opinion.

Page 123

1    BY MR. MARK:
2        Q. Well, does ICBC maintain any kinds of policies
3    with respect to how it is to communicate with third party
4    insurers?
5        A. Not that I'm aware of.
6        Q. Okay. Does it have any policies with respect to
7    maintenance of records concerning communications with
8    those third party insurers, such as Allstate?
9        A. I'm not sure what you're getting at in terms of
10   maintenance of records.
11       Q. I'm just getting at whether or not ICBC has a
12   system in place or a policy in place in which it is -- its
13   adjusters are required to maintain communications with
14   Allstate.
15       A. I hope I'm answering your question. I don't
16   think there's any policy -- formal policy in play or
17   delineated anywhere that speaks to how we should
18   communicate with Allstate.
19       Q. Are there any rules or regulations concerning the
20   types of information that ICBC should be sharing or not
21   sharing with Allstate?
22       A. There are privacy issues to be aware of.
23       Q. Okay. Right. Because obviously, for example,
24   ICBC may come into -- may glean information in connection
25   with a particular claim and then not -- and then it may

Page 124

1    not be appropriate for ICBC to share that information
2    with, in this case, Allstate; correct?
3        A. It's possible. And it depends on the nature of
4    the information and how it relates to the claim, keeping
5    in mind that Mr. Hall was coming to both of us to
6    compensate him for various components of his claim.
7        Q. Yeah. And is it a -- and to your knowledge is
8    there a policy at ICBC concerning how a claimant should be
9    characterized as far as evasive or non-evasive or
10   cooperative or non-cooperative? Or ICBC doesn't have any
11   policies in that respect?
12       A. I'm not aware of any.
13       (DISCUSSION OFF THE RECORD)
14   BY MR. MARK:
15       Q. Have you ever heard of the implied undertaking of
16   confidentiality?
17       A. Yes.
18       Q. Okay. What is that?
19       A. So, for example, if in the course of one
20   litigated claim you come into possession of documents,
21   those shouldn't be -- in a general sense those should not
22   be disclosed and used in a subsequent, separate and very
23   different litigated claim without the consent of the
24   person.
25       Q. Is there any kind of consent required from the



JAMES DI CESARE                                    March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA               125–128

Page 125

1 claimant if you're communicating with, for example, his
2 insurance company as opposed to internally?
3      A. It depends what we're talking about.  In the case
4 of that note, I don't think there's anything untoward
5 there.
6          "Evasive" and "a lack of cooperation," those are
7 a reflection of what that person felt he was being at the
8 time.  And again he was coming to both insurers for claim
9 payments with respect to his car, which we in theory were
10 not responsible for, and medical rehab benefits, which we
11 were not responsible for.  So there's an exchange of
12 information in the context of, you know, why would we pay
13 for it in any event, but if we're going to consider it we
14 need cooperation and we need to understand the nature of
15 the claim.
16     Q. Okay.  So thank you for that gratuitous testimony
17 and an answer to the question that your counsel objected
18 to and then I was forced to rephrase.
19          MR. MARK:  I guess what I'm going to ask is that
20 to the extent that the witness starts testifying about
21 matters that are outside of the scope of jurisdictional
22 discovery in order to get some favorable testimony on the
23 record, I ought to be entitled to continue the lines of
24 questioning along those entry points, that the witness
25 shouldn't have the opportunity to just testify outside of

Page 126

1 the scope of a particular question and then at the same
2 time his counsel invoking an objection on the basis of a
3 jurisdictional discovery that prohibits me from asking
4 additional questions about that.  So I'd just like to make
5 that statement.
6      Q. We were talking about Ken Carter earlier and the
7 production of Mr. Carter's file.  Do you recall that?
8      A. I do.  Yes.
9      Q. And you testified -- remind me -- and this is
10 where we broke for lunch, so I forgot your testimony.  I
11 asked you whether or not you were aware whether Mr. Carter
12 turned his file over to ICBC --
13     A. I don't believe he -- sorry.
14     Q. I'm sorry.  Go ahead.
15     A. I thought you were finished your question.  I
16 don't believe he's ever turned his file over to us.
17     Q. And do you know whether ICBC ever requested it?
18     A. The only thing I recall in that context was that
19 when the allegations surfaced and we were ultimately
20 provided with affidavits there was some discussion with
21 Ken Carter about the allegations, because of course we
22 wanted to satisfy ourselves about his response to those
23 allegations.  And in that context I don't know if his file
24 was ever specifically requested.  I think there was some
25 discussion about what additional information might be in

Page 127

1 the file of his.  But then ultimately he retained his own
2 counsel and I think that's where all that ended.
3      Q. Who owns the file?
4      A. Which file?
5      Q. His file.
6      A. He does.
7      Q. Even though ICBC's paid him for his work?
8      A. We've paid him to investigate the claim and to
9 report on that work, and that's what he's done.
10     Q. And he gets to keep all the records and files
11 associated with it, and ICBC, if it demanded the file to
12 be turned over to it, it couldn't compel him to do that?
13     A. Not that I'm aware of.
14     Q. Are you aware, as we sit here today, of any files
15 that Mr. Carter did not turn over?
16     A. I don't think he's turned over his entire file.
17 Like I say, all we've got is his reports.
18     Q. But what is it in his report that you think he
19 has that has not been turned over?
20     A. I have no idea.
21     Q. Okay.  That's what I'm trying to understand.
22     A. Okay.
23          MR. MARK:  All right.  I'm going to show you a
24 document that we'll mark as Exhibit 12.
25          (Exhibit 12 was marked for identification and is

Page 128

1      attached hereto.)
2 BY MR. MARK:
3      Q. Have you seen this document before?
4      A. I have, yeah.
5      Q. Okay.  What is it?
6      A. This is a recording of an interview with Wayne
7 Ayers, owner, European Specialty Car Services.
8      Q. And is the understanding that Mr. Carter -- that
9 this is a -- that this is a -- when it says "recorded
10 interview," what does that mean to you?
11     A. That it -- the interview was recorded with some
12 kind of a recording device.
13     Q. Okay.  Like a -- like a tape?
14     A. I guess.  I mean, I don't know what device it
15 was.
16     Q. Did Mr. Carter ever produce those tapes to ICBC?
17     A. No.
18     Q. Did you ever ask for them?
19     A. Not that I'm aware of.  No, not that I'm aware
20 of.
21     Q. Do you know who typed these up?
22     A. He would have hired someone to type it up.
23     Q. Okay.  Do you know that or you're assuming that?
24     A. Well, we didn't.  I can tell you that.
25     Q. Well, would the fact that he hired somebody to



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
129–132

Page 129

1 type them up be reflected on his invoices?
2     A. To be honest, I don't know.  I don't know if it's
3 somebody he has on staff or if he contracts that out.  I
4 don't know how he arranges to have the transcripts
5 produced, but that's his responsibility.
6     Q. But ultimately that is a cost that you would
7 expect to be passed on to ICBC; correct?
8     A. It might be.
9     Q. Did you ever make a determination -- did you ever
10 come to any conclusion, one way or the other, as to
11 whether or not this or any of the other transcripts that
12 Mr. Carter produced in this -- or that ICBC produced in
13 this case were actually accurate?
14     A. I'm trying to think of how best to answer that
15 question.  We've never questioned the accuracy of them.
16 We asked him -- I'll leave it at that.  We've never
17 questioned the accuracy.
18     Q. Now, you'll see in the -- you testified I think
19 at the beginning of this deposition that one of the
20 documents that you reviewed was -- I think you said
21 something about procedures relating to outside
22 investigators; is that right?
23     A. Yes.
24     Q. Okay.  Tell me about that, please.
25     A. So we've -- we were able to find an excerpt

Page 130

1 anyway of our procedures manual that deals with the
2 retainer of private investigations -- or private
3 investigators and sort of the standards that they're
4 required to uphold.
5     Q. And what does it say about the standards that
6 they're required to uphold?
7     A. It says a number of things, but included in
8 that -- the ones that caught my attention specifically
9 because they relate to this file and the allegations
10 are -- for example, private investigators have their own
11 provincial standards that they have to live up to, but we
12 have at ICBC a private investigators conduct -- I don't
13 know the exact title, but it's something along the lines
14 of conduct handbook that they have to adhere to.  And it
15 includes things like they should never do anything that
16 breaks the law, for example, never misrepresent yourself,
17 those kind of things that are directly relevant to the
18 allegations on this file.
19     Q. Does it require Mr. Carter to always tell when
20 he's interviewing a witness what the purpose of the
21 interview is?
22     A. I'm just -- the best way for me to answer that,
23 my review of the -- and recollection of what I've seen is
24 that he should never represent -- misrepresent himself.
25 So he should always be clear that he's a private

Page 131

1 investigator retained to conduct the investigation and --
2 sorry.  The second part of your question?
3     Q. I think I only had one part.
4     A. Okay.  So he's never to misrepresent who he is.
5 Put it that way.
6     Q. But when you said that he's retained as a private
7 investigator, is it expected that he indicate that he's
8 being -- or that he was retained by ICBC?
9     A. Yeah.  I would expect that.
10     Q. I mean, that would be consistent with the
11 handbook that you're referring to; correct?
12     A. I don't know if it specifically says that in the
13 handbook, to be honest with you.  But I would expect that.
14     Q. Why would you expect that?
15     A. It's just in keeping with being upfront about
16 your investigations.
17     Q. And in fact, at least with respect to Exhibit 12,
18 you'll see in the first sentence he says:
19         I'm a private investigator licensed by the
20         province.  I have been hired by ICBC to do some
21         background work on Richard Hall."
22 You see that?
23     A. I do see that.
24     Q. So that's consistent with what your expectation
25 would be concerning how it is that Mr. Carter would

Page 132

1 identify himself; right?
2     A. Yeah.
3     Q. Now, at the bottom of each of these
4 transcripts -- and there's several that we'll look at
5 briefly -- there's a little footer that says that:
6         This report may contained statements --"
7 I'm sorry.
8         This report may contain matters of opinion."
9     A. Okay.
10     Q. Did you ever ask Mr. Carter whether any of these
11 transcripts were opinion versus fact, or did you just
12 assume that these were accurate transcripts?
13     A. I've never noticed that, to be honest with you,
14 and I've never asked him about it.  Now, these reports
15 weren't addressed to me at the time.
16     Q. On page 4 of the document you'll see a statement
17 that indicates that Mr. Ayers told Mr. Carter that
18 Mr. Hall had tentatively started to set up a sponsorship
19 agreement with Porsche Cars North America.  Do you see
20 that?
21     A. Yes.
22     Q. Okay.  And do you know whether Mr. Carter ever
23 reached out to Porsche Cars North America?
24     A. You know what?  As part of the investigation I
25 believe he tried to find out who the proper contact at



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
133—136

Page 133

1 Porsche North America might be to talk about the
2 sponsorship agreement. But my review and understanding of
3 the investigation is that he wasn't ever able to determine
4 who that person was.
5      Q. And do you know -- do you know whether he spoke
6 to people at Porsche Cars North America to determine who
7 that person was?
8      A. So there's a circle of referrals, I think. So my
9 understanding is that this gentleman introduced him to
10 somebody who was a member of -- there's different groups.
11 So there's a Porsche cars club -- or Porsche club in the
12 local area and then there's a Porsche Club North America
13 and then there's also Porsche cars regionally and North
14 America. And he was introduced to somebody who I believe
15 was part of the Porsche club regionally and through that
16 tried to develop a contact. I think at one time there's a
17 note that he tried to contact Porsche North America but
18 could never be put in touch with the proper person to
19 speak to and so that was the end of it.
20      Q. Okay. So it's your understanding that he spoke
21 to some people at Porsche Cars North America to try to
22 figure out who this sort of relationship was with [sic]
23 Mr. Hall, but he wasn't able to figure it out?
24      A. Yeah, I think he made a phone call.
25      Q. Now, you'll recall that -- now, Mr. Ayers

Page 134

1 indicated in his -- in this transcript that the car was
2 badly damaged -- that Mr. Hall's car was badly damaged.
3      A. Right.
4      Q. And he kind of goes through the details. Did you
5 ever -- is that consistent with your understanding as
6 to what happened with Mr. Hall's car?
7      A. I can tell you that at some point in the file
8 there is concern about the damages presented by Mr. Hall
9 to his insurer and whether they were all the result of the
10 accident.
11      Q. Right. But this is Mr. Ayers; right? This isn't
12 Mr. Hall. So this is Mr. Ayers, who you understand
13 repaired the car immediately after the accident; right?
14      A. Right. I mean --
15      Q. And he's describing --
16      A. I don't know if it was immediately, but ...
17      Q. Well, he's describing the extent of the damage
18 from the accident; correct?
19      A. Yeah, that he understands to be caused by the
20 accident.
21      Q. All right. And what you were suggesting is,
22 well, there might have been some pre-existing damage
23 before the accident that was part of what Mr. Ayers was
24 repairing. Is that what you're saying?
25      A. No, I'm just saying that I recall in my review of

Page 135

1 the file at least one note where one of the file handlers
2 was questioning whether all the damage was caused by the
3 accident.
4      Q. All right. Okay. Was the file handler ever able
5 to confirm that one way or the other?
6      A. I don't recall there being a lot of discussion
7 after that. There just is the one comment that I recall
8 about it's hard to believe that this damage was caused by
9 this accident.
10      Q. Did you ever look at the car?
11      A. No.
12      MR. MARK: I'm going to show you a document that
13 we'll mark as Exhibit 13.
14      (Exhibit 13 was marked for identification and is
15      attached hereto.)
16 BY MR. MARK:
17      Q. It's two non-consecutive pages. The first page
18 is called "Surveillance" and it's got a Bates number
19 ICBC_320, and the second is a -- it looks like some kind
20 of an ad in a newspaper.
21      A. Sorry. It's just loading.
22      Q. Yeah, that's fine.
23      A. I'm not sure -- it doesn't seem to be loading.
24 Oh, sorry. I'm not down far enough. So where do you want
25 me to go to?

Page 136

1      Q. Well, I'm just saying that -- so if you go to the
2 second page you'll see sort of like this newspaper
3 clipping.
4      A. Yes.
5      Q. And it looks like -- and it was part of the
6 surveillance file that was produced to us.
7      A. Okay.
8      Q. Do you know what that newspaper clipping is?
9      A. That was something that was obtained in the
10 course of the investigation.
11      Q. Who obtained it?
12      A. I don't recall, to be honest with you.
13      Q. All right. Who took out this -- do you know how
14 this was found?
15      A. Just a general background check. One of the
16 inquiries that whoever found it was using.
17      Q. Well, this is -- so are -- I just kind of find it
18 unreasonable and sort of hard to imagine that somebody is
19 trolling the personal ads to see if there's a potential
20 hit on a claimant. Is it your testimony that that's what
21 happened? That sort of -- somebody found this in a
22 newspaper?
23      A. I don't know how it was found.
24      Q. Do you know whether this ad was taken out by
25 Mr. Carter?



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
137–140

Page 137

1    A. Mr. Carter?  No.
2    Q. To obtain -- to attempt to contact Mr. Hall?
3    A. Not that I'm aware of.
4    Q. Do you know one way or the other?
5    A. I don't think the issue's ever been asked.
6    Q. Did you wonder how it was possible that this
7  advertisement was obtained --
8    A. No.
9    Q. -- in the first instance?
10   A. To be honest with you, no.
11   Q. Have you ever seen in all your -- how many years
12 have you been in ICBC?  35?
13   A. 30.
14   Q. 30?  In your 30 years of work at ICBC have you
15 ever seen a personal ad in a claim file?
16   MS. CROW:  Objection.  Jurisdiction.
17   MS. PERRY:  I think it -- I think it goes to his
18 professional experience and opinion of what's normal and
19 what's allegedly a stretch from an investigatory
20 standpoint.
21   MS. CROW:  Go ahead.
22   MS. PERRY:  You can answer the question.
23   THE WITNESS:  I don't recall seeing a personal ad
24 in my previous files.
25   MR. MARK:  I'll show you what we'll mark as 14.

Page 138

1    (Exhibit 14 was marked for identification and is
2    attached hereto.)
3  BY MR. MARK:
4    Q. Do you know who Diane Bobsien is?
5    A. I don't.
6    Q. The subject is "Advice of Assignment."  And it's
7  looks like -- it's hard to read, but it looks like on
8  May 27th, 2004 -- it looks like that this is when it was
9  formally assigned to SIU; is that right?
10   A. Looks like it.
11   Q. Okay.  That's what -- that's what this purports
12 to be; right?  I just want to make sure I understand it.
13   A. Yeah, I believe that's true.
14   Q. Okay.  And it's assigned, it looks like, to Ben
15 Shotton; right?
16   A. Yes.
17   Q. And that's consistent with your earlier testimony
18 that he was one of the SIU investigators on the file;
19 correct?
20   A. Yeah.  He was the first SIU investigator.
21   MR. MARK:  I'll show you what we'll mark as
22 Exhibit 15.
23   (Exhibit 15 was marked for identification and is
24   attached hereto.)
25 BY MR. MARK:

Page 139

1    Q. Who's Joyce Woodske?  I'm probably not
2  pronouncing that right.
3    A. Again, I don't know specifically who she is.
4  You can kind of tell from the document.
5    Q. Well, is she somebody that -- I assume she works
6  at ICBC.  Is she someone at SIU?
7    A. I can tell you who I think she is from the
8  document.  I don't know her -- I didn't know her, so I --
9  all I can do is tell you from this document who I think
10 she was.
11   Q. Okay.  Who do you think she was?
12   A. She was in some way associated with SIU, and so
13 she was making inquiries about whether the file should be
14 transferred to head office because the file had come to
15 head office.
16   Q. All right.  Who's Marcus Dyck or "Dick"?
17   A. Yeah, Marcus Dyck is -- Dave and Tino are all
18 SIU officers.
19   Q. Okay.  So Marcus Dyck, Dave Clenahan and
20 Agostino --
21   A. Pietramala.
22   Q. -- et cetera, Pietramala, they're all SIU guys?
23   A. They are.
24   Q. Okay.  Do you know who Dave Voler is, V-o-l-e-r?
25   A. No.

Page 140

1    MR. MARK:  I'm showing you what I'll mark as
2  Exhibit 16.
3    (Exhibit 16 was marked for identification and is
4    attached hereto.)
5  BY MR. MARK:
6    Q. And this is more going to just sort of how SIU
7  maintains its files, and I'm trying to just understand
8  what sort of the internal file looks like.
9    At this time did SIU only maintain handwritten
10 files?
11   A. I believe that -- I don't know that for sure, but
12 I believe that's the case.
13   Q. Okay.  So in other words their version of the
14 claims file was handwritten as opposed to through this
15 claims management system?
16   A. That's right.
17   Q. There would still be emailing internally and --
18 et cetera, but as far as sort of notes to file, that would
19 all be done through this template that we're looking at
20 that's marked as Exhibit 16?
21   A. Yeah, that's my understanding.
22   Q. And all of those handwritten activities are
23 maintained in the claims file; is that right?
24   A. All the -- the SIU activities, you mean?
25   Q. Yes.



Page 141

1    A.  So I would expect that they would have, in their
2  file, record of anything they did of significance on the
3  file.
4    Q.  And that would be maintained on these kinds of --
5  sort of ledgers; right?
6    A.  That's where they would make their notes.  Yeah.
7    Q.  Do you know who David Leadbetter is?
8    A.  I do.
9    Q.  Are you aware of a time when Mr. Carter reached
10  out to Mr. Leadbetter to speak to him?
11    A.  Yeah.
12    Q.  Do you know why Mr. Carter reached out to speak
13  to Mr. Leadbetter?
14    A.  It was part of the investigation into the
15  allegation that this accident might cause -- impact on his
16  ability to pursue a career as a professional golfer.
17    Q.  Do you know how it was that he first reached out
18  to Mr. Leadbetter?
19    A.  I believe that there was, well, either a phone
20  call or a fax.  He may have called the academy and then
21  sent a fax identifying himself and then followed up with
22  phone calls, because he actually ultimately spoke with one
23  of the associates that works at the academy and then David
24  Leadbetter separately.
25    MR. MARK:  All right.  I'll show you what we'll

Page 142

1  mark as Exhibit 17.
2    (Exhibit 17 was marked for identification and is
3    attached hereto.)
4  BY MR. MARK:
5    Q.  Do you recognize this document?
6    A.  Just give me one sec.  Yep.
7    Q.  Now, he does not in this correspondence indicate
8  that he is reaching out to Mr. Leadbetter to -- in
9  furtherance of an ICBC investigation, does he?
10    A.  Let's read it.  No, it doesn't appear to
11  specifically say that he's calling on behalf of ICBC.
12    Q.  And this was faxed to Mr. Leadbetter, it appears,
13  in Orlando; correct?  407 area code?
14    A.  If that's -- it was certainly faxed to David
15  Leadbetter.  I don't know if it was Orlando, but if you
16  tell me 407 is Orlando ...
17    Q.  Okay.  And then you see that he's attaching this
18  letter from -- that Mr. Leadbetter signed; correct?
19    A.  Is that -- I've got page 1 up still.  Just --
20  which page are we looking at?  2?
21    Q.  2 and 3.
22    A.  Yeah.  So he's attached this letter that came
23  from David Leadbetter's Academy -- or from David
24  Leadbetter.
25    Q.  And all Mr. Carter says that he wants to do is

Page 143

1  confirm that Mr. Leadbetter -- Mr. Leadbetter's, quote,
2  authorship of the attached letter.  Do you see that?
3    A.  Sorry.  Where are you looking now?  Back at the
4  cover sheet?
5    Q.  The first sheet.  Yes, I apologize.
6    A.  Yes.
7    Q.  Do you know why Mr. Carter did not identify in
8  this correspondence that he was acting on behalf of ICBC
9  and not Canadian immigration?
10    A.  No, I don't know.
11    Q.  Do you think he should have?
12    MS. CROW:  Objection.  Jurisdiction.
13    MR. MARK:  Well, this is directly relating to a
14  communication in Florida that interfered with my client's
15  relationships and businesses and is -- you know, it's
16  pretty -- this is certainly one of the bases for
17  jurisdiction under the -- one of the exceptions to the
18  FSIA.
19    MS. PERRY:  I'm going to overrule the objection.
20  You can answer that.
21    THE WITNESS:  Okay.  So -- sorry, what was the
22  question again then?
23    MR. MARK:  Lisa, I'm sorry.  I lost it too.
24    (REPORTER READ BACK)
25    THE REPORTER:  Would you like me to read the

Page 144

1  previous ...?
2    MS. PERRY:  Yeah.
3    THE REPORTER:  Okay.  Question --
4  BY MR. MARK:
5    Q.  Do you think he should have identified himself as
6  an ICBC representative?
7    A.  Ideally he would have said he was -- why he was
8  calling on behalf of ICBC.
9    Q.  And that indeed would have been consistent at
10  least with sort of your expectations and the policies of
11  ICBC; right?
12    A.  Like I say, ideally he would have done that,
13  yeah.
14    MR. MARK:  All right.  I'll show you what we'll
15  mark as Exhibit 18.
16    (Exhibit 18 was marked for identification and is
17    attached hereto.)
18  BY MR. MARK:
19    Q.  Have you seen this document before?
20    A.  Yes.
21    Q.  At any point in this document does Mr. Carter
22  identify himself as calling on behalf of ICBC?
23    A.  You want me to scroll through all the pages?
24    Q.  Well, we can start with the opening paragraph.
25  When he first states why he's calling does he indicate



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
145–148

Page 145

1  that he's calling in furtherance of an investigation on
2  behalf of ICBC?
3      A.  He says he's "calling to confirm the letter that
4  I faxed to you."
5          MS. PERRY:  I didn't hear that --
6  BY MR. MARK:
7      Q.  And does the letter that he faxed him relate --
8          MS. PERRY:  I didn't hear that answer.  He said
9  what?
10         THE WITNESS:  He said he was "calling to confirm
11  this letter that I faxed you."
12  BY MR. MARK:
13     Q.  And nothing in that letter refers to ICBC; right?
14     A.  No.
15     Q.  No, that's wrong, or no, I'm correct?
16     A.  No, there's nothing in there that refers to ICBC.
17     Q.  Are you aware that Mr. Leadbetter believed that
18  Mr. Carter was calling on behalf of Canadian immigration?
19         MS. CROW:  Object to form.  Go ahead and answer.
20         THE WITNESS:  I know that in his affidavit he
21  claims that that was the case.
22  BY MR. MARK:
23     Q.  Do you have any reason to believe that's untrue?
24     A.  That that's what he thought?
25     Q.  Yeah.

Page 146

1      A.  It's a tough question because he says that's what
2  he thought, but when he's been interviewed and he answers
3  questions of Ken, you find out that there's a lot of
4  inconsistencies or half truths in the letter itself.  So I
5  don't know how much effort and time he put into the letter
6  because -- for example, it wasn't even -- it wasn't even
7  written by him.  It was a letter that was written by his
8  associate.  He signed it.  So you get the sense that this
9  was something done in a hurry by Mr. Leadbetter.  So how
10  much attention he paid to who he was talking to, what the
11  contents were, how much of it was fact versus, you know,
12  half fact -- I don't know the answer to that.
13     Q.  I'm not asking you about the letter.  I'm asking
14  you what do you -- do you have any reason to believe that
15  Mr. Leadbetter was lying when he indicated that he thought
16  that he was speaking on behalf of Canadian immigration?
17     A.  I'll answer by saying that I think that there
18  were a number of inconsistencies in his letter, so I don't
19  know if he was being honest.
20     Q.  So you're saying that because there were
21  inconsistencies, you believe, in the letter that he
22  submitted that we looked at to Canadian immigration, that
23  when several years later he submitted an affidavit stating
24  that he believed that Mr. Carter was calling on behalf of
25  Canadian immigration, that he may not have been telling

Page 147

1  the truth?  Is that what you're saying?
2      A.  That is possible.
3      Q.  But certainly there's nothing that would have
4  prevented Mr. Carter from simply saying "I'm calling on
5  behalf of ICBC"; right?
6      A.  I agree with that.
7      Q.  Okay.  And you don't know why he didn't identify
8  himself as calling on behalf of ICBC, do you?
9      A.  I don't know why.
10         MR. MARK:  Same thing with Mr. Tennyson.  We'll
11  mark that as Exhibit 19, Darren.
12         (Exhibit 19 was marked for identification and is
13         attached hereto.)
14         THE WITNESS:  Just give me a second.  It's --
15  "last name unknown" is I think what the "LMU" stands for.
16  But said you know his last name?
17  BY MR. MARK:
18     Q.  So Darren we'll call him.  Did you know -- I'm
19  showing you Exhibit 19.  Do you recognize this document?
20     A.  I do.
21     Q.  This is the transcript from Mr. Carter to ICBC of
22  his telephone conversation with Mr. Tennyson or Darren?
23     A.  Yes.
24     Q.  Now, Mr. Carter did not identify himself as
25  calling on behalf of ICBC here, did he?

Page 148

1      A.  Doesn't look like it.
2      Q.  Do you find it unusual that he did not bother to
3  identified himself as calling on behalf of ICBC in
4  connection with his communications to both Mr. Leadbetter
5  and Darren?
6      A.  Like I say, ideally he would have done that.
7      Q.  Okay.  And are you aware that Darren also
8  believed that Mr. Carter was calling on behalf of Canadian
9  immigration?
10     A.  I'm trying to remember what I saw -- seen in
11  review of the file, and I don't remember that to be
12  honest.
13     Q.  Any reason to think he's lying?
14     A.  Well, I don't know that he said that.  I'm trying
15  to remember if I saw that somewhere.
16     Q.  Do you have any -- you obviously suggested that
17  Mr. Leadbetter lacked some credibility.  Do you have any
18  reason to suspect that Darren lacks credibility?
19         MS. CROW:  Object to form.
20         MS. PERRY:  You can answer.
21         THE WITNESS:  So do I have any reason to believe
22  that he lacks credibility?
23  BY MR. MARK:
24     Q.  Yeah.
25     A.  Not really, no.



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
149—152

Page 149

1    Q. Okay. Now, when Mr. Carter was making these
2  telephone conversations and recording these conversations
3  he was doing so on behalf of ICBC; correct?
4    A. Yeah. The investigation was on behalf of ICBC.
5    Q. Okay. Are you aware that -- do you know whether
6  Mr. Carter -- Mr. Carter's practise is to inform folks
7  that he's calling that they're being recorded?
8    A. I'd like to think that is does. I ...
9    Q. Why would you like to think that?
10   A. So that people are aware that the conversation is
11 being recorded.
12   Q. It seems like the up-and-up thing to do; right?
13     MS. CROW: Objection to form.
14 By MR. MARK:
15   Q. Well, why would you like -- you said you'd
16 like -- you would like to think that. Why would you like
17 to think that?
18   A. I think it would be the proper thing to do.
19   Q. Okay. And you would expect to see that as part
20 of the transcript; right?
21   A. Yeah. Unless he'd done that somewhere else.
22 Yes.
23   Q. Is there anything in the file that you've ever
24 seen suggesting that he obtained any authorization from
25 anybody to record these conversations?

Page 150

1    A. I don't remember, to be honest with you.
2    Q. You don't remember --
3    A. I don't remember seeing something that said "I'm
4  recording this conversation."
5    Q. Okay. Do you know that it's a crime in Florida
6  to record conversations without the party's consent?
7     MS. CROW: Object to form.
8     THE WITNESS: So I don't know what the laws in
9  Florida are.
10 BY MR. MARK:
11   Q. Do you expect that your investigators follow the
12 laws of the jurisdictions to which they're injecting
13 themselves?
14     MS. CROW: Object to form.
15     THE WITNESS: So you want me to answer that
16 question? I don't --
17 BY MR. MARK:
18   Q. Yes.
19   A. -- expect him to know the laws of every
20 jurisdiction he calls in terms of recording, for example.
21   Q. So you don't expect your private investigators to
22 know the wiretapping laws of the jurisdictions to which
23 they're calling?
24     MS. CROW: Objection to form and goes beyond
25 jurisdiction.

Page 151

1    MR. MARK: I think it's quite within the scope of
2  the FSIA, if we have -- if we know that an agent of ICBC
3  was breaking the law when he was communicating with
4  individuals in Florida.
5    MS. CROW: Are you -- are we claiming that he
6  wiretapped? There's a difference between recording and
7  wiretapping, and I want to be clear on that.
8    MS. PERRY: We've got -- we've got a -- there's
9  some Florida statutes that are maybe more unique to
10 Florida. Okay. So backing up, could someone -- Lisa,
11 could you --
12     MR. MARK: Let me go back to the question. Let
13 me re-ask the question. Would that be helpful?
14     MS. PERRY: Yeah.
15 BY MR. MARK:
16   Q. Do you believe it's important that your
17 investigators are familiar with the laws of jurisdictions
18 into which they are injecting themselves?
19     MS. CROW: Object to form.
20 BY MR. MARK:
21   Q. That's just a form objection. Okay. You can
22 answer, sir.
23   A. So I wouldn't want him to break the laws in any
24 jurisdiction.
25   Q. And I think when I asked that question last time

Page 152

1  you said well, how can I expect my investigators to know
2  the laws of all these different places. Again, that's a
3  summary of what you indicated. So then my follow-up
4  question to that was don't you think it's important that
5  your investigators who are engaging in surveillance
6  understand the wiretapping laws of the various
7  jurisdictions that they are conducting that investigation
8  in.
9     MS. CROW: Object to form and object for
10 jurisdiction.
11     MS. PERRY: Well, Ms. Crow, he's saying that
12 Mr. Carter came here -- I mean, it could have been
13 telephonic, it could have been in person -- and that he
14 engaged in conduct related to Florida and if he did so and
15 recorded without someone's consent he would have been
16 violating a Florida law. Why wouldn't that go to
17 jurisdiction?
18     MS. CROW: Well, now we're talking beyond
19 recording. Now we're talking about wiretapping people
20 too. There's a big difference between wiretapping someone
21 and recording a conversation, say, while you're on the
22 phone with them.
23     MS. PERRY: Without permission.
24     MS. CROW: Correct.
25     MS. PERRY: I think he's -- Mark, correct me if



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
153–156

Page 153

1  I'm wrong.  I think he's talking about recording someone
2  without their permission.  Is that what we're talking
3  about?  Right?
4        MR. MARK:  That is the definition of
5  "wiretapping" in Florida.
6        MS. PERRY:  Yeah, Florida has -- has a --
7        MS. CROW:  But I think --
8        MS. PERRY:  -- constitutional right to privacy
9  and statutes that follow the constitutional right.
10        MS. CROW:  If that's the definition in Florida,
11  then I think that definition needs to be a part of the
12  question.  Because that is a -- can be a unique definition
13  under Florida law, whereas often times the commonplace
14  definition of "wiretapping" is very -- it can be very
15  different.  When I hear "wiretap" I think something very
16  different.
17        MR. MARK:  All right.
18        MS. CROW:  [Indiscernible] a conversation that
19  you're on one side of.
20        MR. MARK:  Okay.  So if you're taking issue with
21  the word "wiretap," then I'll ask the question a different
22  way.
23  BY MR. MARK:
24    Q.  Do you think it's important that your
25  investigators, to the extent that they are conducting

Page 154

1  surveillance in jurisdictions outside of British Columbia,
2  that they understand the laws and rules and regulations
3  concerning that surveillance?
4        MS. CROW:  Object to form.  Go ahead and answer.
5        THE WITNESS:  Ken Carter was not conducting
6  surveillance in Florida.
7  BY MR. MARK:
8    Q.  Okay.  He was conduction interviews in Florida;
9  correct?
10    A.  Over the phone.
11    Q.  All right.
12        MS. PERRY:  Instead of "surveillance," why don't
13  you use the word "investigation"?
14  BY MR. MARK:
15    Q.  Fair enough.  Do you think that it is important,
16  Mr. Di Cesare, that your investigators understand the
17  local laws and rules concerning what is or is not legal in
18  connection with an investigation when they are endeavoring
19  to conduct that investigation in foreign jurisdictions?
20        MS. CROW:  Object to form.  Go ahead and answer.
21        THE WITNESS:  We would expect that he doesn't
22  break the law.
23  BY MR. MARK:
24    Q.  Is today the first time that you've learned that
25  he did break the law?

Page 155

1        MS. CROW:  Object to form.  Go ahead and answer.
2        THE WITNESS:  This is the first time that I've
3  heard that that would be considered breaking the law.  So
4  if that's in fact what he did, then that would be the
5  first I've heard of it.
6  BY MR. MARK:
7    Q.  Well, we know that he recorded the conversations;
8  right?
9    A.  Yes.  What I'm saying -- go ahead and finish your
10  question.
11    Q.  No, that's my question.  We know that he recorded
12  the conversation; correct?
13    A.  Right.  And what I'm saying is that this
14  particular document does not show me that he identified
15  himself as calling on behalf of ICBC or that he was
16  recording.  But I don't know if that was dealt with
17  elsewhere.  If it wasn't, then yes, this is the first I've
18  heard of it.
19        MR. MARK:  All right.  I'm going to show you what
20  we'll mark at Exhibit 20.
21        (Exhibit 20 was marked for identification and is
22        attached hereto.)
23        MR. MARK:  Counsel, I take it -- when you look at
24  this you'll see a black box -- that that's your redaction?
25  I don't even know anymore.

Page 156

1        THE WITNESS:  Just give me a sec here.  Where are
2  we looking?
3        MS. CROW:  It's not --
4        THE WITNESS:  Is it there?
5        MS. CROW:  Go down.  Correct.
6        MR. MARK:  Okay.  So look, I'm just going to make
7  a global request that all the documents that were produced
8  with these black redactions be produced without those
9  redactions.  But if there's -- and if there's a privilege
10  you can provide a privilege log.
11        MS. CROW:  That's fine.  That's going to take me
12  a while to go through 3,000 pages.  I've already provided
13  the unredacted claim notes, so ...
14        MR. MARK:  Okay.
15        MS. CROW:  It will take me a while to go back
16  through every email in the paper file that was perhaps
17  from defense counsel to ICBC.
18        MR. MARK:  I get it, counsel, but this request
19  is -- look, again, I don't want to waste time.  Okay?  You
20  have my request.
21        MS. CROW:  Okay.
22        MR. MARK:  We submitted this request for
23  production many months ago.  You told me that you were
24  going to produce the documents unredacted; they were
25  produced redacted.  Please just produce the full



Page 157

1  documents.

2         MS. CROW:  I'll just put for the record that

3  misrepresents our conversation.  We will produce the

4  unredacted ones now that the privilege issues with BC have

5  been resolved.

6  BY MR. MARK:

7     Q.  I'm showing you what we'll mark as Exhibit 20.

8  Are these your notes, sir?  Did you actually make these

9  notes?

10    A.  File analysis -- that's my file analysis.

11    Q.  That's your file analysis?

12    A.  Yes.

13    Q.  And you made -- and you did this analysis on or

14  about December 29th, 2006; correct?

15    A.  Yeah.  That looks right.

16    Q.  And you're still -- so this suggests that you're

17  still continuing to conduct the investigation into

18  Mr. Hall; is that right?

19    A.  So I would have just inherited the conduct of

20  this file.

21    Q.  But -- and you've now said well, we're going to

22  want this investigation to continue; correct?

23    A.  Yeah, I would have reviewed the file and then

24  this is an overview of my review and what we want to do

25  moving forward.

Page 158

1     Q.  Now, you say here that you -- number 6:

2         INVESTIGATE PRIOR LAWSUITS, OF WHICH THERE HAVE

3         BEEN MANY (PARTICULARLY SERIOUS MOTORCYCLE MVA IN

4         FLORIDA 2-3 YEARS AGO AND TOXIC EXPOSURE.)"

5  Do you see that?

6     A.  Yes.

7     Q.  Okay.  What other lawsuits did you discover that

8  Mr. Hall filed or was involved in?

9     A.  I can't -- I recall there'd been mention of

10  him having had many lawsuits.  I don't remember the source

11  of that.

12    Q.  So you were just regurgitating something that you

13  heard without doing any kind of independent verification

14  of the truth of that statement?

15        MS. CROW:  Object to form.  Go ahead.

16        THE WITNESS:  This -- this was based on my review

17  of the file contents when I inherited the file.

18  BY MR. MARK:

19    Q.  I get it.  But there's nothing in the file --

20  lawsuits are public record; right?  So it's easy to find a

21  lawsuit.  There's nothing in the file that contains copies

22  of lawsuits.  So was there anything in the file that

23  actually showed a lawsuit that Mr. Hall filed, or you were

24  just -- heard somewhere that there were other lawsuits and

25  you were just restating that?

Page 159

1     A.  So somewhere on file there there was an

2  indication that there were other lawsuits.  So part of the

3  planned investigation was to confirm whether that was true

4  and, if so, what they were all about.

5     Q.  And were you able to ever confirm that it was

6  true?

7     A.  I don't think we ever got to that.

8     Q.  So in all these years of investigation where you

9  continue this narrative -- and it goes on to the next

10  page:

11        RICHARD IS A PARTY TO MANY OTHER LAWSUITS."

12  That's just -- that was never actually confirmed?

13    A.  That's based on the information from the file at

14  the time that I inherited it.

15    Q.  But what was that information?

16    A.  I don't remember where it came from.  I reviewed

17  the whole file when I got it initially.  And so in the

18  context of that review various things would have come up

19  that I thought were important and I would have tried to

20  include those in my file analysis.  And that was one of

21  those.  I don't remember where I got that information from

22  in the file, but it came from the file.

23    Q.  But you never verified it?

24    A.  I had just received the file.

25    Q.  Well, did you ever verify it?  Did you ever

Page 160

1  verify it?

2     A.  We never got around to it, I don't think.

3     Q.  Is it uncommon for ICBC to conduct surveillance

4  internationally?

5     A.  It's not something we do -- common, but that's --

6  a big function of that is the fact that most of our

7  claimants reside in BC.

8     Q.  And in this case there was some international

9  surveillance done; correct?

10    A.  In Ireland.

11    Q.  And what did you find in the Ireland

12  surveillance?

13    A.  We didn't see him.

14    Q.  Now, the SIU was also reaching out to people in

15  Australia; right?

16    A.  I think there was an email to -- a contact in

17  Australia to clarify some of the information about his

18  educational status, because he knew somebody there that

19  would be able to interpret the feedback he got from

20  Cambridge.

21        MR. MARK:  So I'll show you what we'll mark as

22  Exhibit 21.

23        (Exhibit 21 was marked for identification and is

24        attached hereto.)

25        THE WITNESS:  Yes.



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
161–164

Page 161

1 BY MR. MARK:
2    Q. If you go to the second -- the second page, sir,
3 you'll see a paragraph that begins with "I figured you
4 might know." Do you see that?
5    A. Yes.
6    Q. And there's a sentence that reads:
7       My subject is making a massive claim for
8       injuries, and I have reason to believe that he is
9       nothing more than a professional con artist."
10 Do you see that?
11   A. Sorry. Where am I looking?
12   Q. In the paragraph had a begins with "I figured"
13 you'll see a sentence that begins "my subject is making a
14 massive claim for injuries."
15   A. Yes.
16   Q. And then Mr. Agostino [sic], working on behalf of
17 ICBC, writes:
18       I have reason to believe that he is nothing more
19       than a professional con artist."
20 Do you see that?
21   A. I see that.
22   Q. Do you -- is that -- well, are there any rules or
23 regulations pertaining to communications from either SIU
24 or other ICBC employees to folks outside of ICBC
25 concerning these kind of characterizations of claimants?

Page 162

1    A. I don't know that there's any codified conduct on
2 how to communicate.
3    Q. There's no sort of internal code of ethics?
4 Anything like that?
5    A. We currently have a code of ethics. I don't know
6 if there was one at the time that this was done. I don't
7 know -- yeah, I'll leave it at that. I don't know if
8 there was one in existence at the time that this was done.
9    Q. Does the code of ethics prohibit this kind of
10 behavior?
11      MS. CROW: Object to form.
12 BY MR. MARK:
13   Q. Today's code of ethics?
14   A. He's expressing his opinion about the credibility
15 of the claimant.
16   Q. No, I know -- I understand what you think he's
17 doing. I'm asking whether the code of ethics permits this
18 kind of behavior, to your knowledge?
19   A. I don't know if the code of ethics addresses this
20 specific issue.
21   Q. Do you know what Agostino meant by "professional
22 con artist"?
23   A. I'd only be guessing what he means, but ...
24   Q. You don't need to guess. And then he writes:
25      Or at least that is what I'm trying to prove."

Page 163

1 Do you see that?
2    A. Yes.
3    Q. Okay. Do you think -- so is that standard
4 practise for ICBC, is to assume that somebody's a con
5 artist and then try to work backwards to prove it?
6      MS. CROW: Object to form.
7      THE WITNESS: I think it's just a poor choice of
8 words. Ultimately he's trying to figure out what the
9 coding on his scholastic records mean and, you know,
10 positive or negative he would deal with it.
11 BY MR. MARK:
12   Q. And ultimately was it confirmed that Mr. Hall did
13 in fact attend Cambridge?
14   A. I believe so.
15   Q. So at least in respect of this particular issue
16 Mr. Hall was telling the truth; correct?
17   A. That he attended Cambridge?
18   Q. Yeah.
19   A. Yes.
20   Q. Do you know who this Karen Burke Da Silva is?
21   A. I don't know her.
22   Q. Do you know how it is that Agostino knew her?
23   A. The only thing I can say is that I think that
24 there is some family connection. So he had somebody who
25 lived in Australia who might understand the coding, and so

Page 164

1 he called that -- or emailed this person.
2      MR. MARK: All right. I'll show you what we'll
3 mark as 22.
4      (Exhibit 22 was marked for identification and is
5      attached hereto.)
6 BY MR. MARK:
7    Q. We've probably got one more hour, sir.
8    A. Yeah, that's fine. Okay.
9    Q. All right. Have you seen this document before?
10   A. I have.
11   Q. All right. You -- this email was sent to you;
12 right?
13   A. Yeah, that was Tino to me.
14   Q. So you were -- you were -- so it starts out as an
15 email from Ken Carter to Tino relating to the Ireland
16 investigation and then -- and then Tino's getting your
17 approval to proceed?
18   A. He received the proposal from Ken, and so he's
19 forwarding it to me for my consideration. We did not
20 proceed.
21   Q. I'm sorry. I thought you guys did end up doing
22 surveillance in Ireland.
23   A. No. So this is a proposal by Ken for him to send
24 his people over there to conduct the investigation. And
25 he outlines for Tino why he thinks there's benefit to



Page 165

1  that, what the costs would be, and so Tino runs that by
2  me. And we did not go with this proposal. We ultimately
3  then retained Cox & Côté that we talked about earlier
4  because they had contacts in Ireland and they arranged for
5  the surveillance by an Irish company.
6     Q. Gotcha. And that surveillance proved
7  unsuccessful; right?
8     A. We never saw Mr. Hall.
9     Q. I got -- I'm going to jump onto -- my iPad's
10  about to die, so I'm just switching to a -- to my
11  computer. Just give me one second. All right. Can you
12  hear me?
13    A. I can, yes.
14    Q. Seamless, huh? All right. Do you know -- if you
15  see in the subject line it says "AP#03-1275." Do you see
16  that?
17    A. I do see it, yes.
18    Q. Do you know what that is?
19    A. I can tell you what I think it is.
20    Q. What do you think it is?
21    A. I think that "AP" stands for Action Pacific and
22  that's probably a file number. And then the "Ireland"
23  means that this email relates to Ireland.
24        MR. MARK: Okay. That's what I thought it was
25  too. Okay. I'll show you what we'll mark as Exhibit 23.

Page 166

1        (Exhibit 23 was marked for identification and is
2        attached hereto.)
3        THE WITNESS: Okay.
4  BY MR. MARK:
5     Q. Now, first of all, you see the handwriting at the
6  top? It says --
7     A. Yes.
8     Q. What does that say?
9     A. "Drop Hall."
10    Q. What does that mean?
11    A. That means -- this is actually my handwriting.
12  And so that's a note I would put on correspondence that I
13  wanted somebody to drop into the file.
14    Q. Gotcha. And this refers to the investigator in
15  Dublin that you were referring to; right?
16    A. Looks like it, yes.
17    Q. Do you -- now, Mr. Pietramala writes here that:
18        Subject alleges to be a golf pro. He states that
19        he has played on numerous pro-amateur tours ...
20        Arkansas State University Golf Team, was a member
21        of Heath Golf Club, was a former graduate of
22        Cambridge ... trained by famous golf teacher
23        David Leadbetter ..."
24  Did you ever come to the conclusion that any of those
25  statements were false?

Page 167

1     A. Let me just go over them again. We never were
2  able to confirm whether he played for Arkansas State. I
3  don't know about -- can't recall what about Heath -- can't
4  recall about the Heath Golf Club. Cambridge was true. He
5  was coached by David Leadbetter.
6     Q. Do you know whether he ever "rubbed shoulders
7  with the likes of the Brower Fund"?
8     A. Yes, so one of the investigations included some
9  follow-up there because -- I'm trying to think. At some
10  point Mr. Hall alleged that he had formed a business
11  partnership with the founder of the Brower Fund. And in
12  fact he was -- I'm going to use the term -- wrong term
13  probably because it's business acumen, but like a board
14  member sort of thing. There was an allegation that he was
15  already a significant member of his team, and so -- and a
16  phone call was made to see if we could verify that
17  information -- or if that information could be verified.
18  We learned that the founder -- is it David Brower -- I
19  believe had passed away. And we spoke to another
20  individual there who was part of that organization when
21  David Brower was around. He remembered Mr. Hall, and he
22  confirmed that Mr. Brower, I'll call him, liked the
23  concept that Mr. Hall had, but as far as they knew the
24  project had never got off the ground.
25        MR. MARK: Okay. I'm showing you what we'll mark

Page 168

1  as Exhibit 24.
2        (Exhibit 24 was marked for identification and is
3        attached hereto.)
4  BY MR. MARK:
5     Q. This also has some redactions. Do you know what
6  "FBIG" is?
7        ARRANGE FOR FBIG TO SURVEILLE [sic] CLAIMANT."
8     A. Yeah, FBIG is the name of one of the local
9  surveillance firms.
10    Q. What is -- do you know what that stands for?
11    A. Honestly -- I believe FB is Frank Broderick
12  [phonetic], who was the founding partner of the company
13  that was really just FBI. But the company's gone through
14  a number of mergers and changes. But I believe the FB is
15  the initials of the founder's name.
16    Q. Do you know if FBIG did anything else on this
17  claim other than to surveil the claimant, I believe, in
18  connection with his medical examination?
19    A. No, I don't think they did.
20    Q. But that's what this particular surveillance
21  relates to; right?
22    A. I believe that's true, yeah. He was scheduled
23  for an independent medical assessment, so we surveilled
24  him -- or tried to surveil him sort of in and around that
25  time.



JAMES DI CESARE                                          March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                    169–172

Page 169

1     MR. MARK:  All right.  We'll mark this as
2  Exhibit 25.
3     (Exhibit 25 was marked for identification and is
4     attached hereto.)
5  BY MR. MARK:
6     Q.  Do you know whose handwriting this is?
7     A.  I don't.
8     Q.  At the top it says "Notes of Tino Pietramala."
9     A.  Oh, okay.
10    Q.  And you'll see there's mention on May 9th, 2010,
11 that says:
12       Follow up with examiner Di Cesare.  Discovered
13       [sic] file -- discussed file at length and
14       advised that if SIU is no longer needed, then I
15       will retire my file."
16 Do you see that?
17    A.  Yes.
18    Q.  And then it says here:
19       Examiner prefers to keep me involved as he
20       believes that the subject will activate his claim
21       because we will be seeking a motion to dismiss
22       his claim for inactivity ..."
23 Et cetera.  So do you recall having that conversation with
24 Mr. Pietramala?
25    A.  I don't recall the conversation, no.

Page 170

1     Q.  Do you recall asking SIU to keep the file open in
2  or about May of 2010?
3     A.  I don't recall it, no.
4     Q.  But they did; right?
5     A.  Yeah, and to be honest, it wouldn't be out of
6  what I might reasonably do.
7     Q.  In other words, you're not surprised by that?
8     A.  That I asked him to keep the file open and
9  there's a note about that?  No.
10    Q.  What is an "O8 request"?
11    A.  O8?  Where are you reading that?
12    Q.  It's not in this document.  A zero 8 request?
13    A.  Oh.  The only reference to O8 that I know about
14 is O8 is a specific number on our warning -- I think it's
15 the SIU warning system specifically.  But it's a form of a
16 warning system when it comes up on files that there are
17 files to pay particular attention to and -- for any number
18 of reasons, but SIU's identified it -- I believe it's SIU
19 that's identified it as there being a reason to sort of be
20 particularly aware of that file for some past reason.
21 There may have been a past claim or something.
22    Q.  Do you know whether there was ever -- there was
23 ever an O8 request put on this file?
24    A.  I have no idea.
25    MR. MARK:  All right.  I'll show you what we'll

Page 171

1  mark as Exhibit 26.
2     THE WITNESS:  Okay.
3     (Exhibit 26 was marked for identification and is
4     attached hereto.)
5  BY MR. MARK:
6     Q.  Let's start with the bottom email, the one on the
7  second page, please.  It's an email from Laurie Olstrom to
8  Ken.  Do you know who Laurie Olstrom is?
9     A.  Yeah.  She would have been the adjuster handling
10 the file at the time.
11    Q.  All right.  And Ms. Olstrom writes:
12       As we discussed, Paul's lawyer is alleging that
13       you misrepresented yourself as being from
14       Immigration Canada.  When you get a chance please
15       go through your records to see if you can find
16       evidence confirming that you identified yourself
17       appropriately."
18 Do you see that?
19    A.  I do.
20    Q.  She then writes:
21       I don't think there's any evidence [sic] --"
22 I'm sorry.
23       ... any substance to the allegation, but if you
24       have evidence that contradicts the allegation, it
25       would be very helpful.  They are also alleging

Page 172

1  that we broke into his cabin and messed with his
2  computer!!!"
3  Do you see that?
4     A.  I do.
5     Q.  So -- now, is there anything in this email that
6  provides comfort to ICBC that Mr. Carter appropriately
7  identified himself as an investigator on behalf of ICBC?
8     MS. CROW:  Objection.  Jurisdiction.
9     MR. MARK:  Well, this is all -- you know, this is
10 now 2012, several years after the fact, and this does go
11 directly to our earlier discussion, which is whether or
12 not Carter appropriately identified himself.  He's now
13 saying years later that he did -- or suggesting he did.
14 And I'd like to understand if ICBC ever concluded, one way
15 or the other, that, you know, the -- that there was
16 another transcript -- that there was some another piece of
17 communication that suggested that he actually stated that
18 he was working on behalf of ICBC.
19    MS. CROW:  Think those are all different things
20 than the question does something here give ICBC comfort.
21 Those -- I think those are different questions.
22    MS. PERRY:  I'm going to overrule the objection.
23 Part of his point is -- is that this gentleman may not
24 have properly, in his view, identified himself.  And I --
25 I think he's trying to determine, A, is there anything in

JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
173–176

Page 173

1  this that would undermine his working theory that he
2  didn't properly identify himself and accordingly his
3  investigative techniques may have not been up to par.  So
4  you can answer the question.
5      THE WITNESS:  So she -- Laurie is asking Ken if
6  he misrepresented himself, and he's saying no:
7          I've never purported myself [sic] to be anyone
8          other than myself."
9  BY MR. MARK:
10     Q.  Well, she's also saying:
11         Please go through your records to see if you can
12         find evidence confirming that you identified
13         yourself appropriately."
14     A.  Right.
15     Q.  Do you see that?
16     A.  I do.
17     Q.  Is there any -- is there anything in this email
18  here where Mr. Carter's providing confirmation that he
19  identified himself appropriately?
20     A.  My read of number 1 is that that's his answer and
21  his way of saying that he thinks he did identify himself
22  appropriately.
23     Q.  I'm sorry.  Where does he say that?
24     A.  "I have never purported myself to be anyone other
25         than myself" in answer -- "did you misrepresent

Page 174

1          yourself," and that's his answer.
2      Q.  Oh, I see.  Okay.  But he never indicates, of
3  course, that he was working on behalf of -- there's
4  nothing in here that suggests that he ever indicated that
5  he was working on behalf of ICBC; correct?
6      A.  That doesn't seem to be a specific question
7  addressed in these emails.  It was more "did you
8  misrepresent yourself."  And he's saying:
9          I've never purported myself to be anyone other
10         than myself."
11     Q.  Okay.  And then Laurie Olstrom writes back to
12  Ken:
13         Thanks, Ken.  I have no concerns about -- with
14         respect to your professionalism.  (And I agree
15         with your assessment of Hall.)"
16  Do you see that?
17     A.  Yes.
18     Q.  Are you aware of whether anybody at ICBC ever
19  raised any concerns with respect to Mr. Carter's
20  professionalism?
21     MS. CROW:  Objection.  Jurisdiction.
22     MR. MARK:  Well, I mean, if Mr. Carter has a
23  reputation in ICBC of -- of working along the -- you know,
24  outside of the -- out of bounds, then I think that it
25  provides a lot of additional substance and credibility to

Page 175

1  the allegations that --
2      MS. PERRY:  So the reason I should overrule it is
3  if he did have a reputation -- and I have no idea or
4  reason to believe he did -- for what Mr. Mark says is
5  working out of bounds and he was hired anyway, that would
6  be, you know, like a negligent hiring almost or, you know,
7  an effort to hire someone who's known to be out of bounds.
8  So I'm going to overrule it because of that.  And you can
9  answer the question.
10     MS. CROW:  I'll object to form.  Go ahead and
11  answer.
12     THE WITNESS:  Okay.  So I want to be clear about
13  specifically what question I'm answering.
14  BY MR. MARK:
15     Q.  I don't even know.  Did anybody -- did anybody
16  at -- did you ever receive any complaint from anybody at
17  ICBC or catch wind of anybody at ICBC complaining about
18  Mr. Carter's professionalism?
19     MS. CROW:  Object to form.  Go ahead.  Answer.
20     THE WITNESS:  I'm not aware of that ever
21  happening.
22  BY MR. MARK:
23     Q.  So no one at ICBC ever said to you,
24  Mr. Di Cesare, to your knowledge, that they had an
25  issue with Mr. Carter's professionalism?

Page 176

1      A.  Not that I recall, no.
2      Q.  You earlier mentioned that -- at the beginning
3  of the deposition that you were working with Mr. Carter --
4  or somebody was working with Mr. Carter to obtain
5  affidavits from him.  Do you recall that?
6      A.  To obtain affidavits from him?
7      Q.  To obtain an affidavit from him in connection
8  to -- in responding to certain of the allegations that
9  were made.
10     A.  I don't remember --
11     Q.  Okay.  I don't --
12     A.  I don't think I said we were trying to get an
13  affidavit from him.  I don't know if that was -- that's
14  true.
15     MR. MARK:  I mean -- I'm sorry.  Then I
16  misunderstood.  I apologize.  I'll show you what we'll
17  mark as Exhibit 27.
18     THE WITNESS:  Sorry.  Give me a second.  Okay.
19     (Exhibit 27 was marked for identification and is
20      attached hereto.)
21  BY MR. MARK:
22     Q.  Who's Gordon Marshall?
23     A.  He was defense counsel at the time.
24     Q.  Does he still work -- do legal work for ICBC?
25     A.  I don't think so.  He's definitely left Pacific



Page 177

1 Law, and I think he's retired.
2     Q.  All right.  So Mr. Carter writes to Mr. --  I'm
3 assuming -- if you look at the email, in the middle of the
4 page it says on 2013-02-27 Mr. Carter's emailing
5 Mr. Marshall, I think, and asking him if he's representing
6 Action Pacific in answering these affidavits or only ICBC.
7 And then he's saying that ICBC may wish to obtain separate
8 counsel on Mr. Carter's behalf.  Do you see that?
9     A.  Sorry.  I'm looking for the word "affidavit."
10 Are you talking about:
11     I am in receipt of the affidavits"?
12     Q.  No.  So in the middle of the page you'll see a
13 line that says "on 2013-02-27."
14     A.  Yes.
15     Q.  And then right below that it says "without
16 prejudice."
17     A.  Yes.
18     Q.  Do you see that?
19     A.  Yeah.
20     Q.  I'm talking about that paragraph.
21     A.  Oh, I see.  If I ask --
22     I ask if you are representing Action Pacific in
23         answering these affidavits."
24 Yes?
25     Q.  Yes.

Page 178

1     A.  Okay.  And so what do you want me to answer then?
2     Q.  Are you aware of whether Mr. Carter ever answered
3 those affidavits?
4     A.  There was a discussion -- there was an attempt to
5 have a discussion about what his response to the
6 affidavits was.  And so initially when this came up --
7 because you'll see he's wondering if we're going to pay
8 for his legal expenses, and ultimately we weren't.  But a
9 series of events happened where there were -- you'll see
10 up top where it says, for example -- let me just scroll to
11 the top.
12     My only response, Laurie, was what I sent
13         Carter -- was what I sent ... earlier today.  If
14         ICBC is to cover his private legal costs someone
15         from ICBC will have to talk [to] him."
16 So that's not something Gord was going to get involved in.
17     In the meantime, on my return to Vancouver I will
18         be asking Carter to meet with me."
19 And my understanding is that that never happened.  And I
20 don't know that for sure, but at some point after this Ken
21 went out and got -- retained his own counsel.
22     Q.  Now, he states that:
23     I maintained my evidence, and that is very much
24         contrary to these suggestions."
25 Do you know what evidence he's referring to?

Page 179

1     A.  The affidavits.  The allegations in the
2 affidavits.  He says:
3     You have true and correct [sic] -- true and
4         accurate transcripts of the conversations I have
5         had with Leadbetter and Ayers."
6 And that's consistent with your understanding that those
7 transcripts are true and accurate; right?
8     A.  Sorry.  I'm just trying to get to the page you're
9 on.
10     MS. CROW:  You were there.
11     THE WITNESS:  Oh, was I there?  Sorry.  Bear with
12 me.  Okay.
13     MS. CROW:  There you go.  Right there.
14     THE WITNESS:  Okay.
15 BY MR. MARK:
16     Q.  The transcripts he's referring to -- that's
17 consistent with your understanding, that these -- that the
18 transcripts were true and accurate transcripts of the
19 conversations; right?
20     A.  Yes.
21     Q.  Do you know whether this meeting with Gordon
22 Marshall ever occurred?
23     A.  I don't.  But I haven't seen any confirmation on
24 the file that it ever occurred.
25     Q.  Do you know who Pamela Larsen is?

Page 180

1     A.  Yes, she was a manager at various times, but
2 manager of what was once the head injury department at
3 ICBC and then also I believe she was a manager -- I want
4 to say head office claims -- but I'm not sure about --
5 certainly she was a manager of the head injury department
6 for a period of time and then she had other various
7 management roles.
8     Q.  Do you know who Jasroop Grewal is?
9     A.  Jas Grewal?
10     Q.  Yeah.
11     A.  So he was -- sorry.  He was counsel after Gordon
12 Marshall.
13     MR. MARK:  I'm showing you 28.
14     THE WITNESS:  Okay.
15     (Exhibit 28 was marked for identification and is
16         attached hereto.)
17 BY MR. MARK:
18     Q.  So this is an email from Mr. Carter in July 2014
19 to you asking who's handling the file.
20     I got another call from ICBC lawyer.
21 If you go to -- it's at the bottom of page 2.  Do you see
22 that?
23     A.  Yes.
24     Q.  And Mr. Carter says:
25     John:  Why is the ICBC lawyer contacting me and



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
181–184

Page 181

1    requesting that I resubmit all my file work to
2    him?  Why does he not have a copy of this
3    material?  It was all sent to ICBC over the
4    years."
5    And then you write -- you copy your lawyer and you say:
6        I'll try to speak to him this week so we're on
7        the same page."
8    Do you see that?
9        A.  Yeah.
10       Q.  Now, counsel then writes back just to you and
11   says:
12       Mr. Carter should not be contacting you directly
13       when he has counsel, and we cannot respond to him
14       any further."
15   And then he writes:
16       Also, he himself told me that he did not send the
17       entire file (prior to him re-retaining counsel.)
18       In fact, he said he had a box of stuff sitting on
19       top of his file cabinet."
20   Do you see that?
21       A.  I do, yeah.
22       Q.  And do you recall ever trying to get the box of
23   stuff sitting on top of his file cabinet?
24       A.  No.
25       Q.  Why not?

Page 182

1        A.  Judging from this email, what happened was Jas
2    had a conversation -- let me just -- with his lawyer,
3    I believe.  Let me just read it again.
4            Yeah, so he'd had a conversation with Ken.  At
5    some point Ken had told him that we didn't have his
6    complete file.  Effectively we had his reports.  And so in
7    fact he said he had a box of stuff, as you pointed out,
8    sitting on top of his filing cabinet.  And then, as I
9    recall, Jas was going to speak with Ken's lawyer, and I
10   don't think it ever got much beyond that.  We certainly
11   never obtained the whole of his file or whatever was in
12   this box that was sitting on his desk.  Not that I'm aware
13   of anyway.
14       Q.  Don't you think that that would have been
15   important to have?
16       A.  Well, we didn't have a right to demand it, so ...
17       Q.  But you never did demand it?
18       A.  Judging from this, it looks like there was a
19   discussion about whether or not he would provide that to
20   us, and then through discussion -- I'm gathering through
21   discussions with his counsel they chose not to give it to
22   us.
23       Q.  And when was the last time you spoke to
24   Mr. Carter about Hall?
25       A.  Oh, boy.  I don't remember.  It was a long, long

Page 183

1    time ago.
2        Q.  Years?
3        A.  Yes.
4            MR. MARK:  Okay.  Now I'll show you what we'll
5    mark as Exhibit 29.
6            (Exhibit 29 was marked for identification and is
7            attached hereto.)
8    BY MR. MARK:
9        Q.  Shortly after this email correspondence that we
10   just looked at, you put in a note in the file.
11       A.  Okay.
12       Q.  And you'll see it dated August 14th.
13       A.  August 13th?
14       Q.  14th.
15       A.  2014 maybe?
16       Q.  I'm sorry.  August 13th, 2014.  Thank you.
17           So as I understand it -- so the lay of the land
18   here is that Mr. Hall is making allegations against
19   Mr. Carter regarding impropriety.
20       A.  Yes.
21       Q.  You've asked Mr. Carter to rebut those
22   allegations.  Mr. Carter is not willing to put it -- does
23   not provide an affidavit and does not wish to provide the
24   balance of the documents that he has relating to his
25   investigation.

Page 184

1        A.  Okay.
2        Q.  Is that a fair summary as to what's going on with
3    Carter as of August 13th, 2014?
4            MS. CROW:  Object to form.  Go ahead.
5            THE WITNESS:  I think it's accurate.  Ultimately
6    he didn't want to provide us with the complete file
7    materials, if that's what you're asking.  Yes.
8    BY MR. MARK:
9        Q.  And did you ever determine why he didn't want to
10   provide the complete file materials?
11       A.  No.
12       Q.  Didn't you think that having the complete file
13   materials would be important in rebutting some of the
14   claims that Mr. Hall was making?
15       A.  Ken had adamantly denied that he had engaged in
16   any of these alleged activities.  He was somebody who had
17   an excellent reputation.  We did make the effort to ask
18   him again about the allegations.  He denied them.  There
19   was some discussion about the file materials.  I can't
20   speak to his mindset.  Maybe he was concerned about how
21   those file materials might be used.  I don't know.  All I
22   know is that ultimately we didn't get them.  There was
23   some discussion between our lawyers and his and then there
24   wasn't a lot more activity simply because there were a lot
25   of other things going on with respect to the tort claim



Page 185

1  and there wasn't any action per se to respond to.  So we
2  decided that -- we accepted his word and we moved on with
3  investigating the file and moving on with the litigation
4  because there were other issues to deal with.
5      Q.  But even in this note you indicated that there
6  might be something that Mr. Carter does not want you to
7  see; right?
8      MS. CROW:  Object to form.
9      THE WITNESS:  I'm just reading the note.  Sorry.
10  Forgive me.
11  BY MR. MARK:
12     Q.  It's the last sentence of the note, sir.
13     A.  Yeah.  That's always a possibility.
14     Q.  Who was Mr. Carter's counsel?  Do you know?
15     A.  I don't, to be honest with you.
16     MR. MARK:  All right.  I think now's a good time
17  to take a five-minute break.  And then we'll go another
18  30 and we'll be done.
19     (PROCEEDINGS RECESSED AT 2:06 P.M. PACIFIC TIME)
20     (PROCEEDINGS RECONVENED AT 2:11 P.M. PACIFIC
21         TIME)
22  BY MR. MARK:
23     Q.  You understand you're still under oath, sir?
24     A.  Yes.
25     MR. MARK:  All right.  I'm showing you what we'll

Page 186

1  mark as Exhibit 30.
2      (Exhibit 30 was marked for identification and is
3          attached hereto.)
4      THE WITNESS:  Okay.
5  BY MR. MARK:
6      Q.  Now, are you aware that on or about
7  February 27th, 2014, ICBC confirmed that Allstate had
8  denied the claim?
9      A.  That's not what I get from that.
10     Q.  Okay.  What does that -- what does that third
11  entry down mean to you?
12     A.  "ALLSTATE INSURANCE CONFIRMING MR. HALL IS THE
13         DENY FILE."
14  So my first read of that -- the reaction would be that
15  they're denying liability --
16     Q.  Okay.  And is that --
17     A.  -- for the accident.
18     Q.  Do you know -- do you know that to be true or is
19  that your supposition?
20     A.  No, that's just my interpretation of that line.
21     Q.  Do you know who wrote that line?
22     A.  I don't.
23     Q.  Do you know why Allstate confirmed that it was
24  denying liability?
25     A.  Oh, maybe for anticipated subrogation claims.  I

Page 187

1  don't know.  I'm guessing.
2      MS. CROW:  Don't guess.
3      THE WITNESS:  Sorry.
4  BY MR. MARK:
5      Q.  All right.  Now, you're aware, sir, that one of
6  the allegations in this case is that there are some
7  discrepancies between different claims files; right?
8      A.  Yes, I -- I'm aware of that.  I'm not sure what
9  the discrepancies are, but I'm aware that there's an
10  allegation of discrepancies.
11     MR. MARK:  Okay.  So you'll have your chance.
12  I'm showing you what we'll mark as Exhibit 31.
13     THE WITNESS:  Okay.
14     (Exhibit 31 was marked for identification and is
15         attached hereto.)
16  BY MR. MARK:
17     Q.  Now, this is a printout from a claim file dated
18  May 1st, 2014; correct?
19     A.  Yes.
20     Q.  And it shows --
21     A.  Sorry.  The printout was May 1st, 2014, it looks
22  like.
23     Q.  Yeah.  Yeah.  The printout is May 1st, 2014, and
24  it lists a bunch of entries in the November 2003 to
25  February 2004 time frame; correct?

Page 188

1      A.  I'll just scroll down.  To February 17th, '04?
2  Yes.
3      Q.  All right.  Now, how many entries do you see on
4  November 19th, 2003?
5      A.  Five.
6      Q.  Now go back to Exhibit 3.
7      A.  Okay.
8      Q.  And you'll see -- tell me how many entries do you
9  see on the November 19th, 2003 page?
10     A.  Six.
11     Q.  Okay.  Do you know why --
12     A.  I don't --
13     Q.  Go ahead, sir.  Sorry.
14     A.  Just from the starting point, are they the same
15  claim file?
16     Q.  Yes.  They're both the Dove -- the Dove file,
17  373571.  You can and back -- you can toggle between 31 and
18  3, if you want.
19     A.  Okay.
20     Q.  Okay.  Do you know why there would be a
21  discrepancy between the November 19th, 2003, entries on
22  Exhibit 3 and the November 19th, 2003, entries on
23  Exhibit 31?
24     A.  Let me go back.  I'm just stumbling because they
25  look -- their format is different; right?  So I just --



JAMES DI CESARE
HALL vs INSURANCE OF BRITISH COLUMBIA

March 19, 2021
189–192

Page 189

1  but if in fact there's one note less on one than the
2  other, I'm not sure why that would be, if that's the
3  question.
4      Q.  Well, I'm not asking you to speculate as to
5  whether or not there is or is not one less note.  I think
6  we know there is.  I'm asking you if you know why.
7      MS. CROW:  Object to form.
8      THE WITNESS:  I don't know why.  I have no idea.
9  BY MR. MARK:
10     Q.  How does that occur?  I mean, how is that even
11  possible?
12     A.  Like I say, I don't know.  There's -- we've gone
13  over the process for deleting notes.  Aside from that, I
14  have no idea.
15     Q.  Do you know why a note that was entered in
16  November of 2003 would appear on a claim file from 2007
17  and then be missing from a claim file in 2014?
18     A.  Do we know which note it is?  We should be able
19  to figure that out; right?
20     Q.  Well, I -- I believe it's the note that says
21  "SEND LVI TO TPA."
22     A.  If that's the note, I can't imagine there's any
23  reason for it.  There's nothing -- there's nothing of any
24  real significance there.
25     Q.  In other words, you can't think of a reason why

Page 190

1  that would be deleted?
2      A.  No.
3      Q.  Now, going back to Exhibit 31, you will also see
4  that there are two -- there's one entry on November 26th,
5  2003.  Do you see that?
6      A.  Yeah, it looks like one one-line entry.
7      Q.  Yeah.  And if you go back to Exhibit 3, you'll
8  see that there's two entries on November 26th, 2003.
9      A.  Just a second.  Sorry.  The date again?
10     Q.  November 26th, 2003.
11     A.  So I see two notes with that date.
12     Q.  Correct.  So same questions; right?  Do you know
13  why there would be two notes on the May 1st, 2007, claims
14  file and only one note on the 2014 claims file?  I'm
15  sorry.  Yeah, 2014 claims file.
16     A.  No.  I mean, I'm just struggling with trying to
17  go back and forth between the two documents.  But I don't
18  know of any obvious reason why there would be a different
19  number of notes on any given date.  And these are very --
20  there's really no -- nothing of substance in these notes,
21  but that doesn't matter.  I don't know why there wouldn't
22  be the same number of notes.
23     Q.  And I assume that ICBC has policies as to when
24  notes should be deleted or not be deleted; correct?
25     A.  That I don't know, to be honest.

Page 191

1      Q.  Is there any way to determine -- by looking at
2  the ICBC claims management system, to see who deleted a
3  particular note?
4      A.  That's not something I would know about.
5      Q.  And you've testified that you personally have
6  never deleted any notes in these claims files; correct?
7      A.  Yeah.  No, not that I'm aware of.
8      Q.  Now, I will represent to you that these are not
9  the only examples of deletions or discrepancies between
10  the 2007 file and the 2014 file.  There's many.  As you
11  sit here today -- I mean, I can go through them all one by
12  one, but I guess what I'm wondering is do you have any --
13  can you even hazard an educated guess as to why there
14  might be those discrepancies between the claims files?
15     A.  No.  I mean, sitting here right now I have no
16  idea.
17     MR. MARK:  All right.  I'm going to show you what
18  we'll mark as Exhibit 32.
19     (Exhibit 32 was marked for identification and is
20      attached hereto.)
21     THE WITNESS:  Okay.
22  BY MR. MARK:
23     Q.  You'll see on July 16th -- I'm sorry.  July 11th,
24  2016, you wrote -- well, I don't know if it was you.  Is
25  that your note?

Page 192

1      A.  The first one?  Which is --
2      Q.  The one under "MANAGER REVIEW."
3      A.  Meaning -- I thought it said "manager."  I don't
4  know what that says.  "MANAGER NOTE"?
5      Q.  "Manager" and then there's the letter N.  I think
6  it's just a typo.
7      A.  That's a manager note potentially.
8      Q.  I think that's probably what it is.  Is that your
9  note?
10     A.  No.  That would have been made by a manager.
11     Q.  And who was the manager on the file at this time?
12     A.  I'd have to check, to be honest with you.
13     Q.  Okay.  So it says:
14     THIS FILE JUST WON'T GO AWAY."
15  And we're in 2016 now.
16     A.  Yes.
17     Q.  "WE DID A RECENT CYBER INVESTIGATION THAT SHOWS
18      THE PLAINTIFF DOING LOTS OF WORK."
19  Who performed that cyber investigation?
20     A.  I don't recall, to be honest with you.
21     Q.  What is a cyber investigation?
22     A.  Oh, a review of social media.
23     Q.  What else?
24     A.  That's predominantly it.  It's a review of a
25  person's social media activity just to get a sense of what



Page 193

1 they're up to.
2     Q. Does it review the person's online presence,
3 websites, things of that nature?
4     A. Yeah.
5     Q. I'm sorry?
6     A. Yes.
7     Q. Okay. Is there any kind of cyber surveillance
8 that's included in that?
9     MS. CROW: Object to form.
10     THE WITNESS: What do you mean by "cyber
11 surveillance"?
12 BY MR. MARK:
13     Q. Well, do you know what cyber surveillance is?
14     A. No.
15     Q. Okay. And it states here that it:
16     ... SHOWS THE PLAINTIFF DOING LOTS OF WORK."
17 Do you know what -- what specifically the investigation
18 showed with respect to the plaintiff doing a lot of work?
19     A. No. And as I'm reading it I'm wondering if it's
20 a note that's placed on the wrong file, because that does
21 happen.
22     Q. Well, it says "THIS FILL JUST WON'T GO AWAY," so
23 does that sound like it's the Hall file?
24     A. It could be, but it could be any number of files,
25 to be honest with you.

Page 194

1     Q. So as you sit here today you don't know -- well,
2 do you have any reason to believe it's in the wrong file?
3     A. Well, I don't recall a cyber investigation
4 showing him doing lots of work. That's why I'm led to
5 believe that this is a misplaced note.
6     Q. It then states:
7     WE JUST NEED TO SET THIS FOR TRIAL AND MOVE IT
8     ALONG."
9 Do you see that?
10     A. Yes.
11     Q. And do you know whether the prevailing sentiment
12 at the time, in July of 2016, was that this needed to get
13 set to trial and moved along?
14     MS. CROW: Objection. Jurisdiction.
15     MR. MARK: Well, I'm trying to establish the
16 authenticity of this note, so to the extent of course that
17 they were -- I'd like to try to understand the basis for
18 the witness's statement that this may be in the wrong
19 file. It seems to me that it has a lot of the indicia
20 suggesting that it's in the correct file, including the
21 fact that this was an old file that, quote, won't go away,
22 and my understanding that at the time there was
23 discussions about wanting to set this for trial and moving
24 it along.
25     MS. PERRY: Can you address the jurisdictional

Page 195

1 relevance if it's not in the wrong file?
2     MR. MARK: Sure. To the extent that there's been
3 a cyber investigation, that would fall within the direct
4 effect exception to the Foreign Sovereign Immunities Act.
5 To the extent -- yeah.
6     MS. PERRY: Ms. Crow, what's your response to
7 that?
8     MS. CROW: He's testified that he can't recall if
9 a cyber investigation took place, and he's defined what it
10 was. I think the question as to what was ICBC's sentiment
11 about setting it for trial is a separate inquiry from was
12 there an investigation done, what was that investigation.
13     MS. PERRY: Why -- why, Mr. Mark, would the set
14 for trial piece as opposed to the --
15     MR. MARK: Yeah, because I'm trying -- because
16 I'd like to establish the reasons to suggest that this is
17 actually in the correct file.
18     MS. PERRY: Okay. So we can -- you know, let's
19 say we do that. It would only matter if there was a
20 jurisdictional nexus between what was in that portion, if
21 it's in the correct file. So the cyber investigation I
22 understand. What about the set it for trial part?
23     MR. MARK: Well, so if you look at the note, it
24 says -- it says there's a -- it's one note; right? It
25 says:

Page 196

1     THE FILE WON'T GO AWAY" --
2     MS. PERRY: Right.
3     MR. MARK: "WE DID A RECENT CYBER INVESTIGATION
4 THAT SHOWS the PLAINTIFF DID LOTS OF WORK. WE JUST NEED
5 TO SET THIS FOR TRIAL AND MOVE IT ALONG?"
6     MS. PERRY: Okay.
7     MR. MARK: The witness has testified that this
8 might be in the wrong file -- it might be in the wrong
9 case, so --
10     MS. PERRY: Assume that, you know, we let you
11 finish that piece with him, we would only have you finish
12 that piece with him if proving that it was in the proper
13 file had a jurisdictional connection. So that's what I'm
14 asking you.
15     MR. MARK: Right. So the jurisdiction -- so the
16 reason that if this were in the proper file it would have
17 a jurisdictional connection because it would suggest that
18 there was a cyber investigation that was performed. In
19 connection with this particular file, that of course has
20 the jurisdictional nexus that we've alleged.
21     MS. PERRY: Understood with respect to the cyber
22 investigation. Ms. Crow brought up the "we need to set
23 this for trial" piece. What, if anything, would that have
24 to do with the jurisdictional nexus?
25     MR. MARK: Just because it's one entry. It's not



JAMES DI CESARE                                    March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                    197—200

Page 197

1  three separate entries. It's not --
2       MS. PERRY:  How about this.  How about this.
3       MR. MARK:  Yeah.
4       MS. PERRY:  You can talk -- Ms. Crow, I think he
5  has a right to try to sift through whether it's in the
6  right file or not.  And one way to do that is to go
7  through the whole thing.  He raised, you know, I could
8  have -- I could have dropped this in the wrong bucket;
9  okay?  So you can do whatever you need to do to determine
10  whether it's in right file.  You can then talk about the
11  cyber investigation, which you already have.  If you want
12  to talk about "we need to set it for trial," we're going
13  to have to talk about whether there's a jurisdictional
14  connection.  Fair enough?
15       MR. MARK:  Okay.
16       MS. CROW:  Yeah.
17       MS. PERRY:  Okay.
18  BY MR. MARK:
19       Q.  So I think the question then is -- so let me make
20  sure, Mr. Di Cesare, I understand your testimony.  Your
21  testimony is you're not sure one way or the other whether
22  this is in the correct file; correct?
23       A.  Yeah, I have -- I'm wondering if it's in the
24  correct file or not.
25       Q.  All right.  That you did not personally put in

Page 198

1  this note; correct?
2       A.  No, this is a manager note.
3       Q.  That you don't know which manager put in this
4  note; right?
5       A.  I don't off the top of my head, no.
6       Q.  You don't know -- is there a way to determine
7  what manager put this note in?
8       A.  I believe so, yeah.  I think we --
9       Q.  How?  How?
10       A.  Hello?
11       MS. CROW:  How.
12  BY MR. MARK:
13       Q.  How?
14       A.  Oh, I believe it might be as simple as just going
15  to the file and on a different screen it will show who
16  made the note, I believe.  I'm not positive about that.
17       Q.  Okay.  You will agree with me at least that the
18  beginning part of this note, that the file just won't go
19  away, is consistent with the sentiment concerning
20  Mr. Hall's file; correct?
21       A.  Yeah.
22       Q.  And you'd agree with me that the last part of
23  this note that says we just need to set this for trial and
24  move it along is also consistent with the sentiment
25  concerning Mr. Hall's case; correct?

Page 199

1       A.  Yes.
2       Q.  Okay.  Do you know who Janene Severson is?
3       A.  Yes.
4       Q.  Who's she?
5       A.  She is somebody that we retain to do cyber
6  investigations.
7       MR. MARK:  Now I'm going to show you a document
8  that we'll mark as Exhibit 33.
9       (Exhibit 33 was marked for identification and is
10       attached hereto.)
11  BY MR. MARK:
12       Q.  You wrote this email; right?
13       A.  Yes.
14       Q.  And you're sharing the contact information of
15  Ms. Severson to Jasroop; correct?
16       A.  Yes.
17       Q.  And you're asking her to -- you're asking him to
18  retain her to conduct an investigation on Mr. Hall and his
19  business ventures; correct?
20       A.  The type print shrunk, so we're trying to expand
21  it a bit.  Yes.  Okay.  So -- yeah, when I first read
22  "lots of work" I was thinking evidence of physical work.
23  Sorry.  That's not what this means.
24       Q.  What do you -- what do you mean?
25       A.  There was evidence of Mr. Hall being involved in

Page 200

1  lectures and that sort of thing with respect to a business
2  venture -- that tied into his business venture.
3       Q.  I'm sorry.  How did you get from -- can you
4  explain to me how that light bulb just went off?
5       A.  The fact that his -- we're talking about --
6       Please retain her to conduct such an
7       investigation on Mr. Hall and his business
8       venture."
9  And then I recall Jas Grewal -- there was investigation
10  into what presence there was online.  And as part of
11  that -- part of the results were that there was evidence
12  of him giving lectures, I think, or participating in some
13  form of convention or something that spoke to -- he was a
14  speaker of some sort, I believe.  Whether it actually
15  happened through Janene, though, or Jas I'm not sure.
16  Because I know that at one point Jas was doing a little
17  bit of his own cyber sort of search and he became aware of
18  that.  So I don't know who ultimately did that.  My sense
19  is that it might have been Jas that ultimately did it.
20       Q.  I'm sorry.  I'm confused.  So let me try to make
21  sure I understand.
22       A.  Okay.
23       Q.  And I think it's -- I'm sure it's my fault.  We
24  looked at the note from July 2016 which states that:
25       WE DID A RECENT CYBER INVESTIGATION THAT SHOWS



Page 201

1       THE PLAINTIFF DOING LOTS OF WORK."
2    A. Yeah.
3    Q. That was from July?
4    A. Yes.
5    Q. Now, in December, five months later, you're
6    emailing the contact information of an individual who
7    does -- who's "excellent at conducting online
8    reviews/investigation."
9    A. Right.
10   Q. Okay. So it's your testimony that
11   Ms. Severson --
12   A. Yes.
13   Q. -- was retained to conduct an online review or
14   investigation concerning Mr. Hall's lecturing?
15   A. No.
16   Q. Okay.
17   A. So to do a -- the gist of this is they were
18   contemplating retaining her to do a cyber search with the
19   primary focus being -- and sort of more of it is coming
20   back as we talk about it -- the fact that, as I recall,
21   Jas had done his own research and found dome evidence of
22   Mr. Hall being involved in some respect with promoting the
23   business or talking about the pesticide free treatment of
24   courses or something to that effect, something related to
25   this business venture.

Page 202

1       Jas Grewal, as I recall, had done some research,
2    found out some information, and so then the contemplation
3    was well, do we go further with this. I'm not sure we
4    ever went further with it. I just don't recall, to be
5    honest with you.
6    Q. Okay. And did Mr. Grewal ever share with you
7    these findings specifically?
8    A. I recall there being some -- I don't know what
9    the form was, but I recall him telling me, as I've
10   reported -- or shared with you, something about his
11   participating in some form in a lecture or something along
12   those lines.
13   Q. Any reason that didn't make it into the claim
14   file?
15   A. Pardon me?
16   Q. Any reason that that did not make it into the
17   claim file?
18   A. No.
19   Q. Shouldn't it have?
20      MS. CROW: Object to form.
21      THE WITNESS: Go ahead and answer?
22      MS. CROW: Yeah.
23   BY MR. MARK:
24   Q. Yeah.
25   A. I don't know what form it came in, whether it was

Page 203

1    a conversation or if it was an email. So, you know, for
2    example, if it was a conversation, it's possible that it
3    never made it but that we had continued conversations that
4    led to this. That's a possibility. I just don't know
5    what form that information came to me in.
6    Q. And do you know whether Mr. Grewal figured this
7    out on his own or whether he had hired somebody to find
8    this out?
9    A. No. As I recall, he did his own sort of -- when
10   he had some time -- cyber search/investigation, if you
11   want to call it that.
12   Q. Okay. So it's your testimony then that the note
13   actually did pertain to -- the note we looked at in the
14   last exhibit actually did pertain to Mr. Hall, that
15   Mr. Grewal conducted an online investigation and found
16   somewhere that Mr. Hall was lecturing and -- or giving
17   some kind of a presentation. He shared that with you
18   either orally or in writing. You're not sure which way.
19   Then a few months later you thought maybe we'll retain
20   Janene Severson to conduct a separate online
21   investigation?
22      MS. CROW: Object to form. Go ahead and answer.
23      THE WITNESS: That is --
24   BY MR. MARK:
25   Q. That's a very long question, but I want to make

Page 204

1    sure I got the summary right at least.
2    A. That's the general sense of it, yes.
3    Q. Okay. And you never saw this video?
4    A. I'm not sure there was a video.
5    Q. You never saw whatever it is that Mr. Grewal
6    found relating to Mr. Hall's online activities?
7    A. I honestly don't recall it.
8    Q. But apparently Mr. Grewal shared this not just
9    with you but with somebody else at ICBC, because the
10   manager put in the note that said that Mr. Hall was having
11   some -- what were the words used -- "doing lots of work"?
12      MS. CROW: Object to form. Go ahead.
13      THE WITNESS: No. That may have been as simple
14   as me telling the manager what I heard from Jas.
15   BY MR. MARK:
16   Q. Okay. So -- so you're telling me then that Jas
17   telling you that I did -- that he did an online -- that he
18   was snooping around online in his down time, found
19   something that -- we don't know what -- that suggests that
20   Mr. Hall gave some kind of a presentation or speech or
21   otherwise, that that then -- you passed on to a manager
22   and translates into proof that the plaintiff is doing lots
23   of work?
24      MS. CROW: Object to form. Go ahead.
25      THE WITNESS: I don't know what you mean by



JAMES DI CESARE                                        March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                        205–208

Page 205

1  "proof of lots of work." That was the manager's words --
2  or choice of words in relation to me telling him, in all
3  likelihood, what I had heard from Jas. I can't -- I don't
4  know why he chose those specific words.
5  BY MR. MARK:
6      Q. All right. I mean, it's a bit of an overswing,
7  don't you think?
8      A. No.
9          MS. CROW: Object to form.
10          THE WITNESS: Sorry.
11  BY MR. MARK:
12      Q. You don't think so?
13      A. Not at all.
14      Q. To say that we did a recent cyber investigation
15  that shows the plaintiff doing lots of work, that that's
16  the same as Mr. Grewal Googling -- well, we don't even
17  know what Mr. Grewal did, we don't know what Mr. Grewal
18  found, but the conclusion is the plaintiff's doing lots of
19  work?
20          MS. CROW: Objection. Jurisdiction.
21          MR. MARK: You know what? I'll withdraw the
22  question. It doesn't even matter.
23          Let me -- I'm going to show you these invoices
24  that were just provided to me just so I can -- let's see
25  here. All right. I'll mark this first one as 34.

Page 206

1          (Exhibit 34 was marked for identification and is
2          attached hereto.)
3  BY MR. MARK:
4      Q. I haven't really even looked at these yet, so I
5  just want to spend a couple minutes with you on it. So
6  this is only a two-page document. And this is dated -- do
7  you see a date, sir?
8      A. I mean, I see a date March 31st, '13. I can't
9  read the print above it.
10      Q. Where -- oh, I see it. Okay. "Finish date," it
11  says. Okay. So it looks like this is an invoice from
12  Action Pacific Investigations to ICBC; is that correct?
13      A. Yes.
14      Q. And is this -- earlier in your deposition when we
15  were talking about the itemized invoices is this part of
16  what you were talking about?
17      A. Yeah. This is one of the invoices I reviewed.
18      Q. Okay. And it looks like here what he's billing
19  for, if you look at the lower -- the second page, lower
20  left-hand corner:
21          In-depth historical file review, receive
22          affidavits, preparation of disclosure package for
23          counsel, meeting with counsel."
24  Do you see that?
25      A. No. Where are you looking at that?

Page 207

1      Q. It's in the lower left-hand corner under
2  "Additional Comments" on the second page.
3      A. Yeah. No, it's my eyesight. I've got to expand
4  it. Sorry. "In-depth historical file review," yes. I
5  see that.
6      Q. So -- and if you go, actually, to the first page,
7  you'll see under "non-HST costs" -- do you know what "HST"
8  stands for?
9      A. I'm trying to think. No. It's not popping up in
10  my head, to be honest. I don't know what it is.
11      Q. All right. So you'll see it says "lawyers
12  invoice: 1,469.92." Do you see that?
13      A. One sec. Where is the "non-HST"? Just because
14  it may --
15      Q. So if you look at the -- it's about three
16  quarters down the page, maybe more. On the right side
17  you'll see sort of a shaded row that says --
18      A. Oh, yeah. It's a tax.
19      Q. Okay.
20      A. Yeah, that's a tax.
21      Q. So lawyer's invoicing is 1,469.92; right?
22      A. Yeah.
23      Q. Do you know whether ICBC paid for this attorney's
24  invoice?
25      A. We paid this invoice.

Page 208

1      Q. Okay. How do you know that?
2      A. Because it's with the five invoices that I
3  checked to reconcile against how much we paid for Ken
4  Carter.
5      Q. And then on the second page you'll see some more
6  entries which I think all pertain to file review, receive
7  affidavits, preparation of disclosure package for counsel
8  and meeting with counsel. Is that your understanding?
9      A. That's what it says.
10          MR. MARK: All right. I'm going to show you what
11  we'll mark as 35.
12          (Exhibit 35 was marked for identification and is
13          attached hereto.)
14  BY MR. MARK:
15      Q. Is this the other set of invoices you reviewed?
16      A. Oh, it's 14 pages?
17      Q. Yes, sir.
18      A. I can scroll through. It looks like it. Looks
19  like it.
20      Q. Okay. Did you review any other invoices, to your
21  recollection, besides the two batches that I just showed
22  you?
23      A. No. These should be all of it. They totalled
24  $14,000 and something dollars. So it's just under
25  $15,000. There were, as I recall, five Action Pacific



JAMES DI CESARE                                      March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                209–212

Page 209

1  invoices -- no, more than five.  But they added up to just
2  under 15,000 anyway.
3      Q.  Now if you go to, for example, page -- sorry --
4  3 --
5      A.  Sorry.  Page 3?
6      Q.  Yeah.  You'll see -- I just want to make sure I
7  understand that -- or understand that we have the same
8  sort of view as to what we're looking at here.  So on the
9  left you'll see the date, month and year.  And is that
10 presumably the date, month and year that the service is
11 performed?
12     A.  So just -- are we looking at the invoice that
13 says 780?
14     Q.  I'm looking at -- yes.
15     A.  Okay.  And so on the left column you're saying
16 there are dates.  I see those.
17     Q.  Yeah.  Are those the dates that the service was
18 performed?
19     A.  Looks like it, yeah.
20     Q.  Okay.  "Name of operator" is the name of the
21 investigator who did it?
22     A.  Yes.
23     Q.  Okay.  "Service performed."  Here it's -- for
24 some of these it shows a distance, I think.  Is that like
25 a driving distance?

Page 210

1      A.  Yeah.  It would have been a mileage type of
2  thing.
3      Q.  And do you know what -- did he ever provide any
4  support as to what those -- what that mileage corresponded
5  to?
6      A.  It would be included in these invoices --
7      Q.  Where?
8      A.  -- if he did.  But it wouldn't be expected, to be
9  honest with you.  If it was just driving kilometers, he
10 would record those.  For example, a trip to Salt Spring
11 Island, how many kilometers did he travel, and he would
12 record that for that day.
13     Q.  But where would it say -- where on these invoices
14 does it say, you know, on that day, whatever that day was,
15 if there was a trip to Salt Spring Island?
16     A.  It doesn't.
17     Q.  Okay.  So he never provided, actually,
18 descriptors of what specific work he did; is that right?
19     A.  Well, no.  Because it came with a report; right?
20 So, you know, you take the two in concert and you see what
21 investigations have been done and then if the bill looks
22 reasonable for that -- what you would expect to result
23 from that amount of work, you pay the bill.
24     Q.  Okay.  If you look at -- do you know how many
25 times Mr. Carter went to Salt Spring Island?

Page 211

1      A.  I don't.
2      Q.  More than once?
3      A.  I believe that's true, yeah.
4      Q.  And if you look at the page 8 of 14 here, you'll
5  see a drive in December of 2004 of 240 kilometers.  Do you
6  know what that was about?
7      A.  No, I don't.
8      Q.  All right.  Let me -- I think I'm done.  Let me
9  take two minutes just to confer with my client and -- give
10 me two minutes; okay?
11     A.  Okay.
12         MR. MARK:  Thank you.
13         (PROCEEDINGS RECESSED AT 2:50 P.M. PACIFIC TIME)
14         (PROCEEDINGS RECONVENED AT 2:52 P.M. PACIFIC
15         TIME)
16 BY MR. MARK:
17     Q.  So, sir, do you -- these invoices, were these
18 hard copies of these invoices that were then copied?
19     A.  Yeah, they're paper copies.
20     Q.  They're paper copies?  Okay.  And if you look at
21 page 4 of 14, it looks like the second half of this
22 particular invoice got cut off.
23     A.  Yeah.  Just one second.  4?  Yeah, it looks like
24 the way it was scanned it got the bottom half -- or the
25 top half, rather, of that page.

Page 212

1          MR. MARK:  Okay.  All right.  So, counsel, I'm
2  just going to ask that you provide that.  I think it's the
3  bottom half.  I think it just -- when it probably went
4  through the machine it got caught.  So I'll take -- if you
5  don't mind giving that to me.  Thanks.
6          MS. CROW:  No, of course.  That's fine.  I'll --
7  yeah.  I may only have that version.  So we'll circle
8  back.
9  BY MR. MARK:
10     Q.  All right.  And are these invoices in the actual
11 physical claim file with the -- that we talked about with
12 the double hole punch at the top?
13     A.  Yeah.  They would be in the physical file.
14     Q.  All right.  And would all of the SIU notes
15 relating to this claim be in the physical file as well?
16     A.  No.  SIU has their separate file.
17     Q.  All right.  Are you aware of any other documents
18 that were not copied or provided to your counsel from
19 the -- from the claim file, or it's your understanding
20 that the entire file was just handed over?
21     A.  Yeah.  I asked -- I specifically gave the
22 instructions to copy the entire file and send it to
23 counsel, and two copies were made.  I wasn't there when it
24 was done, but that was the instruction.
25         MR. MARK:  Okay.  All right.  I have got no



JAMES DI CESARE                                                  March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                            213—216

**Page 213**

1  further questions.  Thank you.  Thank you very much,
2  Mr. Di Cesare, for your time.  Enjoy your weekend.
3          (PROCEEDINGS ADJOURNED AT 2:55 P.M. PACIFIC TIME)
4          (SIGNATURES RESERVED)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 214**

1              REPORTER CERTIFICATION
2          I, Lisa Ciurysek, Official Reporter in the Province
3  of British Columbia, Canada, BCSRA No. 623, do hereby
4  certify:
5
6          That the proceedings were taken down by me in
7  shorthand at the time herein set forth, and thereafter
8  transcribed, and the same is a true and correct and
9  complete transcript of said proceedings to the best of my
10  skill and ability.
11
12          IN WITNESS WHEREOF, I have hereunto subscribed my
13  name on this 22nd day of March, 2021.
14
15  _____
16  Lisa Ciurysek
17  Official Reporter
18
19
20
21
22
23
24
25

**Page 215**

1  Reference No.: 6738799
2
3  Case:  HALL vs INSURANCE OF BRITISH COLUMBIA
4
       DECLARATION UNDER PENALTY OF PERJURY
5
6          I declare under penalty of perjury that
   I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the
7  same has been read to me, and the same is
   true and accurate, save and except for
8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
9  hereof, with the understanding that I offer
   these changes as if still under oath.
10
11  _____
12      James Di Cesare
13
14      NOTARIZATION OF CHANGES
15          (If Required)
16
17  Subscribed and sworn to on the _____ day of
18
19  _____, 20____ before me,
20
21  (Notary Sign)_____
22
23  (Print Name)                    Notary Public,
24
25  in and for the State of _____

**Page 216**

1  Reference No.: 6738799
   Case:  HALL vs INSURANCE OF BRITISH COLUMBIA
2
3  Page No._____Line No._____Change to:_____
4  _____
5  Reason for change:_____
6  Page No._____Line No._____Change to:_____
7  _____
8  Reason for change:_____
9  Page No._____Line No._____Change to:_____
10  _____
11  Reason for change:_____
12  Page No._____Line No._____Change to:_____
13  _____
14  Reason for change:_____
15  Page No._____Line No._____Change to:_____
16  _____
17  Reason for change:_____
18  Page No._____Line No._____Change to:_____
19  _____
20  Reason for change:_____
21  Page No._____Line No._____Change to:_____
22  _____
23  Reason for change:_____
24
    SIGNATURE:_____DATE:_____
25  James Di Cesare



JAMES DI CESARE                                        March 19, 2021
HALL vs INSURANCE OF BRITISH COLUMBIA                              217

Page 217

```
1    Reference No.: 6738799

     Case:  HALL vs INSURANCE OF BRITISH COLUMBIA
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   James Di Cesare
```



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:20-cv-01992-CEM-LRH

RICHARD HALL,

     Plaintiff,

v.

INSURANCE CORPORATION OF
BRITISH COLUMBIA,

     Defendant.

_____/

## AMENDED NOTICE OF TAKING DEPOSITION

PLEASE TAKE NOTICE that Plaintiff, Richard Hall,  by and through undersigned counsel and pursuant to the Federal Rules of Civil Procedure 30(b)(6) and 45, will take the deposition of the below at said time, date and location:

**DEPONENT:** Corporate Representative(s) of the Insurance Corporation of British Columbia ("ICBC") with the most knowledge of (i) ICBC's retention of and relationship with Kenneth Carter ("Carter") and his company, Action Pacific; (ii) any communications by Carter or others on behalf of the ICBC Enterprise with the David Leadbetter Golf Academy; the PGA Tour headquartered in Jacksonville, Florida; Allstate Insurance; and Porsche Cars North America; and (iii) the deletion of any references to ICBC's communications with Allstate Insurance in the United States in the accident claim files; and (iv) ICBC's maintenance of any other files that may contain information concerning Plaintiff's claim or ICBC's investigation of it/him, including without limitation any legacy files and any files maintained by ICBC's Special Investigation Unit.

**DATE:** Friday, March 19, 2021

**TIME:** 9:    a.m. (PST)

**PLACE:** Via Zoom administered by Esquire Deposition Solutions

     Esquire Deposition Solutions will provide ZOOM link at least one day prior to the deposition.

```
EXHIBIT
001
```

DATED:  March 1, 2021

Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0

B   *s/ Etan Mark*
Etan Mark, Esq.
Florida Bar No. 720852
Daniel S. Maland, Esq.
Florida Bar No. 114932
Niki Namazi, Esq.
Florida Bar No. 1018346
etan@markmigdal.com
daniel@markmigdal.com
niki@markmigdal.com
eservice@markmigdal.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of March 2021, a true and correct copy of the foregoing was served by electronic mail upon all counsel of record.

By: *s/ Etan Mark*

2



Between:

Insurance Corporation of British Columbia

Petitioner

And:

Rex Yusen and The British Columbia Human Rights Tribunal
(Tribunal Member Administ R. Ghazäki)

Respondents

Before: The Honourable Mr Justice R. D. Wilkie

Oral Reasons for Judgment

In Chambers
July 8, 2008

Counsel for Petitioner

Counsel for Respondent Yusa

Counsel for Respondent British Columbia Human Rights Tribunal

Place of Trial/Hearing   Victoria, B.C.

[1]   THE COURT: The relief played for is the petition if granted

...

April 8, 2009 – Revised Judgment
Revised be added further added in Oral Reasons for Judgment of Mr Justice R D Wilkie dated July 8, 2008 have been edited.
• In paragraph 25 which continues on page 7, a 2 in the third line should read as a 12

"R. D. Wilkie J."
The Honourable Mr Justice R D Wilkie

EXHIBIT
002

EXHIBIT

003

00050

```
DATE: 01MAY07     INSURANCE CORPORATION OF BRITISH COLUMBIA        PAGE: 1
PROGRAM: CWI306P              CLAIM FILE FOLDER

CLAIM      : L373571 4                    TASK STATUS : ALL
INSURED    : DOVE, DONALD A
EXPOSURE A : DOVE, DONALD A
EXPOSURE B : HALL RICHARD DAVID
                                                                  TYPE/
DATE     WORKTYPE   DESCRIPTION/DETAIL                             EXP
--------------------------------------------------------------------CMPL
13NOV03 ADMIN       CLAIM REPORTED (CRIS)  063/2758-0 THOMSON, GLENN    A
--------------------------------------------------------------------NOTE
13NOV03 NOTE        RO REPORTING CA APPT SEE RESOURCE NOTES            A
--------------------------------------------------------------------NOTE
13NOV03 NOTE        INS SAID TP WAS NOT INJURED AT SCENE AS NEVER MENTIONED ANY  A
                    THING, SAID NO POLICE AND DID NOT KNOW TP VEH TOWED AWAY?
--------------------------------------------------------------------CMPL
13NOV03 ONLNECLM    CLAIM OPEN            030/0209-6 HUMBER, SHARLENE   A
--------------------------------------------------------------------CMPL
13NOV03 INCURRED    EXPOSURE OPEN         030/0209-6 HUMBER, SHARLENE  KOL:22 B
--------------------------------------------------------------------CMPL
17NOV03 INCURRED    EXPOSURE OPEN         030/C398-3 FYFE, SHELLIE     KOL:21 B
--------------------------------------------------------------------NOTE
19NOV03 NOTE        ESTIMATE WORK ASSIGNMENT REQUEST NOTES             A
                    EST. ACTION   : N/A        STEREO POLICY :
                    LIMITED DEP.  :            REPLACE POLICY:
                    ATD CODE      :            DECL. VALUE   : $0
                    REBUILT       :            LEASED        :
                    GST REGISTRANT: 000        BAY/BOOTH     : #7
                    VEH. LOCATION : DRV
                    NOTES: LVI TO FRONT BUMPER HEADLIGHT. NO ICBC COVERAGE
                    NEW DAMAGE: FRONT END
                    OLD DAMAGE:
--------------------------------------------------------------------NOTE
19NOV03 NOTE        EST A00: LOADED BY  030/8655-3 WHITEHEAD, LARRY     A
                    EST. ACTION   : N/A        STEREO POLICY :
                    LIMITED DEP.  :            REPLACE POLICY:
                    ATD CODE      :            DECL. VALUE   : $0
                    REBUILT       :            LEASED        :
                    GST REGISTRANT: 000        BAY/BOOTH     : #7
                    VEH. LOCATION : DRV
                    NOTES: LVI TO FRONT BUMPER HEADLIGHT. NO ICBC COVERAGE
                    NEW DAMAGE: FRONT END
                    OLD DAMAGE:
--------------------------------------------------------------------CMPL
19NOV03 ESTIMATE    EST A00:  19NOV2003 030/8655-3 WHITEHEAD, LARRY     A
                    EST GROSS COST: $1,563.92     EST TIME TO REPAIR:  3 DAYS
--------------------------------------------------------------------CMPL
19NOV03 REVIEW      SEND LVI TO TPA                                    A
--------------------------------------------------------------------CMPL
19NOV03                                                               A
--------------------------------------------------------------------NOTE
19NOV03 NOTE        CL398 NOT REQUIRED                                 A
--------------------------------------------------------------------CMPL
26NOV03 TRANSFER    FILE TRANSFER TO     030/C398-3 FYFE, SHELLIE      A
--------------------------------------------------------------------CMPL
26NOV03 REVIEW      RED TAG TO SHELLIE                                 A
--------------------------------------------------------------------CMPL
28NOV03 TRANSFER    FILE TRANSFER TO     030/3360-0 NELSON, JOANNE     A
--------------------------------------------------------------------CMPL
15JAN04 ADMIN       CLAIMS CUSTOMER IDENTIFIED                         B
--------------------------------------------------------------------CMPL   s.17-A
04FEB04 INCURRED                                                      KOL:21 B
```

000047



**ICBC** Low Velocity Impact Questionnaire

EXHIBIT
004

| CLAIM NUMBER | ADJUSTER'S NAME | | | DATE OF LOSS | |
|---|---|---|---|---|---|
| 3735714 | S. Humbe | | | D 01 M 11 YEAR 2003 | |

CLAIMANT'S NAME  Donald Dove

1. Which part of your vehicle hit the other vehicle?  Front end

2. Which part or the other vehicle was hit?  back end

3. Was your vehicle damaged?  ☐ No  ☑ Yes

4. Was damage observed on the other vehicle?  ☐ No  ☑ Yes

5. Was there any old damage to your vehicle/to the other vehicle?
   Your vehicle  ☑ No  ☐ Yes – where
   The other vehicle  ☐ No  ☐ Yes – where  don't know

6. Was the other vehicle moving at the time of collision?  ☑ No  ☐ Yes
   If yes, estimate speed _____ kph/mph at impact    **s.22**

7. Was your vehicle moving at time of collision?  ☐ No  ☑ Yes
   If yes, estimate speed  20  kph/mph at impact

8. Describe the road and weather conditions at the time of the accident.
   clear dry road  early evening - dark

9. Describe in your own words the force or severity of the impact.
   braked as hard as I could and had moderate impact

10. Did your body move on impact? If so, describe (i.e. Did the seatbelt tighten? Hit the steering wheel?)
    No

003651
ICBC_002850

# ICBC  Claim File Report

| Location Centre: 000   HEAD OFFICE CLAIMS | | (604) 415-2850 | | Claim Type: 2 |
| --- | --- | --- | --- | --- |
| Loss Date: 10NOV2003 | Loss Time: 7:00PM | Adjuster: 02306/HUMBER, SHARLENE | | |
| Report Date: 13NOV2003 | Report Time: 9:20AM | | | ADJ/REP: BC9V |
| Appointment Location: | | | | |
| #1-Date: | Time: | Type: | #2-Date: | Time: | Type: |

## Insured Owner

DOVE, DONALD A
104-566 SIMCOE ST
VICTORIA BC

Gender: M
Debt:

**V8V1L9**

| ☐ Address Change | ☐ Involvement Detail | ☒ More Info on CDIR |

Bus:
Fax: (250) 592-0030
Res: (250) 885-5525
Cel: (250) 885-5525
D/L: 2497255
D/L stat: DECEASED  *EXPIRED*

Jur: BC

D/L restr: 21

## Insured Driver

DOVE, DONALD A
104-566 SIMCOE ST
VICTORIA BC

Gender: M
Debt:

**V8V1L9**

Stated Liability:
| ☐ Address Change | ☐ Involvement Detail | ☒ More info on CDIR |

Bus:
Fax: (250) 592-0030
Res: (250) 885-5525
Cel: (250) 885-5525
D/L: 2497255
D/L stat: DECEASED  *EXPIRED*

Jur: BC

D/L restr: 21

## Vehicle Description

| Plate No.: 3916GL | Jur: BC | Registration No.: 06605006 | V.I.N.: 1GTCT19Z1L2510748 | Vehicle Change: ☐ |
| --- | --- | --- | --- | --- |
| Description: BLACK 90 GMC 4WHDR | | | Declared Value: | |

## Autoplan Coverage

| Policy No.: 3916GL-N | ☐ Policy Change | ☐ Coverage Change | ☐ Midterm Change | ☐ Additional Coverage (Cres) | Deductible: |
| --- | --- | --- | --- | --- | --- |
| Effective Date: 18AUG2003 | Expiry Date: 17NOV2003 | Owner: 1 | | Rate Class: 003  Territory: W | CRS Level: -43 (-19) |

Tp liab - basic:  200,000
Tp liab - total:  1,000,000
Collision:
Comprehensive:
Loss of use:
UMP:  Y

## Accident Details

| Use: PLEASURE | Rate Class: 003 | No. of Passengers: 0 | No. Injured: 0 | No. Passengers Identified: 0 | Liability: A 100% |
| --- | --- | --- | --- | --- | --- |
| Date of Loss: 10NOV2003 | Time: 7:00PM | City: SAANICH | | Province: BC | |

Location:
Street Travelling on: DOUGLAS ST                    Cross Street: SAANICH RD
Description: INS NORTHBOUND ON DOUGLAS, DROPPED CIGARETTE, WHEN LOOKED UP TP
HAD STOPPED IN LANE AHEAD AND INS REAR ENDED TP. IS THIS LVI,

Damage: FRONT END

Old Damage:
ER Status:
Repair Facility:

Present Location: DRV

| ☐ Non-Drive | ☐ Stolen | ☐ Recovered | ATD: I  N |
| --- | --- | --- | --- |

Towed by:
| Multi-Accident 2 | Parties Identified: 2 | Witnesses Identified: 0 | ☐ Additional Units | ☐ Charges |
| Role: | Name: | | Report No.: | |
| Role: | Name: | | Report No.: | |

## Resource Action

PREV. CLAIMS : L373571-4
POSSIBLE LVI? SET UP CA APPT FOR POSSIBLE LVI WORK UP IF REQ=ASSUMING TP
HAD AMERICAN PLATES, INS NOT SURE. BUT INS WITH ALLSTATE.

## Other Parties

| Name: | Plate: | Driver: | Claim No.: |
| --- | --- | --- | --- |
| Name: | Plate: | Driver: | Claim No.: |
| Name: | Plate: | Driver: | Claim No.: |

| RESERVES: | E X P | KIND OF LOSS | KIND OF LOSS | KIND OF LOSS | KIND OF LOSS | KIND OF LOSS | KIND OF LOSS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Claimant Name: | | 21 | 22 | | | | |
| Named Insured: | A | | | | | | |
| HALL RICHARD DAVID | B | 80085 | 0 | | | | |
| | C | | | | | | |
| | D | | **EXHIBIT** | | | | |
| | E | | **005** | | | | |

CL75 (112006)

## Claim File Report (Continued)

Claim number: **L373571-4**

### Third Party Owner

Gender:
Debt:

| | Address Change | | Involvement Detail | | More Info on CDIR |
|---|---|---|---|---|---|

Bus:
Fax:
Res:
Cel:
D/L:          Jur:
D/L stat:          :          D/L restr:

### Third Party Driver

Gender:
Debt:

Stated Liability:

| | Address Change | | Involvement Detail | | More Info on CDIR |
|---|---|---|---|---|---|

Bus:
Fax:
Res:
Cel:
D/L:          Jur:
D/L stat:          D/L restr:

### Claim Information

| Claim No.: | Location Centre: | | |
|---|---|---|---|
| Adjuster: | | Phone: | Fax: |

### Vehicle Description

| Plate No.: | Jur: BC | Registration No.: 00000000 | V.I.N.: | | Vehicle Change |
|---|---|---|---|---|---|
| Description: | | | | | Partial Plate |

### Accident Details

| Use: | | Rate Class: | Non-Drive: | Stolen: | Recovered: | No. of Passengers: | No. Injured: |
|---|---|---|---|---|---|---|---|
| Damage: | | | | | | | |
| Old Damage: | | | | | | | |

### Coverage

| Policy No.: | | Policy Change | | Coverage Change | | Midterm Change | | Additional Coverage (Cres) | Deductible: |
|---|---|---|---|---|---|---|---|---|---|
| Effective Date: | Expiry Date: | | Owner: | | | Rate Class: | | Territory: | CRS Level: |

```
DATE: 2021-01-04                                              PAGE : 1
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|

----CMPL

| 11NOV03 | ADMIN | CLAIM REPORTED (CRIS)  063/D961-5 MASON, CARLY | A |

----NOTE

11NOV03 NOTE    RO REPTG RO ATTORNEY#866-383-9104,DOB 22FEB1969,INSD WENT TO A
                HOSPITAL AFTER MVA NECK INJ? INSD HAS HOME IN SALT SPRING.
                INSD PROFESSIONAL GOLFER. INSD ADV CAREER IS AN ISSUE WITH
                THIS MVA.INSD REASON FOR MAKING CLAIM AS HE  TRUSTED TP
                WOULD MADE CLAIM AS WELL. VEH NDV.

----NOTE
                                                                     A

11NOV03 NOTE    DEBT AT TIME OF REPORT
                INSURED DEBT - ICBC:          $0.00
                                 MVB:     $1,439.00
                      CRIMINAL CODE: NO
                DRIVER DEBT  - ICBC:          $0.00
                                 MVB:     $1,439.00
                      CRIMINAL CODE: NO
                POLICY: .      INSURED D/L:        DRIVER D/L:

----NOTE

11NOV03 NOTE    INSD HAS ALREADY CONTACT ALLSTATE, THEY HAVE ADVISED TO       A
                CLAIM THROUGH ICBC.
                INSD ADV ALLSTATE ADV INSD THAT ICBC SHOULD GET HIM AT THE
                STATE HE WAS PRIOR TO THE MVA.
                INSD ASKED ABOUT RENTAL. ADV ON REIMBURSEMENT CONSIDERATION
                ONLY. ADV MID SIZE VEH WOULD BE PROBABLY BE COMPARABLE.

----NOTE

| 11NOV03 | NOTE | INSD WILL CALL BACK TO ADV OF VEH LOCATION | A |

----NOTE

| 12NOV03 | NOTE | OOP INSURED BI HANDOUT TO SHELLIE | A |

----NOTE

| 13NOV03 | NOTE | L/M FOR THE RICHARD TO CALL ME RE: INJURY CLAIM. | A |

----CMPL

| 13NOV03 | ONLNECLM | CLAIM OPEN           030/C398-3 FYFE, SHELLIE | A |

----CMPL

| 13NOV03 | INCURRED | EXPOSURE OPEN        030/C398-3 FYFE, SHELLIE | KOL:37 A |

----NOTE

13NOV03 NOTE    REVIEWING THE FILE: APPEAR RICHARD DOES NOT HAVE             A
                B.C. LIC VEHICLE NOR D.L( OLD B.C. DL 6830679 ESP 2002
                CLASS 56) SO THIS PERSON IS NOT AN INSURED UNDER
                PART SECTION 78, AND SECTION 96 RESTRICTION ON BENEFITS
                WILL APPLY. THE CURRENT D.L IS AN INTERNATIONAL
                D.L NOT SURE WHAT PROV THE VEHICLE IS REG AND INS IN..?
                WHO EVER CARRIES THE INS ( ALLSTATE) WILL BE ON FOR
                THE ACCIDENT BENEFITS RESTRICTED TO OUR PART 7
                LIMITS AND COVERAGES.
                THERE WILL BE A TORT ISSUE, I HAVE THE FEELING THAT THIS
                FILE WILL BECOME REPRESENTED, RICHARD IS LAWYER ..?
                AND MENTIONED PRO GOLFER CAREER TAT MVA LIKELY TO
                EFFECT ( CONSIDERING ONLY 3 DAYS SINCE THE MVA NOT
                SURE HOW THEY ARE ASSUMING THIS) WILL HAVE TO GET
                DETAILS ON THE GOLFING AND STANDING ETC.

----NOTE

| 14NOV03 | NOTE | LOU: RICHARD (AVIS 386-8468) - OOP - NO LOU/RD*/RDSD+ - | A |

EXHIBIT

006

```
DATE: 2021-01-04                                              PAGE : 2
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                    CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|---|---|---|---|
| 14NOV03 | NOTE | AS PER CWMS NOTE OF 11NOV2003, R/O TO PAY FOR RENTAL AND BE REIMBURSED IF ENTITLED. | A |
| 14NOV03 | NOTE | SPOKE TO RICHARD HALL HE SAYS HE IS DIZZY AND SORE. THE VEHICLE APPEARS TO WRITTEN OFF. ALLSTATE FROM OREGON IS THE INSURANCE CARRIER FOR HIS VEHICLE THEY WILL ALSO BE THE ONES THAT DEAL WITH ACCIDENT BENEFITS ( REHAB/MEDICAL TREATMENT) HE SAID THAT CANNOT BE THE CASE AS THE TCD OPERATOR TOLD HIM THAT HE MAY GET A RENTAL AND THE COST, TOLD HIM I CANNOT COMMENT ON THAT AS I HAVE NOT BEEN PRIVY TO THE CONVERSATION. I TRIED TO EXPLAIN, THE VEHICLE HAS INSURANCE THEY FIX THE VEHICLE AND SEND THE BILLS TO THE AT FAULT'S PARTY INSURANCE COMPANY ( CALLED SUBROGATION) HE SAID HE DOES NOT REALLY CARE AND WAS TOLD THAT WE ARE RESPONSIBLE TOLD HIM THE AT FAULT PARTY IS RESPONSIBLE AND WILL PAY THE COST FROM HIS INS POLICY, BUT I DO NOT CARRY INS FOR HIM THEREFORE HIS INSURANCE COMPANY MUST DEAL WITH THESE ISSUES, HE DISAGREES TOLD HIM SORRY BUT IT IS CLEAR THAT WE DO NOT CARRY INSURANCE ON HIS VEHICLE. WHAT WE ARE REASONSIBLE FOR IS THE TORT " PAIN AND SUFFERING ISSUE" HE SAID HE WILL GET A LAWYER TOLD HIM THAT IS FINE, A B.C. LAWYER IS FULLY AWARE OF HOW IS WORKS, HE SAID HE WILL GET A LAWYER IN OREGAN TOLD HIM THAT IS FINE. HE WANTS IT IN WRITTING THAT WE WILL NOT FIX HIS VEHICLE, I  TOLD HIM I WILL OUTLINE IN E-MAIL THE ISSUES. | A |
| 14NOV03 | NOTE | DIANE FROM ALLSTATE INS CALLED ME AND SAID TO ME " I THINK THAT OUR INSURED IS GETTING CONFUSED HE TOLD . ME THAT YOU WILL NOT FIX HIS VEHICLE, TOLD HER CORRECT DOES MR. HALL NOT HAVE COLLISION ON HIS VEHICLE, SHE SAID YES HE DOES BUT THAT IS ONLY IF HE IS AT FAULT. I TOLD HER THAT IS ODD COLLISION IS OWN DAMAGE PURCHASED ON A VEHICLE THE INSURER FIXES THE VEHICLE AND SUBROGATE AGAINST THE AT FAULT PARTY, IS THAT CORRECT THERE. YOU PEOPLE DO NOT DO ANY THING FOR ANYONE IS THAT THE CASE, THANK YOU VERY MUCH" QUITE THE TONE TO THE LAST PART AND I WAS HUNG UP ON. QUITE ODD AS ALLSTATE IS BEING PAID A PREMIUM BY THEIR INSURED THEY APPEARS TO BE PASSING THE BUCK. | A |
| 17NOV03 | NOTE | INS OR AGENT: WHEN THINKING ABOUT THIS FILE I REALIZED IN THE CONVERSATION WITH " DIANE" SHE SAID SHE WILL LET ALLSTATE DEAL WITH THIS, YET SHE ID HERSELF AS ALLSTATE AT THE START OF THE CONVERSATION LEADING ME TO BELEIVE PERHAPS DIANE IS A AGENT NOT FROM ALLSTATE INS CO. AT ALL....? | A |
| 17NOV03 | NOTE | PART 7: THE INS MR. HALL HAS ALLSTATE INS ON HIS VEHICLE AND IS NOT LICENCED IN B.C. ( APPEARS MAY BE A RES AS ON SALT SPRING ISLAND AND THE OLD B.C. DL HAD THE SAME | A |

DATE: 2021-01-04                                                PAGE : 3
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

```
                                                                    TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                 EXP
-------  -------------------------------------------------------------
17NOV03 NOTE     ADDRESS AND THAT D.L WAS UNRENEWED BACK IN 2002)     A
                 MR. HALL DOES NOT MEET THE REQUIRMENTS UNDER SECTION
                 78 OF THE ACT AS AN INSURED TO EXTEND PART 7 TO THEM.
                 IN FACT SECTION 96(A) ID PERSON WHO IS NOT RESIDENT
                 AND IS OCCUPANT OF A VEHICLE NOT DESCRIBED IN AN OWNERS
                 CERT.
                 IF MR. HALL IS FOUND TO BE A RESIDENT- 96(B)(III) THAT THE
                 VEHICLE MR. HALL WAS DRIVING COULD HAVE BEEN REG IN
                 B.C.
-----------------------------------------------------------------------NOTE
17NOV03 NOTE     SPOKE TO DOUG ABOUT PART 7: HE AGREES THAT THERE IS   A
                 NOTHING TO EXTEND ON PART 7 BASED ON THE INFORMATION
                 WE HAVE TO DATE ALSO PRIMARY INS OF ALLSTATE WOULD
                 BE PRIMARY EVEN IF PART 7 EXTENDED. THERE MAY BE SERVERAL
                 ISSUES ON THIS CLAIM
                 D.L: CURRENTLY INT D.L OLD BC. DL IS THIS PERSON A RES OR
                 NOT.
                 VEHICLE: PERHAPS THE VEHICLE WAS REG IN B.C. AT ONE TIME
                 ANDCOULD HAVE BEEN REG IN B.C. ...?
                 PRIVATE INS: BEING THAT THE PERSON LIVES HERE ( SAME
                 ADDRESS ON OLD B.C. D.L FROM 2002) THE PRIVATE INS COM
                 MAY NOT COVER THEM THEN WE WILL NEED TO SEE THE
                 VEHICLE BUT MR. HALL WOULD NOT TELL ME WHERE THE VEHICLE
                 IS.
-----------------------------------------------------------------------NOTE
17NOV03 NOTE     CONTACTED ALLSTATE US. AT 1-877-735-4781 SPOKE TO MARY A
                 ANN THEY WILL NOT GIVE ANY INFORMATION TO US AT ALL,
                 NOT WITHOUT THE CLIENT BEING PRESENT WITH ME AND THEM
                 TALKING TO THEM, I ASKED IF AUTH CAN BE SENT VIS MAIL
                 TO THIS INSURED AND WAS TOLD NO. I WAS THEN TRANSFERED
                 TO CLAIMS, JANETTE LOOKED UP THE NAME AND ADDRESS AND
                 THE BRITHDATE. SHE FOUND THE DATE OF THE ACCIDENT AND
                 INJURY CLAIMED.
                 CLAIM: 4285395506 CLAIM OFFICE 1-888-442-6219 DIRECT
                 503-603-6500.
                 ADJUSTER EXTENSION: JUNE NICOLAS
                 GAVE THEM SOME INFORMATION ON MR HALL ADDRESS AND
                 PHONE NUMBER.
                 THEY DO NOT KNOW WERE THE VEHICLE IS EITHER.
                 GAVE THEM SOME DETAIL AND MY NUMBER FOR THE ADJUSTER
                 TO CALL ME. SHE TRIED TO CONTACT ME SO I CAN FIND
                 OUT WHERE THE VEHICLE IS, BUT NO GO ON THE CONNECTION.
                 SPOKE TO JOE EDWARDS IN PORTLAND, VERY NICE MAN.
                 FILE BEING HANDLE OUT OF WESTERN AUTO EXPRESS OFFICE
                 TRAN TO HIS OFFICE BUT NOT ASSIGNED YET.
                 HE LEFT A MESSAGE ON THE FILE TO HAVE THE ADJUSTER
                 PHONE ME. MR. HALL HAS A 500.00 DED AND HAS DECLINED
                 PROPERTY DAMAGE. MICHELLE BELL IS THE MEDICAL ADJUSTER
                 THE DIRECT LINE FOR MICHELLE IS 503-603-5900.
                 MR. EDWARDS SAID THAT APPEARS THAT THERE INSURED IS
                 WAITING FOR A MOVE FROM ICBC, TOLD HIM SPOKE TO MR.
                 HALL LAST WEEK THAT HIS PRIMARY INSURANCE MUST COVER
```

ICBC_003305

```
DATE: 2021-01-04                                                PAGE : 4
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | |

| 17NOV03 | NOTE | THE VEHICLE PERHAPS THAT INFORMATION ON HIS FILE WAS FROM LAST WEEK, HE CANNOT TELL. | A |

-----NOTE

| 19NOV03 | NOTE | RNT CALL TO JUNE AT ALLSTATE AT 503-443-4038 | A |

-----NOTE

| 19NOV03 | NOTE | SPOKE TO JUNE AT ALLSTATE SHE WANTED TO CONFIRM THE CLAIM NUMBER AND ASKED FOR A DEALER OR SHOP IN NORTH VANCOUVER, APPEARS THE INS THERE VISITING..? GAVE HER MEC DEALER/SHOP OFF OUR WEB SITE AND CON FIRMED THE CLAIM NUMBER. SHE MENTIONED MR. HALL DOES NOT HAVE RENTAL INS AND WAS TOLD TO RENT ON REIMBURMENT BASIS AS THEY WILL NOT ENT CLAIM - NO COVERAGE. SHE SAID THERE IS DIFF ADJUSTER FOR THE PIP ( PERSONAL INJURY PROTECTION). | A |

-----CMPL

| 21NOV03 | ADMIN | PEND TXN - DOT POLICY - OOP (OREGON) | A |

-----NOTE

| 25NOV03 | NOTE | EXAMINER DISC. WITH SHELLIE AFTER RECEIPT OF MSG. FROM HALL | A |

HE DOES NOT HAVE ANY B.C. PLATES ON RECORD
HIS B.C. DRIVER'S LICENCE EXPIRED ON FEB. 22/02
THE VEHICLE HE WAS DRIVING AT THE TIME OF THIS MVA HAD A
USA PLATE ON IT
RICHARD HAS AN INTERNATIONAL LICENCE
AFTER DISCUSSIONS WITH ROB GUENTER, BOB BURROWS, MARK
BEVERIDGE AND SCOTT ADAMS, THIS FELLOW IS LISTED AS BEING
A MEMBER OF BLACKBURN MEADOWS GOLF COURSE ON SSI
--I WOULD RECOMMEND A BACKGROUND CHECK BE DONE ON THIS
GOLF COURSE, HOW LONG HE HAS BEEN A MEMBER, WHEN HE FIRST
STARTED WORKING THERE, DURATION, HOW LONG HE HAS BEEN
LIVING ON SSI, WHATEVER PERTAINS TO AN OCCUPATION PER SE
.
NO INSURANCE ON RECORD WITH ICBC, NO PART 7 WITH US.
AGREE ANY RENTAL WOULD BE AT HIS COST AND WE WOULD
REIMBURSE ONCE HE PROVIDES A BILL.
WE WOULD AUTHORIZE TO CONTROL NEGOTIATE COSTS BUT WE HAVE
NOT AGREED TO BEAR THE COST UNTIL WE RECEIVE THE ACCOUNT
FROM MR. HALL.
POTENTIAL LVI
MR. HALL VERY EVASIVE IN PROVIDING ANY PERSONAL/EMPLOYMENT
HISTORY.  TOLD DAC HE IS A PROFESSIONAL GOLFER.  WILL NOT
RELAY THIS TO SHELLIE
JN

-----NOTE

| 25NOV03 | NOTE | EXAMINER CALL TO LYNN BOLTON, DUNCAN CLAIM | A |

THEY ARE HANDLING AN ONGOING CLAIM FOR DELIA VONSHILLING
SHE AND HER MOTHER ARE THE OWNER/OPERATORS OF BLACKBURN
MEADOWS.  DELIA IS A HOLISTIC HEALER.  SHE LIVES IN
COURTENAY WHEN HER GOLF CLUB IS CLOSED, FROM APPROXIMATELY
NOVEMBER TO MARCH.  THE CLUB IS IN A LOW LYING AREA AND
LIKELY VERY WET DURING THE FALL/WINTER/EARLY SPRING SEASON
SHE IS REPRESENTED BY AHMED MCGARVEY, SOLICITORS IN
COURTENAY.

ICBC_003306

```
DATE: 2021-01-04                                                    PAGE : 5
TIME: 10.56.18          INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

| | | | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | |

```
25NOV03 NOTE     LYNN WILL FAX THE BLACKBURN MEADOWS ADVERT.              A
                 JN
-----------------------------------------------------------------------NOTE
25NOV03 NOTE     EXAMINER CALL FROM MR. HALL                             A
                 HE APOLOGIZED FOR NOT LEAVING HIS NAME OR CLAIM #
                 STATED HE IS "NOT FEELING TOO GOOD. I SEEM TO BE MESSING
                 SOME OF THESE THINGS UP".  HE WOULD RATHER SPEAK TO ME THAN
                 ANYONE ELSE.  HE IS GETTING CONFLICTING STORIES FROM
                 EVERYONE AND WOULD RATHER SPEAK TO A SUPERVISOR REGARDING
                 THE RENTAL CAR.  HIS CREDIT CARD IS MAXED OUT SINCE THIS
                 MVA (NOW 15 DAYS POST)
                 CALLED THE SSI PHONE # AND LEFT A MESSAGE ONCE AGAIN.
                 DISC. WITH LISA - I WILL ATTEMPT TO HAVE MR. HALL COME HERE
                 FOR A STATEMENT/COMPLETE APPLICATION.
                 GET SOME PERSONAL/EMPLOYMENT HISTORY FROM HIM AND FIND OUT
                 IF HE ACTUALLY HAS A VALID LICENCE AND WHAT JURISDICTION.
                 HIS ACCENT WOULD INDICATE HE IS BRITISH.
                 JN
-----------------------------------------------------------------------NOTE
25NOV03 NOTE     EXAMINER REVIEW OF FILE                                 A
                 GOLF PRO INFO. ON FILE
                 "PIP" THROUGH ALLSTATE FOR PERSONAL INJURY - NOT SURE, THEN
                 WHAT WE WOULD COVER MR. HALL FOR.
                 APPEARS THERE IS A SUBROGATION ISSUE HERE BUT NOT
                 NECESSARILY A PART 7 OR TORT.
                 WE NEED A COPY OF THE ALLSTATE POLICY OUTLINING WHAT "PIP"
                 COVERS.
                 JN
-----------------------------------------------------------------------CMPL
25NOV03 TRANSFER FILE TRANSFER TO    030/3360-0 NELSON, JOANNE           A
-----------------------------------------------------------------------NOTE
26NOV03 NOTE     EXAMINER CALL FROM MR. HALL ON VOICEMAIL                A
                 --IT LOOKS LIKE HE CALLED WHILE I WAS IN A MEETING,
                 BETWEEN 1:30-3:00PM  INDICATING HE HAS ANOTHER APPOINTMENT
                 WITH HIS GP TONITE.  HE WANTS ME TO TELL HIM WHEN TO CALL
                 ME.
                 JN
-----------------------------------------------------------------------NOTE
26NOV03 NOTE     EXAMINER CALL TO MR. HALL                               A
                 L. MSG. - 3:30PM
                 JN
-----------------------------------------------------------------------NOTE
27NOV03 NOTE     CALL ON MY VOICEMAIL FROM MR. HALL                      A
                 I HAD LEFT HIM A MESSAGE YESTERDAY TO CALL BETWEEN 9 &
                 10:00AM.
                 HE ADMITTED HE CALLED AT 10:10AM WHEN I WAS NOT AT MY DESK.
                 HE ASKED I CALL BACK ONCE AGAIN AND LEAVE A "PRECISE TIME"
                 FOR HIM TO CALL ME!!
                 HE WANTS "ME TO SORT OUT THIS BUSINESS WITH THE RENTAL CAR"
                 JN
-----------------------------------------------------------------------NOTE
28NOV03 NOTE     MR. HALL CALLED YESTERDAY AFTERNOON                     A
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

| 28NOV03 | NOTE | HE CONFIRMED HE IS NOT FEELING WELL THESE DAYS AND ALL THIS | A |

HE CONFIRMED HE IS NOT FEELING WELL THESE DAYS AND ALL THIS  A
IS STRESSING HIM OUT.
HE RELAYED THAT HE WAS TOLD BY ICBC HE COULD GET AN
"UPGRADE" VEHICLE @ $296 PER WEEK.
TOLD HIM THAT IF THIS IS WHAT HE WAS TOLD, WE WOULD
AUTHORIZE.  I ASKED WHERE THE VEHICLE IS.  HE SAID
VANCOUVERAND ALLSTATE WAS WAITING TO SEND SOMEONE OVER TO
LOOK AT IT.  I SAID IF RENTAL REASONABLE AND DOES NOT GO ON
ADNOSIUMWE WOULD CONSIDER.  IF ALLSTATE DELAYS REPAIRS OR
HE DOES, NOT OUR RESPONSIBILITY.
HE WANTS TO BE CANDID AND PROFESSIONAL ABOUT THIS.
WHEN ASKED WHAT HE DID HE STATED HE IS A PROFESSIONAL
GOLFER AND RUNS A COMPANY.
HE CONFIRMED THERE ARE BIG NUMBERS INVOLVED IN HIS CAREER
AND THERE IS BIG MONEY INVESTED IN HIM.
HE WAS TAKEN TO THE HOSPITAL AFTER THIS MVA AND CHECKED FOR
"A BROKEN NECK AND STUFF LIKE THAT".
WHEN ASKED WHERE HE LIVED HE SAID HE LIVES IN OREGON.
WHEN ASKED FOR AN ADDRESS HE QUICKLY CHANGED THE SUBJECT
AND SAID HE IS TRYING TO BUILD A SUMMER HOME ON SSI.
SINCE THE MVA HE HAS BEEN INCAPABLE OF DOING ANYTHING "THIS
IS THE FIRST WEEK I HAVE SURFACED".  SUGGEST AT THIS TIME
OF YEAR, UNLESS HE HAS A HISTORY OF "HEADING SOUTH" AND
PROOF HE BOOKED PRIOR TO MVA, HE WOULDN'T BE GOLFING
ANYWAY.
HE WAS TOLD BY HIS LAWYER, WOULD NOT SAY WHO IT IS THAT HE
HAD TO GET A "CLAIM 7 FORM" FROM US.  TOLD HIM I WOULD SEND
INFO. TO HIM AS WELL AS A STATEMENT FORM.
HE CUT ME OFF AND SAID "MY PHONE CARD IS ABOUT TO RUN OUT"
HE GAVE ME A FAX NUMBER OF 250-538-0372 AND ASKED I MARK
THE DOCUMENTATION CONFIDENTIAL. HE HUNG UP.
JN
------------------------------------------------------------------------NOTE
28NOV03 NOTE     EXAMINER CALL TO ALLSTATE                                A
JUNE AWAY UNTIL DEC. 8TH, 2003
ADDRESS;
7632 SOUTHWEST DURHAM ROAD
SUITE 200
TIGARD, OREGON
97224
FAX: 503-603-5970
JN
------------------------------------------------------------------------NOTE
3DEC03  NOTE     RECEIVED MESSAGE FROM MR. HALL                           A
AS I HAVE LISTENED TO IT SEVERAL TIMES, I WILL ATTEMPT TO
REITERATE;
"YEA, HI JOANNE.  IT'S RICHARD HALL SPEAKING..UMMM..YOU
FAXED THROUGH SOME THINGS TODAY.  THAT WAS NICE OF YOU.  I
PICKED THEM UP...UMMM...LAUGH. I THINK IT'S TUESDAY
TODAY..LAUGH,LAUGH.  JUST WONDERING WHEN'S A GOOD TIME TO
GET A HOLD OF YOU...UMMM...YOU CAN USE MY MESSAGE LINE.  I
DON'T HAVE A CELL PHONE.  I GAVE THOSE UP ONCE I STARTED

```
DATE: 2021-01-04                                              PAGE : 7
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

```
                                                              TYP
                                                              EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
-------  -------- ------------------------------------------------------
3DEC03  NOTE     TRAVELLING SO MUCH.UMMMM...250-653-9653.  OKAY. I WANTED TO   A
                 TALK TO YOU ABOUT AAH THE RENTAL CAR, THE SETTLEMENT THINGS
                 WHICH I APPARENTLY ARE HAVING TO GO THROUGH ALLSTATE AND
                 AMERICA FOR THAT...UMMM.  OH, I'M JUST NERVOUS IF I'M
                 SITTING ON A BUNCH OF MONEY, A BUNCH OF, YOU KNOW, BUNCH OF
                 RENTAL CAR STUFF.  SO I KNOW YOU DID SAY YOU WOULD COVER
                 THAT TO $296.  I DON'T KNOW WHETHER TAXES ARE ON TOP OF
                 THAT. BUT UMMMM..THERE'S JUST A NUMBER OF THINGS I'M
                 ANXIOUS ABOUT.  IT'S BEEN A TOUGH WEEKEND.  I HAD TO GO
                 BACK INTO HOSPITAL A COUPLE OF TIMES.  I WOKE UP WITH BLOOD
                 IN MY MOUTH AND PROMPTLY FELL OVER.  SO...UMMM...I'M SORRY
                 I'M LATE CALLING ABOUT THIS.  I DON'T KNOW IF YOU SENT THE
                 FAX YESTERDAY OR TODAY, WHATEVER.  ANYWAY, ...UMMM..SO I'M
                 A BIT SLOW IN DEALING WITH PHONE CALLS AND STUFF AS YOU CAN
                 IMAGINE.  I'LL PROBABLY SPEED UP ONCE THE CONCUSSION HAS
                 PASSED. BUT, ANYWAY..UMMM..THAT'S THE STORY.  IF YOU LEAVE
                 A MESSAGE I'LL KEEP TRYING YOU AND SORRY I DIDN'T GET BACK
                 TO YOU MORE PROMPTLY.  OKAY. HAVE A GOOD DAY.  BYE"
-----------------------------------------------------------------------NOTE
3DEC03  NOTE     EXAMINER CALL TO MR. HALL'S MESSAGE LINE                        A
                 RELAYED TO HIM THAT I HAVE NO IDEA WHAT HE SUFFERED AS A
                 RESULT OF THIS MVA AND TO COMPLETE THE DOCUMENTATION ASAP,
                 RETURN THEM TO ME, VIA FAX, IF NECESSARY SO THAT I HAVE A
                 CLEARER PICTURE OF WHAT HAS HAPPENED HERE.  TOLD HIM ONCE
                 I HAVE THE INFO., I WILL BE IN A BETTER POSITION TO
                 UNDERSTAND WHAT HAS HAPPENED AND WILL GET BACK TO HIM.  I
                 REMINDED HIM HE HAS AN OBLIGATION TO MITIGATE HIS LOSS
                 INCLUDING ENSURE HIS VEHICLE IS FIXED, AND ALLSTATE, ASAP.
                 REMINDED HIM THAT IF REPAIRS ARE NOT EXPEDITIOUS, RENTAL
                 COSTS COULD BE HORRENDOUS IF HIS VEHICLE IS NOT REPAIRED
                 AS YET.  WE CANNOT BE RESPONSIBLE FOR DELAYS DUE TO THE
                 INSURANCE COMPANY AND/OR MR. HALL.
                 JN
-----------------------------------------------------------------------NOTE
3DEC03  NOTE     EXAMINER CALL TO ALLSTATE - L. MSG. FOR MICHELLE BELL           A
                 REFERRED TO MY FAX AND ASKED THEY ACKNOWLEDGE WHETHER OR
                 NOT THEY RECEIVED IT AND SECONDLY WHAT EXACTLY HE INTENDS
                 TO CLAIM THROUGH THEM AND WHAT HE EXPECTS US TO PAY FOR.
                 I RELAY HIS EVASIVE NATURE AND LACK OF CO-OPERATION IN
                 PROVIDING DETAILS OF THIS MVA OR SIGNING ANYTHING.  IF HE
                 CONTINUES IN THIS MANNER, WE WILL NOT BE COVERING ANYTHING.
                 JN
-----------------------------------------------------------------------NOTE
3DEC03  NOTE     EXAMINER DISC. WITH CRAIG RE: MSGS. LEFT BY MR. HALL            A
                 MESSAGES RECORDED FOR FUTURE REFERRENCE IF REQUIRED
                 JN
-----------------------------------------------------------------------NOTE
3DEC03  NOTE     MSG. LEFT FROM MICHELLE BELL                                    A
                 SHE DID NOT RECEIVE MY FAX. HER FAX #503-603-5970
                 TOLL FREE FAX - 888-437-8402
                 HER PHONE: 503-603-6471
                 JN
```

ICBC_003309

DATE: 2021-01-04                                                          PAGE : 8
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

```
                                                                      TYP
                                                                      EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
------- ----------------------------------------------------------------------
----------------------------------------------------------------------NOTE
11DEC03 NOTE     BICIT 9092.6 - ASSIST JOANNE NELSON IN CALLING LAWYER JIM   A
                 TURNER AS USED TO KNOW JIM WELL. CALLED GORDON & VELLETTE
                 AT 383-9104 & SPK TO JIM.
                 JIM ADVISED HE HAS BEEN OUT OF PERSONAL INJURY CLAIMS NOW
                 FOR 5YRS. HE IS NOW DOING PRIMARILY IMMIGRATION CASES.
                 *
                 I QUESTIONED JIM ABOUT RICHARD HALL NOTING THAT WE ARE
                 HAVING SOME DIFFICULTY GETTING CLEAR INFO OUT OF HALL, SUCH
                 AS HIS DL STATUS, PERMANENT ADDRESS AND WAGELOSS/WORK
                 STATUS. I NOTED THAT HALL IS FILLING OUT FORMS USING JIM'S
                 WORK ADDRESS & NAME AS CONTACT. JIM ADVISED HE DOES NOT
                 REPRESENT HALL WITH RESPECTS TO HALL'S MVA ACCIDENT CLAIM
                 AND HE WILL NOT BE REPRESENTING HIM IN THAT CAPACITY. HE
                 DOES REPRESENT HALL IN HIS CAPACITY AS AN IMMIGRATION
                 LAWYER. JIM ADVISED THAT VELLETTA IN THEIR OFFICE MAY BE
                 TAKING HALL ON, BUT AT THIS TIME THERE HAS BEEN NO DECISION
                 ON TAKING HALL ON.
                 I ASKED JIM IF HE KNEW IF HALL WAS WORKING ON SALTSPRING
                 ISLAND AT A GOLF COURSE THERE. JIM ADVISED HE "CAN'T". I
                 ASKED IF HE MENT "WON'T". HE CONFIRMED HE WON'T.
                 JIM DID NOTE THAT HALL HAS SPOKEN TO DEB ACHESON ND WITH
                 MIKE VELLETTA, BUT SO FAR NO ONE HAS TAKEN HALL ON.
                 *
                 I ASKED JIM TO PLEASE HAVE VELLETTA ADVISE ASAP IF HE IS
                 ACTING FOR HALL. IN THE MEAN TIME WE WILL CONTINUE TO DEAL
                 DIRECT WITH HALL & TRY & GET HIM TO COOPERATE IN PROVIDING
                 THE INFO REQUESTED.
                 /////////////////////////////////////
                 IT WAS CLEAR FROM THIS DISCUSSION WITH JIM TURNER THAT
                 HALL MUST BE WORKING ON IMMIGRATING TO CANADA AND IN ALL
                 LIKELYHOOD IS NOT LANDED IMMIGRANT. IF HE IS HERE ONLY ON
                 A VISITORS PERMIT OR THE LIKE THEN IT IS LIKELY HE IS NOT
                 PERMITTED TO WORK.  IF HE IS NOT PERMITTED TO WORK THEN HE
                 WOULD NOT HAVE A VALID WAGELOSS CLAIM FOR LOST WORK IN
                 CANADA AT THE SALT SPRING ISLAND GOLF COURSE JOB, WHERE HE
                 CLAIMS TO BE THE "GOLF PRO".
------------------------------------------------------------------------NOTE
11DEC03 NOTE     EXAMINER DISCUSSIONS WITH LISA                              A
                 LYNN BOLTON CANNOT GO TO SSI.  SHE JUST DOESN'T HAVE THE
                 TIME.
                 WE DO NEED TO PIN MR. HALL DOWN RE: PRE HISTORY ESPECIALLY
                 WITH PENDING SUBRO. FROM ALLSTATE.  WE HAVE NO IDEA WHAT
                 THEY WILL BE SUBROGATING FOR.
                 MR. HALL HAS NOT SPECIFICALLY STATED WE SHOULD PAY ANYTHING
                 HERE RE: WAGE LOSS OR MEDS.  HE JUST KEEPS SAYING HE
                 SUFFERS FROM A CONCUSSION AND WILL BE LOSING THOUSANDS.
                 WE DO NEED TO HAVE SOMEONE "COLD CALL" MR. HALL, THE GOLF
                 CUB AND THE LADY ASSOCIATED WITH HIM.  (FAX FORM INDICATES
                 # IS FOR A JEAN ELWELL).  WE ALSO NEED DETAILS FROM THE
                 THIRD PARTY RE: MR. HALL'S DEMEANOR POST MVA.
                 OK TO HIRE KEN CARTER
```

ICBC_003310

```
DATE: 2021-01-04                                                      PAGE : 9
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |
| 11DEC03 | NOTE | JN | A |

---NOTE

| 11DEC03 | NOTE | DISCUSSIONS WITH KEN CARTER | A |

HE WILL ATTEMPT TO CONTACT TP ASAP.
HE WILL BE AWAY OVER CHRISTMAS.
WILL GO TO SSI, IF FERRIES IN SERVICE, IN JANUARY.
JN

---NOTE

| 18DEC03 | NOTE | EXAMINER DISC. WITH RICHARD AT AVIS | A |

EXPLAINED WE TOLD MR. HALL TO TAKE THE RENTAL BACK AND WE
ARE NOT PAYING FOR IT.  WE MAY CONSIDER SOME OR ALL OF IT
WHEN WE GET THE BILL.  UNLIKELY WE WILL PAY IT ALL AS HE
HAS RENTAL WHEN HE SHOULD BE LOOKING FOR A NEW CAR!
RICHARD CALLED BACK;
HE TALKED TO MR. HALL.  HE TOLD MR. HALL THAT IF AVIS HAS
NO AUTHORIZATION TO CONTINUE WITH THE RENTAL, HE HAS TO
BRING IT BACK.  HE ASKED RICHARD IF ICBC HAD ASKED ANY
QUESTIONS ABOUT HIM AND DID RICHARD GIVE ICBC ANY
INFORMATION ABOUT MR. HALL?  HE ALSO TOLD RICHARD HE HAS A
LAWYER AND EVERYTHING IS GOING THROUGH THEM.
RICHARD WAS A BIT CONCERNED THAT HE GAVE ME INFO. MR. HALL
DOES NOT WANT US TO HAVE.
RICHARD DID CONFIRM THAT MR. HALL PROVIDED A "BRITISH"
DRIVER'S LICENCE #HALL9602229RDLC - VERY COMPARABLE TO THE
PERMIT.  APPARENTLY THIS EXPIRES IN 2039.  PROBABLY A GOOD
IDEA TO TRY AND GET COPY OF THIS.
NOTE: MR. HALL HAS NOT PROVIDED US WITH INFO. REQUESTED
TO-DATE. CL-24 - HOW DO WE KNOW THIS IS MR. HALL'S
SIGNATURE AND WHO IS HIS LAWYER??
JN

---NOTE

| 29DEC03 | NOTE | EXAMINER REVIEW & DISC. WITH CRAIG | A |

LETTER TO FILE FROM MR. VELLETA, COUNSEL - NO VERIFICATION
THEY ARE REPRESENTING MR. HALL.  HAVE ASKED HE PROVIDE THIS
DISC. WITH CRAIG.
KEN CARTER TO DO BACKGROUND ASAP.
1) NO DRIVER'S LICENCE - HALL SHOULD NOT BE DRIVING PERIOD
2) NO CO-OPERATION IN PROVIDING DETAILS
3) COUNSEL ALLEGING HARRASSMENT - WE HAVE A RECORD OF THE
CALLS FROM MR. HALL.
4) ONCE HE HAS PRODUCED A VALID LICENCE, WE MAY BE
SECONDARY TO ALLSTATE.
5) NO PROOF, NO CO-OPERTION, WE ARE NOT OBLIGATED TO PAY
ANYTHING.
6) LETTER FAX FROM ALLSTATE CONFIRMING VALUE OF VEHICLE IS
$9700.  WE WOULD ASSUME THIS IS U.S FUNDS.
NEXT MOVE IS UP TO MR. HALL.  WE HAVE NOTIFIED HIM IN
WRITING AND ALLSTATE.  THEIR ASSESSMENT WAS MADE ON

---NOTE

| 2JAN04 | NOTE | AVIS RENT A CAR CHECKING ABOUT RENTAL, ADVISED ALLSTATE IS H | A |

IS INSURER

---NOTE

```
DATE: 2021-01-04                                                    PAGE : 10
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
|  |  |  | EXP |
| DATE | WORKTYPE | DESCRIPTION/DETAIL | |
| ------- | ---------- | ---------------------------------------------------- | --- |
| 12JAN04 | NOTE | EXAMINER CALL FROM ELAINE WAGER @ AVIS (655-4589 | A |

SHE WANTED TO LET US KNOW THAT MR. HALL STILL HAS THE
RENTAL.  HE WAS TOLD BY RICHARD AT AVIS, TO BRING THE
CAR BACK ON DECEMBER 22ND, 2003.
IT IS MR. HALL'S OPINION THAT AS HE IS NOT RESPONSIBLE FOR
THIS ACCIDENT, HE CAN HAVE THE RENTAL UNTIL THE VALUE OF
HIS VEHICLE IS SORTED OUT.  TOLD ELAINE, THIS IS NOT OUR
RESPONSIBILITY.  WE ARE ONLY OBLIGATED TO PAY WHAT IS
REASONABLE.  ALLSTATE IN THE U.S., IS HIS INSURER, NOT US.

AVIS THEN RECEIVED A CALL FROM A MR. VELLETTA STATING HE
WAS REPRESENTING RICHARD HALL IN A CASE WITH ICBC AND THAT
HE HAS ALMOST COME TO AN AGREEMENT WITH ICBC (TOLD HER MOST
DEFINITELY NOT US AS I AGAIN REMINDED HER HALL IS INSURED
THROUGH ALLSTATE - WE HAVE NOT NEGOTIATED THE VALUE OF
HIS VEHICLE AT ALL!!).  MR. VALLETTA TOLD ELAINE THAT THEY
SHOULD HAVE THIS SORTED OUT BY LAST WEDNESDAY, AT THE
LATEST FRIDAY.
I ASKED IF THEY ACTUALLY HAVE A COPY OF HIS DRIVER'S
LICENCE AND SHE REFERRED TO A BRITISH ONE.  HE IS IN B.C.,
MUST HAVE A B.C. D.L. - CAN'T GET THIS AS HE HAS A DEBT.
TOLD HER WE MAY PAY SOME OR EVEN ALL THE RENTAL IF WE FEEL
THE EXPENSE IS REASONABLE BUT MR. HALL HAS TO PAY THE BILL
UP FRONT.  WE THEN CONSIDER IT, NO GUARANTEE WE PAY IT.
THEY WILL BE SENDING A DEMAND LETTER TO MR. HALL AS THE
CAR HE HAS IS DUE TO BE SOLD AND THE LONGER HE HAS IT, THE
LESS THE VALUE AT AUCTION.
JN

---NOTE

| 15JAN04 | NOTE | EXAMINER  CALL FROM DENISE ZINKEL @ ALLSTATE;503-603-6436 | A |

SHE REFERRED TO THE FAX I SENT TO MICHELLE BELL.  RELAYED
WE DO NOT HAVE COPY OF A VALID DRIVER'S LICENCE AND UNTIL
WE DO HAVE ONE, WE HAVE DEEMED HE DOES NOT HAVE ONE.  HIS
B.C. D.L. EXPIRED.  HE IS LIVING IN B.C. AND IS THEREFORE
OBLIGATED TO HAVE A B.C.D.L. AFTER 90 DAYS.  HE HAS BEEN
UNCO-OPERATIVE IN PROVIDING INFO.  DENISE CONFIRMED HE HAS
AN INTERNATIONAL DRIVER'S LICENCE - WHERE'S THE COPY??
SHE ASKED ABOUT OUR POLICIES AND WOULD NOT BE SPECIFIC.
TOLD HER ANY MEDICAL IS EXCESS BEYOND THEIR POLICIES.
THEY WILL NOT PROVIDE COPIES AND I HAVE ASKED THEY DISCLOSE
 WHAT THEY COVER.  UNTIL THEY DO, SUGGEST WE ARE NOT
OBLIGATED TO CO-OPERATE WITH ALLSTATE EITHER.
DENISE CONFIRMED THE ONLY ADDRESS THEY HAVE IS SSI AND
WONDERED WHY HALL HAD INSURANCE IN THE STATES.
WE NEED:
CONFIRMATION OF ADDRESS/ADDRESSES ALLSTATE HAVE AS WELL AS;
(1) COPY OF DRIVER'S LICENCE
(2) COPY OF POLICY, SPECIFIC LIMITS AND CONTRACT INFO.,
REQUESTED DEC. 4, 2003 - NOTHING RECEIVED TO-DATE.
(3) WHAT HE HAS REPORTED TO THEM RE: INJURIES
(4) WHAT MEDICAL INFO. THEY HAVE
(5) PRIMARY COVERAGE

ICBC_003312

```
DATE: 2021-01-04                                                    PAGE : 11
TIME: 10.56.18       INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  |

**15JAN04 NOTE** — MR. HALL HAS SUBMITTED A CLAIM TO ALLSTATE FOR LOST INCOME   A
HE HAS PROVIDED THEM WITH A LETTER FROM A EUROPEAN LEGAL
ADVISOR OUTLINING WHAT HE SHOULD BE MAKING BUT CANNOT AS HE
 IS TOO INCAPACITATED TO WORK.
(6) WE NEED THIS DOCUMENTATION AS WELL.
AS TO THE VEHICLE, DENISE WAS NOT PREPARED TO DISCLOSE THAT
 INFORMATION EITHER.
(7) COPY OF VISITOR'S PERMIT(S)
(8) WE NEED THIS DOCUMENTATION.  IF THEY INTEND TO
SUBROGATE, WE CANNOT ACCOMODATE AS WE HAVE NO DETAILS FROM
WHAT WE KNOW (OR THINK WE DO), MR. HALL IS A BRITISH
CITIZEN AND NOT A LANDED IMMIGRANT.  HE HAS AN ADDRESS ON
SSI.  IS IT POSSIBLE HE HAS TITLE?  CAN WE ESTABLISH WHEN
HE HAS ENTERED/LEFT THE COUNTRY?? AS A BRITISH SUBJECT
WHERE IS HE OBLIGATED TO FILE INCOME TAX RETURNS?  WHAT ARE
THE FILING LAWS?  APPARENTLY WHEN A PRO HAS WINNINGS AS A
NON-RESIDENT WHOEVER PROVIDES THE PURSE WITHHOLDS THE TAX
IT IS, THEREFORE, BENEFICIAL FOR THE PRO TO FILE INCOME TAX
RETURNS AS THEY CAN CLAIM EXPENSES, DEDUCTIONS ETC. AND
WILL LIKELY RECOUP SOME OF THE TAX. JN

-----------------------------------------------------------------------NOTE

**2FEB04  NOTE** — EXAMINER REVIEW OF FILE   A
FILE NOT FOUND AT MY DESK
TWO MESSAGES ON MY PHONE;
(1) GARY - CALLING ON BEHALF OF P/C - WANTS TO TALK
(2) ELAINE FROM AVIS - 655-4589 - VEHICLE RETURNED TO THEM
AFTER HOURS ON THE 19TH WITH A LETTER FROM MR. HALL
STATING ICBC HAS ASKED AVIS SEND THE BILL TO US - HE HAS
NOT PAID THE RENTAL ACCOUNT
JN

-----------------------------------------------------------------------NOTE

**2FEB04  NOTE** — VOICE MAIL FROM ALLSTATE INS THEIR CLAIM 4285395506   A
THE PERSON LEAVING THE MESSAGE WAS ESL SO I DID NOT
GET A NAME OR UNDERSTOOD WHAT THEIR QUESTION WAS.
THEIR NUMBER 1-800-374-4246. WHEN PHONING NEEDED
EXTENSION WHICH THE PERSON DID NOT LEAVE ON THEIR VOICE
MAIL. HELD FOR ABOUT 7 MINUTES AND GAVE UP.
I WAS GOING TO REFER THEM TO CURRENT EXAMINERS NAME
ANYWAY.

-----------------------------------------------------------------------NOTE

**2FEB04  NOTE** — EXAMINER DISC. WITH LISA   A
NO FURTHER INVESTIGATION AT THIS TIME.
**REPORT FORTHCOMING FROM KEN CARTER
**UNTIL ALLSTATE VERIFIES WHAT THEY WILL/HAVE COVERED FOR
MEDICAL, WE ARE NOT DOING ANYTHING.
**AS TO RENTAL, WE HAVE NOT AGREED TO PAY IT.  MR. HALL
PAYS.  WE CONSIDER REASONABLE REIMBURSEMENT AS A RESULT OF
MVA
**AS TO TORT, MR. HALL REFUSES TO PROVIDE INFO., WE CANNOT
ASSIST HIM (NO IDEA WHAT ALLSTATE COVERING ANYWAY)
**AS TO DRIVER'S LICENCE, HE LIVES IN B.C. AND IS REQUIRED
TO HAVE A VALID DRIVER'S LICENCE, THIS BEING A B.C. ONE.

ICBC_003313

```
DATE: 2021-01-04                                              PAGE : 12
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373475-6
```

|      |      |      | TYP EXP |
|------|------|------|---------|

```
                                                             TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                           EXP
-------  -------- -----------------------------------------------
2FEB04   NOTE    THIS HE CANNOT GET UNTIL HIS DEBT IS PAID.  THEREFORE NO    A
                 PART 7 (INTERNATIONAL CERTIFICATE AND BRITISH D.L. NOT
                 ENOUGH AS LIVING IN B.C. TOO LONG)

                 **WHEN AND IF MR. HALL DOES ACTUALLY PRESENT A CLAIM FOR
                 MEDICAL/WAGE LOSS, SIU WOULD LIKE TO SEE FILE AS SOON AS
                 DOCUMENTATION FROM HIM OR THROUGH COUNSEL IS RECEIVED.
                 JN
-----------------------------------------------------------------NOTE
4FEB04   NOTE    SEE REPORT ON FILE.                                         A
                 FURTHER BACKGROUND INFO. REQUIRED  - WILL LEAVE THIS ONE
                 ALONE FOR A WHILE THEN RETURN TO SSI IN A COUPLE OF MONTHS
                 GOOD IDEA TO INTERVIEW AS MANY PEOPLE ASSOCIATED WITH HIM
                 AS POSSIBLE.
                 JN
-----------------------------------------------------------------CMPL
6FEB04   ADMIN   JN/**RUSH** PLEASE TRANSCRIBE TAPE (PHONE MESSAGES LEFT BY  A
                 CLAIMANT)  WHICH IS ON THE INSIDE JACKET (IN AN ENVELOPE)
                 OF THE FILE.  **FILE AT MARGARET'S DESK**
                 PLEASE PAY KEN CARTER'S ACCOUNT - 21B82P ON CROSSFILE
                 JO
                 * WILL HAVE ARLENE LOOK AT THIS PRIOR TO GIVING BACK **
-----------------------------------------------------------------NOTE
6FEB04   NOTE    OA NOTE: HAVE JUST TRANSCRIBED 5 TELEPHONE MESSAGES FROM    A
                 CRAIG RIEMER FOR JOANNE - WILL HAVE ARLENE HAVE A LOOK TO
                 ADVISE WHAT FORMAT I SHOULD DO (PERHAPS ERIN CAN FIX UP ON
                 MONDAY AS I AM NOT HERE RE: FORMAT) ARLENE NORMALLY DOES THE
                 SIU TYPING IS MY UNDERSTANDING AND THERE MAY BE A FORMAT
                 TO USE I AM NOT AWARE OF
-----------------------------------------------------------------MSGS
10FEB04  EMAIL   CC: JOANNE.NELSON@ICBC.COM                                  A
                 MF L373475 6 EXP A
                              CLAIMANT NAME:    HALL, RICHARD
                                        P/C:   MICHAEL VALLETTA
                             REASON FOR LAWYERS:  REPRESENTED(REP)@DOL
                 INJURIES:
                 CLAIMANT STATES; "HEAD, NECK, BACK, CHEST, HIPS, LEGS
                    PRE-EXISTING INJURIES
                 AND/OR HEALTH CONDITIONS:    1997 - KEN CARTER'S REPORT
                 PRIOR ICBC OR WCB CLAIMS:    UNKNOWN
                 EMPLOYMENT
                 --------------------------------------------------------
                 OCCUPATION(S):
                 PROFESSIONAL GOLFER AND BUSINESSMAN
                 EMPLOYER(S):
                 UNKNOWN
                       TTD ADVANCES PAID:   NONE
                   PERIOD OF TIME OFF WORK:   UNKNOWN
                 CURRENT DISABILITY STATUS:   UNKNOWN
                 --------------------------------------------------------
                 RESERVES, CL24A COMPLETED:   $20,000
                                    OFFERS:   NONE
```

```
DATE: 2021-01-04                                                    PAGE : 13
TIME: 10.56.18           INSURANCE CORPORATION OF BRITISH COLUMBIA
                             CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373475-6
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | |

```
10FEB04 EMAIL    THERAPY, ONGOING, END DATES, ETC.:                       A
                 UNKNOWN
                 DEFENCES:
                 PREVIOUS HISTORY - ONGOING INVESTIGATION
                 ================================================
                 LIABILITY:
                 TP HELD 100%
                             COVERAGE:    ALLSTATE IN U.S. NO ICBC
                             BREACHES:    NO VALID DRIVER'S LICENCE PROV
                           TP LIMITS:     1,000,000
                               CL90:      N/A
                       CL217 DATE SENT:   N/A
                 HANDLING RECOMMENDATIONS/ISSUES:
                 PLEASE SEE FILE.  SIU INVOLVEMENT.  IF A CLAIM IS PRESENTED
                 AS IT MAY VERY WELL BE, AT SOME POINT, PLEASE INVOLVE SIU
                 IN INVESTIGATION.  AT PRESENT, KEN CARTER DOING BACKGROUND.
                 MISC:
                 KEN CARTER INVESTIGATING OWNERSHIP OF "SUMMER HOUSE" ON SSI
                 AND HOW LONG MR. HALL HAS ACTUALLY BEEN IN BRITISH
                 COLUMBIA. HE APPEARS TO BE HERE ON A VISITORS PERMIT AND,
                 AS SUCH, IS NOT ALLOWED TO "WORK" HERE - NOTE HE HAS A
                 BUSINESS-UNDER INVESTIGATION VIA KEN CARTER.
                 -------------------------------------------------------CMPL
10FEB04 ADMIN    PLEASE FORWARD COPY OF TELEPHONE NOTES TO MICHAEL VILLETTA. A
                 "FURTHER TO MR. FEDEROFF'S CORRESPONDENCE OF JAN 29/03, WE
                 ENCLOSE TRANSCRIPTIONS OF TELEPHONE MESSAGES LEFT WITH
                 JOANNE NELSON OF OUR OFFICE.  REGARDS, LISA MITCHNER, CLMS
                 MANAGER" PLS CC TO GEORGE FEDEROFF IN FAIR PRACTICES DEPT
                 -------------------------------------------------------CMPL
17FEB04 TRANSFER FILE TRANSFER TO    030/9132-4 LINDSAY, BRENDA           A
                 -------------------------------------------------------NOTE
24FEB04 NOTE     VOICE MAIL FROM ALLSTATE ( EVELYN) THAT THEY HAVE SUBRO  A
                 BUT NOT COMPLETE WITH THEIR SALVAGE YET CAN WE PHONE
                 THEM INREGARDS TO LAIBILTY . 1-800-374-4246
                 CLAIM NUMBER 4285395506
                 -------------------------------------------------------NOTE
26FEB04 NOTE     EXAMINER DISC. WITH KEN CARTER                          A
                 HE SUGGESTS WE OBTAIN PHOTOS AND ESTIMATE OF TP VEHICLE
                 AND COMPARE DAMAGE TO TP VEHICLE COMPARED TO INS. VEHICLE.
                 **NOTE - TP INDICATED THE POLICE WERE NOT AT THE SCENE OF
                 THIS INCIDENT AND THERE WAS NO MENTION BY HALL TO THE TP
                 OR ANY SUGGESTION HE WAS INJURED**
                 -------------------------------------------------------NOTE
27FEB04 NOTE     ALL STATE INSURANCE CONFIRMING MR HALL IS THE DENY FILE A
                 -------------------------------------------------------NOTE
1MAR04  NOTE     NEW FILE EXAMINER REVIEW                                 A
                 WE NEED A STATEMENT FROM THE TP, WHAT WAS THE DAMAGE TO
                 HALL CAR THAT HE COULD SEE.
                 GET THE PHOTOS FROM ALLSTATE WHEN THEY SEND SUBRO LETTER
                 AND HAVE DOVE CONFIRM SAME TYPE OF DAMAGE (JOANNE NELSON
                 SAYS THAT SHE THINKS HALL DID THE DAMAGE AFTER THE FACT).
                 CLAIMANT HAD A SERIOUS MVA IN 1997-WILL NEED DETAILS AT
```

DATE: 2021-01-04                                                    PAGE : 14
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                      CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

```
                                                                        TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                     EXP
-------  -------------------------------------------------------------------
1MAR04   NOTE    SOME POINT, BUT IF THIS IS AN LVI THEN WE HAVE TO CONSIDER   A
                 THAT THE INJURIES MAY PRE-DATE THE MVA. WILL NEED CLINICALS
                 PRE-MVA.
                 RAN HIS DL AND HAS 2 VIOLATIONS FEB 24TH 2004 THAT SHOW ON
                 F3 I ASKED LISA MITCHNER TOI RUN F11 ABD THEY DON'T SHOW
                 THERE YET.
                 DL IS SHOWING HOLD ON COMPUTER WITH A DEBT OF 690 (THE LAST
                 2 VIOLATIONS)
                 NOTHING TO DO ON THIS FILE AT THIS TIME, NO SENSE
                 CONTACTING PC OTHER THAN THE FIRST LETTER, YOU CAN ASK FOR
                 DOC TOR INFO SO THAT WE CAN ORDER A CL19.
------------------------------------------------------------------------NOTE
3MAR04   NOTE    FILE REVIEW--BRENDA LINDSAY                                  A
                 -CLMT, RICHARD HALL, DRIVING A VEHICLE INSD BY ALL-STATE
                 WITH OREGON PLATES.  NO SUBRO DOCUMENT RECEIVED TO DATE,
                 ALL-STATE HAS PRESUMABLY LOOKED AFTER VEHICLE REPAIRS.
                 -CLMT, RICHARD HALL, DOES NOT HAVE A VALID BC DRIVER'S
                 LICENSE, IT WOULD APPEAR HE WAS DRIVING ON AN INTERNATIONAL
                 LICENSE.  IT WOULD APPEAR HE HAS BEEN IN BC FOR A WHILE
                 AND SHOULD HAVE A VALID DL.  WHEN HE REPORTED CLAIM HE HAD
                 EXPIRED BC DL, IT EXPIRED FEB 2002, HIS DL HAS NOW BEEN
                 REINSTATED
                 -CLMT LIVING ON SALT SPRING ISLAND AND HAS BOUGHT A PIECE
                 OF PROPERTY.  HE HAS BUILT WHAT APPEARS TO BE A SHACK ON
                 HIS PROPERTY, PHOTO ON FILE.
                 .
                 -ACCIDENT DETAILS--REARENDED BY TP. TP REPORTED AND
                 INITIALLY INVESTIGATED AS LVI, HOWEVER, GIVEN TP DAMAGE
                 OUTSIDE THE CRITERIA.  WILL OBTAIN STATEMENT FROM TP
                 DRIVER WITH RESPECT TO ACCIDENT DETAILS, DAMAGE TO
                 INSD VEHICLE AND HIS BEHAVIOUR AT THE SCENE
                 .
                 -CLMT-RICHARD HALL--ABSOLUTELY NO INFO ON FILE WITH
                 RESPECT TO HIS INJURIES,
                 WE DO NOT KNOW WHO HIS DOCTOR IS
                                        INDICATES HE IS A PROFESSIONAL
                 GOLFER, ALTHOUGH NO INFO PROVIDED TO SUPPORT THE SAME.
                 -PI HAS BEEN HIRED AND IT WOULD  APPEAR CLMT INVOLVED
                 IN ACCIDENT IN 1997 AND WAS THEN DEVELOPED SOME SERIOUS
                 ILLNESS THAT DOCTORS COULD NOT TREAT AND HE MOVED TO
                 SALT SPRING TO BE TREATED BY DR COLGAN WHO SPECIALIZES
                 IN HUMAN NUTRITION AND AGING.
                 .
                 -LETTER TO P/C ASKING FOR INFO ON DOCTOR
                 -ASSIGNED FRANK TO OBTAIN STATEMENT FROM TP DRIVER
                 -AS PER EXAMINER'S REVIEW THERE IS NOT MUCH ELSE TO DO
                 ON THIS FILE AT THIS TIME.  P/C NEEDS TO BE PROVIDING
                 DOCUMENTATION
                 .
                 -CALLED KEN CARTER AND ADVISED WE DO NOT NEED ANY FURTHER
                 INVESTIGATION AT THIS TIME
------------------------------------------------------------------------NOTE
```

ICBC_003316

```
DATE: 2021-01-04                                              PAGE : 15
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

**3MAR04 NOTE**    MSG FROM KEN CARTER--HE HAS MET WITH DRIVER OF TP    A
VEHICLE AND OBTAINED A STATEMENT ETC. HE WILL SEND ME
THE INFO, THUS FRANK DOES NOT NEED TO OBTAIN STATEMENT
-------------------------------------------------------------NOTE

**2APR04 NOTE**    JOHN MCKENZIE FROM OOP CLAIMS CALLED BACK.    A
JOHN MCKENZIE CALLED FROM OOP. AND ADVISES THAT PERSONAL INJ
URY PROTECTION (PIP) PROVIDES SOME $10,000. MEDICAL COVERAGE
PER PERSON.  THEY ALSO SUBROGATE AGAINST THE WRONGDOER FOR A
NYTHING THEY PAY OUT. I'M NOT SURE WE EVEN NEED TO GO INTO
THE PAU WITH THE LAWYER AS IT HAS NOT BECOME AN ISSUE.  I'M
NOT SURE WHY THIS HAS EVEN BEEN RAISED AT THIS POINT.  JOHN
STORY ADVISES THAT LISA MITCHNER IS RESEARCHING THE SUBJECT
AND ATTEMPTING TO LOCATE THE NEW PAU.  LETTER NOT TO BE SENT
UNTIL NEXT WEEK.  I'LL ADVISE GEORGE FEDOROFF OF SAME. RENAE
-------------------------------------------------------------CMPL

**19APR04 TRANSFER FILE TRANSFER TO    034/2510-4 WRIGHT, GERARD**    A
-------------------------------------------------------------NOTE

**6MAY04 NOTE**    PHONED RICHARD HALL    A
I PHONED MR. HALL AT 653-9653 ON MAY 6, 2004 AT 12:15 PM.
HE WAS NOT HOME BUT I LEFT A VOICE MESSAGE THAT I WOULD BE
WRITING TO HIM AFTER WHICH HE COULD CONTACT ME, OR IF HE
NEEDED TO CONTACT ME I LEFT HIM WITH MY NAME AND TOLL FREE
NUMBER.
DICTATED BY GERARD WRIGHT
-------------------------------------------------------------NOTE

**13MAY04 NOTE**    TELEPHONE CALLS - RICHARD HALL    A
1.   THE FIRST TELEPHONE CONVERSATION I HAD WITH MR HALL WAS
ON MAY 11/04 BETWEEN 11:07 AM AND 11:29 AM. HE WAS PHONING
ABOUT OUR LETTER TO HIM DATED MAY 6/04. HE SAID WE HAD SENT
IT TO THE WRONG ADDRESS BUT IN FACT HE DID RECEIVE IT.  HE
WANTED TO KNOW HOW MUCH THE ADVANCE WOULD BE AND I TOLD HIM
$5,000.00 IF HE WOULD MEET THE CONDITIONS OF OUR LETTER,
I.E. I WOULD CONSIDER THAT AMOUNT.  I HAD TOLD HIM AT THAT
TIME I DID NOT HAVE ENOUGH INFORMATION ON THE FILE TO
ADJUST SAME AND THAT WAS WHY WE MADE THE REQUEST.  HE WAS
RELUCTANT TO GIVE US AUTHORIZATION TO GATHER THE
INFORMATION AND SAID HE WOULD GET IT HIMSELF.
I ASKED HIM ABOUT THE TAX INFORMATION AND HE SAID HE DID
NOT WANT TO GET INTO THAT AS IT WAS PRIVATE INFORMATION. HE
SAID THAT HE WAS NO LONGER REPRESENTED BY MICHAEL VELLATA
AS THEY RAN OUT OF PATIENCE WITH EACH OTHER. I TOLD HIM WE
NEEDED TO GET CONSIDERABLY MORE MEDICAL INFORMATION.  HE
SAYS HE HAS BEEN GOING 2 OR 3 TIMES A WEEK ON SALT SPRING
ISLAND FOR PHYSIO WITH A JOHN NEZIELE. HE SAID THAT BEFORE
HE PHONED ME HE HAD TALKED TO ALEX AT GEORGE FEDOROFF'S
OFFICE AS HE WAS NERVOUS ABOUT TALKING TO ME AND WANTED TO
KNOW IF HE COULD LIMIT THE INFORMATION THAT HE WOULD HAVE
TO PROVIDE US. ALEX TOLD HIM THAT WOULD BE IN ORDER. IN
REGARDS TO THE GOLFING HE'S MISSING, HE SAID HE WOULD HAVE
BEEN ON MANY TOURS PICKING UP $1,000 HERE AND THERE. HE
SAID HE DID NOT HAVE A COPY OF VELLETTA'S LETTER TO US
DATED MAR 12/04.  I EXPLAINED TO HIM IN THAT LETTER ON PAGE

ICBC_003317

DATE: 2021-01-04                                                    PAGE : 16
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

```
                                                                    TYP
                                                                    EXP
DATE      WORKTYPE DESCRIPTION/DETAIL
-------  ---------------------------------------------------------------   ---
13MAY04  NOTE      4 MR VELLETTA APPARENTLY HAD SEEN DOCUMENTATION ABOUT HIS    A
                   FINANCIAL RESOURCES. I ALSO TOLD HIM WE HAVE A DEMAND IN
                   FROM ALLSTATE TO PAY OUT HIS VEHICLE IN THE AMOUNT OF
                   $9,301.62 CANADIAN. HE SAID THAT WE SHOULD NOT PAY THIS
                   BECAUSE HIS VEHICLE IS WORTH DOUBLE THAT AND HE'S DEALING
                   WITH ALLSTATE ABOUT THIS ISSUE. I TOLD HIM BEFORE WE WOULD
                   CONSIDER PAYING ANYTHING TO ALLSTATE WE WOULD HAVE TO AGREE
                   ON AN AMOUNT AND WE WOULD REQUIRE A PROPERTY DAMAGE RELEASE
                   AND A COPY OF THEIR PROOF OF LOSS BEFORE WE PAID.
                   I ALSO TOLD HIM WE FELT THAT THE RENTAL ACCOUNT WAS
                   EXCESSIVE HOWEVER WE REALIZED THERE HAD BEEN SOME
                   ADMINISTRATIVE PROBLEMS IN THE OUTSET OF THE CLAIM AND WE
                   WERE PREPARED TO MAKE A $1,500 ALLOWANCE.  HE SAID THAT WAS
                   NOT GOING TO BE SUFFICIENT.
                   WE TOLD HIM AT THIS TIME THAT WE WOULD CONSIDER THE $5,000
                   ADVANCE IF WE COULD GET ACCESS TO ALL THIS INFORMATION AND
                   IN THE INTERIM WE WOULD MAKE THE $5,000 UNTIL WE GET THIS
                   WHOLE THING SORTED OUT BUT WE NEEDED HIS COOPERATION IN
                   ALLOWING US TO GATHER THIS INFORMATION.
                   WE DISCUSSED THE DOCUMENTATION THAT WAS MENTIONED ON PAGE 4
                   OF THE VELLATA LETTER ABOUT HIS FINANCIAL RESOURCES.  MR
                   HALL DID NOT HAVE A COPY OF THE MAR 12/04 VELLETTA LETTER.
                   HE THEN SAID THAT THERE WAS A LETTER FROM A LAW FIRM CALLED
                   BIRD AND BIRD IN LONDON WHICH IS HIS LAW FIRM THAT WOULD
                   EXPLAIN HIS WAGE LOSS. I TOLD HIM WE DID NOT HAVE A COPY OF
                   THIS LETTER.
                   THE WAY THE CALL ENDED WAS THAT HE WOULD FAX US A COPY OF
                   THE BIRD AND BIRD LETTER AND WE WOULD FAX HIM (537-1163) A
                   COPY OF THE MARCH 12/04 VELLETTA LETTER. WE FAXED THE
                   VELLETTA LETTER TO HIM HOWEVER IT CAME BACK SAYING IT HAD
                   NOT GONE THROUGH AND MR HALL LEFT A FURTHER MESSAGE SAYING
                   THAT THE FAX HE WAS USING NEEDED A NEW CARTRIDGE AND HE WAS
                   GOING TO FIX THAT. HE LATER PHONED BACK AND LEFT ANOTHER
                   MESSAGE SAYING THAT IN FACT HE DID GET OUR FAX, NOT ALL OF
                   IT BUT MOST OF IT BUT THE MOST IMPORTANT THING WAS THE
                   LETTER FROM VELLETTA. .
                   2.   THE NEXT PHONE CALL I HAD WITH MR HALL WAS ON MAY 11/04
                   AT 12:15 PM TO 12:20 PM.  AT THAT TIME I ASKED HIM SOME
                   INFORMATION ABOUT THE BIRD AND BIRD LETTER WHICH WE HAD NOW
                   RECEIVED, ABOUT WHO THE ACTUAL INVESTORS WERE AND HE DID
                   NOT WANT TO GET INTO IT SAYING THAT THIS WAS PRIVATE
                   INFORMATION.  I TOLD HIM WE WOULD LIKE TO GET COPIES OF
                   CONTRACTS BUT ONCE AGAIN HE SAID THAT WAS PRIVATE
                   INFORMATION. HE WANTED TO KNOW IF WE NEEDED AN UNALTERABLE
                   LETTER.  WE DID NOT DISCUSS THAT FURTHER.
                   HE ALSO ADVISES THAT ALLSTATE IS PAYING SOME OF HIS
                   ACCIDENT BENEFITS, I.E. HIS DOCTOR VISITS AND HIS PHYSIO
                   BUT THEY WERE NOT PAYING HIM DISABILITY OR WAGE
                   CONTINUATION AND NO TRAVEL.
                   I TOLD HIM THAT WE STILL NEEDED TO GET INFORMATION IF WE
                   WERE GOING TO PROCEED.  HE WAS RELUCTANT TO PROVIDE THAT
                   AND THE PHONE CALL ENDED SAYING HE WAS GOING TO GET FURTHER
```

DATE: 2021-01-04
TIME: 10.56.18
PAGE : 17

INSURANCE CORPORATION OF BRITISH COLUMBIA
CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

| DATE | WORKTYPE | DESCRIPTION/DETAIL |
|------|----------|--------------------|

TYP
EXP

A

13MAY04 NOTE    INFORMATION FOR US.

3.  MR HALL LEFT A MESSAGE JUST AFTER 3 PM ON MAY 11/04.
THE MESSAGE WAS THAT HE WAS GOING TO GET US SOME MEDICAL
INFORMATION, THAT ICBC NOW HAD THE BIRD AND BIRD LETTER AND
THAT WAS ALL THAT WE WERE GOING TO GET. HE SAID HE LOOKED
FORWARD TO RECEIVING THE $5,000 PAYMENT IN ADVANCE BUT HE
WANTED US TO MAKE IT MORE THAN THAT.

4.  I PHONED THE NUMBER 537-1153 AND THERE WAS A VOICE
MESSAGE MACHINE SAYING THAT THIS WAS THE HOUSE OF MEAGHAN
AND I LEFT A MESSAGE FOR MR HALL TO CALL ME BACK.

5.  I PHONED MR HALL ON MAY 12/04 AT 10:55 AM AT PHONE
NUMBER 653-9653 AND LEFT A MESSAGE.

6.  ON MAY 12/04 AT 11:20 AM I PHONED MR HALL AND LEFT A
MESSAGE AT 537-1163 ASKING HIM TO CALL ME.

7.  MR HALL LEFT A MESSAGE FOR ME ON MAY 12/04 AT 2:20 PM
AND SAID THE BEST WAY TO REACH HIM WAS FROM PHONE NUMBER
653-9653 AND THAT HE WAS IN THE PROCESS OF GETTING MORE
INFORMATION FOR US.

DICTATED BY GERARD WRIGHT
----------------------------------------------------------NOTE
13MAY04 NOTE    PHONE CALL - ALEX VAN GRONDELL                          A
ALEX FROM GEORGE FEDOROFF'S OFFICE PHONED TO ADVISE THAT HE
HAD SPOKEN TO MR HALL YESTERDAY. I TOLD HIM I HAD A COUPLE
OF TELEPHONE CONVERSATIONS WITH MR HALL AND THAT HE HAD NOT
AGREED TO ALLOW US TO GATHER INFORMATION THAT WE REQUIRED
SUCH AS MEDICAL REPORTS, CLINICALS AND FURTHER WAGE
INFORMATION, BUT SAID HE WAS GOING TO PROVIDE SOMETHING FOR
US.  I TOLD ALEX IT WAS GOING TO BE OUR PREFERENCE TO TELL
MR HALL THAT WE NEEDED FULL AND OPEN DISCLOSURE AND
UNRESTRICTED ACCESS TO THIS INFORMATION AS OPPOSED TO WHAT
HE FEELS WE NEED AND THAT I WASN'T IN A POSITION TO ADVANCE
ANY MONIES AND I TOLD ALEX THAT AFTER A REVIEW BY OUR MD
PEOPLE THAT WE FELT THAT A REASONABLE AMOUNT TO PAY FOR THE
U DRIVE WAS $1,500.
DICTATED BY GERARD WRIGHT
----------------------------------------------------------NOTE
13MAY04 NOTE    PHONE CALL MAY 12/04, 3:05PM                            A
I PHONED MR HALL AS WE HAD NOT BEEN ABLE TO CONNECT ON THE
PHONE. I TOLD THAT OUR POSITION WAS THAT WE NEEDED FULL AND
OPEN DISCLOSURE WITHOUT RESTRICTIONS ON OUR TERMS TO GATHER
THE INFORMATION THAT WE REQUIRED TO ADJUST THE CLAIM AND
UNTIL WE HAD THAT THERE WAS NOT MUCH WE COULD DO FOR HIM.
PART OF THE MESSAGE WAS THAT I TOLD HIM WE WOULD CONSIDER
THE ADVANCE BASED ON OUR LETTER BUT THAT WASN'T FORTHCOMING
SO THERE WAS NOTHING REALLY WE COULD DO BUT I INVITED HIM
TO PHONE ME TO DISCUSS THE MATTER FURTHER.

ICBC_003319

DATE: 2021-01-04                                                    PAGE : 18
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

                                                                   TYP
                                                                   EXP
DATE     WORKTYPE  DESCRIPTION/DETAIL
-------  --------  ----------------------------------------------   A
13MAY04 NOTE      DICTATED BY GERARD WRIGHT
                                                               ----NOTE
------------------------------------------------------------------ A
13MAY04 NOTE      ALLSTATE/PIP
                  WE PHONED MICHELLE BELL AT ALLSTATE IN PORTLAND HOWEVER SHE
                  IS NOT HANDLING THE CLAIM FOR MR HALL ANYMORE. THE CLAIM
                  NUMBER THEY ARE USING IS 4285395506. WE SPOKE TO A MIKE
                  BOTHMAN.  HE ADVISED THAT THE PIP ADJUSTER IS ACTUALLY NICK
                  BRAJCICH, TELEPHONE (503) 603-5910 AND EMAIL
                  KQQD@ALLSTATE.COM.  THERE IS ALSO ANOTHER ALLSTATE ADJUSTER
                  INVOLVED NAMED ROBIN RYSER WHO HANDLES SUSPICIOUS WAGE LOSS
                  INVESTIGATION FOR ALLSTATE.  FROM THE COMPUTER MIKE WAS
                  ABLE TO TELL THAT ROBIN HAS WRITTEN TO THE LAW FIRM OF
                  GORDON VELLETTA REQUIRING FURTHER AND BETTER WAGE
                  INFORMATION SUCH AS TAX RETURNS AND VERIFICATION OF THE
                  LOSS. ON THEIR COMPUTER THEY DID HAVE LASERED IN THE LATER
                  DATED DECEMBER 23/03 FROM THE LAW FIRM BIRD AND BIRD.
                  APPARENTLY ROBIN HAS FOLLOWED UP WITH GORDON VELLETTA IN
                  MARCH AND APRIL BUT TO DATE HAS NOT HAD A REPLY TO HER
                  INQUIRIES.
                  NICK BRAJCICH IS HANDLING THE MEDICAL SIDE OF THE ACCIDENT
                  BENEFITS AT ALLSTATE.
                  MIKE WAS ABLE TO TELL US IF A PERSON IS TOTALLY DISABLED
                  FOR MORE THAN 14 DAYS THAN UPON APPROPRIATE DOCUMENTATION,
                  MEDICAL AND WAGE, ALLSTATE WILL PAY UP TO 70% OF THE THEIR
                  GROSS WAGE TO A MAXIMUM OF $1,250.00 PER MONTH AMERICAN.
                  BASED ON THE ABOVE, IT APPEARS THAT WHAT MR HALL TOLD US
                  THAT ALLSTATE IS PAYING FOR HIS DOCTOR AND PHYSIO IS
                  PROBABLY TRUE AND IT LOOKS LIKE HE'S WAITING FOR THEM TO
                  ALSO PAY HIM DISABILITY MONIES, BUT THAT IS UNDER
                  INVESTIGATION.
                  I GAVE MIKE ALL MY INFORMATION IN REGARDS TO CONTACTING US
                  AND ASKED THAT HE PASS IT ON TO ROBIN AND NICK.
                  DICTATED BY GERARD WRIGHT
                                                               ------NOTE
----------------------------------------------------------------- A
13MAY04 NOTE      DR COGLAN
                  IN MY CONVERSATIONS WITH MR HALL HE INDICATED THAT THE
                  REHAB PROGRAM OUTLINED BY DR COGLAN WAS NOT GOING TO HAPPEN
                  AND HE DID NOT ELABORATE.
                  DICTATED BY GERARD
                                                               ------NOTE
                                                                    A
14MAY04 NOTE      REQUIRED DOCUMENTATION
                  CLINICAL RECORDS - DR KAHN, DR MYERS, JUDITH BRADLEY,
                  DR COGLAN, DR HEATON
                  .
                  ALL MEDICAL RECORDS FROM MR HALL'S MOTOR VEHICLE ACCIDENT
                  OF 1997.
                  .
                  FULL MEDICAL REPORT FROM DR CHARLES MYER
                  .
                  A LIST OF GOLF TOURNAMENTS HE PARTICIPATED IN BETWEEN
                  NOVEMBER 2002 AND NOVEMBER 2003
                  .

ICBC_003320

```
DATE: 2021-01-04                                              PAGE : 19
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                      CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373475-6
```

|                                                                                              | TYP |
|                                                                                              | EXP |
| --- | --- |

```
DATE    WORKTYPE DESCRIPTION/DETAIL
------- ----------------------------------------------------------------
```

| | | |
| --- | --- | --- |
| 14MAY04 NOTE | ALL SUPPORTING DOCUMENTATION IN REGARDS TO THE BIRD & BIRD LETTER OF DECEMBER 23, 2003 | A |

```
                    RE: GORDON VELLETTA LETTER OF MARCH 12/04. THE SUPPORTING
                    DOCUMENTATION REGARDING THE CONTRACTS THAT MR VELLETTA
                    APPARENTLY HAD READ ALONG WITH AGREEMENTS OF SPONSERS AND
                    OTHER FINANCIAL SOURCES.
                    .
                    INCOME TAX RETURNS/NOTICE OF ASSESSMENTS FROM ANY COUNTRY
                    FOR THE 5 YEARS PRIOR TO THE MVA.
                    .
                    DICTATED BY GERARD
-------------------------------------------------------------------NOTE
```

| | | |
| --- | --- | --- |
| 18MAY04 NOTE | SUSAN BOX RE: INVOICE FOR DRIVING RICHARD HALL AROUND | A |

```
                    PHONED SUSAN BOX ON MAY 18, 2004.  HER HOME PHONE NUMBER IS
                    (604) 873-9604, AND HER CELL PHONE NUMBER IS 616-5269.  I
                    EXPLAINED WHO I WAS AND THAT WE HAD AN INVOICE NUMBER
                    723660 WHERE SHE APPARENTLY SOLD DRIVING TIME TO RICHARD
                    HALL.  SHE SAID THIS WAS CORRECT AND HAS NOT YET BEEN PAID
                    THE ACCOUNT OF $1,110.00.  SHE SAID THE VEHICLE SHE WAS
                    DRIVING WAS THE RENTAL VEHICLE THAT HALL WAS PAYING FOR AS
                    HE WAS UNABLE TO DRIVE.  SHE SAID THAT HE HAD BEEN TOLD BY
                    THE DOCTORS THAT IN FACT HE SHOULD STAY IN BED AND NOT BE
                    UP AND ABOUT.  SHE SAYS HIS INJURY WAS WHIPLASH, NECK AND
                    SHOULDER. SHE SAID SHE DROVE HIM TO VANCOUVER TO SEE DR.
                    KHAN, A CRANIAL SACRAL CHIROPRACTOR.  SHE ALSO TOOK HIM TO
                    VICTORIA TO SEE, ONCE DR. MYERS, AND THE OTHER TIME HIS
                    LAWYER VALLETTA. SHE MET HIM IN OCTOBER, 2003 AT A SOCIAL
                    OCCASION.  SHE SAID IN THE FIRST WEEK OF NOVEMBER HE HAD
                    BEEN UP ISLAND TO DO A PRACTISE ROUND OF GOLF AND HAD DONE
                    VERY VERY WELL AND HAD TAKEN A PHOTOGRAPHER WITH HIM.  SHE
                    UNDERSTANDS THAT HE HAS INVESTORS IN HIS GOLF AND BELIEVES
                    ONE OF THEM IS FROM FLORIDA, BUT DID NOT KNOW THE PERSON'S
                    NAME. SHE DOES NOT BELIEVE HE HAD WON ANY TOURNAMENTS AND
                    THEREFORE HAD NOT WON ANY MONEY PLAYING GOLF TO DATE.
                    DICTATED BY GERARD WRIGHT
-------------------------------------------------------------------NOTE
```

| | | |
| --- | --- | --- |
| 25MAY04 NOTE | ALLSTATE - CONVERSATION WITH YOLANDA IN IRVING TEXAS | A |

```
                    I EXPLAINED TO HER THEIR AUTO SOURCE SAID THE ACV WAS
                    $11,152.30 AND THE APPRAISER THEY HIRED SAID $10,428.66 BUT
                    THEY SAY THE AGREED ACV IS $11,717.46.  I ASKED HER WHY
                    THAT COULD BE.  WE TOLD HER THAT WE MAY CONSIDER THE
                    $10,428.66 FIGURE AS THE ACV.  SHE SAID THAT THE
                    DOCUMENTATION WE HAVE BEEN SENT IS IN ERROR IN THAT THEY
                    SHOULD NOT HAVE TAKEN OFF THE SALVAGE AS MR HALL RETAINED
                    THE VEHICLE.
                    I TOLD HER THAT WE HAD ALREADY REIMBURSED MR HALL HIS $500
                    SO THEY WILL NOT BE SEEKING THAT.
                    SHE SAID SHE WOULD HAVE SOMEONE SEND US A LETTER WITH THE
                    PROPER PAPERWORK.
                    SHE SAID ONCE WE AGREE ON A FIGURE THEY WILL SIGN A
                    PROPERTY DAMAGE RELEASE FOR US.
```

ICBC_003321

```
DATE: 2021-01-04                                                PAGE : 20
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373475-6
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | |

| DATE | WORKTYPE | DESCRIPTION/DETAIL |
|---|---|---|
| 25MAY04 | NOTE | DICTATED BY GERARD WRIGHT |

---NOTE A

| 26MAY04 | NOTE | MANAGEMENT/SIU REVIEW<br>A MEETING WAS HELD WITH RAY, GERARD AND SIU OFFICER AND IT WAS DECIDED TO REFER THIS FILE TO THE SIU DEPARTMENT. ONCE THIS IS DONE WE WILL THEN HAVE INVESTIGATOR KEN CARTER ATTEMPT TO OBTAIN A FULL AND DETAILED STATEMENT FROM MR HALL.<br>DICTATED BY GERARD WRIGHT |
|---|---|---|

---NOTE A

| 2JUN04 | NOTE | ALLSTATE<br>RECEIVED A PHONE MESSAGE FROM WILLIE AT ALLSTATE IN IRVING, TEXAS ASKING ME TO CALL.<br><br>I RETURNED THE PHONE CALL AND AT THAT TIME SPOKE TO A CATHY.<br><br>I EXPLAINED THAT I HAD SPOKEN TO A YOLANDA, THAT WE DIDN'T AGREE WITH THEIR ACV FIGURE AND SHE SAID THAT THEY HAD SENT US THE WRONG FIGURE THEMSELVES AND WAS GOING TO FORWARD US NEW PAPERWORK.  I TOLD HER I HAD JUST RECEIVED SOME MORE PAPERWORK, BUT IT WAS JUST A COPY OF THE OLD STUFF.<br><br>I TOLD HER IN OUR VIEW THE ACV IS $10,428.00 PLUS $17.00 FOR THE TITLE FEE, FOR A TOTAL OF $10,445.00, LESS THE $500.00 DEDUCTIBLE, WHICH WE HAD ALREADY REIMBURSED TO MR. HALL, LEAVING A BALANCE OF $9,945.00 FROM WHICH WE WOULD SUBTRACT THE SALVAGE, AS THEY HAD SOLD THE VEHICLE, ASFARAS WE KNOW TO MR. HALL FOR $1,937.00, AND THEREFORE WE THOUGHT THAT THE ACV TO BE PAID IN CANADIAN FUNDS WOULD BE $8,007.00.<br><br>CATHY SAID THAT SHE WOULD HAVE SOMEONE GET BACK TO US.<br>DICTATED BY GERARD WRIGHT |
|---|---|---|

---NOTE A

| 9JUN04 | NOTE | CALL FROM ALLSTATE<br>THIS TIME I SPOKE TO EVELYN.  SHE SAID THAT THE MONIES THEY PAYED TO HALL WAS IN CANADIAN FUNDS. I TOLD HER THAT IS NOT WHAT OUR RECORDS SHOW. SHE WENT THROUGH HER WHOLE FILE AND STILL WAS UNABLE TO TELL US WHERE THEY ARRIVED AT THE FIGURE OF $11,717.46.  I TOLD HER THEY STILL HAVE NOT FORWARDED TO US ANY NEW INFORMATION OTHER THAN WHAT WE'VE ALREADY RECEIVED TO EXPLAIN WHERE THEY'RE GETTING THEIR FIGURES FROM.  I TOLD HER WE HAD REPAID THE DEDUCTIBLE TO MR HALL IN CANADIAN FUNDS AS IT APPEARED THAT WAS WHAT THEY PAID HIM IN.<br>SHE SAID SHE'S GOING TO GIVE THIS TO ANOTHER DEPARTMENT AND THEY WILL GET BACK TO US.<br>DICTATED BY GERARD WRIGHT |
|---|---|---|

---NOTE A

| 9JUN04 | NOTE | LETTER FROM HALL DATED MAY 28/04<br>MR HALL HAS WRITTEN TO US SAYING THAT THE DEDUCTIBLE WE |
|---|---|---|

ICBC_003322

DATE: 2021-01-04
TIME: 10.56.18

PAGE : 21

INSURANCE CORPORATION OF BRITISH COLUMBIA
CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|---------------------|---------|
| 9JUN04 | NOTE | FORWARDED TO HIM SHOULD HAVE BEEN PAID IN US FUNDS HOWEVER THE INFORMATION WE HAVE ON THE FILE FROM ALLSTATE IS THAT THEY PAID HIM IN CANADIAN FUNDS, THEREFORE HE APPEARS TO BE WRONG. DICTATED BY GERARD WRIGHT | A |

---------------------------------------------------------------------CMPL

16JUN04 INCURRED EXPOSURE CLOSE        034/2510-4 WRIGHT, GERARD        KOL:37 A
---------------------------------------------------------------------MSGS

30JUN04  EMAIL     CC: GERARD.WRIGHT@ICBC.COM                                   A
                   MF L373571 4 EXP B YF L373475 6 YF        CONF   (Y/N)
                   GOOD DAY GEORGE AND ALEX.
                   THE DUNCAN OFFICE HAS RE-VISITED HALL'S REQUEST FOR PAYMENT
                   OF OUT OF POCKET EXPENSES AND TORT ADVANCE AS PER MICHAEL
                   VELETTA;S LETTER DATED MARCH 12, 2004.
                                     EXPENSE               HALL'S DEMAND
                   AMOUNT DUNCAN AGREES TO PAY
                                     RENTAL                  $3067.58
                   $1879.38
                                     DRIVER ASSISTANCE       1110.00
                   0
                                     ADDITIONAL EXPENSES      334.71
                   206.31
                                     TRAVELLING EXPENSES     1867.75
                   0
                                     (DOCTOR,CHIRO,MRI)
                                     TORT ADVANCE (WAGE LOSS)   45,000.00
                   0
                                     DEDUCTIBLE              500.00
                   500.00
                                     TOTAL                  $51,880.04
                   $2585.69
                                     ADVANCES PAID            2,500.00
                   2500.00
                   RENTAL:  HALL RENTED A VEHICLE ON NOV. 10/03 TO DEC.  9/03,
                   $1254.02. SECOND RENTAL ON DEC. 9/03 TO DEC. 22/03,
                   $625.36. THIRD RENTAL DEC. 22/03 TO JAN 18/04, $1188.20.
                   REASONABLE AMOUNT OF RENTAL ALLOWED: ONE MONTH, WHILE HALL
                   WAS SEEKING SETTLEMENT FROM HIS PRIVATE INSURER. HALL MET
                   FACE TO FACE WITH THE PRIVATE INSURER'S  APPRAISER, HANS
                   DOGE OF HD ADJUSTERS, ON DEC. 22/03 TO DISCUSS THE ACV
                   EVALUATION. MR. HALL HAD PROTRACTED DISCUSSIONS WITH HIS
                   INSURER REGARDING THE SETTLEMENT OF HIS VEHICLE CLAIM. THE
                   DUNCAN OFFICE BELIEVES IT IS FAIR IN PAYING FOR A RENTAL TO
                   DEC. 22/03.
                   DRIVER ASSISTANCE: THERE IS NO MEDICAL EVIDENCE IN ICBC'S
                   POSSESSION INDICATING HALL REQUIRED A DRIVER FOR  THE DATES
                   INDICATED ON THE INVOICE. HALL HAS NOT PAID THE DRIVER TO
                   DATE THEREFORE, IS NOT OUT OF POCKET THESE FUNDS AT THIS
                   TIME.
                   ADDITIONAL EXPENSES:  INVOICES PROVIDED, TOWING AND BARGING
                   ONLY ADD UP TO $206.31.
                   TRAVELLING EXPENSES: THESE ARE COSTS INCURRED FOR ATTENDING

```
DATE: 2021-01-04                                              PAGE : 22
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|--|--|--|-----|
|  |  |  | EXP |

```
DATE    WORKTYPE DESCRIPTION/DETAIL
------- --------------------------------------------------------------
30JUN04 EMAIL    MEDICAL APPOINTMENTS. HALL MAY HAVE COVERAGE UNDER HIS A/B    A
                 BENEFITS OR REHAB. PORTION OF HIS BENEFITS FROM HIS PRIVATE
                 INSURER. THE DUNCAN OFFICE HAS CONFIRMED ALLSTATE IS
                 REQUIRED TO MEET ICBC'S LIMITS. HALL WILL HAVE TO SUBMIT
                 ALL MEDICAL RELATED EXPENSES TO HIS PRIVATE INSURER
                 FOR CONFIRMATION OF COVERAGE PRIOR TO ICBC GIVING
                 CONSIDERATION TO PAYMENTS UNDER TORT.
                 TORT  ADVANCE: THERE IS NO DOCUMENTATION TO FILE TO CONFIRM
                 A WAGE LOSS CLAIM TO DATE.
                 IT APPEARS THE $2500 THE DUNCAN OFFICE HAS ADVANCED
                 SUBSTANTIALLY COVERS REASONABLE OUT OF POCKET EXPENSES.
                 RAY CADORETTE
------------------------------------------------------------------MSGS
                                                                    A
23JUL04 EMAIL    MF L373475 6
                 -----ORIGINAL MESSAGE-----
                 FROM:    CADORETTE, RAY
                 SENT:    FRIDAY, JULY 23, 2004 2:07 PM
                 TO:      VAN GRONDELLE, ALEX
                 CC:   WAGNER, NETTIE; PRINGLE, DOUGLAS; MCNICHOLLS, PAUL;
                 CADORETTE, RAY
                 SUBJECT:    RICHARD HALL --HIGH PROFILE CLAIM--FILE
                 L373475.6
                 HI ALEX.
                 THIS E-MAIL IS TO CONFIRM THE LETTER TO MR. HALL WAS SENT
                 FOR MAIL OUT IN TONIGHT'S COURIER TO HEAD OFFICE. A COPY OF
                 THE LETTER HAS BEEN SENT TO YOURSELF & NETTIE IN THE SAME
                 COURIER.
                 RAY CADORETTE
------------------------------------------------------------------NOTE
8SEP04  NOTE     MGRS. NOTE: I SPOKE WITH RICHARD HALL ON AUGUST 27TH LATE IN A
                 THE DAY. HE WAS WISHING US TI FINALIZE AN ADVANCE FOR HIM
                 BASED ON THE MATERIAL HE SENT TO US WITH RESPECT TO THE
                 "SPONSORSHIP" MONEY HER RECEIVED THROUGH BIRD AND BIRD IN
                 OCT. AND NOV. 2003. HE SAID HE HAS ACTED "IN GOOD FAITH" TO
                 PROVIDE THIS SENSITIVE MATERIAL AND NOW WE TOO SHOULD ACT
                 IN GOOD FAITH AND ADVANCE HIM SOME MONEY. HE SAYS HE HAD
                 TEN "INVESTORS" LINED UP FOR 2004 TO INVEST $10,000 U.S.
                 EACH IN HIM FOR THE 2004 PLAYING SEASON. HE EXPLAINED THAT
                 HE DID NOT HAVE TO WIN TOURNAMENTS TO ATTRACT THESE
                 INVESTORS BUT ONLY BE ABLE TO PROVE HE WAS GOING TO CREATE
                 A RETURN ON THEIR MONEY, THAT HE WAS IMPORVING AS A GOLFER
                 AND HAD POTENTIAL TO WIN. HE AGREED IT WAS NOT UNLIKE
                 INDIVIDUALS THAT "INVESTED" IN A RACE HORSE. THESE
                 INDIVIDUALS ARE WEALTHY AND TO THEM THIS IS NOT JUST AN
                 OPPORTUNITY TO GET A RETURN ON THEIR INVESTMENT BUT TO HAVE
                 THE FUN OF "OWNING" A PIECE OF A PROFESSIONAL GOLFER. THE
                 MVA OF NOV. 2003 TOOK THIS AWAY FROM RICHARD.WHEN I
                 SUGGESTED THAT HE TREAT ICBC AS A POTENTIAL INVESTOR AND
                 PROVE TO US HIS POTENTIAL, THEREFORE HAVE A INCOME LOSS
                 CLAIM. HE SAYS WE ARE NOT LIKE AN INVESTOR AND HE DOES NOT
                 HAVE TO PROVE THIS TO US. HE SAYS HE HAS SHOWN HE COULD GET
                 SPONSORSHIP AND NOW HE CAN'T, DUE TO THE MVA. I EXPLAINED I
```

ICBC_003324

DATE: 2021-01-04                                                    PAGE : 23
TIME: 10.56.18      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|
| 8SEP04 | NOTE | WOULD HAVE TO REVIEW THIS MATTER WITH RAY CADORETTE ON AUGUST 30TH AND THAT RICHARD COULD THEN CALL ME AND I WOULD GIVE HIM AN ANSWER AS FAR AS AN ADVANCE. I WOULD ONLY COMMITT THAT I COULD SEE SOME OF HIS ARGUMENT BUT THAT I DID NOT KNOW WHAT, IF ANYTHING, WE COULD DO AS FAR AS ADVANCING MONEY. AFTER DISCUSSIONS WITH RAY AND PAUL MCNICHOLLS WE DECIDED THAT WE COULD MAKE A SMALL ADVANCE WITH CONDITIONS APPLIED, THAT WE ARE PROVIDED WITH THE NAMES OF HIS SPONSORS, POTENTIAL AND PAST, MEDICAL AND INCOME AUTHORIZATIONS FOR US TO ADEQUATELY INVESTIGATE HIS CLAIM AND ANY OTHER INFORMATION PERTINENT TO HIS ALLEGATIONS OF LOSS. RICHARD WAS TO PHONE ME ON THE AFTERNOON OF AUGUST 30TH TO DISCUSS OUR DECISION. HE HAS NOT CALLED. | A |
| 4NOV04 | NOTE | PI PHONED KEN HE IS STILL GATHERING STATMENTS FROM WITNESSES WHO GOLFED WITH HALL. HIS REPORT WILL FOLLOW. | A |
| 4NOV04 | NOTE | OFFER ALERT SPOKE TO DOUG. HALL HAS NOT CONATCED HIM ABOUT PIA AND THERE IS NOTHING WE CAN REALLY UNTIL HALL GIVES US ALL THE REQUIRED INFO. SIU IN BACKGROUND. | A |
| 13DEC04 | NOTE | MGRS. NOTE: RECIEVED CALL FROM ALEX VANGRONDELLE RE: HALL HE HAS WRITTEN THE MINISTER AGAIN REGARDING HIS QUEST FOR AN ADVANCE PAYMENT. I AM GOING TO HAVE GERARD PREPARE A LETTER CONTAINING OUR CONDITIONS FOR AN ADVANCE OF $10,000. THIS WILL GO OUT UNDER MY SIGNATURE. ONE OF THE CONDITIONS ALSO SHOULD BE HALL'S AGREEMENT TO MEET WITH US (ICBC) IN PERSON TO DISCUSS THIS WHOLE MATTER. | A |
| 17DEC04 | NOTE | HEAD INJURY DEPARTMENT WE FORWARDED TO PAM LARSON, MANAGER AT HEAD OFFICE CLAIMS HEAD INJURY DEPARTMENT, THE MEDICAL REPORT WE RECEIVED FROM RICHARD HALL RECENTLY.  THE MEDICAL IS FROM DR. RAYMOND ANSELL AND IS SUGGESTING THAT IN FACT HALL DID SUFFER A HEAD INJURY AS A RESULT OF THE ACCIDENT.  WE ADVISED PAM THAT THERE IS A WAGE-LOSS OUT THERE OF AT LEAST $100,000.00, OR SO HAS BEEN CLAIMED.  WE ALSO GAVE HER OTHER DETAILS OF THE FILE. | A |

SHE SAYS THAT DR. RAYMOND J. ANSELL IS BAD NEWS.  HE IS A PLAINTIFF EXPERT IN REGARDS TO PSYCHIATRY USED BY THE JIM MURPHY'S OF THE WORLD.  HE DOES DO A LOT OF PRESCRIPTION MEDICAL TREATMENT AND WE DON'T KNOW HOW RICHARD HALL ENDED WITH DR. ANSELL.

PAM THANKED US FOR BRINGING THIS FILE TO HER ATTENTION AND ASKED THAT WE KEEP HER APPRIZED AS FURTHER MEDICAL INFORMATION COMES IN AS TO WHETHER OR NOT THEY COULD BE SUPPORTIVE OF A REAL HEAD INJURY.

```
DATE: 2021-01-04                                              PAGE : 24
TIME: 10.56.18       INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  |

**17DEC04 NOTE**   DICTATED BY GERARD WRIGHT   A
--NOTE

**21JUL05 NOTE**   UPDATE   A
WE HAVE NOT HEARD FROM HALL FOR SOMETIME. SPOKE TO MGT
THERE IS NOTHING WE CAN DO UNTIL HE AGREES TO CO-PERATE
WE WILL TRY AND FIND OUT WHAT HE HAS BEENDOING CURRENTKY.
--NOTE

**6OCT05 NOTE**   MGT MEETING   A
MET WITH PAUL RAY SIU. WE WILL WIAT UNTIL THE 10 NOV. 2005 A
ND THEN DO WRIT SEARCH AND IF IT IS DONE GET COPY AND GET
PLEADINGS CLOSED AND DO AN EARLY EFD.
--NOTE

**15NOV05 NOTE**   CALLED TO DYE DURHAM RE WRIT SEARCH   A

SPOKE WITH BILL FROM DYE DURHAM AND HE ADVISED ME THAT THERE
WAS A SMALL CLAIMS COURT ACTION IN NANAIMO AS WELL AS A
FAMILY LAW MATTER.  THE FAMILY LAW MATTER CAN ONLY BE
REQUESTED FROM COUNSEL OR FROM RICHARD HALL HIMSELF.  THERE
IS ALSO A SUPREME COURT CIVIL ACTION IN VANCOUVER.  BILL
WILL BE FAXING THESE TO US EITHER TODAY OR TOMORROW.
--NOTE

**30NOV05 NOTE**   ██████████████████████████████████████   A

--NOTE

**30DEC05 NOTE**   ALLSTATE/SUBROGATION   A
WE HAVE NOW RESEARCHED WHETHER OR NOT HALL'S INSURANCE
COMPANY CAN SUBROGATE ANY ACCIDENT MONIES THEY HAVE PAID TO
MR HALL. THE ANSWER IS NO.  THERE IS A BC COURT OF APPEAL
CASE - MATILDA V MACLEOD & ICBC THAT SAYS THAT THEY WILL
FAIL IN THEIR ATTEMPTS TO RECOVER BENEFITS UNDER SECTION
25(1)(2) OF THE INSURANCE (MOTOR VEHICLE) ACT.

THE WRITER ON DEC 30/05 PHONED ALLSTATE ON THE OFF CHANCE
HE MAY HAVE BEEN ABLE TO GET FURTHER INFORMATION FROM THEM.
I CALLED (503) 603-5910 IN AN ATTEMPT TO SPEAK TO THE LAST
KNOWN ADJUSTER OF RECORD, NICK BRAJCICH HOWEVER HE WAS NO
LONGER EMPLOYED BY ALLSTATE.  WE SPOKE TO A YOUNG WOMAN
THERE WHO CHECKED HER COMPUTER AND ADVISED US OF THE
FOLLOWING:

1.  THEY CLOSED THEIR FILE 4285395506 ON DEC 31/04
2.  THEY PAID MEDICAL BENEFITS IN REGARDS TO MR HALL'S
CLAIM IN THE AMOUNT OF $9,656.55 (WE ASSUME THAT WAS IN US
FUNDS)
3.  THEY PAID HIM NO WAGE LOSS REPLACEMENT UNDER THEIR
POLICY. IT CERTAINLY WOULD BE INTERESTING TO GET A COPY OF
THEIR FILE TO SEE IF IT STATES THE REASON THEY DID NOT PAY
THIS, I.E. PERHAPS NO ACCEPTABLE PROOF TO THEM THAT HE WAS
TOTALLY DISABLED AS A DIRECT RESULT OF THIS MVA OR,
ALTERNATIVELY, HE COULD NOT PROVE A WAGE LOSS. WE NOTE OUR
FILE NOTE OF MAY 12/04 WHEREIN WE WERE ADVISED BY ALLSTATE
THAT THEY WERE TREATING THE WAGE LOSS PRESENTED BY MR HALL

ICBC_003326

```
DATE: 2021-01-04                                              PAGE : 25
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6


                                                              TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                          EXP
-------  -----------------------------------------------------------
30DEC05 NOTE    AS SUSPICIOUS.                                  A

                DICTATED BY GERARD
----------------------------------------------------------------NOTE
24JAN06 NOTE    [redacted]                                      A

----------------------------------------------------------------NOTE
8FEB06  NOTE    [redacted]
```

ICBC_003327

DATE: 2021-01-04                                                    PAGE : 26
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

```
                                                                   TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                 EXP
------- -------- ------------------------------------------------- ---
8FEB06  NOTE                                                        A
```



```
                                                                  NOTE
27FEB06 NOTE
```

```
                                                                  NOTE
13MAR06 NOTE     CONFIDENTIALITY AGREEMENT                          A
                 P/C HAS SUGGESTED THAT WE ENTER INTO A CONFIDENTIALITY
                 AGREEMENT WITH THE PLAINTIFF AND HIS COUNSEL WHERE A SELECT
                 GROUP OF PEOPLE FROM ICBC WOULD BE PRIVY TO SOME OR ALL OF
                 THE INFORMATION THAT THE PLAINTIFF IS SCARED WILL BECOME
                 PUBLIC AND DO HARM TO HIS CURRENT BUSINESS VENTURE.
                 PAUL, RAY AND GERARD MET ON MAR 13/06 AND DISCUSSED THIS
                 ISSUE. IT WAS DECIDED WE WANT NO PART OF SUCH AN AGREEMENT
                 AS IF ANYTHING GOES SIDEWAYS DOWN THE ROAD IN ALL
                 LIKELIHOOD MR HALL WOULD BLAME ICBC REGARDLESS OF THE
                 CIRCUMSTANCES OF HOW THAT INFORMATION GOT LEAKED AND WE
                 HAVE THEREFORE TAKEN THE POSITION WE HAVE NO INTENTION OF
                 ENTERING INTO SAID AGREEMENT WITH THE PLAINTIFF OR HIS
                 COUNSEL NOR WILL WE ALLOW ANYONE FROM ICBC, OR THEIR
                 REPRESENTATIVE (DEFENCE COUNSEL), ENTER INTO THIS TYPE OF
                 AGREEMENT.
                 DICTATED BY GERARD
------------------------------------------------------------------NOTE
25APR06 NOTE                                                        A
```

ICBC_003328

DATE: 2021-01-04
TIME: 10.56.18

PAGE : 27

INSURANCE CORPORATION OF BRITISH COLUMBIA
CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|



25APR06 NOTE

A

NOTE

27APR06 NOTE  IME/O'SHAUGHNESSY
IS NOW SET FOR APRIL 27, 2007 10:30 AM   IN VAN.

A

NOTE

15JUN06 NOTE

A

NOTE

27JUN06 NOTE  DISMISS CLAIM

A

OTE

3AUG06  NOTE

A

OTE

12SEP06 NOTE

A

NOTE

14SEP06 NOTE  EFD
TENATIVE FOR DEC. 18 2006

A

NOTE

14SEP06 NOTE  H/O CLAIMS
GERARD DISCUSSED FILE WITH WAYNE COATES, ACTING MANAGER,
H/O CLAIMS.
WAYNE WAS ADVISED THAT MANAGEMENT IS HEAVILY INVOLVED IN
THIS FILE AND THAT THROUGH HIS DEALINGS WITH ICBC MR HALL
HAS BEEN AS HIGH AS THE MINISTER OF ICBC AND CUSTOMER
RELATIONS ARE ALSO HEAVILY INVOLVED IN THE FILE.

ICBC_003329

```
DATE: 2021-01-04                                                PAGE : 28
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

| | | | |
|---|---|---|---|
| 14SEP06 | NOTE | GERARD EXPLAINED TO WAYNE THAT ALL IS IN ORDER AT THIS POINT AND THAT WE HAVE NOW FINALLY GOT AN XFD DATE BEING DECEMBER 18, 2006. TERRY VOS WILL GO THROUGH THIS PROCESS AND REPORT TO US IN LONG FORM AT WHICH TIME WE CAN DECIDE WHICH WAY WE'RE GOING TO GO AND IF NEED BE, IF IT LOOKS LIKE HALL'S ALLEGATIONS THAT HE HAS A CLAIM THAT IS WORTH OVER $200,000 WE CAN THIS RE DISCUSS THIS FILE WITH H/O CLAIMS. DICTATED BY GERARD WRIGHT | A --------NOTE |
| 23OCT06 | NOTE | HOC OFFICE VISIT DISCUSSSED THIS FILE WITH F. DAWE. WE WILL DO EFD 18 DEC. AND THEN SSEE WHERE WE ARE AT. | A --------NOTE |
| 9NOV06 | NOTE | HEAD OFFICE CLAIMS FILE SENT TO F. DAWE FOR FURTHER HANDLING. | A --------CMPL |
| 9NOV06 | REVIEW | HALL...MORLEY/VOS...HEAD OFFICE REFERRAL | A --------CMPL |
| 15NOV06 | TRANSFER | FILE TRANSFER TO    000/0230-6 DICESARE, JOHN | A --------MSGS |
| 25APR07 | EMAIL | TO: DICESARE, JOHN; DAWE, FRANCESCA CC: CC00 YF L373475.6        YF L373571.4 RICHARD HALL   HAS MADE A REQUEST FOR INFORMATION UNDER THE FREEDOM OF INFORMATION AND PROTECTION OF PRIVACY ACT (FOIPPA) THIS REQUEST WAS RECEIVED IN OUR OFFICE ON APRIL 24, 2007. UNDER FOIPPA THE INFORMATION AND PRIVACY DEPARTMENT HAS A LEGAL OBLIGATION TO PROVIDE THE APPROPRIATE FILE INFORMATION TO THE INFORMATION REQUESTOR WITHIN 30 DAYS OF OUR RECEIPT OF THEIR REQUEST.  FOR FURTHER INFORMATION ON THIS TOPIC, PLEASE REFER TO THE FPR WEBSITE. SO THAT WE WILL MEET THIS TIMELINE, PLEASE FORWARD THE ABOVE NOTED FILE(S) WITHIN 5 DAYS,  WITH A COPY OF THIS EMAIL, TO:          MICHAEL FEARS,  INFORMATION OFFICER          INFORMATION AND PRIVACY DEPT          L299117 PLEASE NOTE:  IF THERE ARE ANY UNTRANSCRIBED TAPES, PLEASE ENSURE THERE IS A PAPER COPY IN THE FILE AS THIS FORMS PART OF THE REQUESTED RECORDS.  ADDITIONALLY, PLEASE DO NOT ALTER OR AMEND THE REQUESTED CLAIM FILE IN ANY WAY INCLUDING CWMS NOTES. WE WILL MAKE A COPY OF YOUR FILE AND RETURN IT ASAP.  BEFORE THE RELEASE PACKAGE IS PROVIDED TO THE REQUESTER, YOU WILL RECEIVE A COPY FOR DISCUSSION.  THANK YOU. IF YOU HAVE ANY FURTHER QUESTIONS, CONCERNS, OR IF THERE WILL BE A DELAY IN SENDING THE FILE(S), PLEASE DO NOT HESITATE TO CONTACT ME DIRECTLY AT 604-661-6828. THANK YOU. CC:   MANAGER, INFORMATION AND PRIVACY | A --------NOTE |

```
DATE: 2021-01-04                                                PAGE : 29
TIME: 10.56.18        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

| | | | |
|---|---|---|---|
| 26APR07 | NOTE | FILE SENT TO MICHAEL FEARS, INFORMATION OFFICER, INFORMATION AND PRIVACY DEPT. | A |
| | | | NOTE |
| 7MAY07 | NOTE | WE HAVE NOW MADE A COPY OF THIS FILE FOR AN FOI REQUEST. FILE RETURNED TO CC00 | A |
| | | | NOTE |
| 8MAY07 | NOTE | FILE REC'D @CC00 AND GIVEN TO JOHN DICESARE. | A |
| | | | CMPL |
| 15JAN11 | TRANSFER | FILE TRANSFER TO    000/9380-0 OLSTROM, LAURIE | A |
| | | | CMPL |
| 19NOV12 | ADMIN | SUBROGATION CHANGE  FROM 'U' TO 'N' | A |
| | | | CMPL |
| 19NOV12 | ADMIN | CLAIM CLOSE         000/9380-0 OLSTROM, LAURIE | A |
| | | | MSGS |
| 23APR14 | EMAIL | TO: OLSTROM, LAURIE | A |

```
                  CC: CC00
                  YF L373475 6
                  SUDGEN, MCFEE & ROOS LLP HAS MADE A REQUEST FOR INFORMATION
                  UNDER THE FREEDOM OF INFORMATION AND PROTECTION OF PRIVACY
                  ACT (FIPPA) ON BEHALF OF THEIR CLIENT RICHARD HALL.
                  THE PRIVACY AND FREEDOM OF INFORMATION DEPARTMENT HAS A
                  LEGAL OBLIGATION UNDER FIPPA TO PROVIDE THE APPROPRIATE FILE
                  INFORMATION TO THE INFORMATION REQUESTER WITHIN 30 WORKING
                  DAYS OF OUR RECEIPT OF THEIR REQUEST. ·FOR FURTHER
                  INFORMATION ON THIS TOPIC, PLEASE REFER TO
                  HTTP://THEHUB/WORKTOOLS/PAGES/RESPONDING-TO-REQUESTS-FOR-REC
                  ORDS.ASPX
                   TO ASSIST IN MEETING THIS TIMELINE, PLEASE SEND THE ABOVE
                   NOTED FILE(S) AND FORWARD WITHIN 5 BUSINESS DAYS, WITH A
                   COPY OF THIS EMAIL, TO:
                                      PRIVACY AND FREEDOM OF INFORMATION
                                      L299217
                   PLEASE DO NOT ALTER, AMEND OR ADD TO THE REQUESTED FILE(S)
                   IN ANY WAY. SEND THE FILES AS THEY EXIST AT THE TIME OF THI
                   SREQUEST.
                   FILES WILL BE SCANNED IN THE ORDER RECEIVED AND THEN
                   RETURNED TO YOUR OFFICE.  PRIOR TO THE RELEASE OF THE
                   INFORMATION TO THE REQUESTER, YOU WILL RECEIVE A CD
                   CONTAINING THE RELEASE RECORDS FOR YOUR REVIEW.
                   THANK YOU.
                   PRIVACY AND FREEDOM OF INFORMATION DEPARTMENT
                   DEBORA FONSECA
                   INFORMATION AND PRIVACY ACCESS CLERK
                   PRIVACY & FREEDOM OF INFORMATION
                   ICBC BUILDING TRUST, DRIVING CONFIDENCE

                   ..
                   #217-151 WEST EXPLANADE
                   NORTH VANCOUVER, BRITISH COLUMBIA V7M 3J3
                   TELEPHONE: 604.982.6243
```

| | | | NOTE |
|---|---|---|---|
| 3JUN14 | NOTE | FILE ARRIVED AT PRIVACY & FOI, WAITING SCANNING | A |
| | | | MSGS |

DATE: 2021-01-04                                                    PAGE : 30
TIME: 10.56.18       INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6

                                                                    TYP
                                                                    EXP
DATE     WORKTYPE DESCRIPTION/DETAIL
-------  -------- --------------------------------------------------  A
3JUN14   EMAIL    TO: +MD TECH SERVICE CENTRE - 1
                  CC: KERREY, PAUL
                  MF L373475 6
                     YOUR CLAIM CENTRE:   CC00 - HEAD OFFICE CLAIMS
                           CLAIM NUMBER:  L373475-6
                  DESTINATION PRINTER:    PR 217 F
                  COMMENTS:                                         --NOTE
-----------------------------------------------------------------------  A
5JUN14   NOTE     FILE SCANNED & RETURNED TO L177R RECORDS RETENTION, BY PRIVA A
                  CY & FOI                                          --CMPL
-----------------------------------------------------------------------  A
12JUN14  ADMIN    FOI CD SHIPMENT TASK
                  FOI HAS MADE A "CD COPY OF THIS CLAIM". CD SENT TO ADJUSTER
                  AT L174300
                  PLEASE MARK TASK WITH AN X WHEN CD IS RECEIVED
                  F228307
                  FOI CD RECD L174300 AND FWD TO JOHN DICESARE      --CMPL
-----------------------------------------------------------------------  A
23JUL14  ADMIN    FOI CD SHIPMENT TASK
                  FOI HAS MADE AN UPDATED CD COPY OF THIS CLAIM AND SENT IT TO
                  THE @ L174300
                  PLEASE MARK TASK WITH AN X WHEN CD IS RECEIVED
                  F228037
                  JULY23: FOI CD RECD AT CC33/L116 SRY CENTRAL, FWD TO LAURIE
                                                                   --CMPL
-----------------------------------------------------------------------  A
20CT14   ADMIN    FOI CD SHIPMENT TASK
                  FOI HAS MADE A "CD COPY OF THIS CLAIM". CD SENT TO ADJUSTER
                  AT L267
                  PLEASE MARK TASK WITH AN X WHEN CD IS RECEIVED
                  F228037
                  FOI CD REC'D AT L267 AND GIVEN TO JOHN DICESARE   --NOTE
                                                                       A
14AUG15  NOTE     ████████████████████████████████████████████████

                                                                    ─────DTE
                                                                        A
18SEP15  NOTE     ████████████████████████████████████████████████

                                                                    ─────MPL
                                                                        A
24MAY16  ADMIN    ████████████████████████████████████████████████

                                                                    ─────NOTE
                                                                        A
18APR17  NOTE     CDSA: FILE RECEIVED AT BBY LITS L267 // FORWARDED TO
                  SHIRLEY PANG                                      --CMPL
-----------------------------------------------------------------------  A
18APR17  ADMIN    JOHN D - IS THIS FILE IN RECORDS RETENTION? IF SO, PLEASE
                  REQUEST

ICBC_003332

```
DATE: 2021-01-04                                                    PAGE : 31
TIME: 10.56.18         INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373475-6
```

```
                                                                        TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------   -------- ------------------------------------------------------------
18APR17 ADMIN     ** EMAILED WILLIAM TO REQUEST-07APR17                    A
                  ** 1-PART FILE RECEIVED (ABOUT 7 PAGES OF CONTENTS). GIVEN
                  TO EXAMINER.
-------------------------------------------------------------------------NOTE
5JUL18  NOTE      EXAMINER NOTE (JOHN DI CESARE) - CLMT STILL UNDERGOING   A
                  CANCER TMT/INVESTIGATION
                  JUST HAD SOME TESTS AND PC EXPECTS AN UPDATE FROM DOCTORS
                  OVER NEXT 10 DAYS OR SO
                  I'VE LET DC KNOW I AM OUT OF OFFICE JULY 16 - AUG 10
-------------------------------------------------------------------------SCHL
5NOV18  REVIEW    REVIWE HALL                                             A
-------------------------------------------------------------------------MSGS
6OCT20  EMAIL     TO: CC09                                                A
                  CC: STEVENS, GARY; GREWAL, CHEYRAL
                  MF L373475 6
                    YOUR CLAIM CENTRE:   CC09 - CLAIMS SYSTEM ENQUIRES
                        CLAIM NUMBER:    L373475-6
                  DESTINATION PRINTER:   U5459 (PR416A)
                  COMMENTS:
                  PRINTOUT REQUIRED FOR PRESERVATION NOTICE ISSUED BY FIONA
                  TEMPLE, DIRECTOR
                  CORPORATE LEGAL SERVICES.
                  I'M NOT ATTACHED TO A CLAIM CENTRE, SO I SELECTED CC09 FOR
                  THE MANDATORY FIELD
                  ABOVE.
-------------------------------------------------------------------------MSGS
22DEC20 EMAIL     TO: CC09                                                A
                  CC: LEW, JUDY
                  MF L373475 6
                    YOUR CLAIM CENTRE:   CC00 - HEAD OFFICE CLAIMS
                        CLAIM NUMBER:    L373475-6
                  DESTINATION PRINTER:   PR217F
                  COMMENTS:
                  THANK YOU! :)
-------------------------------------------------------------------------SCHL
23JUN25 REVIEW    DR PROUT IME DEC 6 '16/THOMPSON JUNE 14 '17/EFD JUN 15 '17  A
-------------------------------------------------------------------------SCHL
31AUG25 REVIEW    ASSESSMENT, C&D'S, PRT 7 - SET FOR OCT 23 '15 @ 10 AM   A
-------------------------------------------------------------------------
```

** END OF REPORT **

ICBC_003333

```
DATE: 2021-01-04                                                      PAGE : 1
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)
                                                           ┌─────────────────┐
CLAIM : L373571-4                                          │    EXHIBIT      │
                                                           │                 │
                                                           │    007          │
                                                           └─────────────────┘      TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                           EXP
```

```
------- --------------------------------------------------------------------NOTE
13NOV03 NOTE    RO REPORTING CA APPT SEE RESOURCE NOTES                        A
-----------------------------------------------------------------------------NOTE
13NOV03 NOTE    INS SAID TP WAS NOT INJURED AT SCENE AS NEVER MENTIONED ANY    A
                THING, SAID NO POLICE AND DID NOT KNOW TP VEH TOWED AWAY?
-----------------------------------------------------------------------------CMPL
13NOV03 ONLNECLM CLAIM OPEN              030/0209-6 HUMBER, SHARLENE           A
-----------------------------------------------------------------------------CMPL
13NOV03 INCURRED EXPOSURE OPEN           030/0209-6 HUMBER, SHARLENE  KOL:22 B
-----------------------------------------------------------------------------CMPL
17NOV03 INCURRED EXPOSURE OPEN           030/C398-3 FYFE, SHELLIE     KOL:21 B
-----------------------------------------------------------------------------NOTE
19NOV03 NOTE    ESTIMATE WORK ASSIGNMENT REQUEST NOTES                        A
                EST. ACTION   : N/A          STEREO POLICY :
                LIMITED DEP.  :              REPLACE POLICY:
                ATD CODE      :              DECL. VALUE   : $0
                REBUILT       :              LEASED        :
                GST REGISTRANT: 000          BAY/BOOTH     : #7
                VEH. LOCATION : DRV
                NOTES: LVI TO FRONT BUMPER HEADLIGHT. NO ICBC COVERAGE
                NEW DAMAGE: FRONT END
                OLD DAMAGE:
-----------------------------------------------------------------------------NOTE
19NOV03 NOTE    EST A00: LOADED BY  030/8655-3 WHITEHEAD, LARRY               A
                EST. ACTION   : N/A          STEREO POLICY :
                LIMITED DEP.  :              REPLACE POLICY:
                ATD CODE      :              DECL. VALUE   : $0
                REBUILT       :              LEASED        :
                GST REGISTRANT: 000          BAY/BOOTH     : #7
                VEH. LOCATION : DRV
                NOTES: LVI TO FRONT BUMPER HEADLIGHT. NO ICBC COVERAGE
                NEW DAMAGE: FRONT END
                OLD DAMAGE:
-----------------------------------------------------------------------------CMPL
19NOV03 ESTIMATE EST A00:  19NOV2003 030/8655-3 WHITEHEAD, LARRY              A
                EST GROSS COST: $1,563.92      EST TIME TO REPAIR:   3 DAYS
-----------------------------------------------------------------------------CMPL
19NOV03 LETTER   CH281    DOVE DONALD ANTHONY            100%                 A
-----------------------------------------------------------------------------NOTE
19NOV03 NOTE    CL398 NOT REQUIRED                                           A
-----------------------------------------------------------------------------CMPL
26NOV03 TRANSFER FILE TRANSFER TO     030/C398-3 FYFE, SHELLIE               A
-----------------------------------------------------------------------------CMPL
15JAN04 ADMIN    CLAIMS CUSTOMER IDENTIFIED                                  B
-----------------------------------------------------------------------------CMPL
6FEB04  INCURRED CL288    03 1275 RICHARD HALL        $1858.75 LE:9 KOL:21 B
                 REASON: INVESTIGATION/INTERVIEWS
-----------------------------------------------------------------------------CMPL
17FEB04 INCURRED EXPOSURE CLOSE        030/3360-0 NELSON, JOANNE     KOL:22 B
-----------------------------------------------------------------------------CMPL
17FEB04 TRANSFER FILE TRANSFER TO      030/9132-4 LINDSAY, BRENDA            A
-----------------------------------------------------------------------------CMPL
```

ICBC_003243

```
DATE: 2021-01-04                                              PAGE : 2
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  |  | TYP |
|---|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  | EXP |

```
9MAR04  INCURRED CL288    FILE NO. 03-1275          $780.00  LE:9 KOL:21 B
                 REASON: PRIVATE INVESTIGATIVE SERVICES PROVIDED ON
                         RICHARD HALL  COMPLETION DATE OF MAR 8/04
--------------------------------------------------------------------CMPL
16MAR04 OFFER    OFFER ALERT (1ST) REVIEWED                            B
--------------------------------------------------------------------CMPL
1APR04  INCURRED CL288    FILE #03-1275; HALL       $30.00  LE:9 KOL:21 B
                 REASON: FILE NO. 03-1275; HALL, RICHARD
                         CLAIM NO. L373475.6
                         SERVICE:  PHOTOGRAPHS
--------------------------------------------------------------------NOTE
19APR04 NOTE     FILE SENT TO CC34 RES. 2510.4 AS A REDTAG TRANSFER FROM  A
                 CC30 RES. 9132.4
--------------------------------------------------------------------CMPL
21APR04 TRANSFER FILE TRANSFER TO    034/2510-4 WRIGHT, GERARD         A
--------------------------------------------------------------------CMPL
6MAY04  INCURRED RESERVE CHANGE     INCREASE TO    $100,000.00     KOL:21 B
--------------------------------------------------------------------CMPL
14MAY04 INCURRED CL288    HALL, RICHARD            $2000.00  LE:1 KOL:21 B
                 REASON: REIMBURSEMENT OF EXPENSES INCURRED FOR RENTAL,
                         TRAVELING, BARGING, TOWING & COLLISION
                         DEDUCTIBLE
--------------------------------------------------------------------CMPL
14MAY04 INCURRED CL288    HALL, RICHARD             $500.00  LE:1 KOL:22 B
                 REASON: REIMBURSEMENT OF EXPENSES INCURRED FOR RENTAL,
                         TRAVELING, BARGING, TOWING & COLLISION
                         DEDUCTIBLE
--------------------------------------------------------------------CMPL
8JUN04  OFFER    POTENTIAL OFFER NOTICE REVIEWED                       B
                 ONGOING INVESTIGATION
--------------------------------------------------------------------CMPL
8JUN04  OFFER    OFFER ALERT (2ND) REVIEWED                            B
                 ONGOING INVESTIGATION - SIU INVOLVEMENT
--------------------------------------------------------------------MSGS
30JUN04 EMAIL    CC: GERARD.WRIGHT@ICBC.COM                            B
                 MF L373571 4 EXP B YF L373475 6 YF      CONF   (Y/N)
                 GOOD DAY GEORGE AND ALEX.
                 THE DUNCAN OFFICE HAS RE-VISITED HALL'S REQUEST FOR PAYMENT
                 OF OUT OF POCKET EXPENSES AND TORT ADVANCE AS PER MICHAEL
                 VELETTA;S LETTER DATED MARCH 12, 2004.
```

| EXPENSE | HALL'S DEMAND |
|---|---|
| AMOUNT DUNCAN AGREES TO PAY | |
| RENTAL | $3067.58 |
| $1879.38 | |
| DRIVER ASSISTANCE | 1110.00 |
| 0 | |
| ADDITIONAL EXPENSES | 334.71 |
| 206.31 | |
| TRAVELLING EXPENSES | 1867.75 |
| 0 | |
| (DOCTOR,CHIRO,MRI) | |
| TORT ADVANCE (WAGE LOSS) | 45,000.00 |

ICBC_003244

```
DATE: 2021-01-04                                                   PAGE : 3
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

| DATE | WORKTYPE DESCRIPTION/DETAIL | | TYP EXP |
|---|---|---|---|
| 30JUN04 EMAIL | 0 | | B |
| | | DEDUCTIBLE | 500.00 |
| | 500.00 | | |
| | | TOTAL | $51,880.04 |
| | $2585.69 | | |
| | | ADVANCES PAID | 2,500.00 |
| | 2500.00 | | |

```
                RENTAL: HALL RENTED A VEHICLE ON NOV. 10/03 TO DEC.  9/03,
                $1254.02. SECOND RENTAL ON DEC. 9/03 TO DEC. 22/03,
                $625.36. THIRD RENTAL DEC. 22/03 TO JAN 18/04, $1188.20.
                REASONABLE AMOUNT OF RENTAL ALLOWED: ONE MONTH, WHILE HALL
                WAS SEEKING SETTLEMENT FROM HIS PRIVATE INSURER. HALL MET
                FACE TO FACE WITH THE PRIVATE INSURER'S  APPRAISER, HANS
                DOGE OF HD ADJUSTERS, ON DEC. 22/03 TO DISCUSS THE ACV
                EVALUATION. MR. HALL HAD PROTRACTED DISCUSSIONS WITH HIS
                INSURER REGARDING THE SETTLEMENT OF HIS VEHICLE CLAIM. THE
                DUNCAN OFFICE BELIEVES IT IS FAIR IN PAYING FOR A RENTAL TO
                DEC. 22/03.
                DRIVER ASSISTANCE: THERE IS NO MEDICAL EVIDENCE IN ICBC'S
                POSSESSION INDICATING HALL REQUIRED A DRIVER FOR  THE DATES
                INDICATED ON THE INVOICE. HALL HAS NOT PAID THE DRIVER TO
                DATE THEREFORE, IS NOT OUT OF POCKET THESE FUNDS AT THIS
                TIME.
                ADDITIONAL EXPENSES:  INVOICES PROVIDED, TOWING AND BARGING
                ONLY ADD UP TO $206.31.
                TRAVELLING EXPENSES: THESE ARE COSTS INCURRED FOR ATTENDING
                MEDICAL APPOINTMENTS. HALL MAY HAVE COVERAGE UNDER HIS A/B
                BENEFITS OR REHAB. PORTION OF HIS BENEFITS FROM HIS PRIVATE
                INSURER. THE DUNCAN OFFICE HAS CONFIRMED ALLSTATE IS
                REQUIRED TO MEET ICBC'S LIMITS. HALL WILL HAVE TO SUBMIT
                ALL MEDICAL RELATED EXPENSES TO HIS PRIVATE INSURER
                FOR CONFIRMATION OF COVERAGE PRIOR TO ICBC GIVING
                CONSIDERATION TO PAYMENTS UNDER TORT.
                TORT  ADVANCE: THERE IS NO DOCUMENTATION TO FILE TO CONFIRM
                A WAGE LOSS CLAIM TO DATE.
                IT APPEARS THE $2500 THE DUNCAN OFFICE HAS ADVANCED
                SUBSTANTIALLY COVERS REASONABLE OUT OF POCKET EXPENSES.
                RAY CADORETTE
```

| | | | |
|---|---|---|---|
| | | | CMPL |
| 23JUL04 INCURRED CL288 | HALL, RICHARD | $277.19 | LE:1 KOL:21 B |
| | REASON: SPECIAL DAMAGES | | |
| | | | CMPL |
| 16AUG04 INCURRED CL288 | 03-1275 | $2792.00 | LE:9 KOL:21 B |
| | REASON: RICHARD HALL JUNE 23 TO AUG 6, 2004 | | |
| | | | CMPL |
| 29SEP04 INCURRED CLMAN | ALLSTATE INSURANCE COMPANY | $8043.09 | LE:2 KOL:22 B |
| | | | CMPL |
| 30SEP04 INCURRED CL288 | FILE 03-1275 | $1007.50 | LE:9 KOL:21 B |
| | REASON: RICHARD HALL | | |
| | | | CMPL |
| 24JAN05 INCURRED CL288 | 03-1275 | $1328.00 | LE:9 KOL:21 B |

ICBC_003245

```
DATE: 2021-01-04                                              PAGE : 4
TIME: 10.55.50       INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                             TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                         EXP
-------  -----------------------------------------------------------
24JAN05 INCURRED REASON: RICHARD HALL                        B
--------------------------------------------------------------CMPL
2AUG05  INCURRED CL288   03-1275              $1144.90  LE:9 KOL:21 B
                 REASON: RICHARD HALL
--------------------------------------------------------------CMPL
25NOV05 INCURRED CL288   DYE & DURHAM COMPANY INC  $68.00 LE:5 KOL:21 B
                 REASON: INVOICE 4100891
                        RICHARD DAVID HALL
--------------------------------------------------------------CMPL
28DEC05 INCURRED RESERVE CHANGE   INCREASE TO  $160,000.00     KOL:21 B
--------------------------------------------------------------CMPL
28MAR06 INCURRED CL288   FILE 1104189          $1699.16  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                        INVOICE 6001223
--------------------------------------------------------------CMPL
28MAR06 INCURRED CL288   FILE 1104189            $50.65  LE:5 KOL:21 B
                 REASON: HALL V DOVE
                        INVOICE 6001223
--------------------------------------------------------------CMPL
5MAY06  INCURRED CL288   1104189               $4023.74  LE:3 KOL:21 B
                 REASON: HALL V DOVE
--------------------------------------------------------------CMPL
5MAY06  INCURRED CL288   1104189                 $0.65  LE:5 KOL:21 B
                 REASON: HALL V DOVE
--------------------------------------------------------------CMPL
12JUL06 INCURRED CL288                                   LE:3 KOL:21 B
                 REASON: █████████████████████████████
--------------------------------------------------------------CMPL
12JUL06 INCURRED CL288                                   LE:5 KOL:21 B
                 REASON: █████████████████████████████
--------------------------------------------------------------CMPL
26SEP06 INCURRED CL288   1104188                $50.29  LE:3 KOL:21 B
                 REASON: HALL V ICBC
                        INVOICE 6005426
--------------------------------------------------------------CMPL
26SEP06 INCURRED CL288   1104188                 $9.20  LE:5 KOL:21 B
                 REASON: HALL V ICBC
                        INVOICE 6005426
--------------------------------------------------------------NOTE
9NOV06  NOTE     HEAD OFFICE CLAIMS                            A
                 FILE SENT TO HEAD OFFICE CLAIMS FOR FURTHER HANDLING
--------------------------------------------------------------CMPL
15NOV06 TRANSFER FILE TRANSFER TO   000/0230-6 DICESARE, JOHN  A
--------------------------------------------------------------CMPL
24NOV06 INCURRED CL288                                   LE:3 KOL:21 B
                 REASON: ███████████████████████████████
--------------------------------------------------------------CMPL
24NOV06 INCURRED CL288                                   E:5 KOL:21 B
                 REASON: ███████████████████████████████
```

ICBC_003246

```
DATE: 2021-01-04                                                PAGE : 5
TIME: 10.55.50       INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|---|---|---|---|
| 24NOV06 | INCURRED | JULY 17 TO OCT 31, 2006 | B |

----------------------------------------------------------------------MSGS

```
30NOV06 EMAIL     TO: HLTH.BCHIP@GEMS8.GOV.BC.CA; MCRAE, MARIA          A
                  MF L373571 4
                            DATE OF LOSS:     10-NOV-2003
                  ADJUSTER'S E-MAIL ADDRESS:  JOHN.DICESARE
                   ADJUSTER'S PHONE NUMBER:   604.647.6082
                    LOCATION OF ACCIDENT:     DOUGLAS STREET, SAANICH
                  INJURED PERSON'S INFORMATION
                  -------------------------------------------------------
                                   NAME:     HALL, RICHARD
                                   PHN:      9849109133
                          DATE OF BIRTH:     22-FEB-1969
                  NAME OF HOSPITAL(S):
                      IN PATIENT STAY:
                      DAY CARE SURGERY:
                  LIABLE PARTY'S INFORMATION
                  -------------------------------------------------------
                  LIABLE FILE CLAIM NUMBER:   -
                            CLAIM OFFICE:
                           ADJUSTER NAME:
                  ADJUSTER'S E-MAIL ADDRESS:
                   ADJUSTER'S PHONE NUMBER:
                  REQUEST ACCOUNTS FOR EVERY HOSPITALIZED ICBC CLAIMANT. AS
                  PER CDB 942, ACCOUNTS MUST BE PAID WITHIN 30 DAYS OF
                  RECEIVING HOSPITALIZATION/PAYMENT DETAILS OR BCHIP MUST BE
                  NOTIFIED BY USING THE "BCHIP ACCOUNT FOLLOW-UP
                  INFORMATION", FOUND IN THE ICBC FORMS AND
                  PUBLICATIONS INDEX..
                  COMMENTS:
```

----------------------------------------------------------------------NOTE

```
7DEC06  NOTE      CALLED LICENSING AND COLLECTIONS                      A
                  1-250-978-8322
                  CLMT DL ISSUED IN '99 AND AT FIRST I WAS TOLD IT WAS HELD
                  CONTINOUSLY TO PRESENT DATE BUT ON FURTHER QUESTIONING IT
                  WAS CONFIRMED THAT IT LAPSED FEB. '02 AND WAS NOT RENEWED
                  TIL FEB. '04 SO HE DID NOT HOLD A VALID DL @ DOL, NOV 10,
                  2003; FWDED TO COLLECTIONS - NO DEBT AT TIME, THOUGH THIS
                  APPEARS TO BE IRRELEVANT FOR PURPOSES OF UMP
```

----------------------------------------------------------------------NOTE

```
7DEC06  NOTE      [REDACTED]                                            A
```

----------------------------------------------------------------------CMPL

```
8DEC06  INCURRED RESERVE CHANGE       INCREASE TO     $630,000.00    KOL:21 B
```

DATE: 2021-01-04                                                      PAGE : 6
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|

------------------------------------------------------------------------NOTE



13DEC06 NOTE

----------------                                                            E
13DEC06 NOTE

----------------                                                            E
22DEC06 NOTE

------------------------------------------------------------------------NOTE
22DEC06 NOTE    SEE P/C LETTER ON FILE, REQUESTING AN ADVNACE              A
                SAYS HE'S HAD TO BORROW $200,000 BECAUSE OF MVA, TO LIVE
                ANDADVANCE HIS BUSINESS; WHERE WAS HE GOING TO GET THIS
                $200,000 ABSENT THE MVA; THERE IS ABSOLUTELY NO
                CONFIRMATIONTHAT HE HAD A HX OF EARNING $200,000 OVER ANY
                THREE YEAR PERIOD ON FILE (AND A $200,000 BORROWING EQUATES
                TO MORE LIKE $250,000 TO $300,000 GROSS EARNINGS); D/C AND
                I DISCUSSED THIS TODAY AND HE AGREES WITH MY APPROACH; HE
                WAS TO SEND LETTER TODAY, ENCLOSING FORMAL OFFER AND
                REQUESTING VARIOUS RECORDS, SHOULD THE FORMAL NOT BE
                ACCEPTED, SO THAT WE MIGHT MORE PROPERLY CONSIDER AN
                ADVANCE, WITHIN THE FORMAL

------------------------------------------------------------------------MSGS
29DEC06 EMAIL   CC: MCRAE, MARIA                                           A
                MF L373571 4 EXP    YF           YF         CONF   (Y/N)
                FILE MANAGEMENT:
                        1.  IDENTITY OF FRONT VEHICLE IN 3 CAR R/E MVA?
                2.      MEET WITH DEFENCE COUNSEL AND MANAGER, RE:
                CONFIDENTIALITY AGREEMENT? INVOLVE CORP. LAW? DISCUSS
                OPTIONS FOR FURTHER FILE HANDLING/INVESTIGATION OF BUSINESS
                OPPORTUNITY AND UPCOMING DISCOVERY; EXAMINER OBLIGATIONS
                FOR CONFIDENTIALITY? RE: MANILA ENVELOPE OF MEDICAL RECORDS
                THAT CAME WITH FILE;
                3.      OBTAIN PRE MVA HEALTH RECORDS GOING BACK 10 YEARS;

ICBC_003248

```
DATE: 2021-01-04                                              PAGE : 7
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                    TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                 EXP
-------  -------------------------------------------------------------------
29DEC06 EMAIL    CLAIMANT HAS A SIGNIFICANT HISTORY INCLUDING APPARENT    A
                 EXPOSURE TO TOXIC SUBSTANCES, LEADING TO IMPAIRMENT. THIS
                 IS IN PART, RESPONSIBLE FOR HIS MOVE TO SALT SPRING WHERE
                 SUPPOSEDLY, HE SOUGHT TREATMENT FROM  A WORLD RENOWN
                 THERAPIST;
                 4.    PRE MVA TAX RECORDS GOING BACK 10 YEARS;
                 5.    OBTAIN COMPLETE ACADEMIC RECORDS AS WELL AS ANY
                 IMMIGRATION/VISA RECORDS;
                 6.    INVESTIGATE PRIOR LAW SUITS, OF WHICH THERE HAVE BEEN
                 MANY (PARTICULARLY SERIOUS MOTORCYCLE MVA IN FLORIDA 2-3
                 YEARS AGO AND TOXIC EXPOSURE);
                 7.    INVESTIGATE GOLF CAREER AND SUCCESS, OR LACK THEREOF;
                 8.    ARRANGE FOR IME'S; NEUROLOGICAL/PSYCHIATRIC AND
                 LIKELY
                 ORTHOPAEDIC;
                 9.    SURVEILLANCE;
                 10.   BACKGROUND CHECK; CONFIRM EDUCATIONAL BACKGROUND,
                 ETC.
                 (WE WILL BE GETTING A NEUROPSYCHOLOGY REPORT SERVED ON US
                 AT SOME POINT);
                 11. FORMAL OFFER.
------------------------------------------------------------------------MSGS
29DEC06 EMAIL    CC: MCRAE, MARIA                                         A
                 MF L373571 4 EXP   YF          YF          CONF   (Y/N)
                 IN THE SUBJECT MVA, RICHARD TELLS DR. ANCIL THAT ON IMPACT,
                 HE SAW HIS HEAD GO BACK FROM OUTSIDE HIS BODY. DR. ANCIL
                 CONFIRMS NO RETROGRADE NOR POST TRAUMATIC AMNESIA BUT SAYS
                 RICHARD REPORTS BEING CONFUSED (NOTE THAT RICHARD WAS ABLE
                 TO DRIVE TO THE POLICE STATION, POST MVA).
                 DR. ANCIL, DIAGNOSED RICHARD AS HAVING SUSTAINED A SOFT
                 TISSUE INJURY TO HIS C-SPINE AND AN MTBI. DR. ANCIL SAYS
                 HIS CONDITION IS COMPLICATED BY CHRONIC PAIN, DEPRESSION
                 AND ANXIETY/MOOD PROBLEMS (IN PART CAUSED BY FINANCIAL
                 PRESSURES). HE RECOMMENDS A REFERRAL TO DR. LONGRIDGE
                 REGARDING ADDITIONAL COMPLAINTS OF DIZZINESS.
                 APPARENTLY, RICHARD HAS TOLD PEOPLE, INCLUDING A PRE MVA
                 SPONSOR THAT HE HAS A BRAIN STEM INJURY (SO MUCH FOR
                 CONCERN ABOUT CONFIDENTIALITY). HE HAS BEEN SEEN TO WEAR A
                 NECK BRACE.
                 AT 34, RICHARD WAS STRUGGLING AS A GOLFER, PLAYING VARIOUS
                 MINI-TOURS AROUND THE WORLD.  HE ALLEGES THE LOSS OF
                 SIGNIFICANT SPONSORSHIP  INCOME BECAUSE OF HIS INJURIES.
                 COLLATERAL INTERVIEWS TO DATE DESCRIBE RICHARD AS A VERY
                 AVERAGE PROFESSIONAL GOLFER, AT BEST.  HE WITHDREW FROM THE
                 CANADIAN TOUR QUALIFYING SCHOOL IN THE SPRING OF 2003, PRE
                 ACCIDENT.
                 HE IS DESCRIBED BY SOME COLLATERAL AS SOMEONE WHO LIVED OUT
                 OF HIS CAR.
                 MR. HALL'S LAWYER TELLS US THAT HE ATTENDED THE MAYO CLINIC
                 AND THAT THEY RECOMMEND MR. HALL HAVE PERSONAL ASSISTANTS
                 TO OFFSET PROBLEMS RELATED TO HIS BRAIN INJURY. HIS LAWYER
                 SAYS THAT RICHARD'S ABILITY TO MITIGATE HIS LOSS IS
```

```
DATE: 2021-01-04                                                    PAGE : 8
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                      CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4


                                                                    TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                EXP
-------   -------- ---------------------------------------------------------
29DEC06 EMAIL      DEPENDENT UPON HIS ABILITY TO MITIGATE HIS INJURY, BY      A
                   FOLLOWING THROUGH WITH THESE RECOMMENDATIONS.
                   RICHARD MAKES REFERENCE TO A BUSINESS VENTURE HE INITIATED
                   BUT CITES SIGNIFICANT CONFIDENTIALITY CONCERNS AND REFUSES
                   TO DISCLOSE THE NATURE OF THE BUSINESS, NOR ALLOW ANY
                   INVESTIGATION INTO SAME. RICHARD SUGGESTS THAT QUESTIONING
                   PARTIES INVOLVED IN THE VENTURE ABOUT HIS INJURIES MAY
                   CAUSE THEM TO GET NERVOUS AND BACK AWAY FROM INVESTING. HIS
                   LAWYER HAS WRITTEN US A SIX PAGE LETTER DATED NOVEMBER 3,
                   2006 ABOUT THIS VENTURE CLAIMING THAT RICHARD'S PARTNERS
                   INCLUDE 'THE PROVINCIAL GOVERNMENT OF BC, SEVERAL
                   INTERNATIONAL FIRMS, DIRECTORS OR PARTNERS OF A NUMBER OF
                   PROMINENT BC FIRMS, SENIOR EXECUTIVES WITHIN HEALTH
                   ORGANIZATIONS, PUBLIC FIGURES, MEDICAL PROFESSIONALS, AS
                   WELL AS MR. HALL', ALL OF WHOM HAVE SIGNED CONFIDENTIALITY
                   AGREEMENTS. HE DOES NOT WANT US TO PROCEED WITH A SCHEDULED
                   EXAMINATION FOR DISCOVERY UNLESS DEFENCE COUNSEL AND ICBC
                   SIGN A CONFIDENTIALITY AGREEMENT. HE THREATENS THAT A
                   BREACH OF CONFIDENTIALITY COULD RESULT IN DAMAGES TO THE
                   EFFECTED PARTIES, TOTALING SEVERAL MILLIONS.
                   MR. HALL HAS SUPPOSEDLY RETAINED HIS OWN, INDEPENDENT
                   ADVISORS, '.ON HOW AND WHEN TO DISCLOSE APPROPRIATELY THE
                   INJURY HE HAS BEEN DEALING WITH'.
                   EFFECTIVELY, WE ARE BEING THREATENED NOT TO DO ANYTHING TO
                   NEGATIVELY IMPACT THIS CONFIDENTIAL BUSINESS VENTURE.
                   CONVENIENTLY, THIS MEANS NOT INVESTIGATING THE VENTURE AT
                   THIS CRITICAL TIME. IN THEORY, IT ALSO MEANS ACCEPTING
                   RICHARD'S DOCTOR'S TREATMENT RECOMMENDATIONS SO THAT HE CAN
                   DO HIS BEST, TO MITIGATE HIS LOSSES.
                   THIS FILE ARRIVED WITH A SEALED ENVELOPE WITH VARIOUS
                   MEDICAL RECORDS THAT I AM TOLD NOT TO DISCLOSE TO ANYONE. I
                   HAVE NOT OPENED THE PACKAGE BECAUSE I AM WAITING TO SPEAK
                   TO DEFENCE COUNSEL BEFORE DOING SO, JUST AS A PRECAUTION. I
                   DO NOT WANT TO GIVE PLAINTIFF'S COUNSEL ANY EXCUSE TO MAKE
                   UNFOUNDED ALLEGATIONS ABOUT IMPROPER DISCLOSURE OF RECORDS,
                   ETC.
                   TO DATE, WE HAVE REFUSED TO SIGN A CONFIDENTIALITY
                   AGREEMENT.
                   RICHARD HALL HAS ALREADY FILED COMPLAINTS WITH GEORGE
                   FEDOROFF, MANAGER OF CUSTOMER RELATIONS, NETTIE WAGNER, OUR
                   VP AT THE TIME AND RICH COLEMAN, THE MINISTER RESPONSIBLE
                   FOR ICBC AT THE TIME.
                   RICHARD MADE AN EARLY DEMAND FOR A SIX FIGURE ADVANCE.
                   THERE IS MENTION ON FILE ABOUT A VENTURE INVOLVING ORGANIC
                   GOLF COURSES. THE CONFIDENTIAL BUSINESS VENTURE MAY HAVE
                   SOMETHING TO DO WITH THAT.
                   RICHARD IS A PARTY TO MANY OTHER LAW SUITS. MY SENSE IS
                   THAT HE IS OF QUESTIONABLE CREDIBILITY, WHO HAS ALWAYS
                   EXISTED ON MINIMAL EARNINGS. HE HAS AN INFLATED
                   SELF-PERCEPTION THAT SIMPLY DOES NOT ACCORD WITH HIS REAL
                   POTENTIAL, EITHER AS A GOLFER OR AN ENTREPRENEUR.
                   RESERVE:          PART 6
```

ICBC_003250

DATE: 2021-01-04                                                      PAGE : 9
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                          TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                       EXP
-------  -------- ----------------------------------------------------------
29DEC06  EMAIL    ███████████████████████████████████████████████████       A


                  LITIGATION:
                  PLAINTIFF COUNSEL:           WILLIAM MORLEY (FASKEN
                  MARTINEAU)
                  DEFENCE COUNSEL:       TERRY VOSS (PACIFIC LAW GROUP)
                  DISCOVERIES:      DECEMBER 18, 2006
                  TRIAL DATE:     NOT SET.
-----------------------------------------------------------------------MSGS
29DEC06  EMAIL    CC: MCRAE, MARIA                                            A
                  MF L373571 4 EXP    YF           YF          CONF   (Y/N)
                  TO:              FRANCESCA DAWE
                                   BI MANAGER
                  CC:               KEN BOOTH
                                   BI REGIONAL MANAGER
                                   RAY CADORETTE
                                   CLAIM CENTRE MANAGER
                                   HELEN HOSKINS
                                   LITIGATION
                  FROM:            JOHN DICESARE
                                   CLAIMS EXAMINER
                  DATE:            DECEMBER 29, 2006
                  RE:              FILE ANALYSIS
                  CLAIM NUMBER:    L373475.6 (AB)
                       L373571.4 (TORT)
                  DATE OF LOSS:    NOVEMBER 10, 2003
                  DATE OF REFERRAL:   NOVEMBER 9, 2006
                  DATE RECEIVED:   NOVEMBER 15, 2006
                  COVERAGE:     THE DEFENDANT'S COVERAGE IS IN ORDER.
                                   THIRD PARTY LIABILITY:  $1 MILLION
                  RICHARD HALL WAS DRIVING A U.S. INSURED (ALLSTATE) VEHICLE
                  AND HAD AN INVALID BC DRIVER'S LICENCE. THE PLAINTIFF HAS
                  ACCESS TO THE EQUIVALENT OF PART 7 BENEFITS THROUGH
                  ALLSTATE INSURANCE, WHICH IS A SIGNATORY OF THE PAU.
                  OTHERWISE, HE WOULD HAVE BEEN IN BREACH OF ANY PART 7
                  ENTITLEMENT WITH ICBC.
                  UMP: N/A  (US INSURED VEHICLE AND INVALID BCDL).
                  CL209A    N/A
                  FACTS:    THE DEFENDANT REAR ENDED THE PLAINTIFF, PUSHING
                  HIM
                  INTO A THIRD CAR, CAUSING LESS THAT $1,000 DAMAGE TO HIS
                  VEHICLE. THE PLAINTIFF, RICHARD HALL, ALLEGES VARIOUS
                  INJURIES INCLUDING AN MTBI. HE ALLEGES THAT THE MVA RELATED
                  INJURIES HAVE PREVENTED HIM FROM PURSUING A CAREER AS A
                  PROFESSIONAL GOLFER. HE ALSO ALLEGES THAT THEY MAY
                  INTERFERE WITH A BUSINESS VENTURE, THE NATURE OF WHICH HE
                  REFUSES TO DISCLOSE, CITING CONFIDENTIALITY CONCERNS.
                  INVESTIGATION:    WELL DONE TO DATE, WITH THE EXCEPTION OF
                  ARRANGING IME'S, AS WE ARE NOW THREE YEARS POST MVA, THERE
                  IS AN ALLEGATION OF MTBI, AND POTENTIALLY A CLAIM FOR A
                  SUBSTANTIAL WAGE LOSS/LOSS OF OPPORTUNITY.
```

ICBC_003251

DATE: 2021-01-04                                                    PAGE : 10
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                     TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                 EXP
-------  -------- --------------------------------------------------------
29DEC06 EMAIL     LIABILITY:      THE DEFENDANT REAR ENDED THE PLAINTIFF. THE   A
                  DEFENDANT IS 100% RESPONSIBLE. NO INDICATION THAT THE
                  PLAINTIFF REAR ENDED THE CAR IN FRONT OF HIM FIRST.
                  CONTRIB. NEG./
                  OTHER DEFENCES:       THERE ARE NO DEFENCES FOR CONTRIBUTORY
                  NEGLIGENCE.
                  INJURY & RESERVE:
                  CLAIMANT:      RICHARD HALL (FEBRUARY 22, 1969: 34 AT THE
                  DATE
                  OF LOSS). RICHARD IS AN ASPIRING PROFESSIONAL GOLFER (AT
                  34?) AND AN ENTREPRENEUR. HE ALLEGES HAVING ACHIEVED FIRST
                  CLASS HONORS AT THE UNIVERSITY OF CAMBRIDGE.
                  RICHARD'S WORK HISTORY REPORTEDLY INCLUDES BANKING,
                  LECTURING IN PSYCHOLOGY AND PROFESSIONAL GOLFING (PLAYING
                  MINI TOURS IN CANADA, SOUTH AFRICA AND EUROPE) SINCE 1995.
                  HE HAS A HISTORY OF MANY CONCUSSIONS FROM AGE 6 THROUGH
                  1997, WHEN HE ALLEGED A CLOSED HEAD INJURY AFTER BEING REAR
                  ENDED IN OREGON.
                  HE SUSTAINED A GOLF INJURY TO HIS HAND IN 1995 WHICH LEAD
                  TO SURGERY. FOLLOWING THAT SURGERY HE REBUILT HIS GOLF
                  SWING WITH THE ASSISTANCE OF DAVID LEADBETTER, ONE OF THE
                  WORLD'S PREMIERE AND BEST KNOWN INSTRUCTORS. DAVID COACHES
                  MANY PROS AND CONFIRMS HAVING COACHED RICHARD.
                  HE ALLEGED CHRONIC HEALTH PROBLEMS RESULTING FROM TOXIN
                  EXPOSURE FROM 1995 THROUGH 2001.
                  HE ATTENDED FOR COUNSELING WHILE IN UNIVERSITY.
                  AT THE DATE OF LOSS HE HAD MOVED FROM OREGON, TO SALT
                  SPRING ISLAND. HE MAY BE IN CANADA ON A 'PROFESSIONAL
                  ATHLETES VISA', WHICH WOULD APPARENTLY RENDER HIM UNABLE TO
                  WORK IN THIS COUNTRY.
------------------------------------------------------------------------NOTE

26MAR07 NOTE



---------------
29MAR07 INCURRE


---------------
29MAR07 INCURRE
```

ICBC_000202

```
DATE: 2021-01-04                                                    PAGE : 11
TIME: 10.55.50         INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|                   |         |                                | TYP<br>EXP |
|-------------------|---------|--------------------------------|------------|
| DATE              | WORKTYPE | DESCRIPTION/DETAIL             |            |
| 29MAR07 | INCURRED | NOV 1/06 TO JAN 1/07 | B |
|  |  |  | NOTE |
| 17APR07 | NOTE | ███████████████████████ | A |
|  |  |  | NOTE |
| 17APR07 | NOTE | RESCHEDLED O'SHAUGNESSY APPT SEPT 6, 2007 | A |
|  |  |  | CMPL |
| 19APR07 | INCURRED | █████████████ LE:3 KOL:21 | B |
|  |  |  | MSGS |

```
25APR07 EMAIL    TO: DICESARE, JOHN; DAWE, FRANCESCA               A
                 CC: CC00
                 YF L373475.6        YF L373571.4
                 RICHARD HALL   HAS MADE A REQUEST FOR INFORMATION UNDER THE
                 FREEDOM OF INFORMATION AND PROTECTION OF PRIVACY ACT
                 (FOIPPA)
                 THIS REQUEST WAS RECEIVED IN OUR OFFICE ON APRIL 24, 2007.
                 UNDER FOIPPA THE INFORMATION AND PRIVACY DEPARTMENT HAS A
                 LEGAL OBLIGATION TO PROVIDE THE APPROPRIATE FILE INFORMATION
                 TO THE INFORMATION REQUESTOR WITHIN 30 DAYS OF OUR RECEIPT
                 OF THEIR REQUEST.  FOR FURTHER INFORMATION ON THIS TOPIC,
                 PLEASE REFER TO THE FPR WEBSITE.
                 SO THAT WE WILL MEET THIS TIMELINE, PLEASE FORWARD THE ABOVE
                 NOTED FILE(S) WITHIN 5 DAYS,  WITH A COPY OF THIS EMAIL, TO:
                          MICHAEL FEARS,  INFORMATION OFFICER
                          INFORMATION AND PRIVACY DEPT
                          L299117
                 PLEASE NOTE:  IF THERE ARE ANY UNTRANSCRIBED TAPES, PLEASE
                 ENSURE THERE IS A PAPER COPY IN THE FILE AS THIS FORMS PART
                 OF THE REQUESTED RECORDS.  ADDITIONALLY, PLEASE DO NOT ALTER
                 OR AMEND THE REQUESTED CLAIM FILE IN ANY WAY INCLUDING CWMS
                 NOTES.
                 WE WILL MAKE A COPY OF YOUR FILE AND RETURN IT ASAP.  BEFORE
                 THE RELEASE PACKAGE IS PROVIDED TO THE REQUESTER, YOU WILL
                 RECEIVE A COPY FOR DISCUSSION.  THANK YOU.
                 IF YOU HAVE ANY FURTHER QUESTIONS, CONCERNS, OR IF THERE
                 WILL BE A DELAY IN SENDING THE FILE(S), PLEASE DO NOT
                 HESITATE TO CONTACT ME DIRECTLY AT 604-661-6828.
                 THANK YOU.
                 CC:     MANAGER, INFORMATION AND PRIVACY
```

|                   |         |                                |            |
|-------------------|---------|--------------------------------|------------|
|  |  |  | NOTE |
| 30APR07 | NOTE | FILE SENT TO MICHAEL FEARS INFORMATION AND PRIVACY DEPT | A |
|  |  |  | NOTE |
| 2MAY07 | NOTE | ████████████████████ | A |

ICBC_003253



DATE: 2021-01-04                                                    PAGE : 12
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                   TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                               EXP
-------  -------------------------------------------------------------
2MAY07   NOTE                                                       A


                                                                 NOTE
2MAY07   NOTE     TO DO                                             A
                  ONCE WE CONCLUDE SURVEILLANCE (IF WE FIND DUBLIN PI), HAVE
                  I/A DO SOME BACKGROUND INVESTIGATION, KNOCKING ON DOORS
--------------------------------------------------------------------NOTE
7MAY07   NOTE     WE HAVE NOW MADE A COPY OF THIS FILE FOR AN FOI REQUEST.  A
                  FILE RETURNED TO CC00
--------------------------------------------------------------------NOTE
8MAY07   NOTE     FILE REC'D @CC00 AND GIVEN TO JOHN DICESARE.           A
--------------------------------------------------------------------CMPL
14JUN07 INCURRED CL288                                       LE:3 KOL:21 B
                  REASON:


-------------------------                                   ---------CMPL
14JUN07 INCURRED CL288                                       LE:5 KOL:21 B
                  REASON:


--------------------------------------------------------------------NOTE
5JUL07   NOTE     D/C SERVING APPLICATION TO COMPEL ATTEDANCE AT IME AND DISC  A
                  IME WITH O'SHAUGNESSY SEPT 6 '07
--------------------------------------------------------------------CMPL
13JUL07 INCURRED CL288                                       LE:3 KOL:21 B
                  REASON


-------------------------                                   ---------CMPL
13JUL07 INCURRED CL288                                       LE:5 KOL:21 B
                  REASON


-------------------------                                   ---------CMPL
2AUG07  INCURRED CL288                                       LE:3 KOL:21 B
                  REASON                                     2007


-------------------------                                   ---------CMPL
2AUG07  INCURRED CL288                                       LE:5 KOL:21 B
                  REASON                                     2007


-------------------------                                   ---------NOTE
3AUG07   NOTE
```

ICBC_003254



DATE: 2021-01-04                                                            PAGE : 13
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                         TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                       EXP
------- --------------------------------------------------------------------
3AUG07  NOTE                                                              A




                                                                         NOTE
28AUG07 NOTE     WE REC'D ORDER FOR CLMT TO ATTEND SEPT '07 DISC AND IME  A
                 WITH O'SHAUGNESSY; NOW CLMT TRYING TO FIGHT THAT ORDER
                 (THIS OCCURRED DURING MY RECENT 3 WEEK ABSENCE - VACATION)
-----------------------------------------------------------------------CMPL
5NOV07  INCURRED CL288                                         LE:3 KOL:21 B
                 REASON:


                                                              ---------CMPL
5NOV07  INCURRED CL288                                         LE:5 KOL:21 B
                 REASON:


-------------------------------------------------------------------NOTE
27NOV07 NOTE                                                              A









                                                                         TE
29NOV07 NOTE                                                              A

-----------------------------------------------------------------------NOTE
29NOV07 NOTE     VALLANCE IME APRIL 15, 2008 (FROM JACOBS)                A
-----------------------------------------------------------------------CMPL
12DEC07 INCURRED CL288                                         LE:3 KOL:21 B
                 REASON:

                                                              ---------CMPL
12DEC07 INCURRED CL288     FILE 10151 INV 1402        $13.20 LE:5 KOL:21 B
```

ICBC_003255

```
DATE: 2021-01-04                                                      PAGE : 14
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                             CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  |
| 12DEC07 | INCURRED | REASON ███████████████ | B |
|  |  |  | NOTE |
| 26FEB08 | NOTE | ███████████████ | A |
|  |  |  | NOTE |
| 2MAY08 | NOTE | ███████████████ | 8 A |
|  |  |  | CMPL |
| 6MAY08 | INCURRED | CL288 REASON: ███████████████ | LE:3 KOL:21 B |
|  |  |  | CMPL |
| 6MAY08 | INCURRED | CL288 REASON: ███████████████ | LE:5 KOL:21 B |
|  |  |  | NOTE |
| 15MAY08 | NOTE | D/C MATERIALS; APPLIC. FOR DISMISSAL ON FILE; HEARING JUN 13 MATERIALS BEING SENT TO CLMT | A |
|  |  |  | NOTE |
| 6JUN08 | NOTE | THOMAS HARDING NOW SERVED NOTICE THAT HE IS P/C | A |
|  |  |  | NOTE |
| 13JUN08 | NOTE | APPLICATION FOR DISMISSAL ADJOURNED TIL JUN 20, 2008 | A |
|  |  |  | CMPL |
| 23JUN08 | INCURRED | ███████████████ | E:3 KOL:21 B |
|  |  |  | CMPL |
| 23JUN08 | INCURRED | ███████████████ | E:5 KOL:21 B |
|  |  |  | NOTE |
| 11JUL08 | NOTE | ███████████████ | A |
|  |  |  | CMPL |
| 11JUL08 | INCURRED | ███████████████ | LE:3 KOL:21 B |

ICBC_003256



```
DATE: 2021-01-04                                              PAGE : 15
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                  TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                EXP
------- ------------------------------------------------------------------
--------------------------------------------------------------------CMPL
11JUL08 ██████████████████████████████████████████LE:5 KOL:21 B
        ████████████████████████████████████████████████
        ████████████████████████████████████████████████
--------------------------------------------------------------------NOTE
15JUL08 NOTE  ███████████████████████████████████████████ETC  A
              ████████████████████████████████████████████ING
              ████████████████████████████████████████████
              ████████████████████████████████████████████
              ████████████████████████████████████████████
              ████████████████████████████████████████████
--------------------------------------------------------------------NOTE
15JUL08 NOTE    TO DO                                              A
                SET SEPTEMBER STRATEGY MEETING WITH MGR
                WE'LL HAVE SOME DISC EVIDENCE BY THEN
--------------------------------------------------------------------NOTE
31JUL08 NOTE    D. SMITH (PSYCH) IME, SET FOR DECEMBER 3, 2008     A
--------------------------------------------------------------------CMPL
12AUG08 INCURRED CL288    FILE: 10151 INV: 2475    $4911.84 LE:3 KOL:21 B
                REASON: RE:  HALL V DOVE
                        SERV FR JUL 2 08 TO AUG 1 08
                        INV DATE: AUG 1 08
--------------------------------------------------------------------CMPL
12AUG08 INCURRED CL288    FILE: 10151 INV: 2475    $59.80 LE:5 KOL:21 B
                REASON: RE:  HALL V DOVE
                        SERV FR JUL 2 08 TO AUG 1 08
                        INV DATE: AUG 1 08
--------------------------------------------------------------------NOTE
29SEP08 NOTE  ████████████████████████████████████████████      A
--------------------------------------------------------------------NOTE
8OCT08  NOTE    SPOKE TO TINO                                      A
                RE: WE'LL MEET ONCE DISC/IME REPORTS IN, TO REASSESS FILE
                DIRECTION
--------------------------------------------------------------------NOTE
8OCT08  NOTE    TO DO                                              A
                REVIEW DISC/IME - SPEAK TO SIU
--------------------------------------------------------------------NOTE
24NOV08 NOTE    CONDUCT MONEY FOR IME PROVIDED                     A
--------------------------------------------------------------------CMPL
24NOV08 INCURRED CL288    THOMAS HARDING LAW     $3000.00 LE:1 KOL:21 B
                PAYEES: CORPORATION "IN TRUST"
                REASON: RE: RICHARD DAVID HALL - CONDUCT MONEY TO
                        ATTEND EXAMINATION FOR DISCOVERY AND
                        PSYCHIATRIC EXAMINATION
--------------------------------------------------------------------NOTE
25NOV08 NOTE  ████████████████████████████████████████████
```

ICBC_003257

```
DATE: 2021-01-04                                              PAGE : 16
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                      CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |
| 25NOV08 | NOTE | █████████████████████████ | A |
| | | | NOTE |
| 2DEC08 | NOTE | ██████████████████ | A |
| | | RE: ARRANGE FOR FBIG TO SURVEILLE CLMT | |
| | | | CMPL |
| 17DEC08 | INCURRED | CL288 ████████████ | LE:3 KOL:21 B |
| | | REASON: ████████████████ | |
| | | | CMPL |
| 17DEC08 | INCURRED | CL288 ████████████ | LE:5 KOL:21 B |
| | | REASON ████████████████ | |
| | | | NOTE |
| 19DEC08 | NOTE | SEE PI REPORT; PI LOST CLMT AFTER IME | A |
| | | | CMPL |
| 23DEC08 | INCURRED | CL288  08-16682 INV 164 CANPRO      $1331.79 | LE:9 KOL:21 B |
| | | REASON: RE: RICHARD HALL - SURVEILLANCE | |
| | | INVOICE DATED DECEMBER 16, 2008 | |
| | | | CMPL |
| 13JAN09 | INCURRED | CL288 ████████████ | LE:3 KOL:21 B |
| | | REASON: ████████████ | |
| | | | CMPL |
| 13JAN09 | INCURRED | CL288 ████████████ | LE:5 KOL:21 B |
| | | REASON: ████████████ | |
| | | | NOTE |
| 4FEB09 | NOTE | REV'D FILE | A |

```
                    VERY FRUSTRATING
                    WE FINALLY GOT CLMT TO IME AND HE WAS PREDICTABLY VERY
                    EVASIVE ON ANSWERING QUESTIONS
                    DR. SMITH CONFIRMS THAT CLMT SUFFERS FROM NO PSYCHIATRIC
                    DIAGNOSIS
                    WE'VE HAD ORDE FOR EXAMINATION FOR DISC FOR AGES NOW AND
                    HAVE NOT GOT CLMT INTO DISCOVERY
                    SEE EMAIL TO D/C ASKING THEM TO FORCE THE ISSUE - AGAIN
                    I'VE ALSO ASKED MARIA MCRAE TO ARRANGE FOR A STRATEGY
                    MEETING AT OUR OFFICE IN NEXT TWO MONTHS, WITH MGR PRESENT
```

|  |  |  |  |
|---|---|---|---|
| | | ███████████████████ | |
| | | | CMPL |
| 12FEB09 | INCURRED | CL288    DR. DERRYCK H. SMITH INC      $3500.00 | LE:4 KOL:21 B |
| | | REASON: INV DATED DEC 8, 2008 | |
| | | MEDICAL LEGAL REPORT - RICHARD DAVID HALL | |

ICBC_003258

```
DATE: 2021-01-04                                                   PAGE : 17
TIME: 10.55.50           INSURANCE CORPORATION OF BRITISH COLUMBIA
                              CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```



```
                                                                       TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------  ------------------------------------------------------------
--------------------------------------------------------------------------NOTE
24FEB09 NOTE       SEE MARIA'S EMAIL; LOOKING AT MAY29 STRATEGY MEETING   A
                   SHE'LL CONFIRM
--------------------------------------------------------------------------CMPL
23APR09 REVIEW     MANAGER REVIEW                                         A
                   TRANSFERED RVW TO GRANT
--------------------------------------------------------------------------NOTE
26MAY09 NOTE                                                              A




--------------------------------------------------------------------------NOTE
29MAY09 NOTE                                                              A

















--------------------------------------------------------------------------NOTE
1JUN09  NOTE                                                              A
```

ICBC_003259

```
DATE: 2021-01-04                                                    PAGE : 18
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

```
1JUN09   NOTE                                                              A
```



```
                                                                         NOTE
1JUN09   NOTE       TO DO                                                   A
                    F/U MY EMAIL JUNE 1, 2009 AND MGR NOTE MAY 29, 2009
                    F/U SIU
---------------------------------------------------------------------------CMPL
10JUN09  INCURRED CL288    FILE 10151 INV 4216 INTERIM    $7704.00  LE:3 KOL:21 B
                    REASON: HALL V DOVE / MVA: NOV 10, 2003
                            SERVICES FROM JAN 02 TO MAY 31, 2009
                            INTERIM INV DD MAY 31, 2009
---------------------------------------------------------------------------CMPL
10JUN09  INCURRED CL288    FILE 10151 INV 4216 INTERIM     $25.05  LE:5 KOL:21 B
                    REASON: HALL V DOVE / MVA: NOV 10, 2003
                            SERVICES FROM JAN 02 TO MAY 31, 2009
                            INTERIM INV DD MAY 31, 2009
---------------------------------------------------------------------------CMPL
10JUN09  INCURRED CL288    FILE 10152 INV 4215 INTERIM    $118.24  LE:3 KOL:21 B
                    REASON: HALL V ICBC / MVA: NOV 10, 2003
                            SERVICES FROM APR 03/07 TO MAY 31/09
                            INV DD MAY 31, 2009
---------------------------------------------------------------------------CMPL
10JUN09  INCURRED CL288    FILE 10152 INV 4215 INTERIM      $1.70  LE:5 KOL:21 B
                    REASON: HALL V ICBC / MVA: NOV 10, 2003
                            SERVICES FROM APR 03/07 TO MAY 31/09
                            INV DD MAY 31, 2009
---------------------------------------------------------------------------NOTE
26JUN09  NOTE                                                              A
                    HE SPOKE TO RICK KILLOUGH, D/C FOR ALLSTATE IN RELATED HALL
                    V. ALLSTATE ACTION AND ASKED THAT HE PROVIDE A LETTER OR
                    AFFIDAVIT CONFIRMING CLMT'S ENTITLEMENT TO COVERAGE THROUGH
                    ALLSTATE (SOMETHING HE'S PREVIOUSLY DONE AND AGREED TO IN
                    THIS PARTICULARL CALL), BUT HE WILL ONLY CONSIDER IT - WANTS
                    SOMETHING IN RETURN - WE HAVE NO REASON TO OFFER SOMETHING
                    IN RETURN. MR. HALL'S ENTITLEMENT IS WHAT IT IS.
```

ICBC_003260

DATE: 2021-01-04                                                  PAGE : 19
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4



|                  |            |                                                          | TYP EXP |
|------------------|------------|----------------------------------------------------------|---------|
| DATE             | WORKTYPE   | DESCRIPTION/DETAIL                                        |         |

26JUN09 NOTE                                                                        A
                                                                                  NOTE
30JUN09 NOTE                                                                        A
                                                                                  CMPL
7JUL09  REVIEW    MANAGER REVIEW                                                    A
                  DISCUSSED FILE WITH JOHN AND REVIEWED RECENT NOTES. THOMAS
                  HARDING CAN BE VERY DIFFICULT TO DEAL WITH.
                                                                                  CMPL
30JUL09 INCURRED CL288    FILE 10151 INV 4447 INTERIM   $1679.90  LE:3 KOL:21 B
                  REASON: HALL V DOVE / MVA: NOV 10, 2003
                          SERVICES FROM JUN 01 TO JUL 16, 2009
                          INV DD JUL 16, 2009
                                                                                  CMPL
30JUL09 INCURRED CL288    FILE 10151 INV 4447 INTERIM     $3.70  LE:5 KOL:21 B
                  REASON: HALL V DOVE / MVA: NOV 10, 2003
                          SERVICES FROM JUN 01 TO JUL 16, 2009
                          INV DD JUL 16, 2009
                                                                                  CMPL
30JUL09 INCURRED CL288    FILE 10152 INV 4448 INTERIM   $1282.40  LE:3 KOL:21 B
                  REASON: HALL V ICBC / MVA: NOV 10, 2003
                          SERVICES FROM JUN 01 TO JUL 10, 2009
                          INV DD JUL 10, 2009
                                                                                  CMPL
30JUL09 INCURRED CL288    FILE 10152 INV 4448 INTERIM     $1.00  LE:5 KOL:21 B
                  REASON: HALL V ICBC / MVA: NOV 10, 2003
                          SERVICES FROM JUN 01 TO JUL 10, 2009
                          INV DD JUL 10, 2009
                                                                                  NOTE
31AUG09 NOTE                                                                        A


                                                                                  CMPL
23MAR10 REVIEW    MANAGER REVIEW                                                    A
                  SEE NOTE
                                                                                  NOTE
23MAR10 NOTE      MANAGER NOTE - SPOKE WITH JOHN, THIS FILE IDLING. WE ARE          A
                  DOING NOTHING AND P/C IS DOING NOTHING. JOHN HAD MET WITH
                  HIS PRIOR MANAGER ABOUT A YEAR AGO AND DECIDED TO JUST
                  LEAVE THIS AN LET THE PLAINTIFF PROVE HIS CLAIM. IT HAS NOW
                  BEEN 7 YEARS. I ASKED JOHN TO SET A TRIAL DATE. HE WILL SET
                  UP A MEETING WITH D/C.
                                                                                  NOTE
20APR10 NOTE                                                                        A

ICBC_003261

```
DATE: 2021-01-04                                                    PAGE : 20
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                        TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                      EXP
------  ------------------------------------------------------------------
-------------------------------------------------------------------NOTE
                                                                         A
7MAY10  NOTE     ████████████████████████████████████████████████


                 ████████████████████████████████████████████████


                 ████████████████████████████████████████████████
                                                                     CMPL
-------------------------------------------------  $662.87  LE:3 KOL:21 B
20JUL10 INCURRED CL288    FILE 10151 INV 6740
                 REASON: RE: HALL, RICHARD V. DOVE
                 INV DATED JUN 30/10
                 FOR PERIOD JUL 17/09 TO JUN 30/10
                                                                     CMPL
-------------------------------------------------  $0.10  LE:5 KOL:21 B
20JUL10 INCURRED CL288    FILE 10151 INV 6740
                 REASON: RE: HALL, RICHARD V. DOVE
                 INV DATED JUN 30/10
                 FOR PERIOD JUL 17/09 TO JUN 30/10
                                                                     NOTE
----------------------------------------------------------------       A
23AUG10 NOTE     ████████████ STILL NOT COMMITTING ████████████
                                                                     NOTE
----------------------                                                 A
13SEP10 NOTE     ██████████████████████████████████████████████


                 ██████████████████████████████████████████████
                                                                     NOTE
-------------------------------------------------------------------    A
14SEP10 NOTE     SPOKE TO SIU'S TINO PIETRAMALA
                 RE: HARDINGS LETTER JULY 27, 2010, RE: CLMT'S LAST KNOWN ADD
                 RESS OF 28 HARBOUR MEWS, NASSAU, BAHAMAS
                 CAN HE CONFIRM IF CLMT ACTUALLY THERE, VS. POST OFFICE BOX,
                 ETC.; HE'LL LOOK INTO IT FOR ME
                 I'D BE INTERESTED IN SURVEILLANCE IF WE CAN CONFIRM HIM
                 THERE (THIS IS A LONG WAY FROM IRELAND, WHERE HE WAS NOT
                 THAT LONG AGO)
                                                                     CMPL
-------------------------------------------------  $208.00  LE:3 KOL:21 B
16SEP10 INCURRED CL288    FILE 10151 INV 7234
                 REASON: HALL, RICHARD V DOVE / MVA: NOV 10, 2003
                 SERVICES FROM JUL 01 TO AUG 31, 2010
                 INTERIM INV DD AUG 31, 2010
                                                                     CMPL
-------------------------------------------------  $25.01  LE:9 KOL:21 B
16SEP10 INCURRED CL288    FILE 10151 INV 7234
                 REASON: HALL, RICHARD V DOVE / MVA: NOV 10, 2003
                 SERVICES FROM JUL 01 TO AUG 31, 2010
                 INTERIM INV DD AUG 31, 2010
                                                                     CMPL
-------------------------------------------------  $0.40  LE:5 KOL:21 B
16SEP10 INCURRED CL288    FILE 10151 INV 7234
                 REASON: HALL, RICHARD V DOVE / MVA: NOV 10, 2003
                 SERVICES FROM JUL 01 TO AUG 31, 2010
                 INTERIM INV DD AUG 31, 2010
```

ICBC_003262

```
DATE: 2021-01-04                                              PAGE : 21
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                              TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                           EXP
------  -------- ----------------------------------------------------
-----------------------------------------------------------------NOTE
                                                              A
16SEP10 NOTE     SPOKE TO TINO AGAIN
                 HE'S DONE SOME INTERNET RESEARCH ON CLMT'S LAST KNOWN ADDRES
                 S. A PROPERTY UNDER PROPERTY MGMT
                 CLMT IS UNREPRESENTED AT PRESENT SO HE SUGGESTD HE CALL THE
                 COMPLEX AND SIMPLY ASK ABOUT MR. HALL - SEE WHAT REPLY HE
                 GETS. IF HE GETS A HOLD OF MR. HALL, HE CAN SAY HE'S TRYING
                 TO GET IN TOUCH WITH HIM FOR PURPOSES OF SETTING DOWN COURT
                 DATES, FOR VARIOUS APPLICATIONS. I AGREED AND ASKED THAT
                 HE CALL THE COMPLEX AND SEE WHAT HE MIGHT LEARN.
------------------------------------------------------------------NOTE
                                                              A
30SEP10 NOTE
```



```
------------------------------------------------------------------NOTE
8OCT10  NOTE     MANAGER NOTE - I ASKED JOHN TO PUSH THIS MATTER ON AS HE HAS A
                 DESCRIBED IN HIS NOTES. WE WILL HAVE TO GO BACK TO THE
                 COURTS FOR DIRECTION 3 OR 4 TIMES BEFORE WE FINALLY GET
                 ANYWHERE. WE WILL SET TRIAL AND EFD DATES, WE WILL DO
                 SUBSTITUTIONAL SERVICE IF WE CANNOT FIND HIM TO SERVE HIM.
                 WE WILL LIKELY HAVE TO APPLY FOR A DISMISSEL FOR WANT OF
                 PROSECUTION 3 TIMES BEFORE WE GET ANYWHERE ON THIS. OR WE
                 JUST SIT BUT IT NEVER GOES AWAY.
-----------------------------------------------------------------CMPL
                                                              A
15JAN11 TRANSFER FILE TRANSFER TO    000/9380-0 OLSTROM, LAURIE
-----------------------------------------------------------------CMPL
20APR11 INCURRED CL288-P  FILE# 10152 INVOICE# 9430       LE:3 KOL:21 B
-----------------------------------------------------------------CMPL
20APR11 INCURRED CL288-P  FILE# 10152 INVOICE# 9430       LE:9 KOL:21 B
-----------------------------------------------------------------CMPL
26APR11 INCURRED CL288    FILE# 10152 INVOICE# 9430   $153.00 LE:3 KOL:21 B
                 REASON: HALL V. ICBC. MVA DATE: NOVEMBER 10/2003
                         INVOICE DATED: MARCH 31/2011.
                         ACTIVITY PERIOD: SEPT 1/2010 - FEB 28/2011
-----------------------------------------------------------------CMPL
26APR11 INCURRED CL288    FILE# 10152 INVOICE# 9430    $18.36 LE:9 KOL:21 B
                 REASON: HALL V. ICBC. MVA DATE: NOVEMBER 10/2003
                         INVOICE DATED: MARCH 31/2011.
                         ACTIVITY PERIOD: SEPT 1/2010 - FEB 28/2011
-----------------------------------------------------------------NOTE
```

DATE: 2021-01-04                                                    PAGE : 22
TIME: 10.55.50     INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                       TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------  -----------------------------------------------------------   ----
12MAY11 NOTE     ROOS HAS FILED CHANGE OF SOLICITOR AND INTENT TO PROCEED   B
-----------------------------------------------------------------------MSGS
13MAY11 EMAIL
```

```
-----------------
16MAY11 EMAIL
```

ICBC_003264

DATE: 2021-01-04                                                    PAGE : 23
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                   TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                 EXP
-------  ----------------------------------------------------------------
16MAY11 EMAIL

ICBC_003265

DATE: 2021-01-04
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA          PAGE : 24
                            CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|
| 16MAY11 | EMAIL | | A |
| 16MAY11 | NOTE | | E |
| 30MAY11 | EMAIL | MF L373571 4 EXP    YF              YF              CONF N (Y/N)  A | |

WERE SUCCESSFUL IN HAVING PETSCAN EVIDENCE DEEMED
INADMISSIBLE, THE COURTS LEFT OPEN THE POSSIBILITY THAT IT
MIGHT BE ADMISSIBLE IF PAIRED WITH THE PROPER CLINICAL
PICTURE).

THE REMAINDER OF THE REPORTS ON FILE REVEAL A FEW THINGS:
MR. HALL SEEMS TO HAVE CONTINUED ON WITH HIS BUSINESS
VENTURE AND HAD SOME SUCCESS - A REPORT OUT OF THE MAY
CLINIC SPEAKS OF THE NEED FOR HIM TO SUCCESSION PLAN;
DR. LONGRIDGE WAS RETAINED EARLY ON AND BOTH HIS ENG AND
CDP (COMPUTERIZED DYNAMIC POSTUROGRAPHY) WERE NORMAL. HE
FOUND NO 'OBJECTIVE' MEASURES OF ABNORMALITIES, BUT STILL
ATTRIBUTES MR. HALL'S COMPLAINTS TO THE MVA AND MTBI;
ALBERT INCLUDES TWO ECONOMIC REPORTS, ONE OF VOCATIONAL
ECONOMICS WHICH PRODUCES ALLEGED ECONOMIC LOSS FIGURES
BASED ON MR. HALL HAVING A BACCALAUREATE DEGREE, WHEREAS
AEC PRODUCE LOSS FIGURES BASED ON STATS FOR 'U.S. MALES'

ICBC_003266

DATE: 2021-01-04                                                        PAGE : 25
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                        TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------   --------------------------------------------------------------------
                                                                         A
30MAY11 EMAIL    WITH A BACHELOR'S DEGREE.
                 AEC PROVIDE LOSS NUMBERS BASED ON STATISTICAL EARNINGS FOR
                 SOMEONE WITH A BACHELOR'S DEGREE W/O COGNITIVE INJURY AND
                 WITH COGNITIVE INJURY;
                 THERE IS A REPORT FROM PRICE WATERHOUSE COOPERS THAT TRIES
                 TO CALCULATE MR. HALL'S LOSS FROM HIS LOST CAREER AS A
                 PROFESSIIONAL GOLFER - NOTE HE WAS 33 AT THE DATE OF LOSS
                 AND HAD NOT MADE ANY SIGNIFICANT EARNINGS AS A GOLFER, YET
                 THE REPORT IS BASED ON THE ASSUMPTION THAT HE DID HAVE THE
                 CAPABILITY TO BE A PROFESSIONAL GOLFER.
                 FINALLY, THERE IS A 'SUMMARY STMT' FROM A MR. JOHNSON, A
                 FORMER PARTNER WITH KPMG, WHO SPEAKS TO TREMENDOUS LOST
                 BUSINESS EARNINGS BECAUSE OF THE MVA, I.E. HE PROJECTS THE
                 NPV OF THE BUSINESS, ABSENT THE MVA TO BE $300,000,000
                 U.S., WITH THE CLAIMANT BEING ABLE TO PULL IN A SALARY OF
                 $200,000 TO $300,000 ANNUALLY. HE ALLEGES CLMT LOST
                 $2MILLION TO $3MILLION BECAUSE OF THE DELAY IN GETTING THE
                 BUSINESS GOING, WHICH IS ALLEGEDLY ABOUT A 2 YEAR DELAY
                 POST MVA - SOME HUGE NUMBERS. IMPORTANTLY, MR. JOHNSON
                 ACKNOWLEDGES THAT HE IS AN INVESTOR IN MR. HALL'S
                 ENTERPRISE; THE CONFLICT IS OBVIOUS.
-------------------------------------------------------------------------MSGS
30MAY11 EMAIL    MF L373571 4 EXP   YF            YF        CONF N (Y/N)  A
                 HI LAURIE. AS DISCUSSED I'VE BEEN REVIEWING THIS FILE IN
                 THE CONTEXT OF LEARNING THAT THIS IS THE FILE THAT ALBERT
                 ROOS PLANS TO TRY AND INTRODUCE DTI EVIDENCE, IN SUPPORT OF
                 AN MTBI DIAGNOSIS. THIS WAS A FILE THAT I HANDLED AS AN
                 EXAMINER PRIOR TO BECOMING AN ACTING MANAGER BACK IN
                 NOVEMBER 2010 - ONE WHICH WAS VERY FRUSTRATING FILE TO
                 EXAMINE ON A NUMBER OF COUNTS: THERE HAVE BEEN VERY
                 SIGNIFICANT DELAYS OVER THE LAST 3 YEARS, CAUSED BY AN
                 EVASIVE PLAINTIFF, WHO HAS CHANGED LAWYERS TWICE NOW, FROM
                 BILL MORLEY, TO THOMAS HARDING TO ALBERT ROOS. HE HAS ALSO
                 AVOIDED DISCOVERIES AND WHEN HE FINALLY ATTENDED A COURT
                 ORDERED IME, HE WAS EVASIVE IN ANSWERING QUESTIONS POSED BY
                 OUR PSYCHIATRIST, DR. SMITH.  I HAVE ALSO HAD A DIFFICULT
                 TIME GETTING FORMER COUNSEL, TERRY VOS TO MOVE FORWARD WITH
                 APPLICATIONS TO THE COURT - SPECIFICALLY, AND MOST
                 RECENTLY, ASKING HIM TO APPLY TO THE COURT FOR A DISMISSAL
                 OF THE PART 7 ACTION. THROUGH ALL OF THESE DELAYS, IT HAS
                 NOW BEEN CONFIRMED THAT ALBERT ROOS IS MR. HALL'S CURRENT
                 COUNSEL AND HE HAS NOW PROVIDED US WIT A DEMAND FOR THE
                 DEFENDANT'S LIMITS, OF $1MILLION PLUS C&D'S. NOTE THAT WE
                 FIRST REC'D A DEMAND FOR LIMITS BACK IN JANUARY OF 2009,
                 BUT WE HAVE LONG BEEN OF THE VIEW THAT THIS CLAIM IS NOT
                 WORTH ANYTHING NEAR THE DEFENDANT'S LIMITS AND IT IS IN
                 THIS CONTEXT THAT I HAVE BEEN TRYING TO MOVE THE FILE
                 FORWARD; WE CERTAINLY HAD NOT BEEN PROVIDED WITH ANY
                 DETAILS THAT WARRANTED SUCH A DEMAND.
```

CLAIM : L373571-4

```
                                                                        TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                      EXP
------- -------- ----------------------------------------------------------
30MAY11 EMAIL                                                              A
```



CLAIM.
NOW ON REVIEW OF PLAINTIFF COUNSEL'S PROPOSAL/DEMAND FOR
THE LIMITS, IT IS EVIDENT THAT THIS IS THE FILE WHEREIN
ALBERT PLANS TO RELY ON DTI TO PROVE MTBI.
IN LIGHT OF ALL OF THIS, AND AS DISCUSSED, WE SHOULD ATTEND
TO A NUMBER OF ITEMS:
1. PLEASE ARRANGE FOR ANOTHER MEETING AT OUR OFFICE, OVER
THE NEXT MONTH OR SO - I'LL BE IN VACATION MID JULY BUT
WOULD LIKE TO COMPLETE THIS MEETING BEFOR THEN.

I ASK THIS IN THE CONTEXT OF A LIMITS DEMAND
BUT ALSO IN LIGHT OF THIS NEW ISSUE - THAT OF DIFFUSE
TENSOR IMAGING. I DO NOT BELIEVE DTI MEETS THE TEST FOR
ADMISSIBILITY AND WE WILL REQUIRE A VOIRE DIRE ON THE
ISSUE, I.E. EXCLUDING ALL DTI (AND MEG) EVIDENCE FROM
TRIAL, IN THE SAME MANNER WE HAVE PREVIOUSLY EXCLUDED
PETSCAN EVIDENCE AND IN WHICH WE ARE PRESENTLY PREPARING TO
EXCLUDE QEEG EVIDENCE (MORE SCANNING WHICH DOES NOT MEET
THE REQIREMENTS FOR ADMISSIBILITY, I.E.SCIENTIFIC VALIDITY
FOR MEDICAL / LEGAL PURPOSES). WE SHOULD ALSO INVITE THE
FOLLOWING:
NATALIE TAYLOR - SO THAT SHE HAS A HEADS UP ON THE ISSUE
(SHE MAY CHOOSE TO RELY ON OUR UPDATES BUT PLEASE INVITE
HER SO THAT SHE CAN AT LEAST TRACK THE ISSUE);
MARK OLSON - BECAUSE OF HIS INTEREST IN HEAD INJURY AND
VOIRE DIRES AS RELATES TO IMAGING TECHNIQUES THAT ARE NOT
SCIENTIFICALLY VALID IN THE MEDICAL LEGAL CONTEXT;
JASON MCDANIEL - THE PLAINTIFF HAS BEEN SEEKING
CONFIDENTIALITY AGREEMENTS THROUGHOUT THIS PROCESS, AS
RELATES TO HIS BUSINESS VENTURES. IT WOULD BE USEFUL TO
HAVE CORPORATE LAW WEIGH IN ON THIS.
IN THE INTERIM, I WILL SPEAK TO MARK AND PHIL LEE, WHO ARE
COORDINATIGN THE CORPORATE DEFENCE TO FILES INVOLVING QEEG
EVIDENCE AND DISCUSS POSSIBLE EXPERT RETAINERS.

ICBC_003268

DATE: 2021-01-04                                              PAGE : 27
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

|  |  |  | TYP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL | EXP |

30MAY11 EMAIL    PLEASE HAVE DEFENCE COUNSEL THAT THE DEFENDANT'S ESTATE IS    A
                 ON NOTICE ABOUT THE LIMITS DEMAND. PLEASE ALSO HAVE THEM
                 CONFIRM WHETHER OUR DECEASED DEFENDANT LEFT ANY ESTATE.
                 ************************
                 FOR NOW, MY BRIEF COMMENTS ON P/C'S SETTLEMENT PROPOSAL
                 ARE:
                 THE PROPOSAL INCLUDES REPORTED RESULTS BY DR. LEE, OUT OF
                 THE UNIVERSITY OF CALIFORNIA'S MEG CENTRE, ON SLOW WAVE
                 MAPPING AND FX BRAIN MAPPING - MEDIAN NERVE, SOMATOSENSORY
                 MAPPING AND AUDITORY MAPPING; THE RESULTS:
                 1. SLOW WAVE MAPPING INDICATES FREQUENT ABNORMAL MEG SLOW
                 WAVE BURSTS (89) IN THE RIGHT PARIETAL AND TEMPORAL LOBES -
                 'THIS 'MAY' BE CONSISTENT WITH PATIENTS CLINICAL SYMPTOMS
                 OF A) LOW TOLERANCE TO NOICE - AUDITORY CORTEX AND B)
                 ATTENTIONAL PROBLEMS;
                 2. MEDIAN NERVE MEG EVOKED RESPONSES 'ALL WITHIN NORMAL
                 RANGE'.
                 AS RELATES TO THE DTI, THERE IS A REPORT AUTHORED BY ST.
                 PETERSBURG INDEPENDENT DIAGNOSITIC RADIOLOGY DATED AUGUST
                 24, 2010. IT CLAIMS THAT DTI HAS BEEN USED WORLDWIDE FOR
                 DETERMINING THE CONDITION AND COURSE OF AXONS IN THE HUMAN
                 BRAIN FOR OVER A DECASE (IT MAY BE A CLINICAL TOOL BUT THAT
                 DOES NOT, IN AND OF ITSELF, MAKE IT SCIENTIFICALLY VALID
                 FOR MEDICAL LEGAL PURPOSES). CONTAINED IN THE REPORT IS A
                 REFERENCE TO THE SERIES OF IMAGING UNDERTAKEN AND WITH
                 REFERENCE TO EARLIER MEG IMAGING, THERE IS MENTION OF A
                 SOFTWARE PROBLEM THAT NECESSITATED A REANALYSIS OF DATA -
                 WE'LL HAVE TO SEEK EXPERT ADVICE ABOUT THE SIGIFICANCE OF
                 THIS. THSI REPORT CONFIRMS A NORMAL MRI STUDY BUT THEN
                 ABNORMAL MEG (PER ABOVE) AND ABNORMAL DTI, IN THE LEFT
                 FRONTAL LOBE, RIGHT FRONTAL LOBE, RIGHT PARIETO-OCCIPITAL
                 LOBE AND LEFT PARIETAL LOBES. THE REPORT CONCLUDES BY
                 TRYING TO GIVE THE TESTING SOME CLINICAL CONTEXT AND THEN
                 CONCLUDES THAT THE RESULTS ARE EVIDENCE OF MTBI (WHEN WE
--------------------------------------------------------------------------MSGS
2JUN11  EMAIL    TO: OLSTROM, LAURIE                                          A
                 CC: DICESARE, JOHN
                 MF L373571 4 EXP    YF           YF           CONF N (Y/N)
                 HI LAURIE.

                 [REDACTED]

                 I'VE DONE A BIT OF THE BACKGROUND.
                 PHIL LEE HAS RETAINED TWO EXPERTS IN HIS
                 DEFENCE/PREPARATION FOR A VOIRE DIRE,  OF QEEG EVIDENCE. HE
                 RETAINED LOCAL NEUROLOGIST,  DR. PETER WONG (604-875-2124)
                 AND AMERICAN  EXPERT (PROFESSOR IN THE DEPT OF NEUROLOGY
                 AND HEAD, CLINICAL NEUROPHYSIOLOGY @ UCLA SCHOOL OF

ICBC_003269

Case 6:20-cv-01992-CEM-LHP   Document 65-2   Filed 04/02/21   Page 122 of 259 PageID 1081

```
                                                                       TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------  -------- -------------------------------------------------  ------
2JUN11   EMAIL    MEDICINE/MEDICAL CENTRE; UCLA DEPT OF NEUROLOGY, REED    A
                  NEUROLOGICAL RESEARCH CENTER, 710 WESTWOOD PLAZA, ROOM
                  1-190 LOS ANGELES, CA 90095-6987 (PHIL OR HIS CONSEL, JOHN
                  HEMMERLING WOULD HAVE A PHONE NUMBER)).
                  ALSO, AT THE RECENT BLG SEMINAR, DR. JOCELYNE LAPOINTE
                  SPOKE BRIEFLY ABOUT DTI'S.
                  I WOULD TOUCH BASE WITH D/C AND THEN RUN A SEARCH FOR ANY
                  CASELAW INVOLVING DTI TECHNOLOGY AND IF IT IS AVAILABLE,
                  IDENTIFY WHO TESTIFIED AND WHAT POSITION DID THEY TAKE -
                  YOU MAY NOT FIND ANY CASELAW, BUT ITS POSSIBLE
                  -PARTICULARLY O/S THE REALM OF MOTOR VEHICLE LITIGATION.
                  IF COUNSEL COMBINES THAT WITH A PHONE CALL TO EACH OF THE
                  THREE ABOVE-NOTED EXPERTS, PERHAPS THEY CAN TELL US WHAT
                  THEIR EXPERTISE IS ON THE SUBJECT AND WHO WE MIGHT RETAIN
                  TO SPEAK TO ITS INADMISSIBILITY, IN RELATION TO  THE LACK
                  OF SCIENTIFIC VALIDITY/RELIABILITY - WHAT'S KNOWN AS A
                  DAUBERT  (OR GRANT V. DUBE) TYPE CHALLENGE.
-----------------------------------------------------------------------MSGS
6JUN11   EMAIL    TO: NG, MONICA                                           A
                  MF L373571 4
                  HI MONICA,
                  PLEASE SET UP A MEETING TO TAKE PLACE IN OUR BOARDROOM
                  BETWEEN THE FOLLOWING:
                          ME
                          JOHN DICESARE
                          NATALIE TAYLOR - SO THAT SHE HAS A HEADS UP ON THE
                  ISSUE (SHE MAY CHOOSE TO RELY ON OUR UPDATES BUT PLEASE
                  INVITE
                  HER SO THAT SHE CAN AT LEAST TRACK THE ISSUE);
                          MARK OLSON - BECAUSE OF HIS INTEREST IN HEAD INJURY
                  AND VOIRE DIRES AS RELATES TO IMAGING TECHNIQUES THAT ARE
                  NOT SCIENTIFICALLY VALID IN THE MEDICAL LEGAL CONTEXT;
                          JASON MCDANIEL - THE PLAINTIFF HAS BEEN SEEKING
                  CONFIDENTIALITY AGREEMENTS THROUGHOUT THIS PROCESS, AS
                  RELATES TO HIS BUSINESS VENTURES. IT WOULD BE USEFUL TO HAVE
                  CORPORATE LAW WEIGH IN ON THIS.



                  LAURIE OLSTROM, CIP
                  CLAIMS EXAMINER
                  HEAD OFFICE CLAIM SERVICES
                  ICBC BUILDING TRUST. DRIVING CONFIDENCE.
                  . . . . . . . . . . . . . . . . . . . . . . . . . . .
                  300 - 808 NELSON STREET | VANCOUVER | BRITISH COLUMBIA | V6Z
                  2H2
                  DIRECT: 604-647-6076 | FACSIMILE: 604-647-6105
                  SAVE TREES. PRINT ONLY WHEN NECESSARY.
-----------------------------------------------------------------------NOTE
```

ICBC_003270

DATE: 2021-01-04                                                    PAGE : 29
TIME: 10.55.50       INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                    TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                EXP
-------   ---------------------------------------------------------------
7JUN11    NOTE                                                       A

                                                               --------CMPL
24JUN11 INCURRED CL288-P  FILE# 10151 INVOICE# 10220    LE:3 KOL:21 B
-------------------------------------------------------------------CMPL
24JUN11 INCURRED CL288-P  FILE# 10151 INVOICE# 10220    LE:5 KOL:21 B
-------------------------------------------------------------------CMPL
24JUN11 INCURRED CL288-P  FILE# 10151 INVOICE# 10220    LE:9 KOL:21 B
-------------------------------------------------------------------CMPL
27JUN11 INCURRED CL288    FILE# 10151 INVOICE# 10220  $1575.00 LE:3 KOL:21 B
                  REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                          INVOICE DATED: JUNE 16/2011
                          ACTIVITY PERIOD: AUGUST 31/2010-JUNE 12/2011
-------------------------------------------------------------------CMPL
27JUN11 INCURRED CL288    FILE# 10151 INVOICE# 10220   $11.45 LE:5 KOL:21 B
                  REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                          INVOICE DATED: JUNE 16/2011
                          ACTIVITY PERIOD: AUGUST 31/2010-JUNE 12/2011
-------------------------------------------------------------------CMPL
27JUN11 INCURRED CL288    FILE# 10151 INVOICE# 10220   $190.37 LE:9 KOL:21 B
                  REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                          INVOICE DATED: JUNE 16/2011
                          ACTIVITY PERIOD: AUGUST 31/2010-JUNE 12/2011
-------------------------------------------------------------------NOTE
30JUN11  NOTE     ATTENDED STRATEGY MEETING (HALL)                   A
                  I HAD ASKED LAURIE TO ARRANGE MEETING TO INVITE COUNSEL
                  AND NEW DIRECTOR, NATALIE TAYLOR , AND JASON MCDANIEL -
                  CORP LAW AND MARK OLSON - INTEREST IN NEUROIMAGING
                  I WON'T GO INTO DETAIL BECAUSE D/C TO PRODUCE A REPORTING
                  LETTER, CONFIRMING TO DO'S FOR LAURIE THAT WILL SUMMARIZE
                  BASICALLY,
                  DISCUSSED
                  ICBC V. ALLSTATE - PART 7. COUNSEL TO SPEAK TO ALLSTATE
                  COUNSEL - WE WANT DISMISSAL OF PART7 AS CLMT NOT AN INS'D
                  WE'RE GOING TO F/U RE: DECEASED DEF DID NOT LEAVE ESTATE
                  D/C TO REPLY TO P/C, RE: 1) DEMAND FOR LIMITS AND 2)
                  DECEASED DEFENDANT - FORCE AMMENDMENT TO PLEADINGS. WE DO
                  KNOW THATTHE DEFENDANT HAD NOTHING COME UP ON PROBATE SRCH
                  IN BC MOVING FWD, LET'S GET INTO CPC AND PUSH FILE FWD,
                  WITH EXCEPTION OF TRIAL DATE. P/C AND CLMT HAVE CAUSED
                  SIGNFIICANT DELAYS AND WE'RE NOT GOING TO BE FORCED INTO AN
                  EARLY TRIAL NOWBEFORE BEING ABLE TO CONDUCT OUR PROPER
                  INVESTIGATION FORCE PRODUCTION OF ALL BUS. RECORDS, ETC. -
                  WE WILL NOT AGREE TO CONFIDENTIALITY AGREEMENT
                  RE: DTI - D/C TO CONTACT JOCELYN POINT AND PETER WONG, RE;
                  TOP EXPERT ON DTI'S AND MEG'S.

ICBC_003271

```
DATE: 2021-01-04                                                  PAGE : 30
TIME: 10.55.50         INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4


                                                                       TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                   EXP
-------   --------------------------------------------------------------------
30JUN11 NOTE     WE WANT A VOIRE DIRE ON THE DTI/MEG WELL IN ADVANCE OF ANY   A
                 TRIAL, PARTICULARLY IN CASE WE WANT AN APPEAL
                 MARK RAISED ISSUE OF 'SECURITY FOR COSTS'
                 WE'RE GOING TO BE SPENDING A LOT OF MONEY DEFENDING NOW
                 WE HAVE FORMAL IN PLACE AND WANT SECURITY FOR COSTS BECAUSE
                 WITH CLMT DIFFICULT TO TRACK DOWN, HE COULD SCOOP OUR
                 FORMALOFFER AND WE WOULD BE HARD PRESSED TO PURSUE OUR
                 COSTS POST FORMAL
                 MAY REQUIRE APPLICATIONS OUTSIDE A CPC, AS MIGHT ANY OTHER
                 THAT REQUIRE AFFIDAVIT EVIDENCE, ETC.
-----------------------------------------------------------------------NOTE
7JUL11  NOTE     JASON MCDANIEL OF CORPORATE LAW CONFIRMED THAT IT WOULD BE    A
                 APPROPRIATE FOR ME TO SEARCH THE ICBC SYSTEM TO TRY TO
                 LOCATE THE DEFENDANT'S NEXT OF KIN.

                 NO LUCK THERE - IT LOOKS LIKE HE LIVED ALONE
-----------------------------------------------------------------------MSGS
7JUL11  EMAIL
```

ICBC_003272

DATE: 2021-01-04
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

PAGE : 31

CLAIM : L373571-4

| DATE | WORKTYPE DESCRIPTION/DETAIL | TYP EXP |
|------|----------------------------|---------|
| 7JUL11 | EMAIL | |
| 11JUL11 | EMAIL | |

ICBC_003273

DATE: 2021-01-04                                                    PAGE : 32
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                    TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                  EXP
------- ----------------------------------------------------------- ----
11JUL11 EMAIL
```

```
11JUL11 EMAIL
```

DATE: 2021-01-04
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|
| 11JUL11 | EMAIL | | A |

ICBC_003275

CLAIM : L373571-4

```
                                                                   TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                 EXP
------- --------------------------------------------------------------
11JUL11 EMAIL
```



```
--------------------------------------------------------------------CMPL
14JUL11 INCURRED CL288-P  FILE# 10151 INVOICE# 10412        LE:3 KOL:21 B
--------------------------------------------------------------------CMPL
14JUL11 INCURRED CL288-P  FILE# 10151 INVOICE# 10412        LE:5 KOL:21 B
--------------------------------------------------------------------CMPL
14JUL11 INCURRED CL288-P  FILE# 10151 INVOICE# 10412        LE:9 KOL:21 B
--------------------------------------------------------------------CMPL
18JUL11 INCURRED CL288    FILE# 10151 INVOICE# 10412   $5292.50  LE:3 KOL:21 B
                REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                INVOICE DATED: JULY 8/2011
                ACTIVITY PERIOD: JUNE 13/2011-JULY 1/2011
--------------------------------------------------------------------CMPL
18JUL11 INCURRED CL288    FILE# 10151 INVOICE# 10412   $81.65  LE:5 KOL:21 B
                REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                INVOICE DATED: JULY 8/2011
                ACTIVITY PERIOD: JUNE 13/2011-JULY 1/2011
--------------------------------------------------------------------CMPL
18JUL11 INCURRED CL288    FILE# 10151 INVOICE# 10412   $644.90  LE:9 KOL:21 B
                REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
```

ICBC_003276

```
DATE: 2021-01-04                                              PAGE : 35
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                 TYP
                                                                 EXP
DATE     WORKTYPE DESCRIPTION/DETAIL
-------  -------------------------------------------------------------
18JUL11  INCURRED       INVOICE DATED: JULY 8/2011                 B
                        ACTIVITY PERIOD: JUNE 13/2011-JULY 1/2011
-------------------------------------------------------------------CMPL
13SEP11  INCURRED CL288-P  INVOICE# 10876 FILE# 10151    LE:3 KOL:21 B
-------------------------------------------------------------------CMPL
13SEP11  INCURRED CL288-P  INVOICE# 10876 FILE# 10151    LE:5 KOL:21 B
-------------------------------------------------------------------CMPL
13SEP11  INCURRED CL288-P  INVOICE# 10876 FILE# 10151    LE:9 KOL:21 B
-------------------------------------------------------------------CMPL
16SEP11  INCURRED CL288    INVOICE# 10876 FILE# 10151  $2079.00 LE:3 KOL:21 B
                        REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                        INVOICE DATED: SEPTEMBER 1/2011
                        ACTIVITY PERIOD: JULY 12/2011-AUGUST 31/2011
-------------------------------------------------------------------CMPL
16SEP11  INCURRED CL288    INVOICE# 10876 FILE# 10151   $47.00 LE:5 KOL:21 B
                        REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                        INVOICE DATED: SEPTEMBER 1/2011
                        ACTIVITY PERIOD: JULY 12/2011-AUGUST 31/2011
-------------------------------------------------------------------CMPL
16SEP11  INCURRED CL288    INVOICE# 10876 FILE# 10151  $255.12 LE:9 KOL:21 B
                        REASON: RE: HALL V. DOVE. MVA DATE: NOVEMBER 10/2003
                        INVOICE DATED: SEPTEMBER 1/2011
                        ACTIVITY PERIOD: JULY 12/2011-AUGUST 31/2011
-------------------------------------------------------------------CMPL
14OCT11  INCURRED CL288-P  YF AP#11-2553                 LE:9 KOL:21 B
-------------------------------------------------------------------CMPL
17OCT11  INCURRED CL288    YF AP#11-2553         $2440.48 LE:9 KOL:21 B
                        REASON: DONALD ANTHONY DOVE
                        INTERVIEWS
                        08JUL11-26SEP11
-------------------------------------------------------------------NOTE
17OCT11  NOTE      "   WE HAVE BEEN ABLE TO CONFIRM THAT THE EXECUTOR OF THE  A
                   ESTATE OF THE DECEASED DEFENDANT WAS KATHERINE LOUELLA
                   MOFFATT, OF SANTA CLARITA CALIFORNIA
-------------------------------------------------------------------CMPL
7NOV11   INCURRED CL288-P  YF 10152 INV 11480            LE:3 KOL:21 B
-------------------------------------------------------------------CMPL
14NOV11  INCURRED CL288    YF 10152 INV 11480     $199.50 LE:3 KOL:21 B
                        REASON: HALL V ICBC
                        INVOICE: 10/14/2011
                        PERIOD: 03/31/2011-10/07/2011
-------------------------------------------------------------------CMPL
14NOV11  INCURRED CL288    YF 10152 INV 11480      $23.94 LE:9 KOL:21 B
                        REASON: HALL V ICBC
                        INVOICE: 10/14/2011
                        PERIOD: 03/31/2011-10/07/2011
-------------------------------------------------------------------CMPL
21NOV11  INCURRED CL288-P  YF 10151 INV 11708            LE:3 KOL:21 B
-------------------------------------------------------------------CMPL
23NOV11  INCURRED CL288    YF 10151 INV 11708     $750.50 LE:3 KOL:21 B
                        REASON: HALL V DOVE
                        INVOICE: 11/08/2011
```

```
DATE: 2021-01-04                                                PAGE : 36
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  |  | TYP |
|--|--|--|--|-----|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  | EXP |

```
23NOV11 INCURRED          PERIOD: 09/01/2011-11/06/2011              B
-----------------------------------------------------------------CMPL
23NOV11 INCURRED CL288    YF 10151 INV 11708    $260.15  LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 11/08/2011
                         PERIOD: 09/01/2011-11/06/2011
-----------------------------------------------------------------CMPL
23NOV11 INCURRED CL288    YF 10151 INV 11708    $121.28  LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 11/08/2011
                         PERIOD: 09/01/2011-11/06/2011
-----------------------------------------------------------------NOTE
6DEC11  NOTE    ████████████████████████████████████████████        A
-----------------------------------------------------------------NOTE
21DEC11 NOTE    ██████████████████████████████████████████S...       A
                ████████████████████████████████████████████
-----------------------------------------------------------------MSGS
9FEB12  EMAIL   ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                ████████████████████████████████████████████
----------------                                                    A
16FEB12 NOTE     CPC SET FOR MARCH 16/12
-----------------------------------------------------------------CMPL
13MAR12 INCURRED CL288-P  YF 10151 INV 13017      LE:5 KOL:21 B
-----------------------------------------------------------------CMPL
13MAR12 INCURRED CL288-P  YF 10151 INV 13018      LE:5 KOL:21 B
-----------------------------------------------------------------NOTE
15MAR12 NOTE    ████████████████████████████████████████████        A
                ████████████████████████████████████████████
                ████████████████████████████████████████████
                   PROPOSES
-----------------------------------------------------------------CMPL
19MAR12 INCURRED CL288    YF 10151 INV 13018     $80.00  LE:5 KOL:21 B
```

ICBC_003278

```
DATE: 2021-01-04                                                        PAGE : 37
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                          TYP
                                                                          EXP
DATE       WORKTYPE DESCRIPTION/DETAIL
-------   ---------------------------------------------------------------------
                                                                           B
19MAR12 INCURRED REASON: HALL V DOVE
                         INVOICE: 03/09/2012
                         PERIOD: 02/10/2012-03/06/2012
---------------------------------------------------------------------------CMPL

19MAR12 INCURRED CL288    YF 10151 INV 13017         $1062.00  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/09/2012
                         PERIOD: 11/08/2011-03/06/2012
---------------------------------------------------------------------------CMPL

19MAR12 INCURRED CL288    YF 10151 INV 13017          $33.50   LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/09/2012
                         PERIOD: 11/08/2011-03/06/2012
---------------------------------------------------------------------------CMPL

19MAR12 INCURRED CL288    YF 10151 INV 13017         $131.46   LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/09/2012
                         PERIOD: 11/08/2011-03/06/2012
---------------------------------------------------------------------------NOTE
                                                                           A
20MAR12 NOTE      CPC SURVEY COMPLETED
                  PC MUST PROVIDE DRAFT NON-DISCLOSURE AGREEMENT BY MAY 7 AND
                  PRODUCE UPDATED MEDICAL DOCS.
---------------------------------------------------------------------------CMPL

3APR12  INCURRED CL288-P  YF 10151 INV 13200             LE:3 KOL:21 B
---------------------------------------------------------------------------CMPL

10APR12 INCURRED CL288    YF 10151 INV 13200         $1699.00  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/23/2012
                         PERIOD: 03/07/2012-03/18/2012
---------------------------------------------------------------------------CMPL

10APR12 INCURRED CL288    YF 10151 INV 13200          $11.10   LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/23/2012
                         PERIOD: 03/07/2012-03/18/2012
---------------------------------------------------------------------------CMPL

10APR12 INCURRED CL288    YF 10151 INV 13200         $205.21   LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 03/23/2012
                         PERIOD: 03/07/2012-03/18/2012
---------------------------------------------------------------------------CMPL
                                                                           A
18APR12 REVIEW    MANAGER REVIEW - OLSTROM - HALL - GOLFER/DTI
                  SEE NOTE OF APR 18/12
---------------------------------------------------------------------------NOTE
                                                                           A
23APR12 NOTE
```

```
DATE: 2021-01-04                                               PAGE : 38
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                 TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                             EXP
-------  -------- ----------------------------------------------------
23APR12 NOTE      3. RECENT CPC BASICALLY ONLY DEALT WITH ISSUE OF    A
                  CONFIDENTIALITY.  CAN'T DO MUCH ELSE TILL THAT IS IRONED
                  OUT.  PC TO PROVIDE A PROPOSAL BY MAY 7.

                  ████████████████████████████████████████████

                  4.  BUDGET HAS NOT BEEN PRODUCED AS WE STILL DON'T KNOW
                  WHAT WILL BE INVOLVED.  WILL HAVE A BETTER IDEA AFTER MAY 7
                  DEADLINE
                  PRIOR OFFER WAS $150,000 NEW MONEY.  MAY BE WORTHWHILE TO
                  RECONSIDER OUR FORMAL OFFER AFTER WE GET THE MAY 7
                  PROPOSAL
-------------------------------------------------------------------NOTE
14MAY12 NOTE      PC PROPOSED DOCUMENT AGREEMENT IS TOTALLY UNREASONABLE   A
                  INSTRUCTIONS TO DC TO MOVE AHEAD UNDER RULE 7-1
-------------------------------------------------------------------NOTE
24MAY12 NOTE      ███████████████████████████████████████████████      A
                  ███████████████████████████████████████████████
                  ███████████████████████████████████████████████
-------------------------------------------------------------------CMPL
25MAY12 INCURRED CL288-P  YF 10151 INV 13700          LE:9 KOL:21 B
-------------------------------------------------------------------CMPL
28MAY12 INCURRED CL288    YF 10151 INV 13700   $1053.00  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 05/17/2012
                         PERIOD: 03/19/2012-05/15/2012
-------------------------------------------------------------------CMPL
28MAY12 INCURRED CL288    YF 10151 INV 13700    $3.45  LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 05/17/2012
                         PERIOD: 03/19/2012-05/15/2012
-------------------------------------------------------------------CMPL
28MAY12 INCURRED CL288    YF 10151 INV 13700  $126.77  LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 05/17/2012
                         PERIOD: 03/19/2012-05/15/2012
-------------------------------------------------------------------NOTE
30MAY12 NOTE      PC IS ALLEGING THAT ICBC AND ITS AGENTS HAVE CONTINUED TO   A
                  ENGAGE IN DIRTY TRICKS - SOME OF WHICH INVOLVES ILLEGAL ACTS

                  DC TO F/U AND FIND OUT JUST WHAT THEY THINK WE HAVE DONE.
                  AS FAR AS I KNOW EVERYTHING WE HAVE DONE IS ABOVE BOARD.  WE
                  HAVE DONE NEIGHBOURHOOD CANVAS ON THE ISLAND HE HAD LIVED
                  ON, WE INTERVIEWED COLLATERAL WITNESSES AROUND THE GOLF
                  STATUS, WE EXPELLED SIGNIFICANT EFFORT TRYING TO LOCATE THE
                  PLAINTIFF IN IRELAND AND THE CARIBEAN.  SIU WAS ALSO INVOLV
                  ED IN THAT ASPECT.

                  DC TO MEET WITH PC TO FIND OUT WHAT THE ALLEGATIONS ENTAIL.
-------------------------------------------------------------------CMPL
12JUN12 INCURRED CL288-P  YF 10151 INV 13832          LE:3 KOL:21 B
```

```
DATE: 2021-01-04                                               PAGE : 39
TIME: 10.55.50       INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                               TYP
                                                               EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
------- ------------------------------------------------------------
--------------------------------------------------------------CMPL
15JUN12 INCURRED CL288    YF 10151 INV 13832       $1095.00  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 06/01/2012
                         PERIOD: 05/17/2012-05/30/2012
--------------------------------------------------------------CMPL
15JUN12 INCURRED CL288    YF 10151 INV 13832         $1.65  LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 06/01/2012
                         PERIOD: 05/17/2012-05/30/2012
--------------------------------------------------------------CMPL
15JUN12 INCURRED CL288    YF 10151 INV 13832       $131.60  LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 06/01/2012
                         PERIOD: 05/17/2012-05/30/2012
--------------------------------------------------------------NOTE
21JUN12 NOTE     SEE EMAIL TO JASON MCDANIEL RE: PRIVACY BREACH ALLEGATIONS  A
--------------------------------------------------------------CMPL
6JUL12  INCURRED CL288-P  YF 10151 INV 14129                LE:3 KOL:21 B
--------------------------------------------------------------CMPL
6JUL12  INCURRED CL288-P  YF 10151 INV 14129                LE:5 KOL:21 B
--------------------------------------------------------------CMPL
6JUL12  INCURRED CL288-P  YF 10151 INV 14129                LE:9 KOL:21 B
--------------------------------------------------------------CMPL
9JUL12  INCURRED CL288    YF 10151 INV 14129       $1000.00  LE:3 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 07/04/2012
                         PERIOD: 06/01/2012-06/30/2012
--------------------------------------------------------------CMPL
9JUL12  INCURRED CL288    YF 10151 INV 14129         $2.25  LE:5 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 07/04/2012
                         PERIOD: 06/01/2012-06/30/2012
--------------------------------------------------------------CMPL
9JUL12  INCURRED CL288    YF 10151 INV 14129       $120.27  LE:9 KOL:21 B
                 REASON: HALL V DOVE
                         INVOICE: 07/04/2012
                         PERIOD: 06/01/2012-06/30/2012
--------------------------------------------------------------CMPL
9AUG12  INCURRED CL288-P  INV 14469  YF 10151               LE:3 KOL:21 B
--------------------------------------------------------------CMPL
9AUG12  INCURRED CL288-P  INV 14469  YF 10151               LE:9 KOL:21 B
--------------------------------------------------------------CMPL
9AUG12  INCURRED CL288    INV 14469  YF 10151      $1237.00  LE:3 KOL:21 B
                 REASON: INV 14469  YF 10151/ JULY 31/12
                         RE: HALL V. DOVE
                         COVERING PERIOD JULY 4 - JULY 29/12
--------------------------------------------------------------CMPL
9AUG12  INCURRED CL288    INV 14469  YF 10151         $3.75  LE:5 KOL:21 B
                 REASON: INV 14469  YF 10151/ JULY 31/12
                         RE: HALL V. DOVE
                         COVERING PERIOD JULY 4 - JULY 29/12
```

ICBC_003281

```
DATE: 2021-01-04                                                    PAGE : 40
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                      TYP
                                                                      EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
------  ------------------------------------------------------------------
                                                                    --CMPL
9AUG12  INCURRED CL288    INV 14469  YF 10151        $148.89  LE:9 KOL:21 B
                 REASON: INV 14469  YF 10151/ JULY 31/12
                         RE: HALL V. DOVE
                         COVERING PERIOD JULY 4 - JULY 29/12
                                                                    --NOTE
                                                                      A
30AUG12 NOTE
```



```
                                                                    --CMPL
20CT12  INCURRED CL288    INV 14862 YF 10151        $1675.00  LE:3 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 31JUL2012 TO 28SEP2012
                         INV DATE: 28SEP2012
                                                                    --CMPL
20CT12  INCURRED CL288    INV 14862 YF 10151         $320.38  LE:5 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 31JUL2012 TO 28SEP2012
                         INV DATE: 28SEP2012
                                                                    --CMPL
20CT12  INCURRED CL288    INV 14862 YF 10151         $229.86  LE:9 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 31JUL2012 TO 28SEP2012
                         INV DATE: 28SEP2012
                                                                    --NOTE
                                                                      A
22NOV12 NOTE     CPC OCT 25/12
                 AGREEMENT REACHED WITH PC PRIOR TO TMC
                 - TRIAL DATE TO BE SET WITH 30 DAYS
                 - HEARING ON MAY 2 - 3 2013 TO HEAR PC ARGUMENTS WITH
                 RESPECT TO CONFIDENTIALITY OF RECORDS AND ALLEGATIONS OF
                 ICBC MISCONDUCT
                 - ALL AFFIDAVIDT AND RESPONSE MATERIAL TO BE PROVIDED TO US
                 BY FEB 1/2013

                 WE WANTED AN ORDER FOR THIS TO PUT THE DEADLINES IN STONE.
                 THE JUDGE GRANTED THE ORDER
                                                                    --CMPL
26NOV12 INCURRED CL288    INV 15255 YF 10151        $1325.00  LE:3 KOL:21 B
                 REASON: RE HALL V DOVE
                         FROM 09/27/2012 TO 10/31/2012
                         INV DATE 11/06/2012
                                                                    --CMPL
26NOV12 INCURRED CL288    INV 15255 YF 10151         $122.60  LE:5 KOL:21 B
                 REASON: RE HALL V DOVE
```

ICBC_003282

```
DATE: 2021-01-04                                                    PAGE : 41
TIME: 10.55.50         INSURANCE CORPORATION OF BRITISH COLUMBIA
                            CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                        TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------   -------------------------------------------------------------------
26NOV12 INCURRED           FROM 09/27/2012 TO 10/31/2012                  B
                           INV DATE 11/06/2012
------------------------------------------------------------------------CMPL
26NOV12 INCURRED CL288    INV 15255 YF 10151          $173.71  LE:9 KOL:21 B
                 REASON: RE HALL V DOVE
                         FROM 09/27/2012 TO 10/31/2012
                         INV DATE 11/06/2012
------------------------------------------------------------------------MSGS
17DEC12 EMAIL    MF L373571 4                                             A
                 -----ORIGINAL MESSAGE-----
                 FROM: OLSTROM, LAURIE
                 SENT: FRIDAY, DECEMBER 14, 2012 9:26 AM
                 TO: KURPIELA, ERICA
                 SUBJECT: RE: CBRU NOTE - PAYMENT ALLOCATION RE:
                 L373571 4    21B
                 LAURIE OLSTROM, CLAIMS EXAMINER
                 DIRECT: 604-647-6076 | FACSIMILE: 604-647-6105
                 -----ORIGINAL MESSAGE-----
                 FROM: KURPIELA, ERICA
                 SENT: DECEMBER-14-12 9:17 AM
                 TO: OLSTROM, LAURIE
                 SUBJECT: CBRU NOTE - PAYMENT ALLOCATION RE:
                 HELLO LAURIE,
                 CBRU HAS BEEN UNABLE TO IDENTIFY THE CORRECT KOL TO MAKE THE
                 PAYMENT REGARDING THE INVOICE ATTACHED.
                 PLEASE PROVIDE THE CLAIM NUMBER(S), KOL(S) & EXPOSURE(S)
                 WHERE THE PAYMENT SHOULD BE ALLOCATED.
                 YOUR ATTENTION TO THIS MATTER IS GREATLY APPRECIATED.
                 THANK YOU
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 . . . . . . . . . . . . . . . .
                 ERICA KURPIELA
                 OFFICE ASSISTANT III
                 CENTRALIZED BILL REVIEW UNIT
                 ICBC BUILDING TRUST. DRIVING CONFIDENCE.
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . .
                 . . . . . . . . . . . . . 2ND FLOOR | 456 WEST 5TH
                 AVENUE VANCOUVER | BRITISH COLUMBIA | V5Y 3Z3
                 DIRECT: (604) 871-2528 | FACSIMILE: (604) 871-2301
------------------------------------------------------------------------NOTE
12FEB13 NOTE     REVIEWED PC AFFIDAVITS WITH RESPECT TO UPCOMING DOCUMENT  A
                 PRODUCTION HEARING.
                 THE DOCUMENTS INCLUDE POLICE REPORTS WITH RESPECT TO A
                 BREAK IN AND COMPUTER EXPERT REPORTS WITH RESPECT TO ALLEGED
                 COMPUTER TAMPERING.  PC IS ALLEGING THAT ICBC IS BEHIND
                 THESE
                 IT IS PRETTY FAR FETCHED!
------------------------------------------------------------------------NOTE
18FEB13 NOTE     JASON MCDANIEL WILL TALK TO DC.  JASON DOES NOT SEE WHY WE A
                 WOULD NEED CORPORATE COUNSEL AT THIS TIME - THEY WOULD NOT
                 HAVE STANDING
------------------------------------------------------------------------CMPL
```

ICBC_003283

```
DATE: 2021-01-04                                                    PAGE : 42
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                        TYP
                                                                        EXP
DATE     WORKTYPE DESCRIPTION/DETAIL
-------  -------- -----------------------------------------------------------
18FEB13 ADMIN     LAURIE:  MAKE A COPY OF THE RECENT PLAINTIFF AFFIDAVITS FOR  A
                  JASON MCDANIEL  (PLEASE SCAN IT AND EMAIL IT TO ME
                  THEN I WILL EMAIL IT TO HIM WITH SOME COMMENTS)
                  HE DOESN'T NEED ALL THE ATTACHMENTS, JUST THE AFFIDAVITS
                  THEMSELVES
                  TASKS COMPLETE. SCANNED AND EMAILED TO EXAMINER.
-----------------------------------------------------------------------CMPL
21FEB13 INCURRED CL288     I 15610 F 10152          $456.00  LE:3 KOL:21 B
                  REASON: RE: HALL V. ICBC
                          FROM 14OCT2011 TO 27NOV2012
                          INV DATE: 11DEC2012
-----------------------------------------------------------------------CMPL
21FEB13 INCURRED CL288     I 15610 F 10152          $54.72  LE:9 KOL:21 B
                  REASON: RE: HALL V. ICBC
                          FROM 14OCT2011 TO 27NOV2012
                          INV DATE: 11DEC2012
-----------------------------------------------------------------------NOTE
7MAR13  NOTE      VERY QUICK MEETING WITH JIM TSUI TO DISCUSS THIS FILE    A
                  HE POPPED OUT OF A MGT MEETING AND GOT CALLED BACK INTO IT A
                  FEW MINUTES LATER...
                  HIS PLAN IS THAT WE ABANDON THE APPLICATION FOR PRODUCTION
                  OF DOCUMENTS.  THE PROBLEM WITH THAT, IS THAT THE APPLICATIO
                  N IS PART OF THE CPC PROCESS SO THERE ARE OTHER IMPLICATIONS
                  IF WE ABANDON IT.

                  JIM'S REASONING IS THAT IF THEY WANT TO MAKE A LOST EARNINGS
                  CLAIM, THEY WILL NEED TO PROVE THEIR LOSS.  IF WE END UP AT
                  TRIAL WITH NO RECORDS THEY WILL GET ZERO.
                  THE OLD PLAN WAS TO PUSH TO GET AN ORDER THAT THERE WAS NO
                  CLAIM FOR LOST EARNINGS.   THE NEW PLAN IS TO JUST LET IT
                  RIDE AND SEE IF HE EVER PRODUCES ANYTHING...
                                                                        NOTE
7MAR13  NOTE




                                                                        CMPL
11MAR13 INCURRED CL288     I 16406 F 10151          $2620.00  LE:3 KOL:21 B
                  REASON: RE: HALL V. DOVE
                          FROM 14JUN2012 TO 28FEB2013
                          INV DATE: 08MAR2013
-----------------------------------------------------------------------CMPL
11MAR13 INCURRED CL288     I 16406 F 10151          $57.75  LE:5 KOL:21 B
                  REASON: RE: HALL V. DOVE
                          FROM 14JUN2012 TO 28FEB2013
                          INV DATE: 08MAR2013
-----------------------------------------------------------------------CMPL
```

```
DATE: 2021-01-04                                                PAGE : 43
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                    TYP
                                                                    EXP
DATE     WORKTYPE DESCRIPTION/DETAIL
------   -------- --------------------------------------------------------
11MAR13 INCURRED CL288   I 16406 F 10151        $321.33  LE:9 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 14JUN2012 TO 28FEB2013
                         INV DATE: 08MAR2013
-------------------------------------------------------------------CMPL
11MAR13 ADMIN    LAURIE: LETTER TO DC GORD MARSHALL RE ABANDONING THE    A
                 DOCUMENT PRODUCTION APPLICATION
                 TASK COMPLETED.  LETTER FAXED AND ORIGINAL SENT VIA REG MAIL
-------------------------------------------------------------------CNTE
9APR13  CNTE     MGR REVIEW DAPHNE                                       A
                 40 Y/O PL-CLAIMS HE IS AN ASPIRING PRO GOLFER-ALTHO THE
                 EVIDENCE DOES NOT SUPPORT THIS CLAIM AND HE SAYS HE IS AN
                 ENTREPENEUR BUT WON'T BE CLEAR ABOUT THIS
                 HE CLAIMS AN MTBI FROM THIS MINOR MVA
                 THERE HAVE BEEN PROBLEMS WITH ATTENDANCE AT ME'S AND DOCT
                 DISCLOSURE AND WE HAD PREPARED TO APPLY TO DISMISS THE
                 CLAIM
                 THE BEST PLAN WOULD BE TO WORK TOWARD A TRIAL DATE AS THIS
                 MATTER  DRAGGED ON FOR QUITE SOME TIME
-------------------------------------------------------------------NOTE
11APR13 NOTE     CHEQUE FROM CANADIAN DIRECT INSURANCE FOR $386.77       A
                 REGARDING PRO-RATED DEFENCE EXPENSES ON KOPPA V. LINDER
                 GIVEN TO RECEPTION FOR DEPOSIT.  21C/88
-------------------------------------------------------------------CMPL
17APR13 INCURRED CL288   I 16677 F 10151        $700.00  LE:3 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 02/22/2013 TO 03/31/2013
                         INV DATE 03/31/2013
-------------------------------------------------------------------CMPL
17APR13 INCURRED CL288   I 16677 F 10151        $40.00  LE:5 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 02/22/2013 TO 03/31/2013
                         INV DATE 03/31/2013
-------------------------------------------------------------------CMPL
17APR13 INCURRED CL288   I 16677 F 10151        $88.80  LE:9 KOL:21 B
                 REASON: RE: HALL V. DOVE
                         FROM 02/22/2013 TO 03/31/2013
                         INV DATE 03/31/2013
-------------------------------------------------------------------CMPL
6MAY13  INCURRED CL288   I 17064 F 10151        $1948.47  LE:3 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 03/31/13 TO 04/19/13
                         INV DATE 04/29/13
-------------------------------------------------------------------CMPL
6MAY13  INCURRED CL288   I 17064 F 10151        $105.95  LE:5 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 03/31/13 TO 04/19/13
                         INV DATE 04/29/13
-------------------------------------------------------------------CMPL
6MAY13  INCURRED CL288   I 17064 F 10151        $92.35  LE:9 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 03/31/13 TO 04/19/13
```

```
DATE: 2021-01-04                                                    PAGE : 44
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4


                                                                        TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                      EXP
-------  ----------------------------------------------------------------------
6MAY13  INCURRED        INV DATE 04/29/13                                  B
-----------------------------------------------------------------------------CMPL
9JUL13  INCURRED CL288-P  FILE AP 13-2830                      LE:9 KOL:21 B
-----------------------------------------------------------------------------CMPL
9JUL13  INCURRED CL288-P  FILE AP 13-2830                      LE:9 KOL:21 B
-----------------------------------------------------------------------------CMPL
12JUL13 INCURRED CL288    FILE AP 13-2830            $1039.25  LE:9 KOL:21 B
                  REASON: RE: RICHARD HALL - INVESTIGATION REVIEW
                  FINISH DATE:  MARCH 28, 2013
                  PERIOD: JUN 21/12 TO MAR 20/13
-----------------------------------------------------------------------------CMPL
12JUL13 INCURRED CL288    FILE AP 13-2830             $541.85  LE:9 KOL:21 B
                  REASON: RE: RICHARD HALL - INVESTIGATION REVIEW
                  FINISH DATE:  MARCH 28, 2013
                  PERIOD: JUN 21/12 TO MAR 20/13
-----------------------------------------------------------------------------CMPL
12JUL13 INCURRED CL288    FILE AP 13-2830            $1469.92  LE:9 KOL:21 B
                  REASON: RE: RICHARD HALL - LEGAL ASSISTANCE
                  FINISH DATE: MARCH 31, 2013
-----------------------------------------------------------------------------CMPL
9SEP13  INCURRED CL288    I 17962 F 10151             $349.89  LE:3 KOL:21 B
                  REASON: RE: HALL V. DOVE
                  FROM 22APR2013 TO 16AUG2013
                  INV DATE: 05SEP2013
-----------------------------------------------------------------------------CMPL
9SEP13  INCURRED CL288    I 17962 F 10151               $0.95  LE:5 KOL:21 B
                  REASON: RE: HALL V. DOVE
                  FROM 22APR2013 TO 16AUG2013
                  INV DATE: 05SEP2013
-----------------------------------------------------------------------------CMPL
9SEP13  INCURRED CL288    I 17962 F 10151              $16.40  LE:9 KOL:21 B
                  REASON: RE: HALL V. DOVE
                  FROM 22APR2013 TO 16AUG2013
                  INV DATE: 05SEP2013
-----------------------------------------------------------------------------CMPL
7OCT13  INCURRED CL288    I 18224 F 10152             $295.32  LE:3 KOL:21 B
                  REASON: RE: HALL V ICBC
                  FROM 02/27/2013 TO 09/30/2013
                  INV DATE 09/30/2013
-----------------------------------------------------------------------------CMPL
7OCT13  INCURRED CL288    I 18224 F 10152               $0.80  LE:5 KOL:21 B
                  REASON: RE: HALL V ICBC
                  FROM 02/27/2013 TO 09/30/2013
                  INV DATE 09/30/2013
-----------------------------------------------------------------------------CMPL
7OCT13  INCURRED CL288    I 18224 F 10152              $13.85  LE:9 KOL:21 B
                  REASON: RE: HALL V ICBC
                  FROM 02/27/2013 TO 09/30/2013
                  INV DATE 09/30/2013
-----------------------------------------------------------------------------CMPL
6NOV13  INCURRED CL288    I 18803 F 10151             $263.22  LE:3 KOL:21 B
                  REASON: RE: HALL V. DOVE
```

ICBC_003286

```
DATE: 2021-01-04                                              PAGE : 45
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4
```

|  |  |  |  | TYP<br>EXP |
|---|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  |  |

```
------- --------- -----------------------------------------------------------
6NOV13  INCURRED              FROM 05SEP2013 TO 31OCT2013                   B
                             INV DATE: 31OCT2013
---------------------------------------------------------------------CMPL
6NOV13  INCURRED CL288    I 18803 F 10151           $0.10  LE:5 KOL:21 B
                         REASON: RE: HALL V. DOVE
                             FROM 05SEP2013 TO 31OCT2013
                             INV DATE: 31OCT2013
---------------------------------------------------------------------CMPL
6NOV13  INCURRED CL288    I 18803 F 10151          $12.31  LE:9 KOL:21 B
                         REASON: RE: HALL V. DOVE
                             FROM 05SEP2013 TO 31OCT2013
                             INV DATE: 31OCT2013
---------------------------------------------------------------------MSGS
                                                                      A
23APR14 EMAIL     TO: DICESARE, JOHN
                  CC: CC00
                  YF L373571 4
                  SUGDEN, MCFEE & ROOS LLP HAS MADE A REQUEST FOR INFORMATION
                  UNDER THE FREEDOM OF INFORMATION AND PROTECTION OF PRIVACY
                  ACT (FIPPA) ON BEHALF OF THEIR CLIENT RICHARD HALL.
                  THE PRIVACY AND FREEDOM OF INFORMATION DEPARTMENT HAS A
                  LEGAL OBLIGATION UNDER FIPPA TO PROVIDE THE APPROPRIATE FILE
                  INFORMATION TO THE INFORMATION REQUESTER WITHIN 30 WORKING
                  DAYS OF OUR RECEIPT OF THEIR REQUEST.  FOR FURTHER
                  INFORMATION ON THIS TOPIC, PLEASE REFER TO
                  HTTP://THEHUB/WORKTOOLS/PAGES/RESPONDING-TO-REQUESTS-FOR-REC
                  ORDS.ASPX
                  TO ASSIST IN MEETING THIS TIMELINE, PLEASE SEND THE ABOVE
                  NOTED FILE(S) AND FORWARD WITHIN 5 BUSINESS DAYS, WITH A
                  COPY OF THIS EMAIL, TO:
                                        PRIVACY AND FREEDOM OF INFORMATION
                                        L299217
                  PLEASE DO NOT ALTER, AMEND OR ADD TO THE REQUESTED FILE(S)
                  IN ANY WAY. SEND THE FILES AS THEY EXIST AT THE TIME OF THI
                  SREQUEST.
                  FILES WILL BE SCANNED IN THE ORDER RECEIVED AND THEN
                  RETURNED TO YOUR OFFICE.  PRIOR TO THE RELEASE OF THE
                  INFORMATION TO THE REQUESTER, YOU WILL RECEIVE A CD
                  CONTAINING THE RELEASE RECORDS FOR YOUR REVIEW.
                  THANK YOU.
                  PRIVACY AND FREEDOM OF INFORMATION DEPARTMENT
                  DEBORA FONSECA
                  INFORMATION AND PRIVACY ACCESS CLERK
                  PRIVACY & FREEDOM OF INFORMATION
                  ICBC BUILDING TRUST, DRIVING CONFIDENCE
                  ..
                  #217-151 WEST EXPLANADE
                  NORTH VANCOUVER, BRITISH COLUMBIA V7M 3J3
                  TELEPHONE: 604.982.6243
---------------------------------------------------------------------CMPL
                                                                      A
1MAY14  TRANSFER FILE SHIPMENT RECEIVED
                  6 PT FILE SENT TO FOI L299217 C/O DEBORA FONSECA VIA PUROLAT
                  OR (2-6/6) AND INTEROFFICE BLUE BIN (1/6)
```

ICBC_003287

```
DATE: 2021-01-04                                                    PAGE : 46
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

| DATE | WORKTYPE | DESCRIPTION/DETAIL | TYP EXP |
|------|----------|--------------------|---------|
| 1MAY14 | TRANSFER | 6 PART FILE ARRIVED AT PRIVACY & FOI, WAITING SCANNING | A |

MSGS

| 1MAY14 | EMAIL | TO: +MD TECH SERVICE CENTRE - 1 | A |
|--------|-------|----------------------------------|---|

```
                      CC: KERREY, PAUL
                      MF L373571 4
                         YOUR CLAIM CENTRE:   CC00 - HEAD OFFICE CLAIMS
                             CLAIM NUMBER:    L373571-4
                      DESTINATION PRINTER:    PR  217  F
                      COMMENTS:
```

CMPL

```
1MAY14  INCURRED CL288     I 20084 F 10151              $282.48 LE:3 KOL:21 B
                      REASON: HALL V. DOVE
                              FROM 10/31/13 TO 04/15/14
                              INV DATE 04/15/14
```

CMPL

```
1MAY14  INCURRED CL288     I 20084 F 10151                $0.25 LE:5 KOL:21 B
                      REASON: HALL V. DOVE
                              FROM 10/31/13 TO 04/15/14
                              INV DATE 04/15/14
```

CMPL

```
1MAY14  INCURRED CL288     I 20084 F 10151               $13.21 LE:9 KOL:21 B
                      REASON: HALL V. DOVE
                              FROM 10/31/13 TO 04/15/14
                              INV DATE 04/15/14
```

CMPL

```
12MAY14 TRANSFER FILE SHIPMENT RECEIVED                                  A
                      6 PART FILE SCANNED & RETURNED TO L174300 HEAD OFFICE CLAIMS
                      , BY PRIVACY & FOI
                      6 PT FILE RECD L174300 AND FWDED TO JOHN DICESARE
```

CMPL

```
13JUN14 ADMIN        JOHN D - EMAILED PAT, RE: TYPE LETTER TO D/C, ENCLOSING   A
                     FOI MATERIALS
                     COMPLETED
```

CMPL

```
26JUN14 ADMIN        FOI CD SHIPMENT TASK                                A
                     FOI HAS MADE A "CD COPY OF THIS CLAIM". CD SENT TO ADJUSTER
                     AT L174300
                     PLEASE MARK TASK WITH AN X WHEN CD IS RECEIVED
                     F228307
                     CD RECD L174300 HOC AND FWDED TO JOHN DICESARE
```

NOTE

```
12AUG14 NOTE         MR. HALL HAS CHANGED COUNSEL AGAIN                  A
```

CMPL

```
12AUG14 INCURRED CL288     I 20802 F 10151              $2642.88 LE:3 KOL:21 B
```

```
DATE: 2021-01-04                                              PAGE : 47
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4

                                                                    TYP
                                                                    EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
-------  -----------------------------------------------------------------
                                                                     B
12AUG14 INCURRED REASON: HALL V. DOVE
                         FROM 04/15/14 TO 07/31/14
                         INV DATE 08/08/14
-----------------------------------------------------------------------CMPL
12AUG14 INCURRED CL288   I 20802 F 10151        $54.45  LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                         FROM 04/15/14 TO 07/31/14
                         INV DATE 08/08/14
-----------------------------------------------------------------------CMPL
12AUG14 INCURRED CL288   I 20802 F 10151        $126.25  LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                         FROM 04/15/14 TO 07/31/14
                         INV DATE 08/08/14
-----------------------------------------------------------------------NOTE
                                                                       A
13AUG14 NOTE     EXAMINER NOTE (JDICESARE), RE: KEN CARTER
                 SEE EMAILS ON FILE B/W D/C JAS GREWAL (HE'S ASSISTING MHW)
                 AND KEN CARTER'S COUNSEL, AND KEN HIMSELF
                 CLMT MAKING ALLEGATIONS AGAINST KEN, RE: IMPROPRIETY AND
                 HE HAS RETAINED COUNSEL TO ADVISE HIM
                 HOWEVER, WE'RE ALSO BEING ACUSED ON IMPROPRIETY IN OUR
                 INVETIGATIONS AND ARE HAVING TO REFUTE THAT
                 I EMAILED JAS AND ASKED THAT HE CALL ME WHEN HE'S IN
                 HE CALLED TODAY
                 EXPLAINED THAT UNLESS WE FIND SOMETHING OF CONCERN, WE HAVE
                 TO REMEMBER THAT KEN WAS OUR I/A AND WE DON'T WANT THIM
                 THINKING THAT ITS US AGAINST HIM
                 IT SEEMS IT IS BECOMING ANTAGONISTIC, THE DEALINGS B/W KEN
                 (AND HIS COUNSEL) AND US AND IT NEED NOT BE
                 I ASKED JAS TO CALL AND SPEAK WITH KEN'S COUNSEL - AS
                 OPPOSED TO EXCHANGING EMAILS, TO MAKE SURE THEY UNDERSTAND
                 WHY IT IS WE NEED WHAT WE ARE ASKING FOR BY WAY OF
                 DOCUMENT/FIL PRODUCTION AND TO TRY AND ESTABLISH THAT WE
                 SHOULD BE WORKING COOPEATIVELY (UNLESS THERE IS SOMETHING
                 THAT HE IS NOT WANTING US TO SEE)
                 .
                 HE'LL CALL KEN'S COUNSEL TODAY
-----------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288   I 20999 F 10152        $1044.30  LE:3 KOL:21 B
                 REASON: RE HALL V. ICBC
                         FROM 09/30/13 TO 08/21/14
                         INV DATE 08/21/14
-----------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288   I 20999 F 10152        $75.90  LE:5 KOL:21 B
                 REASON: RE HALL V. ICBC
                         FROM 09/30/13 TO 08/21/14
                         INV DATE 08/21/14
-----------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288   I 20999 F 10152        $52.62  LE:9 KOL:21 B
                 REASON: RE HALL V. ICBC
                         FROM 09/30/13 TO 08/21/14
                         INV DATE 08/21/14
-----------------------------------------------------------------------CMPL
```

```
DATE: 2021-01-04                                                PAGE : 48
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                  TYP
                                                                  EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
-------  -------- --------------------------------------------------  -----
                                                                   A
8OCT14  ADMIN    02306: SEND FOI CD TO DC
                 ** SEE CROSS-FILE; FOI REQUEST, CD RECD OCT 2/14
-----------------------------------------------------------------CMPL
3DEC14  INCURRED CL288   I 21366 F 10152        $1206.42  LE:3 KOL:21 B
                 REASON: HALL V. ICBC
                         08/21/14 TO 10/23/14
                         INV DATE 10/23/14
-----------------------------------------------------------------CMPL
3DEC14  INCURRED CL288   I 21366 F 10152         $244.50  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         08/21/14 TO 10/23/14
                         INV DATE 10/23/14
-----------------------------------------------------------------CMPL
3DEC14  INCURRED CL288   I 21366 F 10152          $64.61  LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         08/21/14 TO 10/23/14
                         INV DATE 10/23/14
-----------------------------------------------------------------CMPL
                                                                   A
9DEC14  ADMIN    JOHN D - FOI DISC TO DC, PER EMAIL TO SHIRLEY
                 ** EMAILED JASROOP (DC), EXAMINER & BILL HUTCHON - CAN'T
                 FIND THE MOST RECENT FOI CD (WE RECD IN OCT APPARENTLY) -
                 ASKED DC IF HE WOULD STILL LIKE THE ONE FROM JULY OR IF
                 BILL H. CAN SEND THE MOST RECENT TO HIM
                 ** DC HAS FOI CD. HE ADVD HE WILL REVIEW IT.
-----------------------------------------------------------------CMPL
17DEC14 INCURRED CL288   I 21588 F 10151        $1127.78  LE:3 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 08/01/14 TO 11/27/14
                         INV DATE 11/30/14
-----------------------------------------------------------------CMPL
17DEC14 INCURRED CL288   I 21588 F 10151          $28.10  LE:5 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 08/01/14 TO 11/27/14
                         INV DATE 11/30/14
-----------------------------------------------------------------CMPL
17DEC14 INCURRED CL288   I 21588 F 10151          $54.11  LE:9 KOL:21 B
                 REASON: RE HALL V. DOVE
                         FROM 08/01/14 TO 11/27/14
                         INV DATE 11/30/14
-----------------------------------------------------------------NOTE
                                                                   A
19JAN15 NOTE     MANAGER NOTE - THIS ACCIDENT WAS 11 YEARS AGO. THE PLAINTIFF
                 IS ALLEGING ALL SORTS BUSINESS LOSSES AND LOSS OF A PRO
                 GOLF CAREER. THE PLAINTIFF HAS HAD SEVERAL DIFFERENT
                 COUNSEL. MOST RECENTLY ALBERT ROOS RESIGNED FROM THE CASE.
                 THIS IS A MINOR DAMAGE ACCIDENT WITH AN ALLEGATION OF BRAIN
                 INJURY. THE PLAINTIFF HAS ACCUSED ICBC AND OUR INVESTIGATOR
                 OF IMPROPER CONDUCT. WE HAVE NO TRIAL DATES. THIS FILE HAS
                 BEEN DIFFICULT TO MANAGE OVER THE YEARS. I HAVE ASKED JOHN
                 TO EVALUATE THE CASE AS BEST HE CAN AND LETS MAKE A GOOD
                 OFFER AND SEE WHAT HAPPENS. WE COULD ALSO SERVE A NOTICE TO
                 MEDIATE.
-----------------------------------------------------------------CMPL
```

ICBC_003290

```
DATE: 2021-01-04                                               PAGE : 49
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                   TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                               EXP
------- -----------------------------------------------------------------
27FEB15 INCURRED CL288    I 22072 F 10152        $1187.70  LE:3 KOL:21 B
                 REASON: HALL V. ICBC
                         10/23/14 TO 02/13/15
                         INV DATE: 02/13/15
-----------------------------------------------------------------CMPL
27FEB15 INCURRED CL288    I 22072 F 10152        $124.60  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         10/23/14 TO 02/13/15
                         INV DATE: 02/13/15
-----------------------------------------------------------------CMPL
27FEB15 INCURRED CL288    I 22072 F 10152        $57.74  LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         10/23/14 TO 02/13/15
                         INV DATE: 02/13/15
-----------------------------------------------------------------NOTE
17APR15 NOTE     EXAMINER NOTE (JOHN DI CESARE), RE: UPDATE          A
                 I REV'D GRANTS LAST NOTE
                 THIS IS A COMPLICATED FILE
                 CLMT ALLEGING I/A / PI BROKE INTO HIS CABIN AND HIS
                 COMPUTERALLEGING BAD FAITH
                 P/C LOOKING TO INTRODUCE DTI AS EVIDENCE AT TRIAL - AT
                 LEASTALBERT ROOS WAS. WE NOW HAVE NEW COUNSEL FOR THE PLTF
                 AND HE HAS MADE AN FOI REQUEST
                 THIS HAS POTPONED APPLICATION FOR A DISMISSAL OF THE
                 PART 7 CLAIM
```



```
-----------------------------------------------------------------CMPL
13AUG15 INCURRED CL288    I 23249 F 10152        $1295.77  LE:3 KOL:21 B
                 REASON: HALL V. ICBC
                         02/13/15 - 07/31/15
                         INV DATE 07/31/15
-----------------------------------------------------------------CMPL
13AUG15 INCURRED CL288    I 23249 F 10152        $11.85  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         02/13/15 - 07/31/15
                         INV DATE 07/31/15
-----------------------------------------------------------------CMPL
13AUG15 INCURRED CL288    I 23249 F 10152        $61.15  LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         02/13/15 - 07/31/15
                         INV DATE 07/31/15
-----------------------------------------------------------------NOTE
14AUG15 NOTE     MANAGER NOTE - WE RECENTLY WON OUR APPLICATION TO HAVE THE  A
                 PART 7 ACTION AGAINST ICBC DISMISSED AS THE PLAINTIFF IS
                 ENTITLED TO PART 7 FROM ALLSTATE.
-----------------------------------------------------------------CMPL
24AUG15 INCURRED CL288    I 23424 F 10152        $2486.68  LE:3 KOL:21 B
                 REASON: HALL V. ICBC
```

ICBC_003291

```
DATE: 2021-01-04                                              PAGE : 50
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4
```

|  |  |  |  | TYP |
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  | EXP |
| --- | --- | --- | --- | --- |

```
24AUG15 INCURRED           07/31/15 TO 08/15/15                     B
                           INV DATE 08/15/15
--------------------------------------------------------------CMPL
24AUG15 INCURRED CL288   I 23424 F 10152        $36.90  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         07/31/15 TO 08/15/15
                         INV DATE 08/15/15
--------------------------------------------------------------CMPL
24AUG15 INCURRED CL288   I 23424 F 10152        $118.05  LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         07/31/15 TO 08/15/15
                         INV DATE 08/15/15
--------------------------------------------------------------CMPL
26AUG15 INCURRED CL288   I 23420 F 10151        $778.41  LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                         11/30/14 TO 08/15/15
                         INV DATE 08/15/15
--------------------------------------------------------------CMPL
26AUG15 INCURRED CL288   I 23420 F 10151        $115.30  LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                         11/30/14 TO 08/15/15
                         INV DATE 08/15/15
--------------------------------------------------------------CMPL
26AUG15 INCURRED CL288   I 23420 F 10151        $38.15  LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                         11/30/14 TO 08/15/15
                         INV DATE 08/15/15
--------------------------------------------------------------CMPL
15OCT15 INCURRED CL288   I 23727 F 10151        $1126.69  LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                         08/15/15 TO 09/30/15
                         INV DATE 09/30/15
--------------------------------------------------------------CMPL
15OCT15 INCURRED CL288   I 23727 F 10151        $9.15  LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                         08/15/15 TO 09/30/15
                         INV DATE 09/30/15
--------------------------------------------------------------CMPL
15OCT15 INCURRED CL288   I 23727 F 10151        $53.13  LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                         08/15/15 TO 09/30/15
                         INV DATE 09/30/15
--------------------------------------------------------------CMPL
18NOV15 INCURRED CL288   I 23905 F 10152        $1016.50  LE:3 KOL:21 B
                 REASON: HALL V ICBC
                         08/15/2015 - 10/31/2015
                         INV DATE 10/31/2015
--------------------------------------------------------------CMPL
18NOV15 INCURRED CL288   I 23905 F 10152        $116.15  LE:5 KOL:21 B
                 REASON: HALL V ICBC
                         08/15/2015 - 10/31/2015
                         INV DATE 10/31/2015
```

ICBC_003292

```
DATE: 2021-01-04                                                      PAGE : 51
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                       CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4


                                                                       TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                     EXP
------- ----------------------------------------------------------------------
---------------------------------------------------------------------------CMPL
18NOV15 INCURRED CL288    I 23905 F 10152            $49.34  LE:9 KOL:21 B
                 REASON: HALL V ICBC
                         08/15/2015 - 10/31/2015
                         INV DATE 10/31/2015
---------------------------------------------------------------------------CMPL
7DEC15  TRANSFER FILE FILE TRANSFER TO   000/0230-6 DICESARE, JOHN         A
---------------------------------------------------------------------------NOTE
12JAN16 NOTE                                                              A
```



```
-----------------------------------------------------------------------CMPL
4FEB16  INCURRED CL288    I 24473 F 10151            $217.21 LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                         09/30/2015 - 01/12/2016
                         INV DATE 01/12/2016
---------------------------------------------------------------------------CMPL
4FEB16  INCURRED CL288    I 24473 F 10151            $1.15   LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                         09/30/2015 - 01/12/2016
                         INV DATE 01/12/2016
---------------------------------------------------------------------------CMPL
4FEB16  INCURRED CL288    I 24473 F 10151            $10.21  LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                         09/30/2015 - 01/12/2016
                         INV DATE 01/12/2016
---------------------------------------------------------------------------CMPL
23FEB16 INCURRED CL288    I 24635 F 10152            $4471.53 LE:3 KOL:21 B
                 REASON: HALL V. ICBC
                         10/31/2015 - 01/31/2016
                         INV DATE 01/31/2016
---------------------------------------------------------------------------CMPL
23FEB16 INCURRED CL288    I 24635 F 10152            $76.60  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         10/31/2015 - 01/31/2016
                         INV DATE 01/31/2016
---------------------------------------------------------------------------CMPL
23FEB16 INCURRED CL288    I 24635 F 10152            $212.79 LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         10/31/2015 - 01/31/2016
                         INV DATE 01/31/2016
---------------------------------------------------------------------------CMPL
```

ICBC_003293

```
DATE: 2021-01-04                                                  PAGE : 52
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                    TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                  EXP
-------  -------- ------------------------------------------------------
14JUN16 ADMIN    JOHN D - EMAILED SHIRLEY, RE; SEND FOI DISCS TO D/C FOR   A
                 REVIEW
                 ** WILL BE COURIERED. SENT EMAIL TO FOI OFFICER FOR PASSWORD
                 EMAIL DC WHEN PASSWORD RECEIVED.
-----------------------------------------------------------------------CMPL
11JUL16 REVIEW   MANAGER REVIEW                                            A
-----------------------------------------------------------------------NOTE
11JUL16 NOTE     MANAGERN NOTE - THIS FILE JUST WONT GO AWAY. WE DID A RECENT A
                 CYBER INVESTIGATION THAT SHOWS THE PLAINTIFF DOING LOTS OF
                 WORK. WE JUST NEED TO SET THIS FOR TRIAL AND MOVE IT ALONG.
-----------------------------------------------------------------------CMPL
27SEP16 INCURRED CL288    I 26275 F 10152            $369.15  LE:3 KOL:21 B
                 REASON: HALL V. ICBC
                         01/22/16 - 09/16/16
                         INV DATE 09/16/16
-----------------------------------------------------------------------CMPL
27SEP16 INCURRED CL288    I 26275 F 10152            $114.45  LE:5 KOL:21 B
                 REASON: HALL V. ICBC
                         01/22/16 - 09/16/16
                         INV DATE 09/16/16
-----------------------------------------------------------------------CMPL
27SEP16 INCURRED CL288    I 26275 F 10152             $18.97  LE:9 KOL:21 B
                 REASON: HALL V. ICBC
                         01/22/16 - 09/16/16
                         INV DATE 09/16/16
-----------------------------------------------------------------------CMPL
10NOV16 INCURRED CL288    I 26540 F 10151           $1061.44  LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                         01/08/2016 - 10/26/2016
                         INV. DATE: 10/26/2016
-----------------------------------------------------------------------CMPL
10NOV16 INCURRED CL288    I 26540 F 10151             $12.80  LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                         01/08/2016 - 10/26/2016
                         INV. DATE: 10/26/2016
-----------------------------------------------------------------------CMPL
10NOV16 INCURRED CL288    I 26540 F 10151             $50.26  LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                         01/08/2016 - 10/26/2016
                         INV. DATE: 10/26/2016
-----------------------------------------------------------------------NOTE
18NOV16 NOTE                                                              A



-----------------------------------------------------------------------MSGS
5DEC16  EMAIL    MF L373571 4 EXP B CONF N                                B
```

ICBC_003294

```
DATE: 2021-01-04                                              PAGE : 53
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                  TYP
                                                                  EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
------- -------- -----------------------------------------------------
                                                                   B
5DEC16  EMAIL    PRIVATE INVESTIGATOR INFORMATION

                        FIRM NAME:    IPSA INTERNATIONAL
                        FIRM EMAIL:   ASALVA@IPSAINTL.COM
                 PRIVATE INVESTIGATOR
                        FIRST NAME:   CLIFF
                 PRIVATE INVESTIGATOR
                 ADJUSTER LAST NAME:  AMIEL
                 CLAIM INFORMATION

                    HANDLING CLAIM #: L373571-4 HANDLING EXPOSURE B
                       HANDLING KOL:  21 BODILY INJURY
                       DATE OF LOSS:  10-NOV-2003
                 ICBC ADJUSTER FIRST
                              NAME:   JOHN
                 ICBC ADJUSTER LAST
                              NAME:   DICESARE
                        FAX NUMBER:   604-444-7801
                     ICBC LOCATION:   CC00 - HEAD OFFICE CLAIMS
                           ADDRESS:   8470 COMMERCE COURT
                              CITY:   BURNABY
                       POSTAL CODE:   V5A 4T4
                 LOSS LOCATION IN BC? YES
                 CLAIMANT INFORMATION

                    TYPE OF CLAIMANT:  INDIVIDUAL
                 CLAIMANT FIRST NAME:  RICHARD
                 CLAIMANT LAST NAME:   HALL
                 REPRESENTED AT TIME
                     OF ASSIGNMENT:    YES
                 ASSIGNMENT INFORMATION

                 TYPE OF ASSIGNMENT:
                 - SURVEILLANCE
                 JURISDICTION/LOCATION
                     OF ASSIGNMENT:    BC - LOWER MAINLAND
                       INVESTIGATION RATES:
                 - UNRESTRICTED LICENCE: SURVEILLANCE / REPORTING  $70.00
                 /HOUR
                 - UNRESTRICTED LICENCE: BACKGROUND, COLLATERAL, AND OTHER
                 INVESTIGATIVE SERVICES $80.00 /HOUR
                 - PI UNDER SUPERVISION: FLAT RATE - INVESTIGATIVE SERVICES
                 AND REPORTING $55.00 /HOUR
                   AUTH. INVESTIGATION
                      BUDGET OR HOURS:  25 HOURS
                 FURTHER INSTRUCTIONS:
                 ASSIGNMENT AS PER EMAIL.
                 CLIFF, WE CAN ADJUST THE BUDGET AS NECESSARY. AS JAS POINTS
                 OUT, WE HAVE A
                 LIMITED WINDOW TO CAPTURE THE CLAIMANT ON SURVEILLANCE. HIS
                 COUNSEL MAY WELL
                 HAVE ALTERTED HIM TO POSSIBLE SURVEILLANCE AND EVEN IF NOT,
```

ICBC_003295

```
DATE: 2021-01-04                                              PAGE : 54
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)


CLAIM : L373571-4


                                                                  TYP
                                                                  EXP
DATE    WORKTYPE DESCRIPTION/DETAIL                                ---
------- -------------------------------------------------------    B
5DEC16  EMAIL    HE IS THE TYPE TO
                 BE VERY ALERT TO SUCH EFFORTS.
                 D/C TO PROVIDE DETAILS OF APPOINTMENTS, ETC
                 SUBJECT OR CONTACT INFORMATION
                 CONTACT 1
                      TYPE OF CONTACT:   CLAIMANT/INSURED
                         FIRST NAME:     RICHARD DAVID HEWSON
                          LAST NAME:     HALL
                       COMPANY NAME:
                          ADDRESS 1:     APPOINTMENTS TO BE PROVIDED
                          ADDRESS 2:
                              PHONE:
                               CELL:
                      EMAIL ADDRESS:
-----------------------------------------------------------------CMPL
                                                    LE:9 KOL:21 B
15DEC16 INCURRED CL288-P  YF 2016.8190 07DEC16 HALL
-----------------------------------------------------------------CMPL
                                                    LE:4 KOL:21 B
19DEC16 INCURRED CL288-P  ST. PAUL'S HOSPITAL
-----------------------------------------------------------------NOTE
                                                                  A
20DEC16 NOTE     MANAGER NOTE - WE JUST HAD 2 IME'S AND AN EFD OF THE
                 PLAINTIFF. WE DO NOT HAVE THE EFD REPORT YET.
-----------------------------------------------------------------CMPL
                                              $754.35  LE:9 KOL:21 B
20DEC16 INCURRED CL288    YF 2016.8190 07DEC16 HALL
                 REASON: HALL, RICHARD; SURVEILLANCE-DEC 5 & 6/16-
                         TRAVEL, VIDEO & PARKING; CLAIM L373571-4
-----------------------------------------------------------------CMPL
                                              $1500.00 LE:4 KOL:21 B
20DEC16 INCURRED CL288    ST. PAUL'S HOSPITAL
                 REASON: PATIENT: RICHARD HALL RE: AUDIOLOGICAL TESTING
                         & ENT TESTING ON DEC 12 & 15, 2016 PER DR.
                         WESTERBERG, $750 EA; REQ'D BY PACIFIC LAW GROUP
-----------------------------------------------------------------CMPL
                                                    LE:4 KOL:21 B
23DEC16 INCURRED CL288-P  DR. BRIAN D. WESTERBERG
-----------------------------------------------------------------CMPL
                                              $7612.50 LE:4 KOL:21 B
4JAN17  INCURRED CL288    DR. BRIAN D. WESTERBERG
                 REASON: RE: RICHARD HILL
                         INV DATED DECEMBER 20, 2016
                         REVIEW OF RECORDS AND MEDICAL LEGAL REPORT
-----------------------------------------------------------------CMPL
                                              $1981.07 LE:3 KOL:21 B
3FEB17  INCURRED CL288    I 26957 F 10151
                 REASON: HALL V. DOVE
                         10/26/2016 12/19/2016
                         INV DATE 12/19/2016
-----------------------------------------------------------------CMPL
                                              $126.31  LE:5 KOL:21 B
3FEB17  INCURRED CL288    I 26957 F 10151
                 REASON: HALL V. DOVE
                         10/26/2016 12/19/2016
                         INV DATE 12/19/2016
-----------------------------------------------------------------CMPL
                                              $98.93   LE:9 KOL:21 B
3FEB17  INCURRED CL288    I 26957 F 10151
                 REASON: HALL V. DOVE
                         10/26/2016 12/19/2016
                         INV DATE 12/19/2016
```

ICBC_003296

```
DATE: 2021-01-04                                              PAGE : 55
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4


                                                                  TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                EXP
------  ------ -----------------------------------------------------------
---------------------------------------------------------------------CMPL
10FEB17 INCURRED CL288-P  DR. ALISTER J.E. PROUT INC     LE:4 KOL:21 B
---------------------------------------------------------------------CMPL
1MAR17  INCURRED CL288    DR. ALISTER J.E. PROUT INC  $5105.00 LE:4 KOL:21 B
                 REASON: RICHARD HALL; INV DATE: 11JAN17; EXPEDITED IME,
                 REVIEW OF ADD'L RECORDS; REQ'D BY PACIFIC LAW
                 GROUP
---------------------------------------------------------------------CMPL
18APR17 INCURRED CL288-P  PROVIDENCE HEALTH CARE-        LE:4 KOL:21 B
---------------------------------------------------------------------CMPL
21APR17 INCURRED CL288    I 27686 F 10151       $1104.23 LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                 12/19/2016 - 03/31/2017
                 INV DATE 03/31/2017
---------------------------------------------------------------------CMPL
21APR17 INCURRED CL288    I 27686 F 10151         $19.59 LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                 12/19/2016 - 03/31/2017
                 INV DATE 03/31/2017
---------------------------------------------------------------------CMPL
21APR17 INCURRED CL288    I 27686 F 10151         $52.61 LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                 12/19/2016 - 03/31/2017
                 INV DATE 03/31/2017
---------------------------------------------------------------------CMPL
8MAY17  ADMIN    JOHN D - EMAILED SHIRLEY RE: COURRIER ORIGINAL AFFIDAVIT  A
                 TO COUNSEL, ANGIE WESTMACOTT
---------------------------------------------------------------------CMPL
16MAY17 INCURRED CL288    PROVIDENCE HEALTH CARE-  $1675.00 LE:4 KOL:21 B
                 PAYEES: DEPARTMENT OF AUDIOLOGY
                 REASON: RICHARD DAVID HALL; INV RH030117; INV DATE:
                 03JAN17; SERVICES PROVIDED BY DR. B. WESTERBERG
                 12DEC16
---------------------------------------------------------------------CMPL
2JUN17  ADMIN    PLEASE UPDATE HOBIEM FOR TRIAL DATE                   A
                 NOV 19 , 2018 X 19 DAYS BY JURY
---------------------------------------------------------------------CMPL
24JUL17 INCURRED CL288    I 28438 F 10151        $841.55 LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                 03/31/2017 - 06/30/2017
                 INV DATE 06/30/2017
---------------------------------------------------------------------CMPL
24JUL17 INCURRED CL288    I 28438 F 10151        $242.90 LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                 03/31/2017 - 06/30/2017
                 INV DATE 06/30/2017
---------------------------------------------------------------------CMPL
24JUL17 INCURRED CL288    I 28438 F 10151         $41.47 LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                 03/31/2017 - 06/30/2017
                 INV DATE 06/30/2017
---------------------------------------------------------------------NOTE
```

ICBC_003297

```
DATE: 2021-01-04                                                    PAGE : 56
TIME: 10.55.50          INSURANCE CORPORATION OF BRITISH COLUMBIA
                           CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                       TYP
DATE      WORKTYPE DESCRIPTION/DETAIL                                   EXP
-------  -------------------------------------------------------------  ---
22AUG17  NOTE     MANAGER NOTE - WE HAVE EFD COMING UP IN OCTOBER. MAYBE WE   A
                  WILL HAVE SOME IDEA WHAT THEY MIGHT WANT AFTER THAT. WE
                  REALLY DONT SEE MUCH VALUE IN THIS CLAIM. THE PLAINTIFF
                  CONTINUES TO WORK.
---------------------------------------------------------------------CMPL
3NOV17   ADMIN    JOHN D - NEW FILE JACKET PLEASE                        A
---------------------------------------------------------------------NOTE
13FEB18  NOTE     EXAMINER NOTE (JOHN DI CESARE) - PULLED FILE FOR REVIEW    A
                  ON FRIDAY
```



```
                  I'LL GET SHIRLEY TO CONTACT RHONDA A THEIR OFFICE TO
                  SCHEDULE MEETING AT OUR OFFICE FOR WEEK AFTER
                  MAR 16 '18 EFD
                  AGREED
---------------------------------------------------------------------CMPL
15FEB18  ADMIN    JOHN D - EMAILED SHIRLEY, RE: BOOK PRETRIAL           A
                  STRATEGY MEETING
                  ** CALLED RHONDA WIEBE & SUGGESTED TUES MAR 27 a 2 PM
                  604-638-1105
                  ** RHONDA CALLED. DOES MAR 22 a 3 PM WORK FOR ALL?
                  ** INVITES SENT OUT (SKYPE) FOR MAR 22 a 3 PM
---------------------------------------------------------------------NOTE
7MAR18   NOTE     MANAGER NOTE - WE HAD A DISCOVERY AND IME SET THIS MONTH.   A
                  THE PLAINTIFF ADVISED THAT HE CANNOT ATTEND BECAUSE HE HAS
                  CANCER BUT HAS RECOVERED BUT CANT TRAVEL. THE LAST TIME HE
                  HAD AN ABSESSED TOOTH. THEY ARE NOW SUGGESTING THAT WE DO
                  THE EFD IN FLORIDA. WE SAID THEY HAVE TO PAY FOR IT AND IT
                  SEEMS LIKE THEY WILL AGREE. STRANGE. WE WANT THE NOVEMBER
                  TRIAL ADJOURNED BUT THEY WANT AGREE TO THAT. WE WANT A
```

ICBC_003298

```
DATE: 2021-01-04                                                    PAGE : 57
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                          TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                        EXP
-------  -------- --------------------------------------------------------
7MAR18   NOTE     BUNCH OF RECORDS BEFORE THE EFD WHICH WE DONT HAVE YET.   A
                  THIS FILE JUST NEVER SEEMS TO MOVE FORWARD.
---------------------------------------------------------------------NOTE
23MAR18  NOTE                                                              A


                                                                      -CMPL
27MAR18  ADMIN    JOHN D - PLEASE UPDATE HOBIEM FOR ADJOURNED TRIAL DATE    A
                  NEW TRIAL DATE TO BE SET IN NEAR FUTURE
                  ** TRIAL DATE WAS NOV 19, 2018 (19 DAYS). I'VE DELETED THIS
                  FROM HOBIEM.
-----------------------------------------------------------------------CMPL
9MAY18   INCURRED CL288    I 30333 F 10151              $1506.01  LE:3 KOL:21 B
                  REASON: HALL V. DOVE
                  06/30/2017 - 03/31/2018
                  INV DATE 03/31/2018
-----------------------------------------------------------------------CMPL
9MAY18   INCURRED CL288    I 30333 F 10151               $85.68  LE:5 KOL:21 B
                  REASON: HALL V. DOVE
                  06/30/2017 - 03/31/2018
                  INV DATE 03/31/2018
-----------------------------------------------------------------------CMPL
9MAY18   INCURRED CL288    I 30333 F 10151               $74.72  LE:9 KOL:21 B
                  REASON: HALL V. DOVE
                  06/30/2017 - 03/31/2018
                  INV DATE 03/31/2018
-----------------------------------------------------------------------CMPL
14MAY18  ADMIN    JOHN D - EMAILED SHIRLEY, RE: PLEASE PC REPORTS PER EMAIL  A
                  AND SEND TO DC
-----------------------------------------------------------------------NOTE
23MAY18  NOTE     EXAMINER NOTE (JOHN DI CESARE) - EFD DATES                A


-----------------------------------------------------------------------NOTE
10CT18   NOTE     MANAGER NOTE - WE HAD A TRIAL THIS FALL THAT WAS ADJOURNED. A
                  ALSO THE PLAINTIFF SAID HE COULD NOT COME HERE FOR EFD
                  BECAUSE OF CANCER TREATMENTS SO WE ARE TRYING TO FIND OUT
                  ABOUT THAT. THIS FILE JUST DRAGS ON AND ON.
-----------------------------------------------------------------------CMPL
26OCT18  ADMIN    JOHN D - EMAILED GAIL, PLEASE REQUEST COPY OF POLICY       A
                  26OCT - POLICY DESTROYED (OVER 3 YEARS OLD)
-----------------------------------------------------------------------CMPL
7NOV18   INCURRED CL288    I 31941 F 10151              $1312.88  LE:3 KOL:21 B
                  REASON: HALL V. DOVE
                  03/31/2018 - 10/31/2018
                  INV DATE 10/31/2018
-----------------------------------------------------------------------CMPL
7NOV18   INCURRED CL288    I 31941 F 10151               $10.85  LE:5 KOL:21 B
                  REASON: HALL V. DOVE
                  03/31/2018 - 10/31/2018
```

ICBC_003299

```
DATE: 2021-01-04                                                  PAGE : 58
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

|  |  |  | TYP EXP |
|---|---|---|---|
| DATE | WORKTYPE | DESCRIPTION/DETAIL |  |

```
7NOV18  INCURRED        INV DATE 10/31/2018                           B
--------------------------------------------------------------------CMPL
7NOV18  INCURRED CL288    I 31941 F 10151      $61.92 LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                 03/31/2018 - 10/31/2018
                 INV DATE 10/31/2018
                                                          ---------CMPL
14MAR19 INCURRED CL288    I 32981 F 10151      $1203.63 LE:3 KOL:21 B
                 REASON: HALL V. DOVE
                 10/31/2018 - 2/28/2019
                 INV DATE 2/28/2019
                                                   ----------------CMPL
14MAR19 INCURRED CL288    I 32981 F 10151       $0.60 LE:5 KOL:21 B
                 REASON: HALL V. DOVE
                 10/31/2018 - 2/28/2019
                 INV DATE 2/28/2019
                                                   ----------------CMPL
14MAR19 INCURRED CL288    I 32981 F 10151       $56.29 LE:9 KOL:21 B
                 REASON: HALL V. DOVE
                 10/31/2018 - 2/28/2019
                 INV DATE 2/28/2019
                                                   ----------------NOTE
6SEP19  NOTE     EXAMER NOTE (JOHN DI CESARE) - STATUS UPDATE         A
                 WE HAVE AGREED TO F/U AFTER 2019 TO SEE WHERE CLMT IS WITH
                 CANCER TMT - SEE EXCHANCE OF EMAILS WITH DC ON THE SUBJECT
                 ONCE WE LEARN HOW CLMT IS DOING, WE CAN DECIDE HOW BEST TO
                 PROCEED. RECALL, WE HAVE FORMAL OFFER IN PLACE BUT PC,
                 DESPITE WANTING TO RESOLVE, SAYS FORMAL 'WOEFULLY INADEQUATE
                 '
                                                   ----------------CMPL
20DEC19 INCURRED                                          LE:1 KOL:21 B


                                                   ----------------NOTE
13MAR20 NOTE                                                         A


                                                                    NOTE
30APR20 NOTE                                                         A


                                                                    SCHL
15JUN20 REVIEW                                                       B


                                                   ----------------NOTE
14SEP20 NOTE     MANAGER NOTE - LITIGATION CONTINUES TO BE ON HOLD PENDING  A
                 UPDATE  ON THE PLAINTIFF'S MEDICAL CONDITION
                                                   ----------------MSGS
6OCT20  EMAIL    TO: CC09                                            A
                 CC: STEVENS, GARY
                 MF L373571 4
```

ICBC_003300

```
DATE: 2021-01-04                                                    PAGE : 59
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                    TYP
                                                                    EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
------- ------------------------------------------------------------  ---
6OCT20  EMAIL      YOUR CLAIM CENTRE:    CC09 - CLAIMS SYSTEM ENQUIRES    A
                   CLAIM NUMBER:    L373571-4
                   DESTINATION PRINTER:   U5459 (PR416A)
                   COMMENTS:
                   PRINTOUT REQUIRED FOR PRESERVATION NOTICE ISSUED BY FIONA
                   TEMPLE, DIRECTOR
                   CORPORATE LEGAL SERVICES.
                   NOT ATTACHED TO A CLAIM CENTRE, SO I SELECTED CC09 FOR THE
                   MANDATORY FIELD
                   ABOVE.
----------------------------------------------------------------------CMPL
22OCT20 INCURRED CL288    I 38305 F 10151      $1417.52  LE:3 KOL:21 B
                   REASON: HALL V. DOVE
                          7/5/2019 - 9/29/2020
                          INV DATE 9/30/2020
----------------------------------------------------------------------CMPL
22OCT20 INCURRED CL288    I 38305 F 10151         $1.75  LE:5 KOL:21 B
                   REASON: HALL V. DOVE
                          7/5/2019 - 9/29/2020
                          INV DATE 9/30/2020
----------------------------------------------------------------------CMPL
22OCT20 INCURRED CL288    I 38305 F 10151        $66.34  LE:9 KOL:21 B
                   REASON: HALL V. DOVE
                          7/5/2019 - 9/29/2020
                          INV DATE 9/30/2020
----------------------------------------------------------------------SCHL
26OCT20 REVIEW   MANAGER REVIEW - JOHN - GOLFER - LITIGATION ON HOLD/STATUS?  A
                 PLTF RESIDENT OF US/LVI/ STAUS OF CANCER TREATMENT?
----------------------------------------------------------------------CMPL
29OCT20 INCURRED CL288    I 38354 F 10151      $3544.98  LE:3 KOL:21 B
                   REASON: HALL V. DOVE
                          10/2/2020 - 10/15/2020
                          INV DATE 10/15/2020
----------------------------------------------------------------------CMPL
29OCT20 INCURRED CL288    I 38354 F 10151        $56.75  LE:5 KOL:21 B
                   REASON: HALL V. DOVE
                          10/2/2020 - 10/15/2020
                          INV DATE 10/15/2020
----------------------------------------------------------------------CMPL
29OCT20 INCURRED CL288    I 38354 F 10151       $165.69  LE:9 KOL:21 B
                   REASON: HALL V. DOVE
                          10/2/2020 - 10/15/2020
                          INV DATE 10/15/2020
----------------------------------------------------------------------CMPL
1DEC20  INCURRED CL288    I 38607 F 10151      $1011.26  LE:3 KOL:21 B
                   REASON: HALL V. DOVE
                          10/15/2020 - 11/5/2020
                          INV DATE 11/15/2020
----------------------------------------------------------------------CMPL
1DEC20  INCURRED CL288    I 38607 F 10151       $167.00  LE:5 KOL:21 B
                   REASON: HALL V. DOVE
                          10/15/2020 - 11/5/2020
```

ICBC_003301

```
DATE: 2021-01-04                                                      PAGE : 60
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

                                                                          TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                       EXP
-------  --------------------------------------------------------------------
1DEC20   INCURRED        INV DATE 11/15/2020                               B
------------------------------------------------------------------------CMPL
1DEC20   INCURRED CL288    I 38607 F 10151           $50.50  LE:9 KOL:21 B
                  REASON: HALL V. DOVE
                     10/15/2020 - 11/5/2020
                     INV DATE 11/15/2020
-----------------------------------------------------------------------MSGS
22DEC20 EMAIL      TO: CC09                                                A
                   CC: LEW, JUDY
                   MF L373571 4
                      YOUR CLAIM CENTRE:   CC00 - HEAD OFFICE CLAIMS
                          CLAIM NUMBER:    L373571-4
                   DESTINATION PRINTER:    PR217F
                   COMMENTS:
                   THANK YOU :)
------------------------------------------------------------------------SCHL
31DEC20 ADMIN      JOHN D - EMAILED CORA, RE, PLEASE SEND LETTER WITH COMPLETE  A
                   COPY OF FILE MATERIALS TO DC, MARK SCHEER - THIS FILE AND
                   CROSS FILE AND INCLUDE CWMSNOTES

---------------------------------------------------------------------------

                          ** END OF REPORT **
```

ICBC_003302



**EXHIBIT**

**008**

Insurance
Corporation
British
Columbia

25 Dunedin Street
Victoria
British Columbia
V8T 5H7

Telephone
250 480-5743
Facsimile
250 480-5601



## Fax Transmittal

# FAXED

| DATE | December 1, 2003 | TIME | 09:37 AM |
|---|---|---|---|

| TO: | NAME | June Nicholas/Michelle Bell | **Claim: 4285395506** |
|---|---|---|---|
| | OFFICE | Allstate Insurance Company | |
| | FAX | 1-503-603-5970 | PHONE |

| FROM: | NAME | Joanne Nelson | |
|---|---|---|---|
| | OFFICE | Insurance Corporation of British Columbia | **Claim:L373475.6** |
| | FAX | 1-250-480-5601 | PHONE |

THIS IS PAGE ONE OF 2

Further to several conversations with Shellie Fyfe and your Offices, we can confirm that the Insurance Corporation of British Columbia does not Insure Mr. Richard D. Hall's 1986 Sclass Mercury, Plate #XPD574**(please verify whether or not this is the correct Plate #)**. As you are the Insurer of choice, Mr. Hall is obligated to have his vehicle repaired through Allstate.

We understand Mr. Hall is not covered for Rental Coverage through Allstate, while his vehicle is being repaired. As our Insured appears to be responsible for this accident, ICBC may consider reimbursement of any reasonable Rental costs. As you can appreciate, if you do not initiate expeditious repairs, costs will escalate including that of a Rental vehicle. Mr. Hall is obligated to mitigate his loss and we would ask your co-operation in ensuring repairs are completed as soon as reasonably possible.

Could you please provide your Policy particulars, specific to what Mr. Hall is entitled to through Allstate, including but not limited to coverage, injury protection and exclusions.

Cont'd Page 2.....................

The information in this fax is intended only for the use of the person named above. This fax may contain information that is privileged and confidential. If you are not the person this fax is addressed to, then take notice that any use, dissemination, distribution, or copying of this fax is strictly prohibited. If you have received this fax in error, please call us immediately at the above number (collect if necessary) and return this original to us by mail. Thank you.

SYG215 (0499)        IF YOU DO NOT RECEIVE ALL PAGES CLEARLY, PLEASE CALL SENDER AS SOON AS POSSIBLE

ICBC_000731



Page 2....................

We can confirm that as Mr. Hall is of the opinion he is entitled to medical coverage through ICBC as well as Allstate, as a result of this Motor Vehicle Accident, we would ask that both your Company and Ours remain on the same page regarding this issue. We are certain both entities do not wish to duplicate payments here. In this regard we would greatly appreciate your co-operation in sharing any Medical documentation (including payments) you may receive from his Practitioner(s). We will of course, consider sharing the costs of same.

Our investigation indicates this is a minor accident and damages were minimal. Could you please therefore, verify the extent of the damages to Mr. Hall's vehicle as a result of this accident, including 2 Repair Estimates and detailed photographs of the damage(s).

We would also ask that you provide us with an updated address, including postal code and phone number as well as a driver's licence # for Mr. Hall, in the United States.

We look forward to hearing from you by return and thank you for your continued co-operation and attempts to conclude this matter as soon as possible.

Yours very truly,

J E Nelson

Joanne Nelson
Examiner
Insurance Corporation of British Columbia
425 Dunedin Street
Victoria, B.C.
V8X 4A1

Public Body File F228037
OIPC File F15-62217

In the matter of an inquiry
under s. 58 of the *Freedom of Information and Protection
of Privacy Act,* RSBC 1996, c. 165

**Between:**

**Richard Hall**

**Applicant**

**And:**

**Insurance Corporation of British Columbia**

**Public Body**

**A F F I D A V I T**

**I, JOHN DI CESARE,** of 8470 Burnaby Court, Burnaby, Province of British Columbia, MAKE OATH
AND SAY AS FOLLOWS:

1. I am employed as a Senior Claims Examiner with the Insurance Corporation of British Columbia
("ICBC"), and as such, I have personal information of the matters hereinafter deposed to, save and except
where stated to be based on information and belief, and as to such matters, I verily believe the same to
be true.

2. ICBC is the sole provider of basic (universal compulsory) auto insurance in British Columbia. ICBC
processes approximately 900,000 auto insurance claims each year through its 24-hour, seven-days-a-
week telephone claims handling facility, 38 claims centres and other claims handling facilities across the
province.

3. Auto insurance in BC is based on a full tort system, which means that an at-fault driver or vehicle
owner is liable and may be sued in court for the full amount of damages. In addition, an injured party has
access to accident benefits coverage regardless of fault.

**EXHIBIT
009**

*Claim by Mr. Hall*

4.      Richard Hall was involved in a motor vehicle accident with Donald Dove (now deceased) on November 10, 2003 in Victoria, British Columbia. The accident involved a low velocity impact in which Mr. Hall was rear-ended. I have conduct of the claim file.

5.      Mr. Hall retained counsel and filed his writ of action and statement of claim on November 9, 2004 seeking damages in relation to the accident.

6.      ICBC retained defence lawyer Terry Vos at Alexander Holbourn on December 9, 2005.

7.      I was initially assigned conduct of this file on November 15, 2006. The file was transferred to other examiners while I moved into various acting management roles over the years but I currently have conduct of this file again.

8.      This has been a highly contentious and long-standing action. The file materials are replete with communications between defence counsel and plaintiff's counsel and the extensive efforts undertaken by defence counsel to schedule an independent medical examination, examinations for discovery, obtain production of documents and set a trial date. For example, Mr. Hall claimed that his business venture, for which he was seeking damages, was very confidential. Mr. Hall's counsel indicated that they would only discuss the details of his confidential business venture if ICBC was prepared to discuss a "substantial six figure advance" towards his claim (see note of February 17, 2006). On February 23, 2006, defence counsel had discussions with Mr. Hall's counsel about setting a trial date but plaintiff's counsel raised the issue of a stay to protect the confidentiality of his client's business dealings.

9.      On March 23, 2006, defence counsel advised plaintiff's counsel that there was no reason that the lawsuit could not proceed; however, efforts to move the litigation forward were consistently blocked. For example, defence counsel wrote to plaintiff's counsel on January 25, 2006, March 31, 2006 and May 8, 2006 because he had still not received their List of Documents or answers to interrogatories.  On September 15, 2006, defence counsel confirmed that the examination for discovery was scheduled for December 18, 2006 and requested expedited production of documents. In December 2006, plaintiff's counsel advised defence counsel that the examination for discovery could not proceed because Mr. Hall's

personal and business tax status could be jeopardized if he returned to Canada. There was discussion of examination for discovery taking place in 2007 in Ireland as an option and another request for an advance. On December 14, 2006, plaintiff's counsel again requested an advance. Defence counsel served a formal offer to settle on December 22, 2006 which was never accepted. On March 26, 2007, defence counsel served a notice of motion seeking an order to compel Mr. Hall's attendance for an independent medical examination scheduled for April 2007 because plaintiff's counsel had until then been unable to contact his client and obtain instructions.

10.     The examination for discovery and the independent medical examination scheduled for April 2007 did not proceed. In May 2007, Mr. Hall advised defence counsel that he was representing himself but looking for new legal counsel. On May 31, 2007, Mr. Hall wrote a letter of complaint to ICBC regarding our handling of his file. On July 5, 2007, defence counsel served an application to compel Mr. Hall's attendance for an independent medical examination with Dr. O'Shaughnessy for September 6, 2007 and an examination for discovery. A new independent medical examination was scheduled with Dr. Vallance for May 2008 but Mr. Hall did not show up for the examination despite a court order compelling him to do so. ICBC instructed defence counsel to bring an application to dismiss Mr. Hall's claim but the application was subsequently adjourned after ICBC received confirmation in June 2008 that Mr. Hall had retained new counsel. A letter from defence counsel dated May 26, 2009 outlined the plaintiff's counsel's failure to cooperate on setting a mutually agreeable trial date. On June 30, 2009, ICBC learned that Mr. Hall changed his counsel again to Albert Roos. However, as of August 2010, Mr. Roos was still not in a position to confirm that he has been retained and stated that Mr. Hall's whereabouts were unknown.

11.     The litigation remains outstanding. No trial date has been set. It is my view that this claim will not be resolved without going to trial.

12.     I confirm that the records of communications between ICBC and our legal counsel, which have been withheld on the basis of s. 14 of the *Freedom of Information and Protection of Privacy Act* (FIPPA), were generated in the course of seeking and obtaining legal advice and representation with regard to Mr. Hall's claim. These communications were intended to be and to remain confidential.

13.     I confirm that articles, research, notes and third party derivative communications have been withheld on the basis of s. 14 of FIPPA as they were generated in anticipation of litigation and for trial preparation. These materials were intended to be and remain confidential for trial preparation.

14.     ICBC has severed reserve and claim coding information under s. 17 of FIPPA as that information reveals its litigation strategies.  Reserve information is the dollar amount that ICBC notionally sets aside for a claim based on its view of the upper range of potential damages which may be necessary to settle a claim. Claims adjusters and examiners are required to post reserve information for each claim and to adjust reserve amounts as information becomes available concerning the potential upper ranges of damages for a claim.

15.     Claims adjusters and examiners are also required to code claims using a series of letters. These letters reflect the nature of the claim and an assessment of the severity of the potential loss. Claims adjusters and examiners are also required to update codes as new information becomes available.

16.     Reserve information and claim codes have been severed because they would reveal ICBC's assessment of the claim and file handling strategy to Mr. Hall and his counsel and disclosure of that information would harm ICBC's ability to effectively defend this claim.

SWORN BEFORE ME at the City of          )
of Burnaby, Province of British          )
Columbia, this  3  day of May, 2017      )
                                         )
_Dena Reimer_                            )       JOHN DE CESARE
A Commissioner for taking                )
Affidavits within British Columbia       )

**Dena Reimer**
Barrister & Solicitor
Insurance Corporation of B.C.
Suite 800 - 808 Nelson Street
Vancouver, B.C.
V6Z 2L5

#500251

DEC. 3. 2003  5:07PM                                    NO. 5344   P. 1

OREGON CASUALTY OFFICE
7632 SW DURHAM ROAD STE 200
TIGARD, OR 97224

## PIP DEPARTMENT FAX

FROM: _Michelle Bell_

Main Phone Number:      503-603-5900
PIP Fax Number:         503-603-5970
Toll Free Number:       888-437-8402

PLEASE DELIVER THE FOLLOWING PAPERWORK TO:

_Joanne Nelson @ 1-250-480-5601_

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: _2_

_Re: Richard. Hall._
_Your claim number: L373475.6_

***The information contained in this message is intended only for the addressee or addressee's
agent. The message may contain information that is privileged, confidential, or otherwise
exempt from disclosure. If the reader of this message is not the intended recipient or recipient's
authorized agent, then you are notified that any dissemination, distribution or copying of this
message is prohibited. If you have received this message in error, please notify the sender by
telephone and return the original and any copies of the message by mail to the sender at the
address stated above.

**EXHIBIT**
010

ICBC_000728

NO. 5344   P. 2

DEC. 3. 2003   5:07PM

Oregon Casualty Market Claim Office
**Allstate Insurance Company**
7632 S.W. Durham Road, Suite 200
Tigard, OR 97224
Bus: (503) 603-6500



December 3, 2003

Re: Richard Hall
Your claim number: L373475.6
Allstate claim number: 4285395506

Dear Joanne,

I have received your fax dated December 3rd, 2003. I would be happy to send you a payment ledger with a listing of providers, dates of service and amounts paid, at your request. I have not received any bills at this time. Allstate will pay all reasonable, necessary and related medical expenses, up to Mr. Hall's policy limits. Unfortunately, because of privacy laws, I cannot provide you with Mr Hall's specific limits, or his contact information. Once Mr. Hall's limits have been reached, or he has finished treatment, we will subrogate for the final amount paid out.

Allstate has determined Mr. Hall's vehicle to be a total loss, with a value of over $9700.00. Please let me know what the damages to your insured vehicle are, so I can add this to my file. Also please note that Mr Hall's vehicle is a 1986 Mercedes, not a Mercury.

Please feel free to fax me at 503-603-5970, or call me at 503-603-6471 if I can be of further assistance.

Sincerely,

Michelle Bell
Claims Service Adjuster

ICBC_000729



| | | | |
|---|---|---|---|
| | Insurance Corporation British Columbia | 425 Dunedin Street Victoria British Columbia V8T 5H7 | Telephone 250 480-5743 Facsimile 250 480-5601 |



## Fax Transmittal

**FAXED** again DEC. 3. 03

| | | |
|---|---|---|
| DATE | December 1, 2003 | TIME   09:37 AM |

| | | | |
|---|---|---|---|
| **TO:** | NAME | ✳ /Michelle Bell ✳ **Claim: 4285395506** | |
| | OFFICE | Allstate Insurance Company | |
| | FAX | 1-503-603-5970 | PHONE |

| | | | |
|---|---|---|---|
| **FROM:** | NAME | Joanne Nelson | |
| | OFFICE | Insurance Corporation of British Columbia  **Claim:L373475.6** | |
| | FAX | 1-250-480-5601 | PHONE |

THIS IS PAGE ONE OF 2

Further to several conversations with Shellie Fyfe and your Offices, we can confirm that the Insurance Corporation of British Columbia does not Insure Mr. Richard D. Hall's 1986 Sclass Mercury, Plate #XPD574**(please verify whether or not this is the correct Plate #)**. As you are the Insurer of choice, Mr. Hall is obligated to have his vehicle repaired through Allstate.

We understand Mr. Hall is not covered for Rental Coverage through Allstate, while his vehicle is being repaired. As our Insured appears to be responsible for this accident, ICBC may consider reimbursement of any reasonable Rental costs. As you can appreciate, if you do not initiate expeditious repairs, costs will escalate including that of a Rental vehicle. Mr. Hall is obligated to mitigate his loss and we would ask your co-operation in ensuring repairs are completed as soon as reasonably possible.

Could you please provide your Policy particulars, specific to what Mr. Hall is entitled to through Allstate, including but not limited to coverage, injury protection and exclusions.

Cont'd Page 2.....................

The information in this fax is intended only for the use of the person named above. This fax may contain information that is privileged and confidential. If you are not the person this fax is addressed to, then take notice that any use, dissemination, distribution, or copying of this fax is strictly prohibited. If you have received this fax in error, please call us immediately at the above number (collect if necessary) and return this original to us by mail. Thank you.

SYG215 (0495)          IF YOU DO NOT RECEIVE ALL PAGES CLEARLY, PLEASE CALL SENDER AS SOON AS POSSIBLE

ICBC_000730



**ICBC**

Insurance
Corporation
British
Columbia

25 Dunedin Street
Victoria
British Columbia
V8T 5H7

Telephone
250 480-5743
Facsimile
250 480-5601



## Fax Transmittal

# FAXED

| | DATE | December 1, 2003 | TIME | 09:37 AM |
|---|---|---|---|---|
| **TO:** | NAME | June Nicholas/Michelle Bell | **Claim: 4285395506** | |
| | OFFICE | Allstate Insurance Company | | |
| | FAX | 1-503-603-5970 | PHONE | |
| **FROM:** | NAME | Joanne Nelson | | |
| | OFFICE | Insurance Corporation of British Columbia | **Claim:I.373475.6** | |
| | FAX | 1-250-480-5601 | PHONE | |
| | THIS IS PAGE ONE OF 2 | | | |

Further to several conversations with Shellie Fyfe and your Offices, we can confirm that the Insurance Corporation of British Columbia does not Insure Mr. Richard D. Hall's 1986 Sclass Mercury, Plate #XPD574**(please verify whether or not this is the correct Plate #)**. As you are the Insurer of choice, Mr. Hall is obligated to have his vehicle repaired through Allstate.

We understand Mr. Hall is not covered for Rental Coverage through Allstate, while his vehicle is being repaired. As our Insured appears to be responsible for this accident, ICBC may consider reimbursement of any reasonable Rental costs. As you can appreciate, if you do not initiate expeditious repairs, costs will escalate including that of a Rental vehicle. Mr. Hall is obligated to mitigate his loss and we would ask your co-operation in ensuring repairs are completed as soon as reasonably possible.

Could you please provide your Policy particulars, specific to what Mr. Hall is entitled to through Allstate, including but not limited to coverage, injury protection and exclusions.

Cont'd Page 2.....................

The information in this fax is intended only for the use of the person named above. This fax may contain information that is privileged and confidential. If you are not the person this fax is addressed to, then take notice that any use, dissemination, distribution, or copying of this fax is strictly prohibited. If you have received this fax in error, please call us immediately at the above number (collect if necessary) and return this original to us by mail. Thank you.

SYG215 (0495)          IF YOU DO NOT RECEIVE ALL PAGES CLEARLY, PLEASE CALL SENDER AS SOON AS POSSIBLE

ICBC_000731



PAGE   2

Page 2......................

We can confirm that as Mr. Hall is of the opinion he is entitled to medical coverage through ICBC as well as Allstate, as a result of this Motor Vehicle Accident, we would ask that both your Company and Ours remain on the same page regarding this issue. We are certain both entities do not wish to duplicate payments here. In this regard we would greatly appreciate your co-operation in sharing any Medical documentation (including payments) you may receive from his Practitioner(s). We will of course, consider sharing the costs of same.

Our investigation indicates this is a minor accident and damages were minimal. Could you please therefore, verify the extent of the damages to Mr. Hall's vehicle as a result of this accident, including 2 Repair Estimates and detailed photographs of the damage(s).

We would also ask that you provide us with an updated address, including postal code and phone number as well as a driver's licence # for Mr. Hall, in the United States.

We look forward to hearing from you by return and thank you for your continued co-operation and attempts to conclude this matter as soon as possible.

Yours very truly,

J. E. Nelson

Joanne Nelson
Examiner
Insurance Corporation of British Columbia
425 Dunedin Street
Victoria, B.C.
V8X 4A1



EXHIBIT
011



# Memorandum

| | |
|---|---|
| DATE | June 14, 2004 |
| TO | Ben Shotton, SIU Department<br>Victoria Claims |
| FROM | Gerard G.J. Wright, Examining Adjuster<br>Duncan Claims |
| CC | |
| RE | Claimant: Richard Hall<br>Our Claim Number: L373475.6<br>Date of Loss: November 10, 2003 |

Further to our meeting of June 11, 2004.

We are writing to confirm that you will be employing Ken Carter to meet with Mr. Hall with a view to obtaining a taped statement, or in the alternative, a signed statement.

As we discussed at our meeting, we will ask Mr. Carter to cover off the following information with Mr. Hall, but this is not an exclusive list as there will be other information we will need to explore as this matter develops.

1. A list of all golf tournaments Mr. Hall has participated in since coming to Canada. Where these tournaments were held, comments on his performance and the amount of monies he may have won.

2. Does Mr. Hall belong to the BC Golf or Canadian Golf Association, and if so, what was his point standing prior to the motor vehicle accident, and his current standing.

3. Further and better particulars in regards to his income and sources, and in particular the letter provided by Mr. Hall from the Law Firm of Bird & Bird. It will be in order for you to provide Mr. Carter with a copy of that letter if you feel this is appropriate.

4. Full details in regards to his motor vehicle accident of 1997, including, but not limited to, the circumstances, Doctors he has seen, and whether or not he was suffering from any injuries from this accident at the time of his subsequent automobile accident on November 10, 2003.

5. We note that Mr. Hall at one point had (or still does have) established an office on Salt Spring Island and we need to have further details in regards to the purpose of this office. We need to know if Mr. Hall is currently working, other than golfing, and the details of same.

6. Request from Mr. Hall that he provide us with copies of all his income tax records since coming to Canada and details of whether or not he files income tax in other countries, and if so, provide us with those tax records.

7. Information as to exactly what Mr. Hall can or cannot do as a result of the injuries sustained on November 10, 2003.

8. Further information on the property that he may or may not own on Salt Spring Island.



PAGE   2   OF   2

9.    His current immigration status in Canada, and what his status had been in the United States.

10.   Is he currently working as a Golf Pro at a club, and if so, details in regards to where and the amount of monies he is making.

11.   Copies of all contracts where people have invested in his golfing ability.

12.   If Mr. Hall is willing, we are providing the following authorizations which Mr. Carter can attempt to have him sign so that we can go directly to these sources for the information we require.  Enclosed are copies of medical, wage, hospital and MSP authorizations.  This is further to confirm that you will be interviewing a Mike Pearce in regards to the golf course at Mechosin.

We realize the above is not an exhaustive list and as indicated Mr. Carter will likely gather more information than is noted above.

Once you have had an opportunity to meet with Mr. Carter would you kindly contact the writer so that we can discuss this matter further.

Yours very truly,

Gerard G. J. Wright
Examining Adjuster
Direct Line:  (250) 709-3404
Email:  gerard.wright@icbc.com

GGJW/wgr
Enclosures

EXHIBIT

012

Recorded interview of Wayne Ayers, owner, European Specialty Car Services,

Bus: 1702 Northfield Road, Nanaimo, BC          Tel: (250) 758-3288

2004 December 20                                11:45 AM

KC: Ken Carter                    WA: Wayne Ayers

KC:   I am a private investigator, licenced by the province. I have been hired by ICBC to
      do some background work on Richard Hall. I have been asked to find out how you
      came to meet Mr. Hall and what your arrangements were. What did he tell you
      about his golfing? Mr. Hall has a claim in about being a professional golfer.

WA:   Well, I came to know him because he came to me with his car. He was having the
      car repaired in Victoria. It kept breaking down on him all of the time. The biggest
      concern that he had was that being a professional golfer, he needed a reliable
      vehicle. That was how I got involved with him. It took us quite some time, almost a
      year, to get all of the bugs out of the vehicle. We ripped through the whole fuel
      system and just a whole slew of things to get the vehicle reliable. From that point
      on, the car has been reliable for him. That is how I came to know him. Then,
      afterwards, I had an arrangement with him as sort of a sponsorship arrangement
      where I would do the maintenance and servicing on the car for him on a
      sponsorship basis.

KC:   The repair work, did he pay for the repair work?

WA:   Yes.

KC:   From reading the newspaper article, it seemed like you did the repair work?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003195

Page 2 of 21

WA: I did the repair work and he paid for all of the parts.

KC: Was that part of the sponsorship?

WA: Yes. That is right.

KC: And then the ongoing maintenance after that?

WA: Yes.

KC: What was he supposed to perform for you?

WA: Well, advertising and promotions. There were very skilled tournaments and he has hats that he wears. He has our company name on his golf bag and so forth.

KC: Was he supposed to report to you which tournaments he had gone in and what he is doing to put your name forward?

WA: Not really. We are in contact every so many months when he brings the car in for servicing anyway. He tells me where he has been and what he is doing.

KC: Can you give me an update on what he has been doing to put your name forward? In 2004, did he go in any tournaments? Did you get any feedback from it?

WA: He did some promotion for us and we have got some customers and several from him promoting our business on Salt Spring Island where he lives. In Victoria, he is handing out our business brochures and our business cards that he hands out to people when he is in Victoria or travelling to the island while waiting for the ferry, travelling here or there. We have had quite a few people that have called us on those basis.

KC: Did he make up the brochures or did you?

This document is the property of Action Pacific Ent. Ltd. This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. Action Pacific Ent. Ltd. disclaims all liability for unauthorized publication.

ICBC_003196

Page 3 of 21

WA:   We did those.

KC:   Has he advised you that he has been in some tournaments in 2004 and that he wore your hat and displayed the bag?

WA:   Yes.

KC:   Do you remember any of the tournaments?

WA:   I don't remember, no.

KC:   But he did play in 2004?

WA:   No. He didn't play this year. He had a car accident.

KC:   I understood that he has done some playing?

WA:   No. Not as far as I know. Not in 2004. He hasn't played in any tournaments. From the contact I have had with him, he is doing all sorts of rehabilitation and so forth. He did come at the beginning of this year, in May he came to our Porsche function which I had asked him to do. He does do some things for us as part of our sponsorship agreement, if I ask him to. We have quite a lot of customers that are golf enthusiasts. I have asked him on a couple of occasions to do some coaching or do something a little extra for a customer as a promotion. In May he came up to our Porsche event at Crown Isle. This is a three day event that we have at Crown Isle in May for the Porsche Club of Vancouver Island. He came up and he did some coaching and he did not play.

KC:   Would he stand there and tell people what to do?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 4 of 21

WA:  More or less. He did swing some. He tries all the time to get back into it. He is

taking rehabilitation and all kinds of stuff that he is doing. He really wants to get

back to it. This is his life. This is what he does for a living. I know that. I have

spoken to various other people. I spoke to Michael Coghlan that has helped him

with his health and his training. I spoke with him. I am sure that you have seen

and got letters from Leadbetter and various other people. He has some very serious

sponsorship agreement. He also had a sponsorship, he had a tentative one. In fact,

through my guidance. He had tentatively started to set up a sponsorship agreement

with Porsche cars North America for providing a vehicle for him to use to go on his

tour. He had to put that, basically, on hold. We were trying to get it all teed up for

this year because he hasn't been able to play. I know that he had to put it on hold.

He has got it all lined up to play for next year, for 2005. He has done all of the

work. I think he has an agreement with Porsche cars North America for a

sponsorship. That is what he does. He is not just some amateur golfer that just

decided that he was going to play golf and call himself a professional golfer. That is

what he does for a living.

KC:  What level of tournaments do you understand that he plays in?

WA:  What level, I don't know much about golfing, that is the problem.

KC:  Is it like the local tournaments here on the island? You would have one in Duncan

and one in Nanaimo. Is it tournaments like that or is it the pro tour?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 5 of 21

WA: The professional tour. He tried to get on. You have to be at a certain level before you can get on. You have to qualify in order to do that. That is the point. You have to go through the ringer. You have to go through the hoops to get to that high level.

KC: Was he ever at that level?

WA: I think he has played, well I know he has played in tournaments on the lower mainland. He played in tournaments in Victoria. He has played in professional tournaments, money tournaments as far as I know. He has played in tournaments in the states.

KC: Has he shown you things from the tournaments, whether or not they were CPGA tournaments or local club tournaments? Has he ever showed you what level he is at?

WA: No. I have never asked for the level that he is at.

KC: Does your sponsorship continue on with him? Does he still bring his car in and get the maintenance work done or did you stop that because he did not golf in 2004?

WA: No, no, I still will. Because he is not going to all the tournaments, he is not putting anything like the kind of miles he had been putting on the car the previous year. I am still keeping that up. You can't just drop somebody just because of that kind of luck.

KC: Do you know if his car was ever repaired from this accident?

WA: Well, I did. He was stuck between a rock and a hard place basically. He needed a vehicle to drive. ICBC had refused to pay for his rental car. He needed something

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 6 of 21

to drive.  The car, although the car was badly damaged, enough that to repair it so

that it is back to the original condition, it is not feasible or a practical route to take.

KC:   Because there is not the value in the car?

WA:   There is too much damage.  There is more damage to the car then the car is worth.

The insurance company, from what I understand, has written the car off.  He

needed a car to drive and I am determined that what we needed to do to make the

car driveable and safe for him to drive, so we carried out the repairs so that he had

a vehicle to drive on a temporary basis.

KC:   His original car?

WA:   Yes.

KC:   What kind of repairs did you do?

WA:   Well, we replaced the engine mountings that were broken, a new radiator, and then

we sort of pounded out the rear fender and the trunk so that it would close.  We

heavily modified a tail light from another vehicle that was a similar shape to what

was left of the tail light.  We managed to screw and bolt the tail light and rewire it

all up so that it was legal, so that he had tail lights and backup lights.

KC:   The accident was in November.

WA:   Yeah, I think he had a rental car for a month or so.  Originally, from what I

understood, the insurance company said, it was conveyed to me that they would get

it sorted out.  He would get a rental car and that is what he did until they decided

what would happen with the car.  The car was going to be written off and various

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

other things.  He has had a problem with that on both sides of the fence, both the total loss of the car and his personal injuries claim.  He hasn't be able to resolve those things.  I just helped him by trying to supply him with a vehicle that he could drive.

KC: But you did not give him a vehicle to utilize then?

WA: No.

KC: Did you say that the engine mounts were broken?

WA: Yes.

KC: Both of them?

WA: I can't remember if it was both of them or one of them.  I can't recall.

KC: And the radiator as well?

WA: Yeah, well the engine jumped forward into the radiator, in the accident.

KC: So was the car towed here?

WA: Oh yes.  The car was towed here after the accident in Victoria.  The car was towed to us here.  He wanted me to look at it.  I determined, I didn't think that the car was repairable or economically repairable.  Then, the insurance company wanted the car towed to Mercedes Benz Canada in Vancouver.  They took the car over on the truck ferry across to Vancouver.  They verified.  They said exactly the same thing that I did.  The car sat there for quite some time, for a couple of months as they were going back and forth as to what to do.  I understand that they couldn't come to an agreement as to the value of the car.  That was when I put together a idea of what

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  *Action Pacific Ent. Ltd.*  disclaims all liability for unauthorized publication.

Page 8 of 21

it would cost to make the car safe and legal and driveable.  He had the car towed

back here on the truck ferry.  We carried out that repair.

KC:   Roughly, how much would that repair have been?

WA:   Off the top of my head, I think it was about $1,800.  I don't know.

KC:   Why would Mercedes Benz Canada be involved.  This was a car from the USA.  It is

an older car.

WA:   I guess the people in Vancouver that are acting for the insurer, Great West I think,

who ever is dealing with him for the states, they have a representative in Vancouver.

They had said they wanted the car taken to Mercedes Benz Canada.  That is the

only dealer body shop in the area.  They weren't prepared to take the word of

someone else outside the field.

KC:   Is this Mercedes Benz Canada a dealership?

WA:   It is all Mercedes Benz factory.  There is a dealer in Victoria that is an independent.

There is one here that is independent.  The ones in Vancouver are all owned by

Mercedes Benz, the factory.  Most of the ones in the east, the big ones, are too.  The

ones in Toronto and so forth are.  I am not sure about the one in Calgary.  I have a

feeling the one in Calgary might now be a dealer.

KC:   Do you know which location in Vancouver it went to?

WA:   There is only one body shop and that is in North Vancouver.

KC:   Did Hall pay the roughly $1,800 or was that part of your sponsorship?

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 9 of 21

WA: I can't remember. I am just seeing if there is any thing. He paid us. He paid

$1,462. That was the engine mounts, the radiator and we had to replace a brake

caliper.

KC: You were able to find used parts?

WA: Well, I have a lot of used parts here too.

KC: Was the radiator new?

WA: Yes.

KC: What other kinds of things did he have done, prior to that?

WA: Thousands and thousands of dollars worth of work had been done in regards to

keeping the vehicle in good running condition.

KC: Out of curiosity, what was the fuel system problem?

WA: The problem was that it started off right from the get go that when the car was

purchased, it was represented as being a perfect, flawless car. It was a very low

mileage car but unfortunately, low mileage cars, they also sit around a lot. Sitting

around a lot is not good for mechanical components or devices. They like to be used

especially when they are sitting outside in an outside environment. You get

contamination. You get condensation and things in the fuel system. Basically, what

happened, the fuel tank had rusted out. The car only had 50,000 kilometres on it.

The fuel tank had rusted out because the car had sat around so much over the years

with probably very little fuel in the tank and condensation got in the bottom. The

tank had rusted and this was the problem. The fuel system had to be done. The

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 10 of 21

dealership that he bought the car from, tried to sidestep or repair the problem but didn't actually address the problem as I think they probably should have done. Things just went from bad to worse. Instead of being repaired, it didn't get repaired and it kept on breaking down all of the time. It broke down on Salt Spring Island and he had to have some local garage look at it and they set fire to the engine compartment. He had to have the car towed to Victoria to have this and that done. Something happened because of that, something happened to the timing chain. They bent all of the valves. It was just a nightmare. It was just total incompetence. If they had repaired it properly in the first place, none of those things would have happened. None of that situation would have arisen. Probably I would never have got involved or met the person. I got to meet him initially because he got talking to somebody else that knew me and said that he had to take the car up to see me. We went from there.

KC:   What is he doing nowadays? Have you talked to him at all in the last few months?

WA:   Oh yeah. He is going to physiotherapy and he tries to work out with the exercises. From what I understand, he has some really bad days. He has got some real problems because of his injuries, that he never had before. He has days where he virtually can't even move or do anything. He can't even think straight. I am serious. I have seen him on days, like when I saw him in May up at the Crown Isle event, he was quite, the first day that he was there, the Friday afternoon after he had been working with the people at the golf, doing some instructions. He hadn't

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

been playing golf but he had been showing them doing some strokes and showing some people how to golf.

KC:   How to do the swings an stances?

WA:   Yes. The next day, I expected to see him in the morning or at least by the middle of the day for the events for the club. I didn't see him until about two o'clock. I said to him, "what's up?" He said, "yesterday was just too much for me." He couldn't hardly move. He couldn't think straight. His head was going around. He had terrible headaches and all kinds of things. I know he has some real bad days. He has some not so good days and he has some really bad days.

KC:   What did he do in that afternoon?

WA:   Oh he just kind of mixed around with us and then we went for a bit of a drive. Part of the event was a bit of a procession and a drive around Courtenay and Comox. We ended up at the air museum out at Comox at the base. He just came along with me as a passenger. He was alright. He was pretty quiet.

KC:   He seems like a talker?

WA:   That is what I mean. He is. When he is quiet, you know.

KC:   Has Richard ever talked to you about being involved in a golf course over on Salt Spring Island?

WA:   Yes.

KC:   Has he approached you to become a partner or anything?

WA:   No.

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 12 of 21

KC:   What has he told you about it?

WA:   Well, he has this company called, well he has a company or a business. I think it is called Organic Golf. He is promoting organic golf courses or golf courses that don't use all of the super toxic pesticides on the courses. That is what he is promoting. The golf course, I understand that the golf course on Salt Spring was a non issue any more. He was involved with that golf course on Salt Spring which was going organic but something, I don't quite understand what happened. There was some kind of problem there between himself and the owners of the course. I think it is a woman. There was some kind of problem there. I don't know what that was all about. He is often doing other things and his promoting investors elsewhere. In fact I understand that Porsche Cars America are really interested in helping to promote that too.

KC:   Is that what Richard has told you or Porsche?

WA:   No, that is what he has told me. That is part of what they are talking about being involved with him with regards to supporting and sponsoring him by providing him with a vehicle to use for travelling. He has an Air Stream Trailer which he has got a sponsor to put up the money for him to purchase a special, environmentally friendly Air Stream Trailer that doesn't have all of kinds of toxic furnishings and so forth. That is the idea. He is going to be towing the Air Stream Trailer to the various golf courses and using one of those new Porsche Cayenne SUV's as a promotion for Porsche. It is one of the few SUV's that truly can tow that kind of weight. He needs

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 13 of 21

somewhere to live.  It is increasingly difficult to stay in these hotel rooms or motels because there is so much toxic crap in the air in these places that he gets sick.

KC:   Does he have something that this bothers him?

WA:   Yes.

KC:   Does he have an illness that he cannot be around chemicals?

WA:   Well, he is like us all.  We all get affected by these various chemicals.  Even if we don't know it.  That is why we have plants and things in here to try and keep this atmosphere in here better.  He is definitely more affected by varnishes and stuff that comes out of the carpeting and so forth.  Even myself, we bought some new furniture at home in our bedroom and we had to air it out, and it was expensive furniture, but we had to have the windows open everyday to air the room out.  It doesn't affect me so much but my wife, it really affected her at night sleeping.

KC:   Did he ever say why he came to Canada and Salt Spring Island?

WA:   I understand there were two reasons why he went to Salt Spring.  Salt Spring Island has apparently some of the best, cleanest environment and air in this whole area.  Also, his trainer, at the time the guy that was coaching and training him lives on Salt Spring Island, Mike Coghlan.

KC:   Is Mike Coghlan a golf trainer?

WA:   You've never heard of Mike Coghlan?

KC:   No.

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 14 of 21

WA:  You've obviously never done any kind of physical training on nutrition or any of those kinds of things.  He is a very well known, famous, has written books about personal training and exercise and various things like that.  That is what it is all about.  That is where he lives, on Salt Spring Island.  He is actually a New Zealander like myself.  He has moved here and lives on Salt Spring Island.  That is part of the reason.  He was going to be close to the Salt Spring Island golf course which also was a good environment for him to be able to practice on right on the island.  There were some other facilities there that he wanted to encourage for his golfing that were relatively close in this northwest area.  Salt Spring Island seemed like an ideal spot.

KC:  Now that you mention Mike, has Richard ever talked about any previous accidents or illnesses?

WA:  He did mention about an accident that he had had and that was one of the reasons he bought the Mercedes Benz car, was that he had a car accident in the USA with his sister, in his sister's car and he was injured then.  He recovered from that and was getting back into his golf again and he was getting on board with a couple of serious sponsors.  They said that he needed to go and buy a really, really safe car.  If they were going to be backing him financially, they couldn't afford to have him set back or not being able to golf because of a car injury.  You need to do some much travelling to all of the various golf tournaments, you need to have a safe vehicle to drive.  That was the reason why he bought that car in the first place.  It is the safest

This document is the property of Action Pacific Est. Ltd.  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  Action Pacific Est. Ltd. disclaims all liability for unauthorized publication.

Page 15 of 21

car on the market, that particular model.

KC:   Where does Richard live? You mentioned the trailer, is he living in a trailer?

WA:   No. He has a piece of property on Salt Spring. He built a small home. I have never been there but I understand that it is just a small home he built on the property. He bought the property with one of his backers actually.  One of his golf backers put up some money I understand, to buy this property, as an investment.

KC:   If he is not golfing and as you said, he is trying to get himself better, how does he survive? How does he pay his bills and eat?

WA:   Well, he doesn't have any income. He doesn't have any income to speak of, I don't think. He just lives basically very, very frugally. From what I understand, he doesn't do some of the things he would like to do. He doesn't go here and there because he can't afford to do that. He used to. He hasn't done that in a long while.

KC:   Does he ever say that he has some kind of job?

WA:   No, he doesn't have a job. He can't work. I don't know. That is a personal thing. I don't know his personal affairs. I know what you are saying. The only thing that I can think of, he has got, in the past golfing is what he did. Golfing is what he does. He doesn't do anything else. He used to years back. In England, he was in the banking industry. I guess he was in university.

KC:   Did he talk about going to university in the states?

WA:   No. Just in the UK.

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

KC:   Did he talk about playing professional golf over in the UK in the Ryder Cup or the

European Tour?

WA:   He mentioned something. He has always played a lot of golf. He has played since he

was a kid. I think he did say he had played on one of the professional tours in

England before he came over here. He has been to Leadbetter. He has been down

to the professional training down there. One of his sponsors and I don't know who

it was, sent him over to the Cayman Islands for a month, two or three years ago. He

was over there at one time while I was working on his car, just golf training. That is

all he does. He doesn't have any other income. I know what you are saying. The

only thing I can presume is that he probably has a little bit from here and a little bit

from there. He probably gets, I don't know if he gets some money from his parents.

I don't know. To get by on.

KC:   Does he talk about his parents? Are they alive? Are they in Canada?

WA:   They are in the UK.

KC:   Where is he from over there?

WA:   I don't know for sure. I don't really know exactly where. I know that he is a

completely changed person since the accident.

KC:   In what way?

WA:   Well, since that time, Richard is one of these kinds, a very bubbly person. He is one

of these people that when he comes in here, in to your premises, like we ran into him

over on Salt Spring when we were over on our boat. We bumped into him in a

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 17 of 21

restaurant. He was with some other people. It was like, all of a sudden, your table is Richard Hall. Do you know what I mean? He is just a very bubbly, vivacious personality. When he comes into the shop, if he came in now as he was and came into the upper shop, everyone down here would know. He just talks loudly. He has a piercing voice. He just is bubbly. He is not like that anymore.

KC: How is he now?

WA: Well, he is much, much quieter. Much more subdued. He doesn't give off that same vibration that he did. Do you know what I mean? He is a different person. I know that is how he is. Every time that I have seen him, on different occasions, since the time of the accident, that is how he has been. He is slowly getting better.

KC: He was rear ended and it broke the motor mounts. Did it do anything to the rear end? Was it pushed out of alignment?

WA: Not to the differential, no.

KC: You said that you pounded out the fender. How much did you pound out?

WA: We jacked it up with a porter pal to get it out enough. It was probably a good, four or five inches.

KC: Back towards the rear bumper?

WA: Yes. It was not repairable, not really. Once they have been hit, the whole car is creased right back even that sail panel between the back door and the rear window. That is creased.

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 18 of 21

KC: If you hit that back corner near the tail light, does that buckle up to the door area?

WA: Well that is what it is meant to do. The bumper did it's job. It progressively collapsed. It was unfortunate that there was so much body damage done because he was hit by a vehicle, from what I understand, that was like a truck that was up high. The bumper itself did not get an opportunity to absorb any of the energy. The whole energy was absorbed by that back corner and the fender and the bumper. It just transferred all of the energy right the way through.

KC: Why would it break the motor mounts?

WA: Well, cause they are designed to do that in the case of a serious accident. They are designed to actually break off. Yeah. In the case of a serious, serious accident, like a front end accident, it is designed to break off. I can show you on a car here. The engine is designed to break off here and the actual engine mounts sheer off so the engine can go out through there.

KC: Down where the transmission is?

WA: Yes. That is what it is designed to do.

KC: So on a rear end, if the force is in the back driver's corner, why would it be affecting up here?

WA: Because the engine does that.

KC: Does a lurch?

WA: Yes. The engine would leap back and then when it leapt forward again, he didn't hit anything in the front that I am aware of. It jumped forward enough that the fan

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 19 of 21

blade went through the radiator. I feel sorry for him. I just think that it is unfortunate. He does work hard at what he does. I have seen him work hard. I have heard some comments, both the comments that we got from some of the golf people at our Porsche function were really, really positive. A lot of them are really, really good golfers and they were impressed with Richard's style and how he dealt with showing them. He showed them things they had never been showed before. He is dedicated to what he does, is what I am saying. Not just a fly by night.

KC:  Is Crown Isle in Courtenay?

WA:  Comox, yes.

KC:  Was that put on by Porsche Canada?

WA:  The Porsche Club of Vancouver Island Region. There is the Porsche Club of North America which is not affiliated with Porsche Cars of North America as a club. Porsche Cars of North America are very active in that club.

KC:  Was Porsche Canada at Crown Isle and saw Richard there? Is that how they first met him?

WA:  No. They first met him by me giving him, I gave Richard our regional director's name and phone number. I called the regional director at that time or our zone rep which is for the whole northwestern USA and Canada. I spoke to him about Richard. Richard spoke to him at length and then he suggested Richard speak to the president of PCA (Porsche Club America) and get his green light on approaching Porsche Cars North American. It is a stepping stone kind of thing and

This document is the property of *Action Pacific Est. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Est. Ltd.* disclaims all liability for unauthorized publication.

that is how it all happened. They had meetings with him at head office now, in Atlanta, Georgia. He has been down there and had meetings with them, with Porsche Cars North America.

KC: Who is the regional representative?

WA: Well it has changed now. The guy who was head of the region at that time was Dick Grant. He has since retired. The new director wouldn't be involved. This is the club.

KC: So you turned him on to Dick Grant of the club?

WA: Yes. He was the regional director for the Porsche club.

KC: When Richard went to Atlanta, Georgia, did he meet with Porsche Cars?

WA: Yes. I don't know who he was dealing with there. Last I knew, he had been to Atlanta, Georgia with Porsche Cars North America, the Head Office, to do with the sponsorship. As far as I know, he has got a verbal green light on doing this for next season on a professional basis.

KC: From the cars, not the Porsche club?

WA: Yes. You need to have some kind of reference. If you call up Porsche Cars North America, they are going to say, "who the hell are you?" You have to have some credibility.

KC: But the Porsche Club could get him in the door?

WA: Yes. They gave him some letters of introduction basically. I recommended him to Dick Grant and Dick Grant recommended him through to the president of the

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003214

Page 21 of 21

Porsche Club and then he must have got a letter of introduction to who ever he

needed to speak to that is the head of promotions for Porsche Cars of North

America.

KC:   Other than at Crown Isle, has Richard done other things like that? Was he wearing

you ball cap at Crown Isle?

WA:   Oh yeah. Most definitely.

KC:   Has he done that anywhere else that you saw?

WA:   I am just trying to think. He has volunteered a couple of times to do things like that

for us, promotionally. We haven't taken him up on it. We have just recently, he

did put forward a door prize this last month. We had our year end banquet in

Victoria for the club. I put it up as a door prize, upon Richard's suggestion that he

would be more than happy to help as a sort of a golf clinic for four people. It was a

door prize. He offered that. He is going to be doing that for us.

KC:   Did someone win that?

WA:   Yes. Actually a guy in town, Ron Young. He is the parts service manager at the

Volkswagen dealership here in town. It is one of these silent auction type things. I

don't know what he paid for it. The money goes to the club.

KC:   Do you plan to continue on with your sponsorship of Richard?

WA:   I was, yes. I just want to help him get back to where he was. Yeah.

KC:   Thank you.

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003215

# Surveillance

## Hall, Richard – L373571 4

DOB:   Feb 22/69 - Age 34 at TOL
DOL:   Nov 10/03

**EXHIBIT**

___013___

ICBC_000320



20 ton columbia log trailer. 45 ton columbia lowbed. Excellent condition, any reasonable offer considered. Call 250-283-7230 evenings, email tripp-creek@cablerocket.com

**1988 CHEVROLET** 1500 Silverado extended cab pu. 220,000kms. 350 auto. Overload springs, towing package. Good overall shape with lots of life left. $4250 OBO. 391-6229

**FIBERGLASS CANOPY** with tinted sliding windows to fit 1988 and newer GM 8ft box. Mid rise model in great shape, only about 8 years old. Neutral gray colour. $600 OBO. 391-6229

**1974 JAGUAR** XJ6. Sleek, classic lines, professionally maintained, runs well. $3200 or best offer. 217-8782

**1990 FORD** Taurus $650 obo. Showing Saturday November 6th only. 920-0376

### REAL ESTATE

**WHISPER RIDGE** 13 Okanagan Thompson CHBA Gold and Silver Awards for this project. Phase II now available. Beautifully treed and valley views. 1-3 acre homesites. All services underground. Paved roads. 160 acre private park. (The Ranchlands) 8 miles to Vernon and 40 minutes to Silver Star Mountain. Homesite from $105,000-$143,000. House packages available. (250)   545-5472.   1-800-493-6133 www.whisperridge.com

### VOLUNTEERS

**MOTIVATED   VOLUNTEERS** for overseas community development projects, starting in December, January and February. Visit www.yci.org!

### WANTED

To Respond To
If you see a ☎ after the ad, using a touchtone phone, call the Monday Personals line 69 383-6171. Press *1 to record specific ad, and then enter the 4-digit box number of the ad that interests you. If you want to leave a message for the advertiser, just follow the computers' instructions. It's very simple—and there is no charge. Otherwise, just phone the telephone number in the ad.

**YOU BEAUTIFUL** tall Asian swimmer with kind eyes and beautiful smile. ME- Tall swimmer hoping to show you how nice it can be. Wanting to give you the world. Don't forget.

**FOR RICHARD** British residence Salt Spring drives light coloured Mercedes Benz, crunch left rear with Oregon plates. Dog- German Shepard. For recording Beethoven unfinished write. B. Hogan at dalziel@qwest.net

**VERY PRETTY** redhead had a sexy heart tattoo on your wrist. Whitespot last Sunday with your friend for lunch. I was in black jeans waiting behind you. How about Coffee? MONDAY #1695 ☎

**FOUR   AGREEMENTS**-Vancouver Airport. You had the book, we talked briefly, then my flight to Victoria got called (yours was cancelled). Would like to talk more. MONDAY #9075 ☎

Le

Your Wan
Me:   Lea
Monday s

You   Mai
platform s
Me: Askin
next Mon

You G um
that took r
Me: Danc
out
a

Yo Head
and waite
Me I forge
why don't
dressed n

Be
L
Ni
919

WA

**HEY KERRI**
being such
helping me
mowing my
work on a S

**Bobsien, Diane**

| | |
|---|---|
| From: | Diane.Bobsien@icbc.com |
| Sent: | Thursday, May 27, 2004 1:14 PM |
| To: | Diane.Bobsien@icbc.com; gerard.wright@icbc.com; ben.shotton@icbc.com |
| Subject: | ADVICE OF ASSIGNMENT |

Date:  27 / May / 2004
Claim Center:  CC34 - DUNCAN CLAIMS

Claim Number:  L373571.4
S.I.U. Number:  04-1334

Insured:  HALL, Richard David Hewson

Subject:

Please be advised that the above-named file has been assigned for a detailed
investigation by:  Ben SHOTTON

Do not hesitate to contact the investigator at any time for further assistance.

The investigator will be contacting you regarding the above-noted claim.

**EXHIBIT**

**014**

1

ICBC_000315

*Stop Hall*

## Dicesare, John

| | |
|---|---|
| **From:** | Pietramala, Agostino |
| **Sent:** | Tuesday, November 28, 2006 2:37 PM |
| **To:** | Dicesare, John |
| **Subject:** | FW: Duncan Claim transferred to HO.  L373571.4 HALL  SIU 04-1334 |

John, do require our services on this? If so, just give me or one of us a shout.

Tino

----Original Message----

| | |
|---|---|
| **From:** | Woodske, Joyce |
| **Sent:** | Tuesday, November 28, 2006 2:20 PM |
| **To:** | Dyck, Marcus; Clenahan, Dave; Pietramala, Agostino |
| **Subject:** | Duncan Claim transferred to HO.  L373571.4 HALL  SIU 04-1334 |

Marcus Dave or Tino,

I have this file that I got from Ben SHOTTON in February. I haven't done anything on it, as I was waiting for EFD to be completed (per Ben's last note). The EFD is now scheduled for Dec 18th 2006. This was recently transferred to head office for a few reasons: $$$, high profile, closed head injury.
A fair amount of work was done by Independent Investigator Ken Carter.

A 6 figure advance was requested.

P/C requested confidentiality agreement with ICBC for information disclosure from HALL, as HALL on new business adventure. ICBC declined.

I reviewed a portion of the file and definitely have my concerns on it. I do not have any medical information on my file which puts me at a clear disadvantage regarding medical evidence of injury.  (see below)

I thought perhaps you could speak to John DICESARE and see if this is something that SIU HO should be taking on. If not, I will close this file at this end. Girard WRIGHT - the last adjuster on file did not read the medicals (after a confidentiality warning from D/C), did not know if this file warranted SIU involvement or if it just needed to be handled carefully due to HALL's connections.

Appears HALL originally from England and may have had an MVA there. Also, indications are that he may have had motorcycle MVA in Florida.

Anyway, if one of you could talk to John D and then let me know if you want this SIU file to be transferred, that would be great.

Thanks,

Joyce Woodske

i

**EXHIBIT**

**015**



**ICBC**

— SPECIAL INVESTIGATION UNIT —



Claim Number: _373571.4_

Claimant: _I ALL_                    SIU File #: _04- 1334_

| DATE | SUMMARY OF ACTIVITY |
|------|---------------------|
| 11 ov 12 Dec 06 | Spoke w Tina Sue Ho he did review email + spoke w/John DICESARE as I had. DICESARE still reviewing his file @ the time. As per Ben SHOTTON suggestion I have not done a complete review pending EFD. When I spoke w DICESARE he indicated that unusual claim + pass SIU required @ later date. Tina advised he would contact me after DICESARE reviewed file completely + request SIU invest required. |
| 8 Jan 07 | DICESARE analysis / summary of file on CVMS + attached. I have reviewed most file contents including Action Pacific deposits I note that Richard Hall in his law suit against the Credit Union is a suspect Richard Hall _____ resident |
|  | At this point I will hold file pending EFD + file documentation in Gulf mines + prior MVA's in Florida? + pass Oregon i/k? |

**EXHIBIT**

**016**

"THIS REPORT WAS PREPARED IN CONTEMPLATION OF LITIGATION AND IS THEREFORE PRIVILEGED IN LAW AND ALL LEGAL MATTERS"                    Page: ___

Investigator: Joyce Woodske

ICBC_000021

STATEMENT OF CONFIDENTIALITY: The information in this facsimile transmission is intended only for the person or entity named within and may contain information that is privileged, confidential and exempt from disclosure. If you have received this facsimile in error and are not the named recipient, please immediately notify us by telephone or facsimile at the numbers listed on the cover sheet. You are hereby notified that any dissemination, distribution, copying or other use of the communication or the information contained herein is strictly prohibited.

To:     David Leadbetter

Company:   David Leadbetter Golf Academy

Fax Number: (407) 787-3443

## Action Pacific

**Investigative Service   Security Consultation**

Suite 160 – 1581H Hillside Avenue, Victoria, B.C. V8T 2C1

ActPac@shaw.ca

Tel: (250) 382-4004      Fax: (250) 382-4012

Subject:   Confirmation of Richard Hall letter

# of Pages including cover Page: 3              Date: 2004 Aug 05

Message:

I have been tasked to confirm your authorship to this attached letter. I would appreciate your reply to this confirmation. I would also like the opportunity to speak with you for a few minutes. Please advise of the time and telephone number that would be convenient to you for my call.

Thank you in advance.

Ken Carter

**EXHIBIT**

**017**

ICBC_000522

03/18/2004 09:16 FAX                                                          ☒028/032



ChampionsGate
1410 Masters Boulevard
Davenport, Florida 33837
tel 407.787.3330
fax 407.787.3443
www.DAVIDLEADBETTER.com

**CONFIDENTIAL**

Canadian Immigration
Canadian Government

My Name is David Leadbetter. I am founder and President of the David Leadbetter Golf
Academies, recognized internationally as the finest golf instruction academies worldwide. I am
the author of five books on Golf instruction, which have sold over five million copies worldwide,
as well as numerous golf instruction videos and training aids. My students have included Greg
Norman, Nick Price, Nick Faldo, Mike Weir, Ernie Els, Severiano Ballesteros and Tom Watson
as well as many of the world's top golfers. Between them they have won over 20 major
championships (of which there are only four championships each year) and I am widely regarded
as the most "winning" golf coach in the history of the game.

Accordingly I am known within the industry as "the master of teaching the golf swing". I am
very regularly featured in segments on Television's "The Golf Channel" and a senior
instructional editor for Golf Digest and Golf International Magazine.

My role is to train the most gifted players so that their technique can stand up to the ultimate
pressure of major championships. This can often be a process requiring several years' work to
improve the player's technique to the necessary level to withstand the highest pressures as they
move up through the ranks. The unparalleled success of the players I have taught indicates how
successful my teaching is.

This letter is provided in reference for Richard Hall, an exceptionally talented golfer who has
attained international recognition for his ability. Due to Richard's significant abilities I petitioned
the US Government on Richard's behalf, and he is now recognized by the US Government,
through his P1 Visa, as an athlete of "international standing."

He has represented his country of England on their national team in international competition.
Subsequent to that, he gained a place at Cambridge University where he continued his record of
being undefeated head to head in team competition and went on to break the University course
record. He has won or finished runner up in national and international Championships in France,
South Africa and England. He also earned a prestigious golf scholarship to the University of
Arkansas, known as one of the best NCAA Golf teams in the country. He has also set several
course records including at the Walton Heath Golf Club, which has played host to numerous
Professional Tournaments including the Ryder Cup.

03/18/2004 09:16 FAX                                                        ☒029/032

I have coached Richard Hall for four years and in my experienced professional opinion I have no doubt that Richard has what it takes to succeed at the highest levels in Professional Sport. This will enable Richard to contribute in a meaningful and substantial way to the economic and cultural life of Canada. Individuals with the potential and ability to become world champions – as so many of my students have – are vary rare.

To reinforce that opinion, I also know Richard Hall has a very unusual background for a Professional golfer and is blessed with both a highly trained and gifted mind. He has attained the rare distinction of a First Class Honors Degree in Politics from Cambridge University, where he was also elected a Bundy Scholar and was subsequently awarded a scholarship to study at the Fulbright School of International Relations at the University of Arkansas.

I know that Richard has also worked as an investment banker for UBS Warburg and since pursuing his career as a Professional Golfer he has set up his own company, with the founder of the Sierra Club Foundation, the renowned late David Brower, as his first advisory board member.

I would not be surprised if Richard's passion for Economic and Cultural life spill over into his life as a successful Professional Athlete. He has already been the first golfer I have known to use environmentally friendly golf grips with no dyes, glues or solvents or any man made materials normally inherent in modern manufacturing processes and also represents and currently promotes Canada's ONLY Organic golf course, Blackburn Meadows Golf Course.

His contribution to such issues will no doubt have a positive economic and cultural impact as he becomes increasingly successful as a Professional Golfer. This only serves to reinforce my opinion that Richard Hall is a substantial asset to the country he represents.

His character also further serves to underline this. As an illustration of this, despite a serious car accident, a high speed motorcycle accident and a lengthy illness Richard Hall has remained singularly determined in his profession and has overcome these obstacles while retaining his normal positive outlook. So much so, that while a lesser man might have given up in the face of such ongoing challenges, in this, Richard's return to competition season he has finished high up in many of his tournaments, has been interviewed on Television and has garnered endorsements from Apex Fitness Equipment and a Mercedes/BMW/Porsche car dealership.

In conclusion it has been my pleasure not only to teach the greatest golfers of this generation but also to teach the some of North America and Europe's senior executives and celebrities. Richard Hall's athletic ability, intelligence and character leave me in no doubt that, like them, he is a substantial economic and cultural asset to the country in which he chooses to reside.

Should you require any further information please do not hesitate to contact me.

Yours sincerely,

David Leadbetter

ICBC_000524

## Fax Transmittal

DATE _12 JULY 2004_   TIME

TO:   NAME _KEN CARTER_

OFFICE _ACTION PACIFIC_   _03-1275_

FAX _382-4012_   PHONE

FROM:



Gerard G.J. Wright, BA AIIC
Examining Adjuster

_L 373475.6_

5151 Polkey Road
Duncan BC
V9L 6W3

Direct (250) 709-3404
Tel (250) 709-3400
Fax (250) 709-3401
Toll Free 1 800 663-6144

gerard.wrigh@icbc.com

PAGE 1 OF _3_

_Attached headletter letter_

_I will call you today_

_Cheers._

The information in this fax is intended only for the use of the person named above. This fax may contain information that is privileged and confidential. If you are not the person this fax is addressed to, then take notice that any use, dissemination, distribution, or copying of this fax is strictly prohibited. If you have received this fax in error, please call us immediately at the above number (collect if necessary) and return this original to us by mail. Thank you.

EXHIBIT

018

Recorded telephone interview of David Leadbetter, Professional Golf Instructor,

Bus: 1410 Masters Boulevard, Davenport, Florida          Telephone: (407) 787-3330

2004 August 06                                                      11:45 AM

KC: Ken Carter                              DL: David Leadbetter

KC:   Thank you for calling back Mr. Leadbetter.  What I was calling for, I was calling to

       confirm this letter that I faxed to you.  I take it that you personally know Mr. Hall.

DL:   Yes, I do, very well.  I have known him for several years and that letter is authentic,

       certainly.

KC:   How did you come to meet Mr. Hall?

DL:   He came and took golf instructions from me.  He is a professional golfer and I have a

       reputation for teaching some of the worlds best golfers so, he came down to get golf

       instructions from me.

KC:   Did he take lessons personally from you or from one of your instructors?

DL:   No, from me personally.

KC:   Do you have any idea how long you have known him?

DL:   I would say that I have known Richard now for probably six or seven years.

KC:   You said that he was a pro golfer.  Where was he golfing when you first met him?

DL:   He was playing golf well, he is from England originally.  He was playing over there and

       he essentially came over to work here on his game with me.  He was playing some

       smaller tournaments, I believe, out on the west coast of America, somewhere in

       California, I believe.  He sort of intrigued me.  He was one of those fellows that sort of

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the content of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003168

almost begs to see me. I have a pretty busy schedule. It was just one of those things that he had quite a story to tell. He was living on the rough, so to speak, in an effort to really improve his golf game and to follow his dream as a lot of these younger players are.

KC:   Did he ever play in any tours like the Challenge Tour or the Canadian Tour, that you are aware of?

DL:   He played some smaller tour in Britain. I am aware of that. I think he basically had a pretty good amateur record. I think that with a lot of these players, once you are out there it is easier to stay than to get out there. I know he had a lot of financial problems. It costs a lot of money to sort of get out there. I think that was probably one of the major reasons and I think he played in the smaller tours. He didn't play one of the major tours.

KC:   So he didn't play in the Challenge Tour that you are aware of?

DL:   I think he played in a few events. I am not sure if he played full time but I know he played. That is a smaller tour of Europe that I was referring to, the Challenge Tour which is a secondary tour. It is a much smaller tour.

KC:   I have gone through the stats from 1990 and I can't find him on any of the winnings' lists. It goes right down to golfers winning 24 pounds.

DL:   Really. In the early stages, I know he had some injury problems, I think. I know that was one of the key issues. He had a pretty good amateur record. I met some of the people that he was involved with in the early years. He was a very well educated

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 3 of 9

individual. He went to Cambridge which is no mean feat. He is one of those guys, when you look at golfers there, you can sort of sense that he is following his dream. He is following this trail but yet, in my line of business, you never say no. You see dreams where two out of three are fulfilled. If somebody has got some talent, it is just a matter of really having the right breaks and obviously, he felt, having the right instruction would help him toward those goals.

KC:   In your letter, you mention that he was involved in a serious car accident and also a motorcycle accident. Do you know where those were?

DL:   I think the motorcycle accident was actually, I think it was in Florida if I remember. I don't know. The car accident, I think was in Europe. I don't know. I know he was involved with Lloyds of London and they were insuring him because of his game and so on. That was one of the reasons he was able to play. He had a few serious injuries that he was trying to get over. I think the motorcycle accident might have been in Florida. I honestly can't remember.

KC:   How long ago do you think it was?

DL:   The motorcycle accident was probably, I would think, maybe two to three years ago. It was something like that, I think, if memory serves me correctly.

KC:   The care accident, was that prior?

DL:   I think it was prior. I don't know to be honest. There are a number of people that I have to be involved with and I don't know. I consider him to be a friend. I speak to him periodically and he has certainly followed every trail in order to try to achieve his

This document is the property of Action Pacific Ent. Ltd. This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. Action Pacific Ent. Ltd. disclaims all liability for unauthorized publication.

goals or his dreams.  He is focused.  He basically put a lot of work in with Michael

Colghan up in Canada who is one of the worlds renown physiologists.  He is quite an

interesting fellow in more ways than one.

KC:    I was wondering why he is here in Canada?

DL:    I think, number one, he is a health nut and one of the things where he is out on the west

coast there,   he was playing on an organic golf course believe it or not.  That is one of

the things which is near and dear to his heart because apparently in all the testing they

did on Richard, one of the things that they found is that he is extremely allergic to any

sort of chemicals and even things that are in the golf grip.  He went to the point where

he had these almost organic golf grips put on and that.  He got to a point where he

wanted to play, I mean, one of the things that he got involved with, with this golf course

up in Canada which is just outside of Vancouver.  It sounds wonderful.  It is sort of

almost a retreat area.  Basically it is very close to where Michael Colghan is, whom he

basically got together with to help him with his body, his physical being.  With the

advent of the organic golf course and the ability that they allowed him to sort of

practice and work on his game, I think that is really the basic reason that he is there.

KC:    I wondered if he was coming here because of the Canadian Tour.

DL:    I know that he has played in one or two smaller tournaments in Canada.  This year, he

was actually going to go to the Canadian Tour.  The car accident, the one that you are

probably referring to is the recent one where he had almost like a permanent

concussion.  I have been away for awhile and I haven't heard from him.  I got in touch

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003171

Page 5 of 9

with him the other night and he said, well, as a result of the accident they felt he had a permanent concussion so I think that is the reason why. I am not sure if that is the motorcycle one or the car. That might have been the motorcycle one. I sort of get them confused. I know he has had at least two pretty serious accidents. His goal this year was to play on the Canadian Tour and to do well for himself and then probably head to the European Tour.

KC:   This amateur record, how would I be able to find anything about his amateur record? Do you have any idea?

DL:   Shoot, I know he was a member at a golf club in London called Walton Heath which is a very famous golf course. I know that they know of him. Maybe a call to them might sort of shed some light on what he did as an amateur.

KC:   There was talk in the letter of a lengthy illness. Do you have any idea what that was?

DL:   A what?

KC:   In your letter, there was mention of a lengthy illness.

DL:   Yeah, that was based on, I think that was pretty much based on the fact that I don't know if you want to call it an illness but it was very much a case of his, I think a throw back to his one accident which I believe he had some very serious wrist injury. He had a very serious wrist injury if I remember correctly. To be honest, I would have to check the records and see.

KC:   I wondered what you do recall.

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003172

Page 6 of 9

DL:  I know there was something there. With what Richard has gone through and what he has been through, I have no reason to doubt his word. Obviously you have to take a lot of people at face value. One thing for sure, with his education and his knowledge, the odds of him being successful are not great as they are with a lot of people unless you have got an absolutely unbelievable pedigree. I always thought that well, if he wasn't successful at golf, he is going to be successful at some other career because he has certainly got the, he certainly is a very intelligent man.

KC:  You do see a wide scope of people and some of the best in the world. Where does Richard Hall fit in there? Is he going to be another Tiger Woods?

DL:  No, he is not going to be Tiger Woods but yeah, obviously his goal really is to, I think, it depends on how you gauge success. If success is gauged by okay, a player who's sole goal it is to finish in a tournament. They win a tournament and that is basically it. Other people's goals are to just get on a tour. They got on tour and they are there for a couple of years and it is okay. It isn't an easy way to make a living. He is a very talented sports person. He strikes the ball well and I think the key for him now is to be able to get into a competitive base.

KC:  I noticed that he went to qualify for the Canadian Tour and he only played two rounds. He never finished the qualifying school.

DL:  Right.

KC:  Did you ever get any feedback on that?

DL:  This was recently?

This document is the property of Action Pacific Ent. Ltd. This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. Action Pacific Ent. Ltd. disclaims all liability for unauthorized publication.

Page 7 of 9

KC:   That was in 2003.

DL:   I don't know. I am not sure. That is usually that you are outside the number and you
      don't qualify for the last two days.

KC:   No, he had the numbers. It seemed like he only did two rounds and that was it.

DL:   Oh really. I can't remember. Obviously there was some reason for it other than, I
      can't remember. You would have to check with him on that.

KC:   Do you think that he is of the quality that could play on the PGA or the Canadian
      Tour?

DL:   Oh certainly. He has the quality to get on the Canadian Tour. Whether he has the
      quality to get on the regular tour, time will tell. You really have to take small steps in
      this game. Really, you have to go through the first level and see how you react under
      pressure. See what your results are and then go from there. Every level of play is really
      a rung that gets added to the next rung. It is a process. It is one of those things were
      people have goals and people have dreams. A lot of it is what are you prepared to
      sacrifice. He has already sacrificed a lot. I would certainly say that at this stage of his
      life, he could certainly be very successful at some other area in the business world but
      obviously he wants to see how far he can take this.

KC:   I see that you mentioned that he worked for USB Warburg.

DL:   Yeah, right.

KC:   What was he doing there?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding
that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal
safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 8 of 9

DL:   He was doing some, involved in some TV stuff.  I have a minor involvement because

some management company that I was involved with, ING, really run that tournament

and they were looking for some odd bods there to help out in some various areas.  I am

not sure what he did in the end.  It was part of the tournament.

KC:   So it was something to do with golf, not as a banker?  It is a large investment company.

DL:   Right, yeah.  Okay.  We did two things.  The Warburg is a tournament that they have

in South Carolina.  I got on the wrong wave length there.  The Warburg basically was

the fact that he tried to raise this money for this group that are getting together to

create this organic, I want to say pesticide free zone for golf courses.  He was involved

with the raising of the finances and he had some involvement with that institution

previously.  He is in a part time mode of trying to put this whole thing together.  To get

various heads of industry together to see if they can create an entity to try to keep golf

as chemical free as possible.

KC:   He was more trying to raise money or awareness than as a banker?

DL:   It is really that there is money involved in it but basically it is really getting the people

together.  The people that would have the clout to be able to put this thing together.

KC:   You made mention of a David Brower.  Is that where he came in?

DL:   Yeah, that's right.  David Brower was involved in the whole thing.

KC:   He passed away in 2002, I believe.

DL:   Yeah, I think he was pretty much Richard's mentor in a lot of ways.  He was a very

intelligent man.  I am not sure.  I am not sure if he was involved with something that

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards.  *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 9 of 9

he was involved with at Cambridge.

KC:   Richard knew Brower personally?

DL:   I believe. You are asking me questions that I can't answer. Obviously I got some facts at the point when I wrote the letter. I don't know the ins and outs. I am a little busy for that unfortunately. Is this going to last much longer? I am really busy. I was only planning on a couple of minutes.

KC:   I just have a few more questions. The University of Arkansas, Richard had a scholarship there. Is it a golf school? Would that have been a golf scholarship that he had?

DL:   Yeah. The University of Arkansas is one of the NCAA division one school and golf is part of their program. He was offered a scholarship to play on their golf team.

KC:   I could find lots on the lady's golf there but nothing on the men's program.

DL:   Oh really.

KC:   Is there definitely a men's golf team?

DL:   Yeah. By all accounts, yes. Absolutely. If there isn't, I'd be very much surprised, let's put it that way.

KC:   Thank you very much for your time.

DL:   Okay, bye.

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003176

EXHIBIT

019

Recorded telephone interview of Darren (LNU), assistant to David Leadbetter,

Bus: 1410 Masters Boulevard, Davenport, Florida          Telephone: (407) 787-3330

2004 August 06                                            10:10 AM

KC: Ken Carter                          DL: Darren (LNU)

KC:   This is Ken Carter calling from Victoria, British Columbia.

DL:   Yes.

KC:   You called and left a message this morning. I was wondering if there was a time that

      I could speak with Mr. Leadbetter?

DL:   I talked to him this morning and he wants me to try to handle this if I can. He is just

      extremely busy. I actually typed this letter for David so I can authentic it if you will

      and verify that David did write it. I typed it up and sent it out.

KC:   One of the things that I would like to know about, which is commented on in the letter,

      which I would like to verify, did Richard take personal instruction from Mr.

      Leadbetter or was he a student at your academy?

DL:   He worked directly with David. He has for years.

KC:   It seems like he knows a fair amount about Mr. Hall.

DL:   Yes. I have worked for David for eight years and Richard has been taking lessons with

      David for longer than that. When I started, he was already taking lessons from him.

KC:   I am under the understanding that Richard played in the European Challenge Tour.

DL:   Correct.

KC:   Are you aware of that?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003163

DL:   I believe he did. I don't know the specifics of Richard's career but I am sure that he did play in a number of European Tour challenges and he has played in the Canadian Tour stuff. I know that he holds a bunch of course records around the world.

KC:   I have been trying to verify that but I have not been able to find anything. I have looked at the Challenge Tour and the Canadian Tour.

DL:   The Challenge Tour stuff was a number of years ago. The way they keep the stats, if you look on the European Tour web site, if you are not an exempt player or you don't play in enough events, they won't put you on there. There are too many Richard Halls in the world, if you will, that have played in maybe a dozen or two dozen events over their career but were never fully exempt or partially exempt to get on the web site. If you are not ever a fully exempt player, they don't have your profile on their web site.

KC:   I was looking at the winnings and there are people that are listed going down to having made only 140 pounds. I thought they would have everyone on there that had won. This information goes back to 1990. Would he have played before 1990?

DL:   I don't think so. I came to work for David in 1996. It probably would have been in the early 1990's that he played. Like I said, I shouldn't even speculate because I don't know the specifics.

KC:   But he did play on the Challenge Tour? Or played some of the Challenge Tour?

DL:   Yes. I don't know if he was exempt or not or whether he just went and qualified. I don't know how he played but I know that he played in several events.

This document is the property of Action Pacific Ent. Ltd. This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. Action Pacific Ent. Ltd. disclaims all liability for unauthorized publication.

Page 3 of 5

KC:  You said that he holds some club records. The Walton Heath Club, that is in Scotland, that he had a record. I wonder where the other golf course records that he set are?

DL:  You would have to call the clubs.

KC:  Is there any others or is that the only one that you are aware of?

DL:  That is the only one listed here.

KC:  In that letter?

DL:  Yes, exactly. Richard can probably tell you all the other ones that he broke. I don't know off the top of my head.

KC:  To verify, Mr. Leadbetter has been personally instructing Richard for a number of years.

DL:  For over eight years that I know of.

KC:  From your web site, it looks like students can go there but they don't get personal instruction. Richard is getting personal instruction?

DL:  Yes.

KC:  Do you know anything more about what other tours Richard has been on? You said that he had been on the Canadian Tour.

DL:  He played a couple of events on the Canadian Tour. I think that he qualified for a couple of them but he was never exempt on the Canadian Tour. I think he just qualified. He just did the Monday qualifying.

KC:  He was involved in a serious car accident. I take it that was over in Europe or was that the accident in the USA?

This document is the property of *Action Pacific Ent. Ltd.* This report may contain matters of opinion. It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator. Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

ICBC_003165

Page 4 of 5

DL:  I know he was in a motorcycle accident and a car accident.  Where the car accident was, I couldn't tell you.

KC:  Where was the motorcycle accident?

DL:  I have no idea.  I don't keep tabs on his private, personal life.  It is not my job.

KC:  I wondered because there was a comment in the letter about an accident.  Someone must have known where or when it was.

DL:  David may.  It is not in the letter.

KC:  Do you know if they are recent or if they are very historical?

DL:  I know one was a few years ago.  One was just last year.  The car accident was the recent one.

KC:  Was that the one here in Canada then?  There was a car accident here in Canada and I was wondering about the motorcycle accident.

DL:  Yeah, I don't know.

KC:  Would that have been since your employment with David?

DL:  I couldn't tell you.  All I know is I heard through the grapevine that he was in a motorcycle accident at one point.

KC:  In the letter, it also states, "Richard has also worked as an investment banker for UBS Warburg." I am not having any luck finding out about UBS Warburg.  How do you know about that?

DL:  I don't.  Like I said, I just typed the letter.

This document is the property of *Action Pacific Ent. Ltd.*  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.  Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd.* disclaims all liability for unauthorized publication.

Page 5 of 5

KC:   That is why I wondered if I could talk to David.   Could I talk with him for a few

minutes to verify some of this information?

DL:   Yeah.  I will see if I can get him to give you a call.  I will call him now.  Will you be in

your office?

KC:   I will.  I am here right now.

DL:   I will get him to give you a quick call.

KC:   I will give you my toll free number.  1-866-382-4004.  If not just call collect.

DL:   Thank you.

This document is the property of *Action Pacific Ent. Ltd*.  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.   Distribution within your agency is to be protected in accordance with normal safeguards. *Action Pacific Ent. Ltd*. disclaims all liability for unauthorized publication.

ICBC_003167

```
DATE: 08JAN07      INSURANCE CORPORATION OF BRITISH COLUMBIA        PAGE:  1
PROGRAM: CWI306P              CLAIM FILE FOLDER

CLAIM      : L373571 4                     TASK STATUS : ALL
INSURED    : DOVE, DONALD A
EXPOSURE A : DOVE, DONALD A
                                                                    TYPE/
                                                                    EXP
DATE      WORKTYPE  DESCRIPTION/DETAIL                             --MSGS
----------------------------------------------------------------------------
                                                                    A
29DEC06 EMAIL       FILE ANALYSIS PART III
                    DATE: FRIDAY, DECEMBER 29, 2006 12:47:54 PM
                    CC: MCRAE, MARIA
                    MF L373571 4 EXP   YF            YF        CONF   (Y/N)
                    FILE MANAGEMENT:
                            1    IDENTITY OF FRONT VEHICLE IN 3 CAR R/E MVA?
```

██████████████████████████████████████████████████

```
                    3.     OBTAIN PRE MVA HEALTH RECORDS GOING BACK 10 YEARS;
                    CLAIMANT HAS A SIGNIFICANT HISTORY INCLUDING APPARENT
                    EXPOSURE TO TOXIC SUBSTANCES, LEADING TO IMPAIRMENT. THIS
                    IS IN PART, RESPONSIBLE FOR HIS MOVE TO SALT SPRING WHERE
                    SUPPOSEDLY, HE SOUGHT TREATMENT FROM A WORLD RENOWN
                    THERAPIST;
                    4.     PRE MVA TAX RECORDS GOING BACK 10 YEARS;
                    5.     OBTAIN COMPLETE ACADEMIC RECORDS AS WELL AS ANY
                    IMMIGRATION/VISA RECORDS;
                    6.     INVESTIGATE PRIOR LAW SUITS, OF WHICH THERE HAVE BEEN
                    MANY (PARTICULARLY SERIOUS MOTORCYCLE MVA IN FLORIDA 2-3
                    YEARS AGO AND TOXIC EXPOSURE);
                    7.     INVESTIGATE GOLF CAREER AND SUCCESS, OR LACK THEREOF;
                    8.     ARRANGE FOR IME'S; NEUROLOGICAL/PSYCHIATRIC AND
                    LIKELY
                    ORTHOPAEDIC;
                    9.     SURVEILLANCE;
                    10.    BACKGROUND CHECK; CONFIRM EDUCATIONAL BACKGROUND,
                    ETC.
                    (WE WILL BE GETTING A NEUROPSYCHOLOGY REPORT SERVED ON US
                    AT SOME POINT);
                    11. FORMAL OFFER.
----------------------------------------------------------------------------

                         ** END OF CWI306P  REPORT **
```

**EXHIBIT**

020

```
DATE: 08JAN07     INSURANCE CORPORATION OF BRITISH COLUMBIA        PAGE:  2
PROGRAM: CWI306P            CLAIM FILE FOLDER

CLAIM    : L373571 4                    TASK STATUS : ALL
                                                                   TYPE/
DATE     WORKTYPE  DESCRIPTION/DETAIL                              EXP
                   EFFECTIVELY, WE ARE BEING THREATENED NOT TO DO ANYTHING TO
                   NEGATIVELY IMPACT THIS CONFIDENTIAL BUSINESS VENTURE.
                   CONVENIENTLY, THIS MEANS NOT INVESTIGATING THE VENTURE AT
                   THIS CRITICAL TIME. IN THEORY, IT ALSO MEANS ACCEPTING
                   RICHARD'S DOCTOR'S TREATMENT RECOMMENDATIONS SO THAT HE CAN
                   DO HIS BEST, TO MITIGATE HIS LOSSES.
                   THIS FILE ARRIVED WITH A SEALED ENVELOPE WITH VARIOUS
                   MEDICAL RECORDS THAT I AM TOLD NOT TO DISCLOSE TO ANYONE. I
                   HAVE NOT OPENED THE PACKAGE BECAUSE I AM WAITING TO SPEAK
                   TO DEFENCE COUNSEL BEFORE DOING SO, JUST AS A PRECAUTION. I
                   DO NOT WANT TO GIVE PLAINTIFF'S COUNSEL ANY EXCUSE TO MAKE
                   UNFOUNDED ALLEGATIONS ABOUT IMPROPER DISCLOSURE OF RECORDS,
                   ETC.
                   TO DATE, WE HAVE REFUSED TO SIGN A CONFIDENTIALITY
                   AGREEMENT.
                   RICHARD HALL HAS ALREADY FILED COMPLAINTS WITH GEORGE
                   FEDOROFF, MANAGER OF CUSTOMER RELATIONS, NETTIE WAGNER, OUR
                   VP AT THE TIME AND RICH COLEMAN, THE MINISTER RESPONSIBLE
                   FOR ICBC AT THE TIME.
                   RICHARD MADE AN EARLY DEMAND FOR A SIX FIGURE ADVANCE.
                   THERE IS MENTION ON FILE ABOUT A VENTURE INVOLVING ORGANIC
                   GOLF COURSES. THE CONFIDENTIAL BUSINESS VENTURE MAY HAVE
                   SOMETHING TO DO WITH THAT.
                   RICHARD IS A PARTY TO MANY OTHER LAW SUITS. MY SENSE IS
                   THAT HE IS OF QUESTIONABLE CREDIBILITY, WHO HAS ALWAYS
                   EXISTED ON MINIMAL EARNINGS. HE HAS AN INFLATED
                   SELF-PERCEPTION THAT SIMPLY DOES NOT ACCORD WITH HIS REAL
                   POTENTIAL, EITHER AS A GOLFER OR AN ENTREPRENEUR.


                        PART 7          NO PART 7 COVERAGE
                   LITIGATION:
                   PLAINTIFF COUNSEL:          WILLIAM MORLEY (FASKEN
                   MARTINEAU)

                   DISCOVERIES:    DECEMBER 18, 2006
                   TRIAL DATE:   NOT SET.
------------------------------------------------------------------------

                   ** END OF CWI306P  REPORT **
```

```
DATE: 08JAN07     INSURANCE CORPORATION OF BRITISH COLUMBIA     PAGE: 1
PROGRAM: CWI306P            CLAIM FILE FOLDER

CLAIM      : L373571 4                    TASK STATUS : ALL
INSURED    : DOVE, DONALD A
EXPOSURE A : DOVE, DONALD A
                                                              TYPE/
                                                               EXP
DATE    WORKTYPE  DESCRIPTION/DETAIL                          MSGS
------------------------------------------------------------------------
29DEC06 EMAIL      FILE ANALYSIS PART II                        A
                   DATE: FRIDAY, DECEMBER 29, 2006 12:46:50 PM
                   CC: MCRAE, MARIA
                   MF L373571 4 EXP    YF         YF         CONF   (Y/N)
                   IN THE SUBJECT MVA, RICHARD TELLS DR. ANCIL THAT ON IMPACT,
                   HE SAW HIS HEAD GO BACK FROM OUTSIDE HIS BODY. DR. ANCIL
                   CONFIRMS NO RETROGRADE NOR POST TRAUMATIC AMNESIA BUT SAYS
                   RICHARD REPORTS BEING CONFUSED (NOTE THAT RICHARD WAS ABLE
                   TO DRIVE TO THE POLICE STATION, POST MVA).
                   DR. ANCIL, DIAGNOSED RICHARD AS HAVING SUSTAINED A SOFT
                   TISSUE INJURY TO HIS C-SPINE AND AN MTBI. DR. ANCIL SAYS
                   HIS CONDITION IS COMPLICATED BY CHRONIC PAIN, DEPRESSION
                   AND ANXIETY/MOOD PROBLEMS (IN PART CAUSED BY FINANCIAL
                   PRESSURES). HE RECOMMENDS A REFERRAL TO DR. LONGRIDGE
                   REGARDING ADDITIONAL COMPLAINTS OF DIZZINESS.
                   APPARENTLY, RICHARD HAS TOLD PEOPLE, INCLUDING A PRE MVA
                   SPONSOR THAT HE HAS A BRAIN STEM INJURY (SO MUCH FOR
                   CONCERN ABOUT CONFIDENTIALITY). HE HAS BEEN SEEN TO WEAR A
                   NECK BRACE.
                   AT 34, RICHARD WAS STRUGGLING AS A GOLFER, PLAYING VARIOUS
                   MINI-TOURS AROUND THE WORLD.  HE ALLEGES THE LOSS OF
                   SIGNIFICANT SPONSORSHIP  INCOME BECAUSE OF HIS INJURIES.
                   COLLATERAL INTERVIEWS TO DATE DESCRIBE RICHARD AS A VERY
                   AVERAGE PROFESSIONAL GOLFER, AT BEST.  HE WITHDREW FROM THE
                   CANADIAN TOUR QUALIFYING SCHOOL IN THE SPRING OF 2003, PRE
                   ACCIDENT.
                   HE IS DESCRIBED BY SOME COLLATERAL AS SOMEONE WHO LIVED OUT
                   OF HIS CAR.
                   MR. HALL'S LAWYER TELLS US THAT HE ATTENDED THE MAYO CLINIC
                   AND THAT THEY RECOMMEND MR. HALL HAVE PERSONAL ASSISTANTS
                   TO OFFSET PROBLEMS RELATED TO HIS BRAIN INJURY. HIS LAWYER
                   SAYS THAT RICHARD'S ABILITY TO MITIGATE HIS LOSS IS
                   DEPENDENT UPON HIS ABILITY TO MITIGATE HIS INJURY, BY
                   FOLLOWING THROUGH WITH THESE RECOMMENDATIONS.
                   RICHARD MAKES REFERENCE TO A BUSINESS VENTURE HE INITIATED
                   BUT CITES SIGNIFICANT CONFIDENTIALITY CONCERNS AND REFUSES
                   TO DISCLOSE THE NATURE OF THE BUSINESS, NOR ALLOW ANY
                   INVESTIGATION INTO SAME. RICHARD SUGGESTS THAT QUESTIONING
                   PARTIES INVOLVED IN THE VENTURE ABOUT HIS INJURIES MAY
                   CAUSE THEM TO GET NERVOUS AND BACK AWAY FROM INVESTING. HIS
                   LAWYER HAS WRITTEN US A SIX PAGE LETTER DATED NOVEMBER 3,
                   2006 ABOUT THIS VENTURE CLAIMING THAT RICHARD'S PARTNERS
                   INCLUDE 'THE PROVINCIAL GOVERNMENT OF BC, SEVERAL
                   INTERNATIONAL FIRMS, DIRECTORS OR PARTNERS OF A NUMBER OF
                   PROMINENT BC FIRMS, SENIOR EXECUTIVES WITHIN HEALTH
                   ORGANIZATIONS, PUBLIC FIGURES, MEDICAL PROFESSIONALS, AS
                   WELL AS MR. HALL', ALL OF WHOM HAVE SIGNED CONFIDENTIALITY
                   AGREEMENTS. HE DOES NOT WANT US TO PROCEED WITH A SCHEDULED
                   EXAMINATION FOR DISCOVERY UNLESS DEFENCE COUNSEL AND ICBC
                   SIGN A CONFIDENTIALITY AGREEMENT. HE THREATENS THAT A
                   BREACH OF CONFIDENTIALITY COULD RESULT IN DAMAGES TO THE
                   EFFECTED PARTIES, TOTALING SEVERAL MILLIONS.
                   MR. HALL HAS SUPPOSEDLY RETAINED HIS OWN, INDEPENDENT
                   ADVISORS, '.ON HOW AND WHEN TO DISCLOSE APPROPRIATELY THE
                   INJURY HE HAS BEEN DEALING WITH'.
```

ICBC_000017

```
DATE: 08JAN07      INSURANCE CORPORATION OF BRITISH COLUMBIA      PAGE:  2
PROGRAM: CWI306P              CLAIM FILE FOLDER

CLAIM   .  : L373571 4                 TASK STATUS : ALL
                                                              TYPE/
DATE     WORKTYPE  DESCRIPTION/DETAIL                          EXP
                   CLASS HONORS AT THE UNIVERSITY OF CAMBRIDGE.
                   RICHARD'S WORK HISTORY REPORTEDLY INCLUDES BANKING,
                   LECTURING IN PSYCHOLOGY AND PROFESSIONAL GOLFING (PLAYING
                   MINI TOURS IN CANADA, SOUTH AFRICA AND EUROPE) SINCE 1995.
                   HE HAS A HISTORY OF MANY CONCUSSIONS FROM AGE 6 THROUGH
                   1997, WHEN HE ALLEGED A CLOSED HEAD INJURY AFTER BEING REAR
                   ENDED IN OREGON.
                   HE SUSTAINED A GOLF INJURY TO HIS HAND IN 1995 WHICH LEAD
                   TO SURGERY. FOLLOWING THAT SURGERY HE REBUILT HIS GOLF
                   SWING WITH THE ASSISTANCE OF DAVID LEADBETTER, ONE OF THE
                   WORLD'S PREMIERE AND BEST KNOWN INSTRUCTORS. DAVID COACHES
                   MANY PROS AND CONFIRMS HAVING COACHED RICHARD.
                   HE ALLEGED CHRONIC HEALTH PROBLEMS RESULTING FROM TOXIN
                   EXPOSURE FROM 1995 THROUGH 2001.
                   HE ATTENDED FOR COUNSELING WHILE IN UNIVERSITY.
                   AT THE DATE OF LOSS HE HAD MOVED FROM OREGON, TO SALT
                   SPRING ISLAND. HE MAY BE IN CANADA ON A 'PROFESSIONAL
                   ATHLETES VISA', WHICH WOULD APPARENTLY RENDER HIM UNABLE TO
                   WORK IN THIS COUNTRY.
-------------------------------------------------------------------------------

                    ** END OF CWI306P  REPORT **
```

ICBC_000018

```
DATE: 08JAN07    INSURANCE CORPORATION OF BRITISH COLUMBIA      PAGE:  1
PROGRAM: CWI306P             CLAIM FILE FOLDER

CLAIM     : L373571 4                    TASK STATUS : ALL
INSURED   : DOVE, DONALD A
EXPOSURE A : DOVE, DONALD A
                                                               TYPE/
                                                                EXP
DATE    WORKTYPE  DESCRIPTION/DETAIL                            -MSGS
------------------------------------------------------------------------

29DEC06 EMAIL    FILE ANALYSIS PART I                            A
                 DATE: FRIDAY, DECEMBER 29, 2006 12:45:32 PM
                 CC: MCRAE, MARIA
                 MF L373571 4 EXP   YF        YF       CONF  (Y/N)
                 TO:              FRANCESCA DAWE
                                  BI MANAGER
                 CC:              KEN BOOTH
                                  BI REGIONAL MANAGER
                                  RAY CADORETTE
                                  CLAIM CENTRE MANAGER
                                  HELEN HOSKINS
                                  LITIGATION
                 FROM:            JOHN DICESARE
                                  CLAIMS EXAMINER
                 DATE:            DECEMBER 29, 2006
                 RE:              FILE ANALYSIS
                 CLAIM NUMBER:    L373475.6 (AB)
                     L373571.4 (TORT)
                 DATE OF LOSS:    NOVEMBER 10, 2003
                 DATE OF REFERRAL:  NOVEMBER 9, 2006
                 DATE RECEIVED:   NOVEMBER 15, 2006
                 COVERAGE:    THE DEFENDANT'S COVERAGE IS IN ORDER.
                              THIRD PARTY LIABILITY:  $1 MILLION
                 RICHARD HALL WAS DRIVING A U.S. INSURED (ALLSTATE) VEHICLE
                 AND HAD AN INVALID BC DRIVER'S LICENCE. THE PLAINTIFF HAS
                 ACCESS TO THE EQUIVALENT OF PART 7 BENEFITS THROUGH
                 ALLSTATE INSURANCE, WHICH IS A SIGNATORY OF THE PAU.
                 OTHERWISE, HE WOULD HAVE BEEN IN BREACH OF ANY PART 7
                 ENTITLEMENT WITH ICBC.
                 UMP: N/A  (US INSURED VEHICLE AND INVALID BCDL).
                 CL209A     N/A
                 FACTS:    THE DEFENDANT REAR ENDED THE PLAINTIFF, PUSHING
                 HIM
                 INTO A THIRD CAR, CAUSING LESS THAT $1,000 DAMAGE TO HIS
                 VEHICLE. THE PLAINTIFF, RICHARD HALL, ALLEGES VARIOUS
                 INJURIES INCLUDING AN MTBI. HE ALLEGES THAT THE MVA RELATED
                 INJURIES HAVE PREVENTED HIM FROM PURSUING A CAREER AS A
                 PROFESSIONAL GOLFER. HE ALSO ALLEGES THAT THEY MAY
                 INTERFERE WITH A BUSINESS VENTURE, THE NATURE OF WHICH HE
                 REFUSES TO DISCLOSE, CITING CONFIDENTIALITY CONCERNS.
                 INVESTIGATION:    WELL DONE TO DATE, WITH THE EXCEPTION OF
                 ARRANGING IME'S, AS WE ARE NOW THREE YEARS POST MVA, THERE
                 IS AN ALLEGATION OF MTBI, AND POTENTIALLY A CLAIM FOR A
                 SUBSTANTIAL WAGE LOSS/LOSS OF OPPORTUNITY.
                 LIABILITY:    THE DEFENDANT REAR ENDED THE PLAINTIFF. THE
                 DEFENDANT IS 100% RESPONSIBLE. NO INDICATION THAT THE
                 PLAINTIFF REAR ENDED THE CAR IN FRONT OF HIM FIRST.
                 CONTRIB. NEG./
                 OTHER DEFENCES:    THERE ARE NO DEFENCES FOR CONTRIBUTORY
                 NEGLIGENCE.
                 INJURY & RESERVE:
                 CLAIMANT:    RICHARD HALL (FEBRUARY 22, 1969: 34 AT THE
                 DATE
                 OF LOSS). RICHARD IS AN ASPIRING PROFESSIONAL GOLFER (AT
                 34?) AND AN ENTREPRENEUR. HE ALLEGES HAVING ACHIEVED FIRST
```

ICBC_000019

Pietramala, Agostino

**From:** Karen Burke Da Silva [karen.burkedasilva@flinders.edu.au]
**Sent:** Wednesday, June 10, 2009 11:39 PM
**To:** Pietramala, Agostino
**Subject:** RE: Designations

Hi Tino,

**I don't know these things off hand but this is what I found:**

**Tripos** - the formal university examinations in which undergraduates are required to obtain *honours* in order to qualify for the degree of Bachelor of Arts. Triposes may be divided into two *Parts,* taken in succession as Part I and Part II. The word *tripos* is reputedly derived from the legend that the examiner sat on a three-legged stool.

**Class** - a grade of *honours,* as in *First Class, Second Class, Third Class.*

**Part** - a stage of *Tripos* examination, as in *Part I* or *Part II.* Part II is normally a third or fourth year examination. Part I may be subdivided into Parts Ia and Ib, normally taken in the first and second years. It is usually necessary to obtain *honours* in all *parts* to qualify for a *Bachelor of Arts* degree.

**Bachelor of Arts** - one of the lowest forms of degree in the university, abbreviated *B.A.* In medieval times obtained by disputation after studying the *Trivium,* now obtained by obtaining *honours* in sufficient *Tripos* examinations and by *keeping* nine *terms.* B.A. degrees come in two types: *Honours* and *Ordinary.*

I couldn't find anything on Bundy Scholar other than a well known barrister who has Bundy Scholarship on his CV.

As these are all undergraduate terms I'm afraid I can't help as we were only involved in graduate courses.


Things are going well here – better than you could imagine considering.  The girls are very busy as am I with the end of semester this week.  I'm going to Townsville (up in north Queensland) for a conference at the end of the month, so nice warm weather which will be good as it is getting cold and wintery here.

We wished we could have been at your place for Genelle's birthday – it sounds as though it went well? We are organising our tickets for our trip out in February.  Robyn and I will stay for a month and Carmen will stay about 3 months so we'll have lots of time for getting caught up.

Sorry I couldn't be more helpful.

*Karen*

Karen Burke da Silva
Lecturer in Biodiversity and Conservation
School of Biological Sciences
Flinders University
tel: (08) 8201 2010

**EXHIBIT**
**021**

1

ICBC_000099



**From:** Pietramala, Agostino [mailto:Agostino.Pietramala@icbc.com]
**Sent:** Thursday, 11 June 2009 3:39 AM
**To:** karen.burkedasilva@flinders.edu.au
**Subject:** Designations

Hello Karen,

Perhaps you can help me out on an investigation that I am working on. The subject of my investigation alleges to have attended the University of Cambridge and is a recipient of a distinguished award. I have contacted the university and have confirmed his attendance. My question to you pertains to the classification or grading of the student. The registrars office indicates that he successfully completed the requirements for a bachelor of Arts degree. They do not provide overall classifications but indicated the results as follows:

1989 Social and Political Sciences Tripos, Part 1                    Class II, division 1

1990 Preliminary examination for Part II of the Social and Political  Tripos,  Pass

1991 Social and Political Sciences Tripos, Part II A,                 Class I

I figured you might know how the grading worked and what exactly Tripos, Class 1 or 2 and Pass means. Is a pass anything below an "A or B" grading. Have you ever heard of a Bundy Scholar? My subject is making a massive claim for injuries and I have reason to believe that he is nothing more than a professional con artist. Or at least that is what I am trying to prove. He has a similar fact pattern in that he tends to surround or allege to be associated with famous people and attend famous institutions.

I have not spoken to you since you were here last. It has really been a tough time for you having to experience a death, being so far away from family and now this recent episode with Jack.   I am not sure what to say other than you and the girls are in our thoughts.

Take care,

2

Tino Pietramala
Officer, Special Investigation Unit
ICBC Head Office Claims
Office: (604) 647-6101
Cell: (604) 908-3291
Agostino.pietramala@icbc.com

---

*This email and any attachments are intended only for the named recipient and may contain confidential and/or privileged material. Any unauthorized copying, dissemination or other use by a person other than the named recipient of this communication is prohibited. If you received this in error or are not named as a recipient, please notify the sender and destroy all copies of this email immediately.*



3

Message

## Dicesare, John

From:     Pietramala, Agostino
Sent:     Tuesday, May 29, 2007 12:21 PM
To:       Dicesare, John
Subject:  FW: L373475.6 Richard David Hewson Hall AP#03-1275 (Ireland)

Here is an option for you. If you use the guy in the Uk and we are successful you will most likely incur the cost of bringing the pi here for trial. Why not send someone from BC over to Ireland.

Food for thought

Tino
-----Original Message-----
From: Ken [mailto:actpac@shaw.ca]
Sent: Monday, May 28, 2007 1:40 PM
To: Pietramala, Agostino
Subject: L373475.6 Richard David Hewson Hall AP#03-1275 (Ireland)

I have discussed the surveillance in Dublin with my investigators and I have the following suggestions. They are motivated to conduct this investigation and as such have agreed to reduce some of their wages:

#1)    Single investigator:

- Travel between Victoria and Ireland @ $350.00 each way
- Flat rate of daily surveillance @ $800.00 per day
- All lodging/ meals/ car rentals/ fuel/ etc at cost
- Air travel and connections at cost. You may be able to obtain a gov't discount.

#2)    Double team:

- Travel between Victoria and Ireland @ $350.00 each way (both investigators included)
- Flat rate of daily surveillance @ $1,100.00 per day
- All lodging (shared) meals/ car rentals/ fuel etc at cost
- My 2nd investigator is a part time employee with Air Canada and can arrange standby travel for both investigators at minimal cost. Flight from England to Ireland for primary investigator will be at a larger but discounted fee.

EXHIBIT
022

I suggest utilizing Canadian investigator(s) as they are familure with our court/ evidence process. The investigator(s) are motivated as they are working on behalf of ICBC a large client to my firm. You would not need to bring an investigator from Ireland to Victoria for court. Would the investigator in Ireland meet the standards of the ICBC surveillance guidelines?  Keep in mind that Hall is a frequent writer to MLA's, lawyers and ICBC to lodge complaints.

My primary investigator has been conducting surveillance for ICBC for 20 years. He is also a professional videographer.  He is motivated, is aware of ICBC guidelines, and is capable of making good judgement calls when away from direction. He is unfamiliar with driving on the left or of the area.

My secondary investigator has frequently travelled throughout Ireland/ England/ Scotland.  She is familure and comfortable driving on the left.  She is junior but adept at video surveillance and mobile surveillance.

To supply the best evidence, I would suggest a double team so that the secondary investigator can do the driving and who is familure with the area.  The secondary investigator can spell off the primary investigator when conducting close surveillance.  Also at times they can appear as a couple when in close surveillance.

Both investigators have current passports and travel abroad frequently.

Please advise if I can answer any questions.

Ken Carter
**Action Pacific Investigative Service**
#160-1581H  Hillside Ave.
Victoria, BC   V8T 2C1
Off:   (250) 382-4004
Fax:  (250) 382-4012

www.ActPac.ca      ActPac@shaw.ca
This message (including attachments) is confidential and may be legally privileged. It is for the use of the named recipient(s) only. Confidentiality and privilege are not lost by this message having been sent to the wrong person. If you are not an intended recipient of this message, please notify us immediately, delete it from your computer system. You are hereby notified that any disclosure, copying, or distribution of this message, or the taking of any action based on it is unauthorized and prohibited. This message was not encrypted and internet email may not be secure.

5/30/2007

**Dicesare, John**

| | |
|---|---|
| From: | Pietramala, Agostino |
| Sent: | Friday, September 14, 2007 10:01 AM |
| To: | 'sean@ccinvestigations.ca' |
| Cc: | Dicesare, John |
| Subject: | Hall L373571-4 |

*Drop Hall*

Our subject Mr. Richard David Hewson HALL (Date of Birth 22 Feb 1969) resides at 11B Lower Dorsett Street, Dublin.

Subject's height 196 cm or 6' 5', weight 82. kg or 185 lbs.

Subject alleges to be a golf pro. He states that he has played on numerous Pro-Amature tours while living in the US, attended and played for Arkansas State University Golf Team, was a member of Heath Golf Club, was a former graduate of Cambridge University, trained by famous golf teacher David Leadbetter (true but not really trained), he also name drops and alleges to have rubbed shoulder with the likes of the Brower Fund. The gentleman appears to have surrounded himself with the "famous" pedigree but I am not so convinced. While the subject was residing on Salt Spring Island he lived in a make shift tent and drove a 1986 S class Mercedes Benz. Sounds nice but its still old.

Sean, we have done extensive background work on this fellow and the connections to these famous people and clubs are not really clear. I have my doubts. As you can appreciate we need to locate him and eventually do some surveillance. At this point I have been instructed only to locate him. I will seek further instruction from John Dicesare if we are successful in locating him.

Thank you for your attention to this matter.

Regards,

Tino Pietramala

1

**EXHIBIT**

**023**



DATE: 2021-01-04                                                    PAGE : 16
TIME: 10.55.50      INSURANCE CORPORATION OF BRITISH COLUMBIA
                        CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

**EXHIBIT**

**024**

                                                                        TYP
DATE    WORKTYPE DESCRIPTION/DETAIL                                      EXP
------- -----
25NOV08 NOTE                                                              A
--------------------------------------------------------------------NOTE
2DEC08  NOTE                                                              A
            RE: ARRANGE FOR FBIG TO SURVEILLE CLMT
----------------------------------------------------------------------CMPL
17DEC08 INCURRED CL288                                      LE:3 KOL:21 B
                 REASON:

----------------------------------------------------------------------CMPL
17DEC08 INCURRED CL288                                      LE:5 KOL:21 B
                 REASON

----------------------------------------------------------------------NOTE
19DEC08 NOTE     SEE PI REPORT; PI LOST CLMT AFTER IME                    A
----------------------------------------------------------------------CMPL
23DEC08 INCURRED CL288    08-16682 INV 164 CANPRO     $1331.79 LE:9 KOL:21 B
                 REASON: RE: RICHARD HALL - SURVEILLANCE
                         INVOICE DATED DECEMBER 16, 2008
----------------------------------------------------------------------CMPL
13JAN09 INCURRED CL288                                      LE:3 KOL:21 B
                 REASON:

----------------------------------------------------------------------CMPL
13JAN09 INCURRED CL288                                      LE:5 KOL:21 B
                 REASON:

----------------------------------------------------------------------NOTE
4FEB09  NOTE     REV'D FILE                                               A
                 VERY FRUSTRATING
                 WE FINALLY GOT CLMT TO IME AND HE WAS PREDICTABLY VERY
                 EVASIVE ON ANSWERING QUESTIONS
                 DR. SMITH CONFIRMS THAT CLMT SUFFERS FROM NO PSYCHIATRIC
                 DIAGNOSIS
                 WE'VE HAD ORDE FOR EXAMINATION FOR DISC FOR AGES NOW AND
                 HAVE NOT GOT CLMT INTO DISCOVERY
                 SEE EMAIL TO D/C ASKING THEM TO FORCE THE ISSUE - AGAIN
                 I'VE ALSO ASKED MARIA MCRAE TO ARRANGE FOR A STRATEGY
                 MEETING AT OUR OFFICE IN NEXT TWO MONTHS, WITH MGR PRESENT

----------------------------------------------------------------------CMPL
12FEB09 INCURRED CL288    DR. DERRYCK H. SMITH INC     $3500.00 LE:4 KOL:21 B
                 REASON: INV DATED DEC 8, 2008
                         MEDICAL LEGAL REPORT - RICHARD DAVID HALL

ICBC_003258



**EXHIBIT**

**025**

SPECIAL INVESTIGATION UNIT

Notes of: Tino Pietramala, Officer



SUMMARY OF ACTIVITY

| DATE: | |
|---|---|
| June 09 | Received confirmation from Registrar at Cambridge University that subject did in fact receive an undergraduate degree from Magdalene College at Cambridge University |
| | - File claim file in long term abeyance as the subject has filed his counsel. I have discussed my findings with the examiner and DC and they are going to simply wait for movement on his part. |
| | - Flu in 90 days |
| 9 May 2010 | - Flu with Examiner Decesare. Discussed file at length and advised that if Siu is no longer needed then I will retire my file |
| | - Examiner prefers to keep me involved as he believes that subject will activate his claim because we will be seeking a motion to dismiss his claim for inactivity. Examiner anticipates some potential activity and specifically has requested Siu involvement |
| | Cycle time sheet requested in excess of 180 days |

"THIS REPORT WAS PREPARED IN CONTEMPLATION OF LITIGATION AND IS THEREFORE PRIVILEGED IN LAW AND ALL LEGAL MATTERS"

ICBC_000007

**Olstrom, Laurie**

**EXHIBIT**

**026**

| | |
|---|---|
| **From:** | Olstrom, Laurie |
| **Sent:** | June-21-12 10:31 PM |
| **To:** | 'Ken' |
| **Subject:** | RE: L373475.6  Richard Hall  AP#03-1775 |

Thanks Ken,
I have no concerns with respect to your professionalism. (and I agree with your assessment of Hall) ☺

*Laurie Olstrom,* Claims Examiner
**direct:** 604-647-6076 | **facsimile:** 604-647-6105

**From:** Ken [mailto:ActPac@shaw.ca]
**Sent:** June-21-12 4:14 PM
**To:** Olstrom, Laurie
**Subject:** L373475.6 Richard Hall AP#03-1775

When did I break in?  What year?  I photographed his cabin from a neighbour's property on 2004 Jan 21.  I was back onto the island 2004 March 17 and photographed his car where he worked.  I rarely go to Salt Spring Island.  Maybe once every year or two on a file.  I thought this was over years ago.  Then last year I did some work on Dove the defendant.

I found the fax that I sent to Leadbetter.  You have the attached letter that Gerard Wright gave me to confirm.  As a result there were the 2 interviews that you have.

In reviewing the 2 page letter that Gerard gave me, you will note that there is a fax date on the top of 2004 March 18, also Gerard's cover page is the same date.  The letter was from Leadbetter to Canada Immigration.  I faxed and spoke with Leadbetter in August 2004  much later than when this letter was sent.  If I am correct on my recollections, (confirm with Gerard Wright, Joanne Nelson, SIU: Ben Shotton, Craig Riemer) that Hall had 2 different lawyers here in Victoria that they either dropped him or he fired them.  I believe these lawyers were dealing with something to do with immigration, not sure.  The above ICBC staff would know better.  I believe that is where this letter may have come from one of his lawyers.

You must keep in mind that this guy is a smooth talker, possibly a fraud artist, and convinces people with his accent and Remington Steele look to part with money.  He appears to give part truths just enough to make it believable.  I did many years in the RCMP investigating con artists and this guy really fits the mold.

1

ICBC_000511

1)     I have never purported myself to be anyone other than myself and find it extremely hard to believe that he could allege that I stated that I was Canada Immigration. The fax to Leadbetter states Action Pacific Investigative Service and my telephone number which Leadbetter called back.

2)     I did not go onto Hall's property and did not break into his cabin and never touched his computer.

I find it hard to believe that anyone can take this guy's allegations with any seriousness.


I hope this puts the matter to rest.

**Ken Carter**
*Action Pacific* Investigative Service
ActPac@shaw.ca  www.ActPac.ca
Tel: 250-382-4004
Fax: 250-382-4012
#160-1581H Hillside Ave.
Victoria, BC  V8T 2C1

 Please consider the environment before printing this e-mail



**From:** Olstrom, Laurie [mailto:Laurie.Olstrom@icbc.com]
**Sent:** June-21-12 9:30 AM
**To:** Ken
**Subject:** Richard Hall - golfer investigation from 2004

MF L373571 4
Hi Ken,
As we discussed, Hall's lawyer is alleging that you misrepresented yourself as being from Immigration Canada.

When you get a chance, please go thru your records to see if you can find evidence confirming that you Identified yourself appropriately.

I don't think there is any substance to the allegation, but if you have evidence that contradicts the allegation it would be very helpful.
They are also alleging that we broke into his cabin and messed with his computer!!!

*Laurie Olstrom, CIP*
*Claims Examiner*
Head Office Claim Services
ICBC building trust. driving confidence.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2

ICBC_000512

300 - 808 Nelson Street | Vancouver | British Columbia | V6Z 2H2
direct: 604-647-6076 | facsimile: 604-647-6105
Save trees. Print only when necessary.

This email and any attachments are intended only for the named recipient and may contain confidential and/or privileged material. Any unauthorized copying, dissemination or other use by a person other than the named recipient of this communication is prohibited. If you received this in error or are not named as a recipient, please notify the sender and destroy all copies of this email immediately.

3

ICBC_000513

**Olstrom, Laurie**

| | |
|---|---|
| From: | Gordon Marshall <gmarshall@pacificlaw.ca> |
| Sent: | February-28-13 12:22 PM |
| To: | Olstrom, Laurie |
| Subject: | FW: L373475.6  Richard Hall  AP#03-1775 |
| Attachments: | image003.jpg |

My only response Laurie was what I sent Carter earlier today. If ICBC is to cover his private legal costs someone from ICBC will have to talk with him. In the meantime, on my return to Vancouver, I will be asking Carter to meet me with respect to the 'innuendo' and a response by him.

Gordon

From: Gordon Marshall
Sent: February-28-13 5:44 AM
To: Ken
Cc: Olstrom, Laurie; Ken
Subject: Re: L373475.6  Richard Hall  AP#03-1775

Pacific Law Group represents only the interests of the defendant as instructed by his insurer, ICBC.

On 2013-02-27, at 11:12 PM, "Ken" <ActPac@shaw.ca> wrote:

> WITHOUT PREJUDICE
>
> I ask if you are representing Action Pacific in answering these affidavits or strictly the interest of ICBC and Mr. Dove (deceased). Before any meeting or transfer of documentation, I should know your status in this matter. ICBC may wish to obtain separate counsel on my behalf to represent Action Pacific and through counsel the exchange of evidence that I hold.
>
> I am in receipt of the affidavits that you called about. You have true and accurate transcripts of the conversations I have had with Leadbetter and Ayers which are quite contrary to the affidavits and language utilized in same. I maintained my evidence that is very much contrary to these suggestions. My summation of the affidavits are that they are part truths and lots of smoke. He does not allege that I did anything, lots of innuendo.
>
> Please advise of your legal standing in this matter.
>
> Thank you
>
> Ken Carter
> [API Red dot with name (2)]
>
> ActPac@shaw.ca  www.ActPac.ca
> Tel:  250-382-4004
> Fax: 250-382-4012
> #160-1581H  Hillside Ave.
> Victoria, BC   V8T 2C1
> P Please consider the environment before printing this e-mail
>
>
>

1

EXHIBIT
027

ICBC_000478

> 
> 
> 
> From: Ken [mailto:ActPac@shaw.ca]
> Sent: June-21-12 4:14 PM
> To: 'Olstrom, Laurie'
> Subject: L373475.6 Richard Hall AP#03-1775
> 
> When did I break in?  What year?  I photographed his cabin from a neighbour's property on 2004 Jan 21.  I was back onto the island 2004 March 17 and photographed his car where he worked.  I rarely go to Salt Spring Island.  Maybe once every year or two on a file.  I thought this was over years ago.  Then last year I did some work on Dove the defendant.
> 
> I found the fax that I sent to Leadbetter.  You have the attached letter that Gerard Wright gave me to confirm.  As a result there were the 2 interviews that you have.
> 
> In reviewing the 2 page letter that Gerard gave me, you will note that there is a fax date on the top of 2004 March 18, also Gerard's cover page is the same date.  The letter was from Leadbetter to Canada Immigration.  I faxed and spoke with Leadbetter in August 2004  much later than when this letter was sent.  If I am correct on my recollections, (confirm with Gerard Wright, Joanne Nelson, SIU: Ben Shotton, Craig Riemer) that Hall had 2 different lawyers here in Victoria that they either dropped him or he fired them.  I believe these lawyers were dealing with something to do with immigration, not sure.  The above ICBC staff would know better.  I believe that is where this letter may have come from one of his lawyers.
> 
> You must keep in mind that this guy is a smooth talker, possibly a fraud artist, and convinces people with his accent and Remington Steele look to part with money.  He appears to give part truths just enough to make it believable.  I did many years in the RCMP investigating con artists and this guy really fits the mold.
> 
> 1)    I have never purported myself to be anyone other than myself and find it extremely hard to believe that he could allege that I stated that I was Canada Immigration.  The fax to Leadbetter states Action Pacific Investigative Service and my telephone number which Leadbetter called back.
> 
> 2)    I did not go onto Hall's property and did not break into his cabin and never touched his computer.
> 
> I find it hard to believe that anyone can take this guy's allegations with any seriousness.
> 
> 
> I hope this puts the matter to rest.
> 
> Ken Carter
> Action Pacific Investigative Service
> ActPac@shaw.ca  www.ActPac.ca
> Tel:  250-382-4004
> Fax: 250-382-4012
> #160-1581H  Hillside Ave.
> Victoria, BC   V8T 2C1
> P Please consider the environment before printing this e-mail
> 
> 
> 
> From: Olstrom, Laurie [mailto:Laurie.Olstrom@icbc.com]
> Sent: June-21-12 9:30 AM

ICBC_000479

> To: Ken
> Subject: Richard Hall - golfer investigation from 2004
>
> MF L373571 4
> Hi Ken,
> As we discussed, Hall's lawyer is alleging that you misrepresented yourself as being from Immigration Canada.
>
> When you get a chance, please go thru your records to see if you can find evidence confirming that you Identified yourself appropriately.
>
> I don't think there is any substance to the allegation, but if you have evidence that contradicts the allegation it would be very helpful.
> They are also alleging that we broke into his cabin and messed with his computer!!!
>
> Laurie Olstrom, CIP
> Claims Examiner
> Head Office Claim Services
> ICBC building trust. driving confidence.
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
> 300 - 808 Nelson Street | Vancouver | British Columbia | V6Z 2H2
> direct: 604-647-6076 | facsimile: 604-647-6105 Save trees. Print only
> when necessary.
>
> _____

> This email and any attachments are intended only for the named recipient and may contain confidential and/or privileged material. Any unauthorized copying, dissemination or other use by a person other than the named recipient of this communication is prohibited. If you received this in error or are not named as a recipient, please notify the sender and destroy all copies of this email immediately.
> <image003.jpg>
> <DSC01047.JPG>
> <File0105.PDF>

ICBC_000480

## Olstrom, Laurie

**From:** Olstrom, Laurie
**Sent:** February-25-13 2:45 PM
**To:** 'Ken'
**Subject:** RE: Richard Hall - golfer investigation from 2004

Hi Ken,
Defense Counsel is Gord Marshall (you have his first and last name reversed.

The file number is L373571 4.

*Laurie Olstrom,* Claims Examiner
**direct:** 604-647-6076 | **facsimile:** 604-647-6105

---

**From:** Ken [mailto:ActPac@shaw.ca]
**Sent:** February-25-13 2:43 PM
**To:** Olstrom, Laurie
**Subject:** RE: Richard Hall - golfer investigation from 2004

I was contacted by Marshal Gordon and advised that he had a number of Affidavits that he was sending me for review, research and reply. Can you advise which claim number I should be utilizing for billing, when doing these tasks for Mr. Gordon.

I await your reply.


**Ken Carter**



ActPac@shaw.ca  www.ActPac.ca
Tel:  250-382-4004
Fax: 250-382-4012
#160-1581H  Hillside Ave.
Victoria, BC  V8T 2C1

 Please consider the environment before printing this e-mail

---

**From:** Olstrom, Laurie [mailto:Laurie.Olstrom@icbc.com]
**Sent:** June-21-12 9:30 AM
**To:** Ken
**Subject:** Richard Hall - golfer investigation from 2004

MF L373571 4

Hi Ken,

As we discussed, Hall's lawyer is alleging that you misrepresented yourself as being from Immigration Canada.

When you get a chance, please go thru your records to see if you can find evidence confirming that you Identified yourself appropriately.

I don't think there is any substance to the allegation, but if you have evidence that contradicts the allegation it would be very helpful.

They are also alleging that we broke into his cabin and messed with his computer!!!

*Laurie Olstrom, CIP*
*Claims Examiner*
Head Office Claim Services
**ICBC** building trust. driving confidence.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . .
300 - 808 Nelson Street | Vancouver | British Columbia | V6Z 2H2
**direct:** 604-647-6076 | **facsimile:** 604-647-6105
Save trees. Print only when necessary.

*This email and any attachments are intended only for the named recipient and may contain confidential and/or privileged material. Any unauthorized copying, dissemination or other use by a person other than the named recipient of this communication is prohibited. If you received this in error or are not named as a recipient, please notify the sender and destroy all copies of this email immediately.*

2

**EXHIBIT**

**028**

Dicesare, John

| | |
|---|---|
| **From:** | Jasroop Grewal <jgrewal@pacificlaw.ca> |
| **Sent:** | Wednesday, August 13, 2014 8:19 AM |
| **To:** | Dicesare, John |
| **Subject:** | RE: L373571.4   Richard Hall AP#13-2830 |

Hi John,

I am just getting into the office so need a moment to catch up before I give you a call.

Mr. Carter should not be contacting you directly when he has counsel, and we cannot respond to him any further.

Also, he, himself, told me that he did not send the entire file (prior to him re-retaining counsel). In fact he said he had a box of stuff sitting on top of his file cabinet.

I'll give you a call in a few minutes.

Jas

**From:** Dicesare, John [mailto:John.DiCesare@icbc.com]
**Sent:** August-13-14 7:30 AM
**To:** Ken
**Cc:** Jasroop Grewal
**Subject:** RE: L373571.4 Richard Hall AP#13-2830

Ken,
I am copying Jas with this email.
I will try to speak with him this week so that we are on the same page.

Thanks,

John Di Cesare

Claims Examiner , BComm, CIP
**ICBC** building trust. driving confidence
8470 Commerce Court,
Burnaby BC V5A 4T4
604-444-7806

**From:** Ken [mailto:ActPac@shaw.ca]
**Sent:** Tuesday, August 12, 2014 4:44 PM
**To:** Dicesare, John
**Subject:** RE: L373571.4 Richard Hall AP#13-2830

John, why is the ICBC lawyer contacting me and requesting that I resubmit all my file work to him. Why does he not have a copy of this material? It was all sent to ICBC over the years and placed on the claim file #L373475.6

1

Thank you

## Ken Carter
Private Investigator, RCMP Ret'd



ACTION PACIFIC INVESTIGATIONS

ActPac@shaw.ca  www.ActPac.ca
Tel: 250-382-4004
Fax: 250-382-4012
#160-1581H  Hillside Ave.
Victoria, BC  V8T 2C1

 Please consider the environment before printing this e-mail

**From:** Dicesare, John [mailto:John.DiCesare@icbc.com]
**Sent:** July-18-14 11:20 AM
**To:** Ken; Olstrom, Laurie
**Subject:** RE: L373571.4 Richard Hall AP#13-2830

Ken,
I am.
I am away for two weeks after today.
thx.

John Di Cesare

Claims Examiner , BComm, CIP
**ICBC** building trust. driving confidence
8470 Commerce Court,
Burnaby BC V5A 4T4
604-444-7806

**From:** Ken [mailto:ActPac@shaw.ca]
**Sent:** Friday, July 18, 2014 11:15 AM
**To:** Olstrom, Laurie
**Cc:** Dicesare, John
**Subject:** L373571.4 Richard Hall AP#13-2830

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Who is handling this file at the moment.  I got another call from ICBC lawyer, now
over 1 year.  He wanted me to layout his file.  I just need to know who is handling
the file.

ICBC_000550

Thank you

**Ken Carter**
Private Investigator, RCMP Ret'd



ACTION PACIFIC INVESTIGATIONS

ActPac@shaw.ca  www.ActPac.ca
Tel: 250-382-4004
Fax: 250-382-4012
#160-1581H  Hillside Ave.
Victoria, BC  V8T 2C1

 Please consider the environment before·printing this e-mail

This email and any attachments are intended only for the named recipient and may contain confidential and/or privileged material. Any unauthorized copying, dissemination or other use by a person other than the named recipient of this communication is prohibited. If you received this in error or are not named as a recipient, please notify the sender and destroy all copies of this email immediately.

Insurance Corporation of British Columbia | 151 W. Esplanade | North Vancouver | V7M 3H9
Contact Us

ICBC_000551

```
DATE: 2021-01-04                                                    PAGE : 47
TIME: 10.55.50        INSURANCE CORPORATION OF BRITISH COLUMBIA
                          CLAIM FILE FOLDER (WITH CONF NOTES)        EXHIBIT

CLAIM : L373571-4                                                      029
                                                                             TYP
                                                                             EXP
DATE    WORKTYPE DESCRIPTION/DETAIL
-------  --------------------------------------------------------------------
                                                                            B
12AUG14 INCURRED REASON: HALL V. DOVE
                        FROM 04/15/14 TO 07/31/14
                        INV DATE 08/08/14
---------------------------------------------------------------------CMPL
12AUG14 INCURRED CL288    I 20802 F 10151        $54.45  LE:5 KOL:21 B
                REASON: HALL V. DOVE
                        FROM 04/15/14 TO 07/31/14
                        INV DATE 08/08/14
---------------------------------------------------------------------CMPL
12AUG14 INCURRED CL288    I 20802 F 10151        $126.25 LE:9 KOL:21 B
                REASON: HALL V. DOVE
                        FROM 04/15/14 TO 07/31/14
                        INV DATE 08/08/14
---------------------------------------------------------------------NOTE
                                                                          A
13AUG14 NOTE    EXAMINER NOTE (JDICESARE), RE: KEN CARTER
                SEE EMAILS ON FILE B/W D/C JAS GREWAL (HE'S ASSISTING MHW)
                AND KEN CARTER'S COUNSEL, AND KEN HIMSELF
                CLMT MAKING ALLEGATIONS AGAINST KEN, RE: IMPROPRIETY AND
                HE HAS RETAINED COUNSEL TO ADVISE HIM
                HOWEVER, WE'RE ALSO BEING ACUSED ON IMPROPRIETY IN OUR
                INVETIGATIONS AND ARE HAVING TO REFUTE THAT
                I EMAILED JAS AND ASKED THAT HE CALL ME WHEN HE'S IN
                HE CALLED TODAY
                EXPLAINED THAT UNLESS WE FIND SOMETHING OF CONCERN, WE HAVE
                TO REMEMBER THAT KEN WAS OUR I/A AND WE DON'T WANT THIM
                THINKING THAT ITS US AGAINST HIM
                IT SEEMS IT IS BECOMING ANTAGONISTIC, THE DEALINGS B/W KEN
                (AND HIS COUNSEL) AND US AND IT NEED NOT BE
                I ASKED JAS TO CALL AND SPEAK WITH KEN'S COUNSEL - AS
                OPPOSED TO EXCHANGING EMAILS, TO MAKE SURE THEY UNDERSTAND
                WHY IT IS WE NEED WHAT WE ARE ASKING FOR BY WAY OF
                DOCUMENT/FIL PRODUCTION AND TO TRY AND ESTABLISH THAT WE
                SHOULD BE WORKING COOPEATIVELY (UNLESS THERE IS SOMETHING
                THAT HE IS NOT WANTING US TO SEE)

                HE'LL CALL KEN'S COUNSEL TODAY
---------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288    I 20999 F 10152        $1044.30 LE:3 KOL:21 B
                REASON: RE HALL V. ICBC
                        FROM 09/30/13 TO 08/21/14
                        INV DATE 08/21/14
---------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288    I 20999 F 10152        $75.90  LE:5 KOL:21 B
                REASON: RE HALL V. ICBC
                        FROM 09/30/13 TO 08/21/14
                        INV DATE 08/21/14
---------------------------------------------------------------------CMPL
4SEP14  INCURRED CL288    I 20999 F 10152        $52.62  LE:9 KOL:21 B
                REASON: RE HALL V. ICBC
                        FROM 09/30/13 TO 08/21/14
                        INV DATE 08/21/14
---------------------------------------------------------------------CMPL
```

```
DATE: 08JAN07        INSURANCE CORPORATION OF BRITISH COLUMBIA        PAGE: 14
PROGRAM: CWI306P              CLAIM FILE FOLDER

CLAIM    : L373475 6                      TASK STATUS : ALL
                                                                     TYPE/
DATE     WORKTYPE  DESCRIPTION/DETAIL                                  EXP
-----------------------------------------------------------------------NOTE
24FEB04 NOTE       VOICE MAIL FROM ALLSTATE ( EVELYN) THAT THEY HAVE SUBRO  A
                   BUT NOT COMPLETE WITH THEIR SALVAGE YET CAN WE PHONE
                   THEM INREGARDS TO LAIBILTY . 1-800-374-4246
                   CLAIM NUMBER 4285395506
-----------------------------------------------------------------------NOTE
26FEB04 NOTE       EXAMINER DISC. WITH KEN CARTER                          A
                   HE SUGGESTS WE OBTAIN PHOTOS AND ESTIMATE OF TP VEHICLE
                   AND COMPARE DAMAGE TO TP VEHICLE COMPARED TO INS. VEHICLE.
                   **NOTE - TP INDICATED THE POLICE WERE NOT AT THE SCENE OF
                   THIS INCIDENT AND THERE WAS NO MENTION BY HALL TO THE TP
                   OR ANY SUGGESTION HE WAS INJURED**
-----------------------------------------------------------------------NOTE
27FEB04 NOTE       ALL STATE INSURANCE CONFIRMING MR HALL IS THE DENY FILE  A
-----------------------------------------------------------------------NOTE
01MAR04 NOTE       NEW FILE EXAMINER REVIEW                                 A
                   WE NEED A STATEMENT FROM THE TP, WHAT WAS THE DAMAGE TO
                   HALL CAR THAT HE COULD SEE.
                   GET THE PHOTOS FROM ALLSTATE WHEN THEY SEND SUBRO LETTER
                   AND HAVE DOVE CONFIRM SAME TYPE OF DAMAGE (JOANNE NELSON
                   SAYS THAT SHE THINKS HALL DID THE DAMAGE AFTER THE FACT).
                   CLAIMANT HAD A SERIOUS MVA IN 1997-WILL NEED DETAILS AT
                   SOME POINT, BUT IF THIS IS AN LVI THEN WE HAVE TO CONSIDER
                   THAT THE INJURIES MAY PRE-DATE THE MVA. WILL NEED CLINICALS
                   PRE-MVA.
                   RAN HIS DL AND HAS 2 VIOLATIONS FEB 24TH 2004 THAT SHOW ON
                   F3 I ASKED LISA MITCHNER TOI RUN F11 ABD THEY DON'T SHOW
                   THERE YET.
                   DL IS SHOWING HOLD ON COMPUTER WITH A DEBT OF 690 (THE LAST
                   2 VIOLATIONS)
                   NOTHING TO DO ON THIS FILE AT THIS TIME, NO SENSE
                   CONTACTING PC OTHER THAN THE FIRST LETTER, YOU CAN ASK FOR
                   DOC TOR INFO SO THAT WE CAN ORDER A CL19.
```

**EXHIBIT**

030

ICBC_000289

DATE: 2014-05-01                                                    PAGE : 1
TIME: 12.16.36        INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4

```
                                                                          TYP
  DATE   WORKTYPE DESCRIPTION/DETAIL                                       EXP
------- ----------------------------------------------------------------------
-----------------------------------------------------------------------NOTE
 13NOV03 NOTE     RO REPORTING CA APPT SEE RESOURCE NOTES                   A
-----------------------------------------------------------------------NOTE
 13NOV03 NOTE     INS SAID TP WAS NOT INJURED AT SCENE AS NEVER MENTIONED ANY A
                  THING, SAID NO POLICE AND DID NOT KNOW TP VEH TOWED AWAY?
-----------------------------------------------------------------------CMPL
 13NOV03 ONLNECLM CLAIM OPEN         030/0209-6 HUMBER, SHARLENE            A
 --------
 13NOV03
 --------
 17NOV03
 --------
 19NOV03




 --------
 19NOV03




 --------
 19NOV03
 --------
 19NOV03
 --------
 19NOV03
 --------
 26NOV03
 --------
 28NOV03
 --------
 15JAN04
 --------
 6FEB04

 --------
 17FEB04
 --------
```

s.22-A

EXHIBIT

031

```
DATE: 2021-01-04                                                    PAGE : 52
TIME: 10.55.50       INSURANCE CORPORATION OF BRITISH COLUMBIA
                         CLAIM FILE FOLDER (WITH CONF NOTES)

CLAIM : L373571-4
```

```
                                                                       TYP
DATE     WORKTYPE DESCRIPTION/DETAIL                                    EXP
-------  -------- ------------------------------------------------- -------
14JUN16  ADMIN    JOHN D - EMAILED SHIRLEY, RE; SEND FOI DISCS TO D/C FOR    A
                  REVIEW
                  ** WILL BE COURIERED. SENT EMAIL TO FOI OFFICER FOR PASSWORD
                  EMAIL DC WHEN PASSWORD RECEIVED.
-------------------------------------------------------------------------CMPL
11JUL16  REVIEW   MANAGER REVIEW                                             A
-------------------------------------------------------------------------NOTE
11JUL16  NOTE     MANAGERN NOTE - THIS FILE JUST WONT GO AWAY. WE DID A RECENT A
                  CYBER INVESTIGATION THAT SHOWS THE PLAINTIFF DOING LOTS OF
                  WORK. WE JUST NEED TO SET THIS FOR TRIAL AND MOVE IT ALONG.
-------------------------------------------------------------------------CMPL
27SEP16  INCURRED CL288    I 26275 F 10152          $369.15  LE:3 KOL:21 B
                  REASON: HALL V. ICBC
                          01/22/16 - 09/16/16
                          INV DATE 09/16/16
-------------------------------------------------------------------------CMPL
27SEP16  INCURRED CL288    I 26275 F 10152          $114.45  LE:5 KOL:21 B
                  REASON: HALL V. ICBC
                          01/22/16 - 09/16/16
                          INV DATE 09/16/16
-------------------------------------------------------------------------CMPL
27SEP16  INCURRED CL288    I 26275 F 10152          $18.97  LE:9 KOL:21 B
                  REASON: HALL V. ICBC
                          01/22/16 - 09/16/16
                          INV DATE 09/16/16
-------------------------------------------------------------------------CMPL
10NOV16  INCURRED CL288    I 26540 F 10151          $1061.44 LE:3 KOL:21 B
                  REASON: HALL V. DOVE
                          01/08/2016 - 10/26/2016
                          INV. DATE: 10/26/2016
-------------------------------------------------------------------------CMPL
10NOV16  INCURRED CL288    I 26540 F 10151          $12.80  LE:5 KOL:21 B
                  REASON: HALL V. DOVE
                          01/08/2016 - 10/26/2016
                          INV. DATE: 10/26/2016
-------------------------------------------------------------------------CMPL
10NOV16  INCURRED CL288    I 26540 F 10151          $50.26  LE:9 KOL:21 B
                  REASON: HALL V. DOVE
                          01/08/2016 - 10/26/2016
                          INV. DATE: 10/26/2016
-------------------------------------------------------------------------NOTE
18NOV16  NOTE                                                               A
```

EXHIBIT
032

```
-------------------------------------------------------------------------MSGS
5DEC16  EMAIL     MF L373571 4 EXP B CONF N                                 B
```

ICBC_003294

## Dicesare, John

| | |
|---|---|
| **From:** | Dicesare, John |
| **Sent:** | Wednesday, December 07, 2016 7:25 AM |
| **To:** | Jasroop Grewal |
| **Subject:** | FW: Janene Severson - APAC / Mr. Hall |
| **Attachments:** | Janene Severson - APAC |

Jas,

Here's the contact information for Janene Severson.

She is excellent at conducting online reviews/investigations.

Please retain her to conduct such an investigation on Mr. Hall and his business venture.

If she confirms the ability to conduct the investigation for us, I will complete the internal forms.

Thanks,

John Di Cesare

Senior Claims Examiner , BComm, CIP
ICBC building trust. driving confidence
8470 Commerce Court,
Burnaby BC V5A 4T4
604-444-7806

**EXHIBIT**
033

1

ICBC_000411

*Auth : Diclesure / Jones / Pat*     *LOC: 000*
*02306*

Itemized Statement of Account

| COMPANY NAME | | | | | | |
|---|---|---|---|---|---|---|
| **Action Pacific Investigations** | | | | | | |

| STREET ADDRESS | | CITY | | PROV. | POSTAL CODE | |
|---|---|---|---|---|---|---|
| Suite 160 -1581H Hillside Avenue | | Victoria | | BC | V8T 2C1 | |

| Client's File Number | Subject | | | START DATE (dd-mmm-yy) | FINISH DATE (dd-mmm-yy) | |
|---|---|---|---|---|---|---|
| L373475.6 | Richard Hall | | | | 31-Mar-13 | |

| Client's Name | SERVICE REQUESTED | | | Action Pacific File Number | ICBC SUPPLIER ACCT NO. | |
|---|---|---|---|---|---|---|
| Laurie Olstrom | Legal Assistance | | | AP#13-2830 | A010231 | |

### Hourly Rates

| TRAVEL RATE | | ASSIGNMENT RATE/SURVEILLANCE | | REPORT RATE | | 2ND INVESTIGATOR | |
|---|---|---|---|---|---|---|---|
| $ 80.00 | /hr | $ 80.00 | /hr | $ 80.00 | /hr | $ 55.00 | /hr |

| # | DATE (dd-mmm-yy) | INVESTIGATOR | MILEAGE (kms) | TELEPHONE (Minutes) | 2ND INVEST (hours) | TRAVEL TIME (hours) | ASSIGN. TIME (hours) | REPORT TIME (hours) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | . | | | | | | $0.00 |
| 2 | | | | | | | | | $0.00 |
| 3 | | | | | | | | | $0.00 |
| 4 | | | | | | | | | $0.00 |
| 5 | | | | | | | | | $0.00 |
| 6 | | | | | | | | | $0.00 |
| 7 | | | | | | | | | $0.00 |
| 8 | | | | | | | | | $0.00 |
| 9 | | | | | | | | | $0.00 |
| 10 | | | | | | | | | $0.00 |
| | | | **Totals** | | 0.00 | 0.00 | 0.00 | 0.00 | $0.00 |

### Additional Comments

Legal advise to prepare and respond to Hall's Affidavits RA#1

ActPac@shaw.ca

Tel: (250) 382-4004

Fax: (250) 382-4012

HST #899616544RT

### Office & Miscellaneous    (HST)

| DESCRIPTION | NO. OF UNITS | COST PER UNIT | AMOUNT | |
|---|---|---|---|---|
| Travel - Mileage | 0 | $0.70 | $0.00 | |
| Telephone - Cellular | 0 | $0.50 | $0.00 | |
| Photographs - CD | | $15.00 | $0.00 | |
| Video - DVD | | $15.00 | $0.00 | |
| Typing - Reports | | $7.00 | $0.00 | |
| Typing - Statements | | $3.50 | $0.00 | |
| Photocopying | | $0.50 | $0.00 | |
| Scene Photos | | $50.00 | $0.00 | |
| Courier | | $10.00 | $0.00 | |
| | | | $0.00 | |
| | | | $0.00 | TOTAL OF HST COSTS |
| | | | $0.00 | $0.00 |

| Non HST Costs | | | | |
|---|---|---|---|---|
| Lawyers Invoice | | | $1,469.92 | |
| | | | $0.00 | TOTAL OF NON HST COSTS |
| | | | $0.00 | $1,469.92 |

| | | |
|---|---|---|
| Subtotal | | $1,469.92 |
| HST @ 12% | | $0.00 |
| Total Charges | | $1,469.92 |

**EXHIBIT**

**034**

Payment of Account is due within 15 days of billing date.

*Huth : Dicesare / Jones / Pat*
*02306.*

*LOC:000*
*See over*
*2 invoices*

**Itemized Statement of Account**

| COMPANY NAME | | | | | |
|---|---|---|---|---|---|
| **A c t i o n   P a c i f i c   I n v e s t i g a t i o n s** | | | | | |

| STREET ADDRESS | | CITY | PROV. | POSTAL CODE |
|---|---|---|---|---|
| Suite 160 -1581H Hillside Avenue | | Victoria | BC | **V8T 2C1** |

| Client's File Number | Subject | START DATE (dd-mmm-yy) | FINISH DATE (dd-mmm-yy) |
|---|---|---|---|
| L373475.6 | Richard David Hall | | 28-Mar-13 |

| Client's Name | SERVICE REQUESTED | Action Pacific File Number | ICBC SUPPLIER ACCT NO. |
|---|---|---|---|
| Laurie Olstrom | Investigation Review | AP#13-2830 | A010231 |

**Hourly Rates**

| TRAVEL RATE | ASSIGNMENT RATE/SURVEILLANCE | REPORT RATE | 2ND INVESTIGATOR |
|---|---|---|---|
| $ 80.00 /hr | $ 80.00 /hr | $ 80.00 /hr | $ 55.00 /hr |

| # | DATE (dd-mmm-yy) | INVESTIGATOR | MILEAGE (kms) | TELEPHONE (Minutes) | 2ND INVEST (hours) | TRAVEL TIME (hours) | ASSIGN. TIME (hours) | REPORT TIME (hours) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 21-Jun-12 | KC-R131666 | | | | | 1.00 | | $80.00 |
| 2 | 19-Feb-13 | KC-R131666 | | | | | 0.20 | | $16.00 |
| 3 | 25-Feb-13 | KC-R131666 | | | | | 0.20 | | $16.00 |
| 4 | 27-Feb-13 | KC-R131666 | | | | | 2.10 | | $168.00 |
| 5 | 28-Feb-13 | KC-R131666 | | | | | 0.20 | | $16.00 |
| 6 | 04-Mar-13 | KC-R131666 | | | | | 0.20 | | $16.00 |
| 7 | 05-Mar-13 | KC-R131666 | | | | | 3.40 | | $272.00 |
| 8 | 12-Mar-13 | PR-R131736 | | | | | 2.20 | | $176.00 |
| 9 | 13-Mar-13 | PR-R131736 | | | | | 2.00 | | $160.00 |
| 10 | 14-Mar-13 | PR-R131736 | | | | | 1.50 | | $120.00 |
| 11 | 14-Mar-13 | KC-R131666 | 36 | | | | 1.70 | | $136.00 |
| 12 | 18-Mar-13 | KC-R131666 | | | | | 0.40 | | $32.00 |
| 13 | 20-Mar-13 | KC-R131666 | | | | | 0.40 | | $32.00 |
| 14 | | | | | | | | | $0.00 |
| 15 | | | | | | | | | $0.00 |
| 16 | | | | | | | | | $0.00 |
| 17 | | | | | | | | | $0.00 |
| 18 | | | | | | | | | $0.00 |
| 19 | | | | | | | | | $0.00 |
| 20 | | | | | | | | | $0.00 |
| | | | | **Totals** | 0.00 | 0.00 | 15.50 | 0.00 | $1,240.00 |

**Additional Comments**
Indepth historical file(s) review, receive affidavits, preparation of disclosure package for counsel, meeting with counsel.

**ActPac@shaw.ca**
**Tel: (250) 382-4004**
**Fax: (250) 382-4012**
**HST #899616544RT**

**Office & Miscellaneous   (HST)**

| DESCRIPTION | NO. OF UNITS | COST PER UNIT | AMOUNT |
|---|---|---|---|
| Travel - Mileage | 36 | $0.70 | $25.20 |
| Telephone - Cellular | 0 | $0.50 | $0.00 |
| Photographs - CD | 1 | $15.00 | $15.00 |
| Video - DVD | | $15.00 | $0.00 |
| Typing - Reports | | $7.00 | $0.00 |
| Typing - Statements | | $3.50 | $0.00 |
| Photocopying | 526 | $0.25 | $131.50 |
| Scene Photos | | $50.00 | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 |
| Courier | | $10.00 | $0.00 |

| | | | TOTAL OF HST COSTS |
|---|---|---|---|
| | | | $171.70 |

| Non HST Costs | | |
|---|---|---|
| | | $0.00 |
| | | $0.00 |
| | | $0.00 |

| | TOTAL OF NON HST COSTS |
|---|---|
| | $0.00 |

| Subtotal | $1,411.70 |
|---|---|
| HST @ 12% | $169.40 |
| **Total Charges** | **$1,581.10** |

*0513.2*

**Payment of Account is due within 15 days of billing date.**



**ICBC** Itemized Statement of Account

| Frc | | |
|---|---|---|
| | ***Action Pacific*** | |
| | **Investigative Service** | |
| | Suite 160 - 1581H Hillside Ave., Victoria, B.C. | |
| | **V8T 2C1** | |
| | ActPac@shaw.ca | |
| | Tel: (250) 382-4004   Fax: (250) 382-4012 | |
| | **Vendor# A01023-1** | |
| | GST #899616544RT | |

ICBC CLAIM NUMBER  L3,7,3,4,7,5,6   Q.C./M.D. NUMBER

ICBC ADJUSTER NAME  Brenda Lindsay

ASSIGNMENT DATE  D 3 M 0 YEAR ___   COMPLETION DATE  D 0 M 3 YEAR 20,0,4

SUBJECT  Richard Hall

SERVICE REQUESTED  Photographs

FILE NUMBER  03-1275   ACCOUNT NUMBER  A01023-1

| D | DATE M | YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL. \| PERS. | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1 | | | | | | $ |
| | | | | 2 | | | | | | $ |
| | | | | 3 | | | | | | $ |
| | | | | 4 | | | | | | $ |
| | | | | 5 | | | | | | $ |
| | | | | 6 | | | | | | $ |
| | | | | 7 | | | | | | $ |
| | | | | 8 | | | | | | $ |
| | | | | 9 | | | | | | $ |
| | | | | 10 | | | | | | $ |

**Totals** — TRAVEL TIME / ASSIGN. TIME / REPORT TIME / CHARGES — $

| BASIC HOURLY RATES | | |
|---|---|---|
| Travel | $ | /hour |
| Assignment | $ | /hour |
| Reporting | $ | /hour |

L373571.4

21B 82P

Thanks.

PA₁... 01/09/04

| OFFICE & MISCELLANEOUS | | AMOUNT |
|---|---|---|
| Travel   Kms x $   /Km = | | $ |
| Film/Photographs | | $ 30.⁰⁰ |
| Telephone | | $ |
| Typing | | $ |
| Photocopying | | $ |
| | | $ |
| | | $ |
| | | $ |
| | | $ |
| Office & Miscellaneous   TOTAL | $ | $ 30.⁰⁰ |

**Total Charges** $ 30.⁰⁰

**EXHIBIT**
**035**

CL-268 (032001)   **Itemized Statement of Account**
(PLEASE CROSS REFERENCE ITEM NO. ON YOUR REPORT)

White – Claim Office
Canary – Originator



**ICBC** Itemized Statement of Accr

## *Action Pacific*

### Investigative Service

Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shaw.ca

Tel: (250) 382-4004    Fax: (250) 382-4012

**Vendor# A01023-1**

GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L37347.5.6 | | |
| ICBC ADJUSTER NAME | | |
| Joanne Nelson | | |
| ASSIGNMENT DATE | | COMPLETION DATE |
| 19 D / 11 M / 12 2003 YEAR | | 02 D / 02 M / 2004 YEAR |
| SUBJECT | | |
| Richard Hall | | |
| SERVICE REQUESTED | | |
| Investigation / interviews | | |
| FILE NUMBER | | ACCOUNT NUMBER |
| 03-1275 | | A01023-1 |

| DATE | | | | PERFORMED | CONTACT (CHECK ONE) TEL. \| PERS. | | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D | M | YEAR | | | | | | | | | |
| 11 | 12 | 2003 | | | | | | .50 | .25 | $ | 52.50 |
| 18 | 12 | 2003 | | | | | | .10 | | $ | 7.00 |
| 02 | 01 | 2004 | | | | | | .10 | | $ | 7.00 |
| 20 | 01 | 2004 | | | | | | 2.80 | | $ | 196.00 |
| 21 | 01 | 2004 | | Km | 18 | 4 | | 13.30 | | $ | 791.00 |
| 27 | 01 | 2004 | | | | | | 1.40 | | $ | 98.00 |
| 26 | 01 | 2004 | | | | | | 1.10 | | $ | 77.00 |
| 28 | 01 | 2004 | | | | | | 1.20 | | $ | 84.00 |
| 30 | 01 | 2004 | | | | | | 1.80 | | $ | 126.00 |
| 02 | 02 | 2004 | | | | | | .20 | 2.60 | $ | 196.00 |

| | TRAVEL TIME | ASSIGN. TIME | REPORT TIME | CHARGES 5.70 |
|---|---|---|---|---|
| | 20.50 | 2.85 | | $ 1,634.50 |

**BASIC H**

Travel

Assignment

Reporting

| OFFICE & MISCELLANEOUS | | AMOUNT | |
|---|---|---|---|
| 176 | Kms x $ .50 /Km = | $ | 88.00 |
| hotographs | 7 @ #2.50 | $ | 17.50 |
| one | 18 @ #.50 | $ | 9.00 |
| | 16 @ #5.00 | $ | 80.00 |
| copying | 11 @ #.50 | $ | 5.50 |
| | | $ | 24.25 |
| | | $ | |
| | | $ | |
| | | $ | |
| Office & Miscellaneous | TOTAL | $ | $ 224.25 |

L37357.4
213 82P

**PAID**
4/2/04

**Total Charges**   $ 1,858.75



Gierard Wright
CC34                    DO.

## Action Pacific
### Investigative Service
Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shaw.ca
Tel: (250) 382-4004    Fax: (250) 382-4012
### Vendor# A01023-1
GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L3,734,75,6 | | |

ICBC-ADJUSTER NAME: Brenda Lindsay

| ASSIGNMENT DATE | | | COMPLETION DATE | |
|---|---|---|---|---|
| D | M | YEAR | D M YEAR |
| | | | 08 03 2004 |

SUBJECT: Richard Hall

SERVICE REQUESTED: Invest interviews

FILE NUMBER: 03-1275

ACCOUNT NUMBER: A01023-1

| DATE D | M | YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL. | PERS. | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04 | 02 | 2004 | CARTER | 1 | 18 Km | | | 1.90 | | | $ 133.00 |
| 10 | 02 | 2004 | | 2 | | | | 1.10 | | | $ 77.00 |
| 25 | 02 | 2004 | | 3 | 16 Km | | | .80 | | | $ 56.00 |
| 26 | 02 | 2004 | | 4 | 6 Km | | | 1.60 | | | $ 112.00 |
| 03 | 03 | 2004 | | 5 | | | | .40 | | | $ 28.00 |
| 04 | 03 | 2004 | | 6 | | | | 1.20 | | | $ 84.00 |
| 05 | 03 | 2004 | | 7 | | | | .20 | | | $ 14.00 |
| 08 | 03 | 2004 | CARTER | 8 | | | | | | .90 | $ 63.00 |
| | | | | 9 | | | | | | | $ |
| | | | | 10 | | | | | | | $ |

| | TRAVEL TIME | ASSIGN. TIME | REPORT TIME | CHARGES |
|---|---|---|---|---|
| **Totals** | | 7.20 | .90 | $ 567.00 |

### BASIC HOURLY RATES
| | | |
|---|---|---|
| Travel | $ 70.00 | /hour |
| Assignment | $ 70.00 | /hour |
| Reporting | $ 70.00 | /hour |

| OFFICE & MISCELLANEOUS | | AMOUNT |
|---|---|---|
| Travel 40 Kms x $ .50 /Km = | | $ 20.00 |
| Film/Photographs | | $ — |
| Telephone | | $ — |
| Typing 30 @ #5.00 | | $ 150.00 |
| Photocopying | | $ — |
| Land Titles | | $ 31.00 |
| BC Assesment | | $ 12.00 |
| | | $ |
| | | $ |
| Office & Miscellaneous | TOTAL $ | $ 213.00 |

L373571.4.
P/5 pay
21382P
Thanks.

PAID
Mar 9/04

**Total Charges** $ 780.00



Itemized Statement of Acco .

## Action Pacific

### Investigative Service
Suite 160 - 1581H Hillside Ave., Victoria, B.C.
V8T 2C1
ActPac@shaw.ca
Tel: (250) 382-4004    Fax: (250) 382-4012

### Vendor# A01023-1
GST #899616544RT

| ICBC CLAIM NUMBER | | | Q.C./M.D. NUMBER |
|---|---|---|---|
| L373475.6 | | | |

ICBC ADJUSTER NAME: Gerard Wright.

| ASSIGNMENT DATE | | COMPLETION DATE | |
|---|---|---|---|
| 23 06 2004 | | 06 08 2004 | |

SUBJECT: Richard Hall

SERVICE REQUESTED: Research / Investigation

| FILE NUMBER | ACCOUNT NUMBER |
|---|---|
| 03-1275 | A01023-1 |

| DATE | | | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) | | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D | M | YEAR | | | | TEL. | PERS. | | | | |
| 23 | 06 | 2004 | CARTER | 1 | 8 km | | | | .70 | | $ 49.00 |
| 29 | 06 | 2004 | | 2 | | | | | .30 | | $ 21.00 |
| 05 | 07 | 2004 | | 3 | | | | | .10 | | $ 7.00 |
| 06 | 07 | 2004 | | 4 | | 4 | 4 | | .90 | | $ 63.00 |
| 07 | 07 | 2004 | | 5 | 12 km | 2 | 1 | | 1.80 | | $ 126.00 |
| 08 | 07 | 2004 | | 6 | | | | | 4.20 | | $ 294.00 |
| 12 | 07 | 2004 | | 7 | | | | | 2.70 | | $ 189.00 |
| 13 | 07 | 2004 | | 8 | | | | | 1.40 | | $ 98.00 |
| 14 | 07 | 2004 | | 9 | 42 km | | | | 2.70 | | $ 189.00 |
| 20 | 07 | 2004 | CARTER | 10 | | | | | .50 | | $ 35.00 |



**ICBC** Itemized Statement of Account

| | |
|---|---|
| Fror | |

## Action Pacific
### Investigative Service
Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shaw.ca
Tel: (250) 382-4004   Fax: (250) 382-4012
**Vendor# A01023-1**
GST #899616544RT

| | |
|---|---|
| ICBC CLAIM NUMBER | 3 7 3 4 7 5 . 6 |
| ICBC ADJUSTER NAME | Gerard Wright |
| ASSIGNMENT DATE | 23 06 2004 |
| COMPLETION DATE | 06 08 2004 |
| SUBJECT | Richard Hall |
| SERVICE REQUESTED | Research / Investigation |
| FILE NUMBER | 03-1275 |
| ACCOUNT NUMBER | A01023-1 |

Q.C./M.D. NUMBER

| DATE D | M | YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL. | PERS. | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 07 | 2004 | CARTER | 1 | | | | | 1.20 | | $ 84.00 |
| 22 | 07 | 2004 | | 2 | | | | | .40 | | $ 28.00 |
| 26 | 07 | 2004 | | 3 | | | | | 1.80 | | $ 126.00 |
| 27 | 07 | 2004 | | 4 | | | | | 4.70 | | $ 329.00 |
| 28 | 07 | 2004 | | 5 | | | | | 4.00 | | $ 280.00 |
| 30 | 07 | 2004 | | 6 | | | | | .20 | | $ 14.00 |
| 05 | 08 | 2004 | | 7 | | | | | 3.70 | | $ 259.00 |
| 06 | 08 | 2004 | CARTER | 8 | | | | | .50 | 4.60 | $ 357.00 |
| | | | | 9 | | | | | | | $ |
| | | | | 10 | | | | | | | $ |
| | | | | **Totals** | TRAVEL TIME | ASSIGN. TIME 31.80 | | | REPORT TIME 4.60 | | CHARGES $ 2,578. |

| BASIC HOURLY RATES | |
|---|---|
| Travel | $ 70.00 /hour |
| Assignment | $ 70.00 /hour |
| Reporting | $ 70.00 /hour |

| OFFICE & MISCELLANEOUS | AMOUNT |
|---|---|
| Travel  62  Kms x $ .50 /Km = | $ 31.00 |
| Film/Photographs  6 @ $2.50 | $ 15.00 |
| Telephone  6 @ $.50 | $ 3.00 |
| Typing  Report 5 @ $5. | $ 25.00 |
| Photocopying  146 @ $.50 | $ 73.00 |
| Statements  47 @ $1.00 | $ 47.00 |
| | $ |
| BCC Rpt. | $ 50.00 |
| | $ |
| Office & Miscellaneous   TOTAL | $ | $ 244.00 |

PAID AUG 06 2004

**Total Charges** $ 2,792.00

| | |
|---|---|
| **CL-268 (032001)** | **Itemized Statement of Account** (PLEASE CROSS REFERENCE ITEM NO. ON YOUR REPORT) |

White - Claim Office
Canary - Originator



**ICBC** Itemized Statement of Account

# *Action Pacific*

## Investigative Service

Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**

ActPac@shawe.ca

Tel: (250) 382-4004    Fax: (250) 382-4012

## Vendor# A01023-1

GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L373475·6 | | |
| ICBC ADJUSTER NAME | | |
| Gerard | Wright | |
| ASSIGNMENT DATE | | COMPLETION DATE |
| D    M    YEAR | | D   M   YEAR |
| | | 20 09 2004 |
| SUBJECT | | |
| Richard Hall | | |
| SERVICE REQUESTED | | |
| Interviews / Invest. | | |
| FILE NUMBER | | ACCOUNT NUMBER |
| 03-1275 | | A01023-1 |

| DATE D M YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL. PERS. | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|
| 15 09 2004 | CARTER | 1 | | | | .20 | | $ 14.00 |
| 17 09 2004 | CARTER | 2 | | | | .30 | | $ 21.00 |
| 20 09 2004 | CARTER | 3 | | | | | .90 | $ 63.00 |
| | | 4 | | | | | | $ |
| | | 5 | | | | | | $ |
| | | 6 | | | | | | $ |
| | | 7 | | | | | | $ |
| | | 8 | | | | | | $ |
| | | 9 | | | | | | $ |
| | | 10 | | | | | | $ |

| Totals | TRAVEL TIME | ASSIGN. TIME 12.60 | REPORT TIME 0.90 | CHARGES 995.00 $ |
|---|---|---|---|---|

| BASIC HOURLY RATES | |
|---|---|
| Travel | $ 70.00 /hour |
| Assignment | $ 70.00 /hour |
| Reporting | $ 70.00 /hour |

L373571·4

PAY
KOL  21B
L/E   82
P/F        P
DATE
INITIAL

| OFFICE & MISCELLANEOUS | | AMOUNT |
|---|---|---|
| Travel | Kms x $ /Km = | $ |
| Film/Photographs | | $ |
| Telephone | 32 @ $.50 | $ 16.00 |
| Typing | 4 @ $5.00 | $ 20.00 |
| Photocopying | 25 @ $.50 | $ 12.50 |
| Interviews | 14 @ $1.- | $ 14.00 |
| | | $ |
| | | $ |
| | | $ |
| Office & Miscellaneous | TOTAL | $ | $ 62.50 |

PAID
SEP 20 2004

**Total Charges** $ 1,007.50

---

**CL-268 (032001)**   **Itemized Statement of Account**
(PLEASE CROSS REFERENCE ITEM NO. ON YOUR REPORT)

White  -  Claim Office
Canary  -  Originator



**ICBC**   Itemized Statement of Acco...

L373475-6

Fro

# 𝒜ction 𝒫acific

## Investigative Service

Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shaw.ca
Tel: (250) 382-4004   Fax: (250) 382-4012

### Vendor# A01023-1

GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L373475·6 | | |

| ICBC ADJUSTER NAME |
|---|
| Gerard Wright |

| ASSIGNMENT DATE | | | COMPLETION DATE | | |
|---|---|---|---|---|---|
| D | M | YEAR | 2010 | MO 12 | YEAR 2004 |

| SUBJECT |
|---|
| Richard Hall |

| SERVICE REQUESTED |
|---|
| Interviews / Invest. |

| FILE NUMBER | ACCOUNT NUMBER |
|---|---|
| 03 — 1275 | A01023-1 |

| DATE | | | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) | | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| D | M | YEAR | | | | TEL. | PERS. | | | | |
| 06 | 08 | 2004 | CARTER | 1 | | 27 | 1 | | 4.10 | | $ 287.00 |
| 10 | 08 | 2004 | | 2 | | | | | 2.30 | | $ 161.00 |
| 11 | 08 | 2004 | | 3 | | | | | 1.10 | | $ 77.00 |
| 18 | 08 | 2004 | | 4 | | | | | .70 | | $ 49.00 |
| 19 | 08 | 2004 | | 5 | | | | | .30 | | $ 21.00 |
| 20 | 08 | 2004 | | 6 | | | | | 1.90 | | $ 133.00 |
| 22 | 08 | 2004 | | 7 | | | | | .40 | | $ 28.00 |
| 30 | 08 | 2004 | | 8 | | 5 | 1 | | .70 | | $ 49.00 |
| 08 | 09 | 2004 | | 9 | | | | | .40 | | $ 28.00 |
| 14 | 09 | 2004 | CARTER | 10 | | | | | .20 | | $ 14.00 |



**ICBC** Itemized Statement of Account

L 373475.6

From

## *Action Pacific*

### Investigative Service

Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shawe.ca
Tel: (250) 382-4004   Fax: (250) 382-4012
**Vendor# A01023-1**
GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L3,73,4,75.6 | | |
| ICBC ADJUSTER NAME | | |
| Gerard Wright | | |
| ASSIGNMENT DATE | | COMPLETION DATE |
| 19 01 12 05 D M YEAR | | D M YEAR |
| SUBJECT | | |
| Richard Hall | | |
| SERVICE REQUESTED | | |
| Investigation | | |
| FILE NUMBER | | ACCOUNT NUMBER |
| 03-1275 | | A01023-1 |

| DATE D / M / YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL. / PERS. | | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| 27 09 2004 | CARTER | 1 | | | | | .40 | | $ 28.00 |
| 19 10 2004 | | 2 | | | | | 1.10 | | $ 77.00 |
| 28 10 2004 | | 3 | | | | | .50 | | $ 35.00 |
| 10 11 2004 | | 4 | | | | | .20 | | $ 14.00 |
| 23 11 2004 | | 5 | | | | | .90 | | $ 63.00 |
| 15 12 2004 | | 6 | | 4 | 1 | | .30 | | $ 21.00 |
| 18 12 2004 | | 7 | | | | | 1.40 | | $ 98.00 |
| 20 12 2004 | | 8 | 240 km | 1 | 1 | 6.90 | | | $ 483.00 |
| 22 12 2004 | | 9 | | 1 | 1 | .90 | | | $ 63.00 |
| 14 01 2005 | CARTER | 10 | | | | 1.90 | | 1.70 | $ 253.00 |

**Totals** | TRAVEL TIME | ASSIGN. TIME 14. | REPORT TIME 1.70 | CHARGES $ 1,135.00

| BASIC HOURLY RATES | | |
|---|---|---|
| Travel | $ 70.00 | /hour |
| Assignment | $ 70.00 | /hour |
| Reporting | $ 70.00 | /hour |

L 373 571.4

PAY
KOL   21R
L/E    82
P/F
DATE
INITIAL

PAID JAN 00 2005

| OFFICE & MISCELLANEOUS | | AMOUNT |
|---|---|---|
| Travel  240  Kms x $ .50 /Km = | | $ 120.00 |
| Film/Photographs | | $ |
| Telephone  6 @ $.50 | | $ 3.00 |
| Typing  3 @ $5.00 | | $ 15.00 |
| Photocopying  40 @ $.50 | | $ 20.00 |
| Interviews  35 @ $1.00 | | $ 35.00 |
| | | $ |
| | | $ |
| | | $ |
| Office & Miscellaneous  TOTAL | $ | $ 193.00 |

**Total Charges** $ 1,328.00

CL-268 (032001)   **Itemized Statement of Account**
(PLEASE CROSS REFERENCE ITEM NO. ON YOUR REPORT)

White  -  Claim Office
Canary  -  Originator



**ICBC** Itemized Statement of Account

Fr 

# *Action Pacific*

## **Investigative Service**

Suite 160 - 1581H Hillside Ave., Victoria, B.C.
**V8T 2C1**
ActPac@shaw.ca
Tel: (250) 382-4004   Fax: (250) 382-4012
**Vendor# A01023-1**
GST #899616544RT

| ICBC CLAIM NUMBER | | Q.C./M.D. NUMBER |
|---|---|---|
| L 37.34.75.6 | | |
| ICBC ADJUSTER NAME | | |
| Gerard Wright | | |
| ASSIGNMENT DATE | | COMPLETION DATE |
| D | M | YEAR | | M | YEAR |
| | | | 2 10 7 2085 |
| SUBJECT | | |
| Richard Hall | | |
| SERVICE REQUESTED | | |
| Investigation | | |
| FILE NUMBER | | ACCOUNT NUMBER |
| 03-1275 | | A01023-1 |

| DATE D\|M\|YEAR | NAME OF OPERATOR WHO PERFORMED SERVICE | ITEM NO. | SERVICE PERFORMED | CONTACT (CHECK ONE) TEL.\|PERS. | TRAVEL TIME (HR./MIN.) | ASSIGN. TIME (HR./MIN.) | REPORT TIME (HR./MIN.) | CHARGE |
|---|---|---|---|---|---|---|---|---|
| 24 01 2005 | CARTER | 1 | | / \| / | .90 | | | $ 63.00 |
| 01 02 2005 | | 2 | | / \| / | .20 | | | $ 14.00 |
| 28 04 2005 | | 3 | | | 1.60 | | | $ 112.00 |
| 30 06 2005 | | 4 | 176 km | | 6.50 | | | $ 455.00 |
| 19 07 2005 | | 5 | | | 1.10 | | | $ 77.00 |
| 21 07 2005 | CARTER | 6 | | | .60 | 2.80 | | $ 238.00 |
| | | 7 | | | | | | $ |
| | | 8 | | | | | | $ |
| | | 9 | | | | | | $ |
| | | 10 | | | | | | $ |
| | | **Totals** | TRAVEL TIME 10.90 | ASSIGN. TIME 2.80 | | REPORT TIME | | CHARGES $ 959.00 |

| BASIC HOURLY RATES | |
|---|---|
| Travel | $ 70.00 /hour |
| Assignment | $ 70.00 /hour |
| Reporting | $ 70.00 /hour |

| OFFICE & MISCELLANEOUS | | AMOUNT |
|---|---|---|
| Travel 176 | Kms x $ .65 /Km = | $ 114.40 |
| Film/Photographs | | $ |
| Telephone | 2 @ $.50 | $ 1.00 |
| Typing | 3 @ $5.00 | $ 15.00 |
| Photocopying | 34 @ $.50 | $ 17.00 |
| Reg of Companies | | $ 12.50 |
| Personal Property Registrare | | $ 10.00 |
| Interviews 16 @ $1.00 | | $ 16.00 |
| | | $ |
| Office & Miscellaneous | TOTAL | $ 185.90 |

L3735714

PAY

KOL — 2/B
L/E — 82
P/F — P.
DATE —
INITIAL —

PAID
2005

**Total Charges** $ 1,144.90

White  -  Claim Office
Canary  -  Originator

*Chris Williams*   Amber.

## Itemized Statement of Account

### *Action Pacific* Investigative Service

| COMPANY NAME | *Action Pacific* Investigative Service | | | |
|---|---|---|---|---|
| STREET ADDRESS Suite 160 -1581H Hillside Avenue | | CITY Victoria | PROV. BC | POSTAL CODE V8T 2C1 |
| Client's File Number: L373475.6 | Subject Donald Anthony Dove | | START DATE (dd-mmm-yy) 08-Jul-11 | FINISH DATE (dd-mmm-yy) 26-Sep-11 |
| Client's Name Lauri Olstrom | SERVICE REQUESTED Interviews | | Action Pacific File Number AP#11-2553 | ICBC SUPPLIER ACCT NO. A01023-1 |

### Hourly Rates

| TRAVEL RATE | ASSIGNMENT RATE/SURVEILLANCE | REPORT RATE | 2ND INVESTIGATOR |
|---|---|---|---|
| $ 80.00 /hr | $ 80.00 /hr | $ 80.00 /hr | $ 50.00 /hr |

| # | DATE (dd-mmm-yy) | INVESTIGATOR | MILEAGE (kms) | TELEPHONE (Minutes) | 2ND INVEST (hours) | TRAVEL TIME (hours) | ASSIGN. TIME (hours) | REPORT TIME (hours) | CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 08-Jul-11 | KC | | 5 | | | 0.90 | | $72.00 |
| 2 | 09-Jul-11 | DF | | | | | 1.00 | | $80.00 |
| 3 | 11-Jul-11 | DF | | | | | 0.30 | | $24.00 |
| 4 | 13-Jul-11 | DF | 12 | 2 | | | 1.40 | | $112.00 |
| 5 | 14-Jul-11 | DF | | 2 | | | 1.10 | | $88.00 |
| 6 | 15-Jul-11 | DF | 8 | 8 | | | 2.40 | | $192.00 |
| 7 | 16-Jul-11 | DF | 8 | | | | 1.00 | | $80.00 |
| 8 | 17-Jul-11 | DF | | | | | 1.50 | | $120.00 |
| 9 | 18-Jul-11 | DF | 15 | 17 | | | 7.10 | | $568.00 |
| 10 | 19-Jul-11 | DF | | 19 | | | 2.20 | | $176.00 |
| 11 | 24-Jul-11 | KC | 22 | 10 | | | 2.40 | | $192.00 |
| 12 | 25-Jul-11 | KC | | | | | 0.90 | | $72.00 |
| 13 | 27-Jul-11 | KC | | | | | 1.30 | | $104.00 |
| 14 | 01-Aug-11 | KC | | 10 | | | 0.70 | | $56.00 |
| 15 | 02-Aug-11 | DF | | | | | 0.40 | | $32.00 |
| 16 | 23-Aug-11 | KC | | | | | 0.20 | | $16.00 |
| 17 | 13-Sep-11 | KC | | | | | 0.20 | | $16.00 |
| 18 | 26-Sep-11 | KC | | | | | | 0.90 | $72.00 |
| 19 | | | | | | | | | $0.00 |
| 20 | | | | | | | | | $0.00 |
| | Totals | | | 0.00 | 0.00 | | 25.00 | 0.90 | $2,072.00 |

L373571.4.
21B
82.

### Additional Comments

CRIMINAL
PAID
Oct 14/11
AB

**ActPac@shaw.ca**
**Tel: (250) 382-4004**
**Fax: (250) 382-4012**
**HST #899616544RT**

### Office & Miscellaneous   (HST)

| DESCRIPTION | NO. OF UNITS | COST PER UNIT | AMOUNT |
|---|---|---|---|
| Travel - Mileage | 65 | $0.70 | $45.50 |
| Telephone - Cellular | 73 | $0.50 | $36.50 |
| Photographs - CD | | $25.00 | $0.00 |
| Video - DVD | | $15.00 | $0.00 |
| Typing - Reports | 2 | $7.00 | $14.00 |
| Typing - Statements | | $3.50 | $0.00 |
| Photocopying | 2 | $0.50 | $1.00 |
| Scene Photos | | $50.00 | $0.00 |
| Courier | 1 | $10.00 | $10.00 |
| | | | $0.00 |
| | | | $0.00 |
| | | | $0.00 TOTAL OF HST COSTS $107.00 |
| Non HST Costs | | | |
| | | | $0.00 |
| | | | $0.00 TOTAL OF NON HST COSTS |
| | | | $0.00 $0.00 |

LO 9380.0
Ok to Pay
LW 05040
AB 17/11

| | |
|---|---|
| Subtotal | $2,179.00 |
| HST @ 12% | $261.48 |
| Total Charges | $2,440.48 |

Payment of Account is due within 15 days of billing date.



# CANPRO®
## Investigations
### A CANPRO GLOBAL COMPANY
www.canproglobal.com

**VENDOR NUMBER: A095152**

Inquiries:
investigations@canproglobal.com
Tel: 604-517-4545
Fax: 604-517-4510

**GST/HST No.** 133953331

Invoice

**Invoice To**

Insurance Corporation of BC
300 - 808 Nelson Street
Vancouver, BC V6Z 2H2

*h 3735764*
*21 B P*
*82.*

| Date | Invoice # |
|------|-----------|
| 12/16/2008 | 164 |

| Attention: | Subject: | CANPRO File# | Your File# |
|------------|----------|--------------|------------|
| John DiCesare | HALL, Richard David | 08-16682 | L373475.6 |

| Serviced | Description | Qty | Rate | Amount |
|----------|-------------|-----|------|--------|
| | Professional Hours - Surveillance | 10 | 79.00 | 790.00 |
| | Professional Hours - Surveillance @ No Charge ($316.00) | 4 | 0.00 | 0.00 |
| | Travel Time | 0.5 | 79.00 | 39.50 |
| | VDO Editing | 2 | 79.00 | 158.00 |
| | Report Preparation | 1 | 79.00 | 79.00 |
| | | | | |
| | EXPENSES | | | |
| | Mileage | 146 | 0.69 | 100.74 |
| | Mileage @ No Charge ($45.54) | 66 | 0.00 | 0.00 |
| | Cell Phone | | 10.80 | 10.80 |
| | Original master video tapes & storage of evidence | 2 | 20.00 | 40.00 |
| | Video CD/DVD client copies | 2 | 20.00 | 40.00 |
| | Typing / Wordprocessing Reports (per page) | 4 | 9.50 | 38.00 |
| | Parking | | 35.75 | 35.75 |
| | GST on Zero Rated sales | | 0.00% | 0.00 |

```
  4• X
  9•5 =
 39•00 +

1,056•50 +
 100•74 +
  10•80 +
  40•00 +
  40•00 +
  39•00 +
  34•75 +
1,331•79 *
```

*peie*
*23/12/08*

ints subject to finance charges of 1.5% per month. Please
nber on cheque or money order

**Total** $1,331.79

**Payments/Credits** $0.00

**Please remit to : Canpro Risk Solutions Inc.**
**#225 - 17 Fawcett Road**
**Coquitlam, BC Canada V3K 6V2**

**Balance Due** **$1,331.79**

# *Action Pacific*

## Investigative Service    Security Consultation

Suite 160 - 1581H  Hillside Avenue, Victoria,  B.C.  V8T 2C1

Tel: (250) 382-4004      ActPac@shaw.ca  www.ActPac.ca      Fax: (250) 382-4012

Gordon Marshall
Pacific Law Group                                                      **2011 August 26**
#203 - 815 Hornby Street
Vancouver, B.C.  V6Z 2E6

Re: Donald Dove
ICBC File:      L373475.6
Our File:       11-2553

### PRIVILEGED & CONFIDENTIAL
for the exclusive use of our clients or their solicitors

Dear Mr. Marshall,

Please be advised that the following investigative measures were taken in relation to this file:

1)      **Internet searches Donald Anthony Dove**

2)      **Probate & Adoption Registry, Province of BC**

3)      **Interview of Bruce Corbett, long time resident**
        **Res: #103 - 566 Simcoe Street, Victoria, BC**

4)      **Victoria Public Library searches**

5)      **Inquiries at 2105 Dowler Place, Dowler Lodge, Victoria, BC**

6)      **Inquiries with Alan Kurtz, manager, Marifield Park Apartments**
        **Res: 566 Simcoe Street, Victoria, BC**          Tel: 250-216-1162

7)      **Interview of Ron Zahar, friend**
        **Bus: 780 Fort Street, Victoria, BC**              Tel# 250-381-06151

8)      **Sands Funeral Chapel, Nathan Ramagnoli**
        **Bus: 1803 Quadra Street, Victoria, BC**          Tel: 250-388-5155

9)   Elaine Simpson, Park Lawn Cemetery, Toronto, ON
     Bus: 57 Linelle St, Toronto, ON              Tel: 416-231-1462

10)  Interview of Carole-Eugenie Dove, sister
     Res: 13952 Country Road 29, Warkworth, ON         Tel: 705-924-2620

11)  Telephone interview Mary Louise Aro (nee: Dove), sister
     Res: 2840 East Downe Road, Victoria, BC      Tel: 250-595-2882

12)  Michael Hutchison, Smith Hutchison Law Corporation
     Bus: 202-1640 Oak Bay Ave, Victoria, BC      Bus: 250-388-6666

13)  Email to Katie Moffet, kmwhq@katymoffatt.com
     Add: California, USA


Through our interviews and inquiries I have learned:

* Donald Anthony Dove was known as Tony by his family.
* Tony was a librarian and very eccentric.  He suffered from a mental illness.
* he never married but had a number of female friends.
* Tony resided with his father.
* at the time of the father's death, Tony inherited the family home.  This estranged the remaining children.  The family members never spoke to Tony subsequently.
* the family home had been sold years ago by Tony.
* Tony resided in hospice at the time of his death.
* upon Tony's death, Sands Funeral Chapel made arrangement to transfer his body to Ontario to be interned in the family plot, with his father, at Park Lawn Cemetery, Toronto, ON.  Section V Lot 44.
* Michael Hutchinson and his law firm were the family lawyers.
* Katie Moffet, a recording artist, was a close friend of Tony's and she may have made funeral arrangements and executed his will in California.
* Donald Stanley Dove (father) died in 2002.
* Kathleen Schnell (step mother) died in 1999.
* Naomi Dove (sister) died as a small child.
* James Edwin Dove (brother) passed away 6 months ago of brain cancer.  His widow is Carole Dove.  Neither had any contact with Tony since his father's death.
* Mary Aro, (sister) who resides in Victoria, had no contact with Tony since their father's death.
* Andrew Schnell, step-brother, resides in Chicago and has never met Tony.
* the Probate Registry has no record for Tony Dove.


The only leads are Michael Hutchison, lawyer and Katie Moffet.  I have made numerous attempts to contact Katie Moffet with no success.  Michael Hutchison would only speak directly with yourself.  Should you require any additional assistance in this matter, please do not hesitate to contact me.

Sincerely,

Ken Carter,
Private Investigator
Action Pacific Ent. Ltd.

cc:     Laurie Olstrom
        ICBC - Vancouver

This document is the property of Action Pacific Ent. Ltd.  This report may contain matters of opinion.  It is loaned to your agency on the understanding that it is not to be further disseminated without the consent of the originator.   Distribution within your agency is to be protected in accordance with normal safeguards.  Action Pacific Ent. Ltd.  disclaims all liability for unauthorized publication.