# EXHIBIT H

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:20-cv-01992-CEM-LRH

RICHARD HALL,

    Plaintiff,

v.

INSURANCE CORPORATION OF
BRITISH COLUMBIA,

    Defendant.

_____/

### Declaration of Elaine Carey

Pursuant to 28 U.S.C. § 1746, I, Elaine Carey, declare as follows:

1. I am currently the Managing Director of FTI Global Risk and Investigations Practice based in California. All of the statements made in this declaration are made upon personal knowledge unless otherwise stated. I make this declaration in support of Plaintiff's opposition to Defendant's amended motion to dismiss in the above captioned action.

2. From 2000 to 2012, I served as the National Director of Investigations at Control Risks Group in Los Angeles, leading all its investigative work in North America, including due diligence, fraud, business intelligence, Foreign Corrupt Practices Act compliance, anti-corruption programs, litigation support, anti-money laundering reviews and investigations, asset-tracing, and supply chain issues for corporations and law firms.

3. In both positions, my clients have been and continue to be mostly global Fortune 100 companies, major global law firms, private equity and hedge funds etc. I am a Certified Fraud Examiner and a Certified Anti-Money Laundering Expert, I have served as an advisor and

1

problem solver to senior executives of Fortune 100 corporations and law firms for more than 25 years, overseeing my clients' most complex and sensitive problems around the globe involving integrity, political risks, security, and reputational risks.

4. My investigations have routinely identified white collar criminals, gangs, and organized crime groups that have used institutions to launder money. These investigations have also identified criminal groups that have targeted officials with the aim of corrupting them. In such cases I have worked with law enforcement to safeguard these targeted individuals.

5. Mr. Richard Hall contacted me when I was at my former firm, Control Risks Group, to ask for my professional assistance in or about late 2004 or early 2005. He explained that he was extremely concerned about alleged illegal activities that he felt were directed against him by the Insurance Corporation of British Columbia ("ICBC"), and/or its investigator Kenneth Carter. He described to me his car accident, his brain injury, and - although he did not then have enough information to know who was behind this - the subsequent troubling and unusual events occurring immediately after he submitted an insurance claim against ICBC. In particular, he described his concerns about an ICBC private investigator who might be damaging him and his key business relationships in the United States.

6. Mr. Hall described to me the events that he was concerned were threatening, damaging, and interfering in some of his most valuable, important and sensitive relationships in Florida and the United States and were otherwise harassing him.

7. At Control Risks, it was our normal practice to represent mostly globally prominent executives or other high-level individuals and Fortune 100 companies. However, I made an exception in Mr. Hall's case for a few reasons. First, the detailed and credible description of the circumstances he was able to provide was rather unique and quite compelling.

8. Second, the mission of his company to reduce pesticide use to protect public health was one that I personally supported and that I felt was important.

9. I decided to proceed with a risk and threat assessment to look further into whether what he had described to me was supported by evidence.

10. One of the first steps I took was to recommend that he contact an individual I knew in British Columbia by the name of Kim Marsh, President of IPSA International, to look into Mr. Carter and potentially what he was doing.

11. When Mr. Hall came back to me, he advised that he had met with Mr. Marsh and that Mr. Marsh knew of Mr. Carter. Mr. Hall advised me he had learned from Mr. Marsh that Mr. Carter had a bad and troubling reputation. This was one of the factors in my decision to further assist Mr. Hall and take him on as an individual client.

12. We also looked into the reputation of ICBC and learned of scandals including the "chop shop scandal" in which written off high end or prestige cars had their repair histories fraudulently altered by ICBC, so that staff or executives within ICBC could benefit from owning them at deeply discounted prices. This was another of the factors in my decision to assist Mr. Hall.

13. The risk assessment we carried out showed that the dangers and illegal acts Mr. Hall had described against himself and his business were, in my judgment, legitimate and credible.

14. Because of the foregoing, in my professional judgment, Mr. Hall had no other reasonable choice but to take immediate evasive action to remove himself and his company (and its key assets) from any further threat from the ICBC and its negative interference.

15. I advised Mr. Hall that the only viable solution was for him to take specific deliberate steps to go "off the grid" in order to protect both him and his young, early-stage company from further risk of harm from ICBC's activities.

16. I advised Mr. Hall not to put his name on anything including credit cards, phones, email, leases, property, corporate papers, web sites, social media for his company, cars, etc. This would allow him to avoid the risk of ICBC and its investigators following him in order to prevent them from damaging and disrupting his life any further.

17. We felt the risks and damage already inflicted against Mr. Hall and his company were sufficiently serious that, to assist him in protecting himself from unlawful surveillance, Control Risks supplied Mr. Hall with a satellite phone that could not be traced to him.

18. In addition, I advised Mr. Hall to change locations frequently and to also spend time in 2nd world countries with less sophisticated mechanisms to track individuals, such as the Caribbean.

19. As the former National Director of Investigations for Control Risks, I advised Mr. Hall that as a direct result of the alleged illegal activities undertaken against him, he had no other reasonable choice but to go off the grid and stay off the grid for an extended period until the risks of these types of illegal activities stopped.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at __Oakland__, California on April __1__, 2021.

_Elaine Carey_
Elaine Carey

4